**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

**LINWOOD GEQUAN WALDEN,**

    Petitioner,

v.                                                                                          Case No. 1:24-cv-173-MSN-LRV

**CHADWICK DOTSON, DIRECTOR OF THE VIRGINIA DEPARTMENT OF CORRECTIONS**

    Respondent.

**BRIEF IN SUPPORT OF MOTION TO DISMISS
AND RULE 5 ANSWER**

The respondent, by counsel, submits the following brief in support of his Motion to Dismiss and Rule 5 Answer:

**Procedural Background**

1. Linwood Gequan Walden is challenging the validity of the judgment of the Circuit Court of the City of Richmond in matters CR19-F-3055, CR19-F-3056, CR19-F-2888, and CR19-F-2891. After a bench trial, Walden was found guilty of two counts of robbery and two counts of abduction with intent to obtain pecuniary benefit. Prior to being sentenced, Walden moved for the trial court to provide him funds to obtain an expert psychologist to assist his defense at his sentencing hearing. By order entered October 16, 2020, the trial court denied Walden's motion. The trial court sentenced Walden to 80 years of incarceration, with 58 years suspended, for an active sentence of 22 years and entered its final judgment on January 15, 2021. (Resp. Ex. 1, State Court Judgments and Transcripts).

2. Walden appealed his convictions to the Court of Appeals of Virginia, raising the following assignment of error:

1

> I. The trial court erred in denying Mr. Walden's motion for expert funds.

The Court of Appeals of Virginia affirmed the judgment of the trial court in an unpublished opinion dated February 22, 2022. (Resp. Ex. 2, Court of Appeals Judgment and All Pleadings). Walden also filed a petition for appeal in the Supreme Court of Virginia, which was refused on October 18, 2022. Walden further requested a rehearing which was denied February 2, 2023. (Resp. Ex. 3, Supreme Court of Virginia Judgment and All Pleadings).

**Current Petition**

3. On or about February 1, 2023, Walden, by counsel, timely filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C § 2254, in this Court containing the following claim:

> I. Mr. Walden's sentence violates the Due Process Clause because the Virginia courts failed to follow *Ake v. Oklahoma*, 470 U.S. 68 (1985).

(ECF 1 at 5).

**Statement of Facts**

**a. Facts Adduced at Trial**

4. On August 31, 2019, Caitlin Hill and Sonya Sheldon drove to pick up pizza from DaVinci's in the City of Richmond. (Resp. Ex. 1, 1/21/2020 Tr. p. 14, 56-57). Sheldon waited in the front passenger seat of the car while Hill went into the restaurant to get the food. (Resp. Ex. 1, 1/21/2020 Tr. p. 15). A man with a washcloth on his head walked out in front of Hill, and he drew her attention because he did not hold the door for her, even though her arms were full. (Resp. Ex. 1, 1/21/2020 Tr. p. 15). After Hill returned to the car, the man with the washcloth on his head, who was unknown to both women and who was later identified as 27-year-old Linwood Gequan Walden, Jr., got into the back seat of their car. (Resp. Ex. 1, 1/21/2020 Tr. p. 16).

5. Hill repeatedly told Walden to get out of the car. (Resp. Ex. 1, 1/21/2020 Tr. p. 16). Walden, however, did not get out; instead, he told the women not to look at him, told them he had a gun and to do what he said, or he would hurt them. (Resp. Ex. 1, 1/21/2020 Tr. p. 17, 19, 59-60). He cautioned them not to use their phones or he would shoot them. (Resp. Ex. 1, 1/21/2020 Tr. p. 60). Walden then demanded their phones and wallets; he took their cell phones, Sheldon's cigarettes and make up bag, and other miscellaneous items. (Resp. Ex. 1, 1/21/2020 Tr. p. 18, 59-60).

6. While continuing to threaten to shoot the women, Walden ordered Hill to drive. (Resp. Ex. 1, 1/21/2020 Tr. p. 18). He told her to pull into an alley, where he ordered both women to remove their clothing. (Resp. Ex. 1, 1/21/2020 Tr. p. 19-20). The women attempted to negotiate with Walden, and Walden asked if they had anything else in the front seat of the vehicle. (Resp. Ex. 1, 1/21/2020 Tr. p. 20, 62). As Walden already had most of their miscellaneous items, including a blender, Hill offered him bug spray. (Resp. Ex. 1, 1/21/2020 Tr. p. 20, 60). Walden got angry, told Hill to "stop effing playing" with him and that he was "going to do something once to show [her] that he was serious." (Resp. Ex. 1, 1/21/2020 Tr. p. 20). At that point, Walden hit her on the side of the head and face twice with an open hand. (Resp. Ex. 1, 1/21/2020 Tr. p. 20). Hill questioned Walden, saying, "I thought you were only going to do that once," to which Walden responded "to stop playing with him or the next thing [Hill] would see [would be] [her] friend's brains on the sidewalk." (Resp. Ex. 1, 1/21/2020 Tr. p. 21).

7. Walden then ordered Hill to tell him the PIN for her debit card and, because Sheldon was using the sideview mirrors to look at Walden, he further ordered Sheldon to keep her eyes closed. (Resp. Ex. 1, 1/21/2020 Tr. p. 22, 63-64). In response, Sheldon closed her eyes and put her head down; Sheldon did not lift her head or open her eyes until Hill knocked on the car door to

retrieve her at the conclusion of the robbery, as she was afraid Walden would hurt her if he saw Sheldon with her eyes open. (Resp. Ex. 1, 1/21/2020 Tr. p. 65).

  8. Walden next ordered Hill to drive out of the alley and directed Hill until they pulled up in front of an ABC store and parked. (Resp. Ex. 1, 1/21/2020 Tr. p. 22). Walden informed Hill that they would be going to Ocean Grocery. (Resp. Ex. 1, 1/21/2020 Tr. p. 22). As they walked in, Hill mouthed "help me" or "call the police" to the cashier, but the cashier did not understand. (Resp. Ex. 1, 1/21/2020 Tr. p. 24). Walking behind Hill, Walden instructed her to go to the ATM, where he stood directly behind her; he told Hill to type in her PIN and "if [she] got it wrong, he would hurt [her]." (Resp. Ex. 1, 1/21/2020 Tr. p. 24). Once Hill withdrew the money, Walden reached past her, grabbed the money, put it in his pocket, and directed Hill to leave the store. (Resp. Ex. 1, 1/21/2020 Tr. p. 26). Ultimately, Walden left the store, while Hill went to the cash register for help, and she did not see where he went. (Resp. Ex. 1, 1/21/2020 Tr. p. 26). Surveillance video and still photos from Ocean Grocery, as well as the 911 call were introduced into evidence at trial. (Resp. Ex. 1, 1/21/2020 Tr. p. 26-33).

  9. Walden gave multiple conflicting versions of events to both police and the trial court; his stories included a drug deal gone wrong, a prior friendship with one of the victims, Hill, who he called "Kay Kay," as he had known her "since she was like, 16," and different iterations of a heroin user named Mark, who Walden identified as the person who *actually* struck Hill in the face and head. (Resp. Ex. 1, 1/21/2020 Tr. p. 126-31, 165-73). In finding Walden guilty, the trial court expounded that "[t]he Court went over the testimony that you gave, Mr. Walden, and, quite frankly, the Court found the testimony to be incredible." (Resp. Ex. 1, 1/21/2020 Tr. p. 193).

### B. Defense Request for Expert Funds

10. On September 18, 2020, approximately nine months after he was found guilty, Walden filed a "Notice and Motion for Release of Court Funds for Expert Assistance" for a mitigation expert at sentencing. (Resp. Ex. 1, p. 232-61). Specifically, the motion requested an expert in clinical psychology on the basis that "[t]hrough interviews and preliminary investigation counsel has uncovered information that Mr. Walden has been the victim of extensive domestic violence and familial trauma." (Resp. Ex. 1, p. 233, 235). There is no mention of a mental health diagnosis in the written motion.

11. Indeed, at no point during the proceedings, up until the motion argument on September 30, 2020, was there any indication that Walden suffered from any type of mental illness. The record is completely devoid of any competency or sanity evaluations, or any requests for the same. From the beginning, when Walden was arrested on September 30, 2019, the checklist for bail determinations filled out at the magistrate painted a picture of a stable individual: Walden grew up in Richmond where he and his family still resided, had completed his GED, maintained his current place of residence for the past three years, and maintained employment at Cookout for the past year. (Resp. Ex. 1, p. 5).

12. At trial, Walden provided explanations unrelated to mental health to explain any issues with or inconsistencies within his statements. He testified that some of the statements he gave to police were intentionally inconsistent and given out of fear for his safety, as it related to "snitching" while working as a drug dealer:

> Okay. If you tell something of the street—and I don't mean keep—if you tell something on the street where I come from, you be killed. Straight up. You get killed. If you don't get killed, people come to see you get killed. Your family, your daughter, son. Man, go ahead.

(Resp. Ex. 1, 1/21/2020 Tr. p. 142, 11/20/2020 Tr. p. 79).

13. On cross examination, Walden had a diminished recollection of any subject matters on which the prosecutor inquired; he blamed his memory issues on being intoxicated, stating, "Half of it I was drunk. I was drunk." (Resp. Ex. 1, 1/21/2020 Tr. p. 186). Walden did not, at any point, allege or describe any kind of mental defect that otherwise impaired his memory or influenced his behavior on the date of offense. In fact, Walden testified to having a pleasant day, where earlier he had gone to his Aunt Michelle's house for a family cookout. (Resp. Ex. 1, 1/21/2020 Tr. p. 156). At the conclusion of the trial and upon setting the matter for sentencing, the trial court stated directly to Walden, "probation will be in touch with you to get further information regarding your family history. It could be beneficial to you as well as the Commonwealth to help for purposes of the presentencing hearing." (Resp. Ex. 1, 1/21/2020 Tr. p. 226).

14. The Presentence Investigation Report, with the date of preparation listed as July 1, 2020, was also devoid of any information suggesting Walden had any mental health issues: "Walden reports no history of mental health treatment." (Resp. Ex. 4, Presentence Investigation Report, p. 396). There is similarly no indication of any type of disruption or trauma during his childhood: Walden reported he was raised by both parents in a single-family dwelling; "[h]e was provided adequate food, clothes, and shelter. He received love, guidance and discipline. Education and religion were emphasized in the household. No type of abuse reported. He reports no alcohol or drug use in his family life." (Resp. Ex. 4, p. 392). The report did not include that he lost his three-year-old daughter to homicide on February 15, 2016. (Resp. Ex. 4, p. 392).

15. Two months after the Presentence Investigation Report was prepared, the defense filed a motion and the trial court conducted a hearing on Walden's motion for expert funds on September 30, 2020. (Resp. Ex. 1, 9/30/2020 Tr. p. 1-22). It was at this hearing that, for the first time, the defense mentioned Walden's mental health diagnosis: "[Walden] was previously . . . as

a juvenile diagnosed as having bipolar disorder"; [A]ccording to his mother, he was diagnosed with bipolar when he was a juvenile, so there is a specific allegation of underlying mental illness." (Resp. Ex. 1, 9/30/2020 Tr. p. 5, 17). Walden was unable to provide any supporting documentation, and indeed, Walden himself only "thought he was maybe diagnosed." (Resp. Ex. 1, 9/30/2020 Tr. p. 17). The trial court commented that "these words are thrown out very loosely now and people—everybody who comes before the Court is all of a sudden bipolar." (Resp. Ex. 1, 9/30/2020 Tr. p. 17-18). The trial court declined to rely solely on information provided by Walden's mother, who had a history of both substance abuse and "serious documented mental illness." (Resp. Ex. 1, 9/30/2020 Tr. p. 17-18).

16. Walden's counsel clarified that she sought an expert to conduct "a comprehensive psychological evaluation and . . . talk about the developmental impact of psycho-social trauma and head trauma." (Resp. Ex. 1, 9/30/2020 Tr. p. 5-6). In addressing any prejudice that would result from the denial of Walden's motion for expert funds, Walden's counsel argued,

> This [expert] would give Mr. Walden the impact, the ability to have him investigated, to see what underlying mental health issues there are or may be that have impacted his ability to function in society that would impact his cognitive properties, just the way he thinks, the way he sees the world and interacts with it. He would be significantly harmed by an inability to explore that . . .

(Resp. Ex. 1, 9/30/2020 Tr. p. 8). The Commonwealth responded that there are "other ways for the Court certainly to hear evidence about [Walden's] childhood and any trauma that he received, certainly, for him to testify about the changes in his personality, and the [defense] can [obtain] testimony from [Walden] on that issue or from family members [which] would be admissible." (Resp. Ex. 1, 9/30/2020 Tr. p. 13).

17. On November 20, 2020, Walden's counsel renewed the motion for expert funds; she did not incorporate any new information or argument. (Resp. Ex. 1, 11/20/2020 Tr. p. 8-9). At

sentencing, Molly O'Rourke, a Mitigation Specialist employed by the Richmond Public Defender's Office testified, "I help gather background information on our clients, reach out to family members, get records, create release plans, and anything in that kind of general area." (Resp. Ex. 1, 11/20/2020 Tr. p. 43). With all of the information she compiled, she produced a "trauma timeline," in which she identified Walden's significant life events and described the compounding impacts of trauma. (Resp. Ex. 1, 11/20/2020 Tr. p. 42-58). Walden's mitigation specialist testified that she had uncovered medical records confirming a prior diagnosis of bipolar disorder. (Resp. Ex. 1, 11/20/2020 Tr. p. 48).

18. During argument at the conclusion of the sentencing hearing, Walden's counsel noted, "The courts frequently see reoccurring mental health and substance abuse issues and pile on trauma after trauma after trauma." (Resp. Ex. 1, 11/20/2020 Tr. p. 69). During his allocution, Walden addressed his failure to be truthful with probation when interviewed for his Presentence Investigation Report, stating, "It's not nobody else's job to tell you about my life. Who better to tell you [than] me." (Resp. Ex. 1, 11/20/2020 Tr. p. 78). He also questioned why, if he had indeed robbed them, the two women failed to walk "20 seconds across the street [to] the [F]irst [P]recinct" or ask for help in the "store where there [were] many people." (Resp. Ex. 1, 11/20/2020 Tr. p. 77).

**Exhaustion**

19. A state prisoner must exhaust his remedies in state court before seeking habeas corpus relief in federal court. 28 U.S.C. § 2254(b). The purpose of the exhaustion doctrine is to give "state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). The exhaustion requirement is satisfied by a finding that the "essential legal theories and factual allegations advanced in federal court . . . [are] the same as those advanced at least once to the

highest state court." *Pruett v. Thompson*, 771 F. Supp. 1428, 1436 (E.D. Va. 1991), *aff'd*, 996 F.2d 1560 (4th Cir. 1993) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971)). This means that both the same argument and factual support raised in the petitioner's § 2254 application must have been presented to the Supreme Court of Virginia on direct appeal, or in a state habeas corpus petition. *See, e.g.*, *Duncan v. Henry*, 513 U.S. 364 (1995). Walden has exhausted his claim by presenting it to the Supreme Court of Virginia on appeal.

**Merits Standard of Review**

20. Under the Antiterrorism and Effective Death Penalty Act (AEDPA), "a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) (quoting 28 U.S.C. § 2254(d)(1)).

21. "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 20 (2013). Indeed, "[w]hen a state court has applied clearly established federal law to reasonably determined facts in the process of adjudicating a claim on the merits, a federal habeas court may not disturb the state court's decision unless its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn v. Kayer*, 592 U.S. 111, 112 (2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03 (quotation marks and citation omitted).

22. An unreasonable application of federal law is not the same as an incorrect application. "The question under AEDPA is not whether a federal court believes the state court's

determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). That is, the state court's judgment "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks and citation omitted). "The prisoner must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn*, 592 U.S. at 118 (quoting *Richter*, 562 U. S. at 103). "Congress 'meant' this standard to be 'difficult to meet.'" *Id*. (quoting *Richter*, 562 U.S. at 102).

23. This "highly deferential standard" demands that state court decisions "be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks and citations omitted). "The required deference encompasses both the state court's legal conclusions and its factual findings." *Lenz v. Washington*, 444 F.3d 295, 299 (4th Cir. 2006). "[A] determination on a factual issue made by a State court shall be presumed correct." *Tucker v. Ozmint*, 350 F.3d 433, 439 (4th Cir. 2003) (quoting 28 U.S.C. § 2254(e)(1)). "In reviewing a habeas petition, federal courts must presume the correctness of a state court's factual determinations unless the habeas petitioner rebuts the presumption of correctness by clear and convincing evidence." *Green v. Johnson*, 515 F.3d 290, 299 (4th Cir. 2008).

**Discussion**

24. Walden contends that his sentence violates the Due Process Clause because the trial court did not allow him to hire an expert psychologist to assist him at his sentencing hearing. The Court of Appeals of Virginia's unpublished opinion was the last reasoned opinion on the issue. Thus, the Court may look to the rationale assigned in that opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). The Court of Appeals of Virginia reasoned:

The trial court did not err in concluding that Walden failed to present a particularized need for a mitigation expert. The Commonwealth is required, "upon request, [to] provide indigent defendants with 'the basic tools of an adequate defense.'" *Husske v. Commonwealth*, 252 Va. 203, 211 (1996) (citing *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)). "[I]n certain instances, these basic tools may include the appointment of non-psychiatric experts." *Id.* Nevertheless, an indigent defendant's right to the appointment of an expert "is not absolute." *Johnson*, 292 Va. at 778 (quoting *Husske*, 252 Va. at 211). Instead, an indigent defendant "must demonstrate that the subject which necessitates the assistance of an expert is 'likely to be a significant factor in his defense' and that he will be prejudiced by the lack of expert assistance." *Id.* (quoting *Ake*, 470 U.S. at 82-83). That is, he "must show a particularized need." *Id.* "A particularized need is more than a 'mere hope' that favorable evidence can be obtained through the services of an expert." *Green v. Commonwealth*, 266 Va. 81, 92 (2003) (quoting *Husske*, 252 Va. at 212). Rather, it amounts to a "demonstrat[ion] that the services of an expert would materially assist [the defendant] in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial." *Johnson*, 292 Va. at 778. "[W]hether a defendant has made the required showing of particularized need is a determination that lies within the sound discretion of the trial court." *Id.* (quoting *Sanchez*, 268 Va. at 165).

Here, the record demonstrates that Walden's proffers regarding his family dysfunction, abuse, and mental health were either expressly contradicted or inconsistent with the statements he made to the probation officer who prepared the presentence investigation report. The July 1, 2020 presentence investigation report, which was available to the trial court at the motion hearing, indicated that "Walden reports no history of mental health treatment." The report did not indicate whether Walden volunteered or was asked about any current or prior mental health diagnoses. The report did, however, reflect that Walden indicated that he was raised by both parents in a single-family dwelling where "[h]e was provided adequate food, clothes, and shelter. He received love, guidance and discipline. Education and religion were emphasized in the household. No type of abuse reported. He reports no alcohol or drug use in his family life." The report also mentioned that Walden lost his three-year-old daughter to homicide on February 15, 2016.

The portrait of Walden's life offered to the probation officer preparing the report was in stark contrast to the proffers made by defense counsel in support of the motion for expert funds. In support of his motion, Walden's counsel proffered that Walden may have received a bipolar diagnosis as a juvenile. Defense counsel's proffer was based on information from Walden's mother that "he was maybe diagnosed." Walden did not provide any supporting documentation at the time of his motion hearing nor was there any allegation that he was currently suffering from any mental illness. Further, there was no indication in the trial court record of any concern about Walden's mental capacity nor did the Commonwealth indicate that it planned to present any psychiatric testimony at the sentencing hearing regarding Walden's future dangerousness or propensity to commit crimes. Walden's stated purpose for requesting funds for the expert was so the expert could conduct "a comprehensive psychological evaluation and . . . talk about the developmental

impact of psycho-social trauma and head trauma." Also such an expert could, in large part, "see what underlying mental health issues there are or may be" so as to "help[] his case and help[] for when he is released to reduce the risk of recidivism and to make the community safer." Walden argued that denial of the expert funds would significantly prejudice him by preventing him from exploring his childhood trauma and mental health issues as well as precluding him from developing a plan to address any recidivism concerns. The Commonwealth challenged the weight to be given to Walden's counsel's proffer largely because of the contradictory evidence contained in the presentence report, and the trial court evaluated the evidence before it in making its decision.

Because of Walden's statements during the presentence investigation about his stable family life and pleasant childhood, the trial court gave little weight to his contrary proffers regarding his family dysfunction and abuse and the death of his three young children. The trial court also found the proffers regarding Walden's potential prior mental health diagnosis to be "insufficient," in light of the lack of any allegation of current mental illness or medical documentation indicating a past diagnosis as well as Walden's mother's self-interest and apparent credibility issues. *Bethea v. Commonwealth*, 297 Va. 730, 756 n.13 (2019) (noting that even if a proffer is properly admitted, the rules of evidence "say[] nothing about the evidentiary weight the factfinder may or should give to the proffer" (citing *Bloom v. Commonwealth*, 262 Va. 814, 821 (2001))).

In light of the trial court's determination that Walden's proffers were insufficient to satisfy the legally required threshold showing, Walden's motion for expert funds was denied. That determination is neither plainly wrong nor without evidentiary support. Like in *Hoverter v. Commonwealth*, 23 Va. App. 454 (1996), Walden hoped that expert assistance would develop mitigation evidence that would lead to leniency in sentencing. But "a mere hope or suspicion that favorable evidence may result from an expert's services does not create a constitutional mandate." *Id.* at 467. *Husske* requires that the subject matter necessitating assistance of an expert is "likely to be a significant factor in his defense" and that the defendant "will be prejudiced by the lack of an expert." *Husske*, 252 Va. at 211 (internal quotations omitted). Walden's desire to address recidivism concerns that might be present at his sentencing is understandable but all he offered in support was mere speculation that he *might* have a mental illness. His claim was not based on any current symptomatology, but on an uncorroborated possible history of a bipolar diagnosis as a juvenile and contradicted assertions of family dysfunction and abuse. Surely every defendant could justify a request for expert funds if the test only required an allegation that they *might* benefit from a psychological expert, but that is not the standard nor is it the Commonwealth's burden to fund such an expert in every case. Under these facts where the trial court had to weigh a defendant's proffer against contrary evidence in the record that had largely been supplied by the defendant himself, the trial court did not abuse its discretion by giving the proffer little weight and holding that Walden failed to demonstrate a particularized need for expert assistance. We will not disturb the trial court's ruling on appeal. Code § 8.01-680.

(Resp. Ex. 2, p. 79-83).

25. This holding of the state court is not contrary to or an unreasonable application of federal law as stated by the Supreme Court of the United States. Nor is it based on an unreasonable determination of the facts. The state court's holding that Walden failed to show a particularized need for an expert psychologist was not an objectively unreasonable application of *Ake*.

26. *Ake*'s language supports Virginia's rule:

> We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the state must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Ake*, 470 U.S. at 83.

27. Additionally, the Supreme Court of the United States held that the Supreme Court of Mississippi correctly affirmed a trial court's denial of a defendant's request for an expert when the defendant only generally argued that an expert witness would be helpful. *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985). The Court held that petitioner's due process rights were not deprived because petitioner "offered little more than undeveloped assertions that the requested assistance would be beneficial." *Id*. at 323 n.1.

28. The Fourth Circuit found in *Page v. Lee*, 337 F.3d 411, 416 (4th Cir. 2003) that North Carolina's test to determine whether a court appointed psychiatrist was necessary was a reasonable interpretation of *Ake*. North Carolina's test considered "whether the defendant has made the requisite showing of his particularized need for the requested expert, the court 'should consider all the facts and circumstances known to it at the time the motion for psychiatric assistance is made.'" *Id*. at 415-16 (citations omitted).

29. Further, the Sixth Circuit found that when the Ohio Supreme Court required defendants to make a particularized showing that an expert would benefit their defense and that a denial of the expert would create an unfair result for them, it was not contradictory to *Ake*. *Mason v. Mitchell*, 320 F.3d 604, 615 (6th Cir. 2003).

30. Here, Virginia's rule that Walden needed to provide a particularized showing that an expert psychologist would benefit his defense was not improper and similar to other circuits that applied the mandate outlined by *Ake* and *Caldwell*. Virginia's test does not impose an improper additional requirement on Walden. The test provides reasonable context to the federal threshold requirements that he demonstrate the significance of his mental conditions and that those mental conditions actually be in question.

31. In making its ruling, the Court of Appeals of Virginia cited *Husske* and *Johnson*, which both applied *Ake* in its decision. (Resp. Ex. 2, p. 79-83). Here, the Court of Appeals of Virginia held that "all [Walden] offered in support was mere speculation that he *might* have a mental illness. His claim was not based on any current symptomatology, but on an uncorroborated possible history of a bipolar diagnosis as a juvenile and contradicted assertions of family dysfunction and abuse." (Resp. Ex. 2, p. 83). The Court of Appeals of Virginia reasonably determined that the inconsistencies Walden offered in his presentence report, his motion for expert funds, and at the argument held during the motions hearing do not meet the threshold required by *Ake* and *Caldwell* because he did not demonstrate that his sanity was a significant factor at trial. He merely offered "undeveloped assertions that the requested assistance would be beneficial" to his defense—far from the requisite threshold. *Caldwell*, 472 U.S. at 323 n.1.

32. The Court of Appeals of Virginia's denial of relief on Walden's claim is factually reasonable and does not conflict with Supreme Court of the United States precedent. The mere

speculation that Walden might have a mental illness fell short of the requisite threshold required for an expert's appointment, as recognized by the Supreme Court of the United States in *Ake* and *Caldwell*. As such, since the Court of Appeals of Virginia's determination of Walden's claim was not contrary to, nor an unreasonable application of, applicable federal law and was not based on an unreasonable interpretation of the facts, its holding must also be reached here. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). *See also Moore v. Pearson*, No. 1:14cv483, 2016 U.S. Dist. LEXIS 129945 (E.D. Va Sept. 20, 2016); *Johnson v. Kiser*, No. 7:19CV00488, 2022 U.S. Dist. LEXIS 210500 (W.D. Va Nov. 21, 2022).

**Compliance with Rule 5**

33. Respondent's Exhibits 2 and 3 contain the briefs submitted by the petitioner and the prosecution on direct appeal and the respondent on collateral appeal in state court, as well as the opinion and orders disposing of the appeals, in compliance with Rule5(d)(1)-(3). In compliance with Rule 5(c), the respondent states that the following transcripts pertinent to Walden's claims have been prepared and are part of the state court record:

    1/21/2020
    9/30/2020
    11/20/2020

**Conclusion**

34. Every allegation not specifically admitted should be taken as denied.

35. The lack of merit of the petitioner's claim is ascertainable from the record and an evidentiary hearing should not be held in this Court. *See* 28 U.S.C. § 2254(e)(1) and (e)(2).

**WHEREFORE**, the respondent moves this Court to dismiss the § 2254 petition

Respectfully submitted,

15

**CHADWICK DOTSON, DIRECTOR OF THE VIRGINIA DEPARTMENT OF CORRECTIONS**

By:   /s/ _____
      J. Brady Hess
      Assistant Attorney General
      Virginia State Bar No. 98223
      Attorney for Respondent
      OFFICE OF THE ATTORNEY GENERAL
      202 North 9th Street
      Richmond, Virginia 23219
      (804) 786-2071    phone
      (804) 371-0151    fax
      oagcriminallitigation@oag.state.va.us

**CERTIFICATE OF SERVICE**

I certify that on November 26, 2025, I electronically filed the foregoing Brief in Support of Motion to Dismiss and Rule 5 Answer with the Clerk of the Court using the CM/ECF system, which will send notification of such filing (NEF) to the following counsel of record in this case:

Meghan Shapiro, Esq.
Law Office of Meghan Shapiro
VSB No. 79046
421 King Street, Suite 505
Alexandria, VA 22314
703-915-9594 (phone)
shapiro.meghan@gmail.com

Daniel Goldman, Esq.
The Law Office of Daniel E. Goldman, PLLC.
VSB No. 82144
421 King Street, Suite 505
Alexandria, VA 22314
202-677-5709 (phone)
dan@dangoldmanlaw.com

By: /s/
J. Brady Hess
Assistant Attorney General
Virginia State Bar No. 98223
Attorney for Respondent

OFFICE OF THE ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071     phone
(804) 371-0151     fax
oagcriminallitigation@oag.state.va.us