4

1          THE CLERK:  The case of the Commonwealth v.

2   Linwood Walden.  The defendant is present in court, represented

3   by Ms. Feinman and Mr. Efird.

4          Counsel, are you prepared to proceed?

5          MS. FEINMAN:  We are.

6          THE CLERK:  The Commonwealth is represented by

7   Brooke Pettit.  Counsel, are you prepared to proceed?

8          MS. PETTIT:  Yes, ma'am.

9          THE CLERK:  Am I arraigning on all charges?

10         MS. PETTIT:  Yes, ma'am.

11         THE CLERK:  Proceeding on file 19F-3055, you stand

12   charged in this indictment dated November 4, 2019, that on or

13   about August 31st, 2019, in the City of Richmond, you did

14   unlawfully and feloniously take by force, threat, intimidation,

15   or the threat or presentation of firearm or deadly weapon

16   personal property or currency from the person or in the presence

17   of Caitlyn Hill.

18         How do you plead?  Guilty or not guilty.

19         THE DEFENDANT:  Not guilty.

20         THE CLERK:  File 19F-3056, you stand charged in

21   this indictment dated November 4, 2019, that on or about August

22   31, 2019, in the City of Richmond, you did unlawfully and

23   feloniously take by force, threat, intimidation or the threat or

24   presentation of a firearm or deadly weapon personal property or

25   currency from the person or in the presence of Sonya Sheldon.

5

```
 1            How do you plead?  Guilty or not --
 2            THE DEFENDANT:  Not guilty.
 3            THE CLERK:  19F-2888, you stand charged in this
 4   indictment dated September 25th, 2019, that on or about August
 5   31, 2019, in the City of Richmond and within the jurisdiction of
 6   the multi-jurisdiction grand jury, you did feloniously and
 7   unlawfully abduct Caitlyn Hill by the use of force,
 8   intimidation, or deception with the intent to obtain pecuniary
 9   benefit.  How do you plead, guilty or not guilty?
10            THE DEFENDANT:  Not guilty.
11            THE CLERK:  File 19F-2889, you stand charged in
12   this indictment dated September 25, 2019, that on or about
13   August 31, 2019, in the City of Richmond and within the
14   jurisdiction of the multi-jurisdiction grand jury, you did
15   feloniously and unlawfully use or display in a threatening
16   manner a firearm while committing the abduction of Caitlyn Hill
17   with the intent to obtain pecuniary benefit.  How do you plead,
18   guilty or not guilty?
19            THE DEFENDANT:  Not guilty.
20            THE CLERK:  19F-2890, you stand charged in this
21   indictment dated September 25, 2019, that on or about August
22   31st, 2019, in the City of Richmond, and within the jurisdiction
23   of the multi-jurisdiction grand jury, you did unlawfully and
24   feloniously use or display in a threatening manner a firearm
25   while committing the robbery of Caitlyn Hill.  How do you plead,
```

6

```
 1   guilty or not guilty?

 2              THE DEFENDANT:  Not guilty.

 3              THE CLERK:  File 19F-2891, you stand charged in

 4   this indictment dated September 25, 2019, that on or about

 5   August 31st, 2019, in the City of Richmond, within the

 6   jurisdiction of the multi-jurisdiction grand jury, you did

 7   feloniously and unlawfully abduct Sonya Sheldon by the use of

 8   force, intimidation, or deception with the intent to obtain

 9   pecuniary benefit.  How do you plead, guilty or not guilty?

10              THE DEFENDANT:  Not guilty.

11              THE CLERK:  19F-2892, you stand charged in this

12   indictment dated September 25th, 2019, that on or about August

13   31st, 2019, in the City of Richmond, within the jurisdiction of

14   the multi-jurisdiction grand jury, you did feloniously and

15   unlawfully use or display in a threatening manner a firearm

16   while committing the abduction of Sonya Sheldon with intent to

17   obtain pecuniary benefit.  How do you plead, guilty or not

18   guilty?

19              THE DEFENDANT:  Not guilty.

20              THE CLERK:  19F-2893, you stand charged in this

21   indictment dated September 25th, 2019, that on or about August

22   31st, 2019, in the City of Richmond, and within the jurisdiction

23   of the multi-jurisdiction grand jury, you did unlawfully and

24   feloniously use or display in a threatening manner a firearm

25   while committing the robbery of Sonya Sheldon.  How do you
```

7

```
 1   plead, guilty or not guilty?
 2              THE DEFENDANT:  Not guilty.
 3              THE CLERK:  On your pleas of not guilty, do you
 4   wished to be tried by His Honor, the Judge, or by jury?
 5              THE DEFENDANT:  The judge.
 6              THE CLERK:  Court concur?
 7              THE COURT:  Yes, ma'am.
 8              THE CLERK:  Commonwealth?
 9              MS. PETTIT:  Yes, ma'am.
10              THE COURT:  All right.  Good morning, Counsel, and
11   good morning, Mr. Walden.  The Court, Mr. Walden, is going to
12   ask you a few questions before we get started.  If you don't
13   understand the questions the Court asks you, stop me so I can
14   try to better explain it.
15              Are you the person that was named in all the
16   charges that were just read to you by the clerk?
17              THE DEFENDANT:  Yes, sir.
18              THE COURT:  Do you understand the charges for
19   which you stand before the Court?
20              THE DEFENDANT:  Yes, sir.
21              THE COURT:  Have you had a sufficient amount of
22   time to discuss these matters with your attorney in order to
23   prepare for today proceedings?
24              THE DEFENDANT:  Yes, sir.
25              THE COURT:  Have you advised your attorney of any
```

8

```
 1  witnesses that you may have to testify on your behalf, if there
 2  are any witnesses?
 3              THE DEFENDANT:  Yes, sir.
 4              THE COURT:  Are there any witnesses?
 5              THE DEFENDANT:  No, sir.
 6              THE COURT:  Okay.  Are you prepared to move
 7  forward today with the trial before the bench?
 8              THE DEFENDANT:  Yes, sir.
 9              THE COURT:  Have you previously waived and given
10  up your right to a trial by jury?
11              THE DEFENDANT:  Yes, sir.
12              THE COURT:  All right.  Defense counsel ready?
13              MR. EFIRD:  Yes, sir.
14              THE COURT:  All right.  Good morning, Ms. Feinman,
15  Mr. Efird.  Commonwealth ready?
16              MS. PETTIT:  Yes, sir.
17              THE COURT:  Good morning, Ms. Pettit.
18              All right.  Counsel wish to be heard by way of
19  opening before we get started?
20              MS. PETTIT:  I would like to give a brief opening,
21  yes, sir.
22              THE COURT:  All right.
23              MS. PETTIT:  On August 31st of 2019, Caitlyn Hill
24  and Sonya Sheldon were in the First Precinct here in the City of
25  Richmond and just after 8 p.m., went to Davinci's Pizza in order
```

9

1   to pick up a pizza that they had ordered and planned to eat for

2   dinner.  They drove there together.  Ms. Hill was driving.  Ms.

3   Sheldon was in the front passenger seat.  Ms. Hill parked, went

4   into Davinci's and purchased her pizza, walked back to her car

5   and handed the pizza to Ms. Sheldon.

6          At that point the back door to the car opened and the

7   defendant got into the back seat of the car.  Neither Ms. Hill

8   or Ms. Sheldon knew the defendant.  They had not had any

9   interaction with him, and they had not invited him to get in the

10  back seat of the car.  They asked him to get out of the car, at

11  which point he told them to turn around or they would be dead.

12  He made multiple threats to shoot them and he demanded their

13  property with both of the girls handing over their cell phones

14  as well as Ms. Sheldon handing over a makeup bag to the

15  defendant in the back seat.

16         At that point he ordered them to drive as he held their

17  property, ordered them to pull into an alley, and once parked in

18  the alley while everyone was still in the car, he ordered both

19  Ms. Hill and Ms. Sheldon to strip off their clothing.

20         The girls both refused to do that.  They will tell the

21  Court that they attempted to bargain in an effort to do that.

22  The defendant became frustrated from the back seat while

23  continuing to make threats to shoot both of them and using the

24  phrase, You'll see your friend's brains splattered on the

25  sidewalk.  He also reached forward and struck Ms. Hill on the

10

1  side of the head twice.

2      He then ordered her to drive -- directed Ms. Hill to

3  drive to the Ocean Grocery.  On the way there, he instructed Ms.

4  Sheldon to hunch forward and close her eyes so that she couldn't

5  see him.  He forced -- again threatening her with what she

6  believed to be a firearm.  Although both victims will tell the

7  Court that they never saw a firearm, they believe based on the

8  defendant's repeated statements that he had one -- to go into

9  the Ocean Grocery where he instructed Ms. Hill to withdraw $100

10  from the ATM.

11      The defendant took that money.  He ran out the back of

12  the Ocean Grocery.  Ms. Hill immediately asked the clerk at the

13  store to call the police, who were just right across the street

14  at Richmond Police Department First Precinct.

15      They provided a description.  Police officers located

16  the defendant just a few blocks away, ultimately did not arrest

17  him then, but once they got a more complete description, located

18  him again, at which point he was placed under arrest.

19      Both Ms. Hill and Ms. Sheldon identified the defendant

20  as their assailant.  Cigarettes taken during the robbery were

21  found on the defendant's person.  He was wearing a white T-shirt

22  that matched a T-shirt that the Court will see a still

23  photograph in a surveillance video that he was wearing during

24  the attack, but he then placed it into his pocket and an amount

25  of currency consistent with the amount of currency taken during

11

1   the robbery was recovered from the defendant's person.

2          Additionally, the Court will see he is actually holding

3   the makeup bag in a brief clip of surveillance video, which then

4   was discarded behind Davinci's Pizza in the path in which he

5   would have to have traveled to leave Ocean Grocery and

6   ultimately come into contact with police several minutes later

7   where he did.

8          At the close of evidence, I'm going to ask the Court to

9   find the defendant guilty of all charges based upon the evidence

10  that you'll hear.

11          THE COURT:  Does defense counsel wish to be heard?

12          MS. FEINMAN:  I would, Your Honor.  Before I am

13  heard, I would ask that -- we did not do this before openings

14  began -- is if you would be willing to exclude witnesses.  I

15  don't believe that there are any in the courtroom at this point,

16  however, I would ask that they be advised not to discuss the

17  case or their testimony amongst themselves or any other

18  individuals while they're in the hallway.

19          THE COURT:  Okay.  Are there any

20  witnesses present?

21          MS. PETTIT:  There are no witnesses in the

22  courtroom.  I would be happy to step out and further instruct

23  them not to discuss their testimony if the Court would like.

24          THE COURT:  Well, as they come to the stand, the

25  Court will advise them of that.

12

 1          MS. FEINMAN:  Thank you, Your Honor.

 2          Your Honor, you heard the Commonwealth's recitation of

 3   the facts in this case.  However, I will say they have left out

 4   some significant facts that do not square up with this being a

 5   robbery or an abduction.  Chief among those is that for much of

 6   these events Mr. Walden is not near one or both of these women,

 7   that you'll see video where one of the alleged victims in this

 8   case is across the street in a busy, populated area.  She is in

 9   a storefront.

10          There are people walking by.  There are cars walking

11   by.  At no point is there any indication that she is in

12   distress.  While she is over in front of this store, again,

13   across the street from Mr. Walden, he is standing by the back

14   driver's side of the vehicle getting -- I believe Caitlyn will

15   say he was smoking a cigarette, and his back was towards her for

16   a period of time.

17          The other woman, Sonya, is sitting in the front

18   passenger side of the vehicle.  Again, people are walking by

19   with no indication of any distress.  At that point in time, you

20   will see Caitlyn cross the street in front of the vehicle.  A

21   vehicle actually stops while she and Mr. Walden have a

22   conversation in the road, and then they walk together past

23   several people into the Ocean Grocery store.

24          As far as this case is concerned, according to the

25   Commonwealth's evidence, they say that Mr. Walden was in

13

1  complete control of where the vehicle drove, where it parked,

2  what everyone was doing.  However, the evidence will also show

3  that where they went was the Ocean Grocery store, which is

4  directly across from the First Precinct and that that was the

5  location he chose for this alleged robbery.

6          Your Honor, you will hear from Mr. Walden today who

7  will testify that this, in fact, was not a robbery or abduction.

8  This all centers around a drug deal.  It was an agreement

9  entered into by consenting adults.  He will explain that

10  situation to you, and that will explain why it was $100

11  specifically that was withdrawn from the ATM and why throughout

12  this entire encounter where there were multiple opportunities to

13  flag down someone or to show signs of distress or ask for help,

14  but that was never done.

15          So, Your Honor, we will argue that there are

16  significant holes in the Commonwealth's case, and at the end of

17  this, we will ask you to find him not guilty.

18                  THE COURT:  Okay.  First witness.

19                  MS. PETTIT:  Caitlyn Hill.

20                  CAITLYN HILL, called on behalf of the

21  Commonwealth, first being duly sworn, testifies as follows:

22                  THE COURT:  Good morning, ma'am.  If you would

23  answer any questions that the attorneys may have for you, and if

24  you would give a verbal response to all questions because the

25  court reporter is taking down all of the proceedings.

Hill - Direct                                                    14

1             THE WITNESS:  Yes.

2             THE COURT:  Thank you.

3                    DIRECT EXAMINATION

4    BY MS. PETTIT:

5       Q    Good morning.  Could you please introduce yourself to

6    the Court.

7       A    My name is Caitlyn Hill.

8       Q    I'm going to turn your attention back to the evening of

9    August 31st of 2019, just after 8 p.m.  What were you doing

10   then?

11      A    I had gone to pick up a pizza that I had ordered.

12      Q    Where did you order the pizza from?

13      A    From the Davinci's Pizza, a place five minutes away

14   from where I lived.

15      Q    Is Davinci's Pizza located here in the City of

16   Richmond?

17      A    Yes, ma'am.

18      Q    Who went with you to pick the pizza up?

19      A    My temporary roommate, Sonya Sheldon.

20      Q    Sonya Sheldon?

21      A    Yes, ma'am.

22      Q    How did you all get to Davinca's pizza?

23      A    I drove my car.

24      Q    Where did Sonya ride?

25      A    She was in the passenger seat and stayed there when I

Hill - Direct                                        15

1   went in to get the pizza.

2       Q    Where did you park in relation to Davinci'a Pizza?

3       A    Directly across the street.  Every time I've gone

4   there, there's always a spot open by the bus stop.

5       Q    Then you went inside the Davinci's alone?

6       A    Yes, ma'am.

7       Q    What happened when you went inside Davinci's?

8       A    I had to wait a couple minutes.  When I walked outside,

9   a man left before me, and they didn't hold the door open.

10  That's the only reason I remember.

11           THE COURT:  I'm sorry.  Could you repeat?

12           THE WITNESS:  They didn't -- someone had exited

13  shortly before I did and didn't hold the door open.  That's why

14  it was relevant to me.

15      Q    Did you notice it because your hands were full with

16  pizza?

17      A    Yes.

18      Q    Other than noticing that and interacting with the

19  Davinci's employees in order to purchase the pizza, did you

20  interact with anyone else inside the store?

21      A    No, ma'am.

22      Q    And the person who walked out who did not hold the door

23  for you, was that someone you knew?

24      A    No, ma'am.

25      Q    After you walked outside with the pizza, what did you

Hill - Direct                                                16

1  do?

2      A    I went straight to my car and gave the pizza to Sonya

3  and --

4      Q    Did you get in the driver's seat?

5      A    Yes, ma'am.

6      Q    At that point did something unusual happen?

7      A    Yes.  A man was walking toward the car and then got

8  into the back seat, which was very shocking.  I did not expect

9  that.

10     Q    Had you given anyone permission to get in the back seat

11 of your car?

12     A    No, ma'am.

13     Q    What did you do when someone unannounced got into the

14 back seat?

15     A    I immediately said, "Get out," and then I turned around

16 and repeated, "Get out.  Get out.  Get out."

17     Q    When you say you turned around, you mean you turned

18 around to face the person in the back seat?

19     A    Yes, ma'am.

20     Q    Did you recognize that person at that point?

21     A    Only because he had a wash cloth on his head, the same

22 as the man who exited the Davinci's before me and did not hold

23 the door open.

24     Q    Did you get a good look at that person's face when you

25 turned around and told him to get out?

17

Hill - Direct

1    A    Not at that moment.

2    Q    When you told that man to get out of the car, what did

3    he do?

4    A    That is when he said that he had a gun and to do what

5    he said or he would hurt us both.

6    Q    At that point had you seen a firearm?

7    A    No, ma'am.

8    Q    Based upon his statement, did you believe that he had

9    one?

10    A    Yes.  I believed there was something in his hand that

11    he was holding.  I assumed that it was a gun.

12    Q    Based upon those threats and being concerned that that

13    person had a firearm, what happened next?

14    A    Sonya handed me the car keys that she had been holding

15    while I was in Davinci's, and I started the car.

16    Q    Did there come a time when the person in the back seat

17    demanded property from you?

18    A    Yes, ma'am.  I believe that was before I turned the car

19    on.  He said to gave him our phones and our wallets.

20    Q    Did you do that?

21    A    Yes, I did.

22    Q    What specifically that belonged to you did you give to

23    the person in the back seat?

24    A    I handed him my cell phone, and on the back of my cell

25    phone is a phone wallet.  So it had two debit cards and $20 in

Hill - Direct                                                     18

1   cash.

2        Q     Why did you give your phone and your phone wallet to

3   the person in the back seat?

4        A     I was scared.  I just knew that he would be angry if I

5   didn't follow his orders.

6        Q     Did you see if Sonya gave that person anything?

7        A     Yes, ma'am.  Sonya also gave him her cell phone and a

8   bag of makeup that was sitting by her feet.

9        Q     At the time that you handed your phone back, was it in

10  Sonya's makeup back or was it by itself?

11       A     It was by itself.

12       Q     After taking your phone, the makeup bag, and the

13  personal property, what did the person in the back seat tell you

14  to do?

15       A     He told me to drive down the street, and I did so.

16       Q     Are you sure where exactly you drove?

17       A     I'm not sure.  I know I went straight.  He had me go

18  through about three traffic circles and then pull into an alley.

19       Q     Did he direct you into the alley?

20       A     Yes, ma'am.

21       Q     Was the man making any sort of threats to you as you

22  drove in the direction where he told you to go?

23       A     Yes.  He was very angry, very aggressive, kept

24  reiterating that he would hurt us if we did not do what he said.

25       Q     Was he specifically using the word "shoot" when making

Hill - Direct                                                19

1  those threats toward you?

2              MS. FEINMAN:  Objection.  Leading, Your Honor.

3              MS. PETTIT:  I don't know that it suggests the

4  answer.  It's just a "yes" or "no" if he was using that word or

5  not.

6              THE COURT:  I'm sorry.  The question again was?

7              MS. PETTIT:  The question was if he was

8  specifically using the word "shoot" when he was making the

9  threats that she just described.

10             THE COURT:  Any follow-up on the objection?

11             MS. FEINMAN:  Your Honor, I do believe it's

12 leading.  It's suggesting a word that she had not said up to

13 this point that it's clear the Commonwealth would like her to

14 say.

15             THE COURT:  All right.  Sustained.

16    Q    You mentioned that you thought that he would hurt you.

17 Did he make any specific statement about how he would hurt you?

18    A    Yes.  When he got into the car when he first told us to

19 do what he said, he did say the word "shoot."  That is the only

20 reason I believe he had a firearm.

21    Q    When you pulled into the alley, did you get out of the

22 vehicle or did you stay in the seat?

23    A    I stayed in the seat.

24    Q    At that point what did the person tell you to do?

25    A    He said to get out of the car and remove our clothes.

Hill - Direct                                                    20

1  He asked Sonya and I both to do so.

2      Q    Did you comply with that request?

3      A    No, ma'am.

4      Q    What did you do instead?

5      A    I said we are not doing that.  Sonya started begging,

6  offering money --

7              MS. FEINMAN:  Object to hearsay, Your Honor.

8              MS. PETTIT:  That was not being offered for the

9  truth of the matter but all we wanted was to --

10             THE COURT:  All right.

11 BY MS. PETTIT:

12     Q    At some point did something else happen rather than you

13 all taking your clothes off?

14     A    He asked if we had anything else in the front of the

15 vehicle.  I offered him bug spray.  It is what my eyes landed

16 on.  He got angry.  Told me I should stop effing playing with

17 him, and he told me he was going do something once to show me

18 that he was serious.  And that's when he hit me in the face

19 twice.

20     Q    You said he hit you in the face twice?

21     A    Yes, ma'am.

22     Q    Which side of your face did he hit?

23     A    Right side.

24     Q    And were you able to see what he had hit you with?

25     A    I felt like just a hand, an open hand.

Hill - Direct                                    21

1    Q    Open hand.  I've been asking you about the man.  You

2  said earlier that you did not at first get a very good glance at

3  his face.  But, ultimately, during this interaction, were you

4  able to see the face of the person who was in the back seat of

5  the car?

6    A    Yes, ma'am, when we were getting out to go to the

7  convenience store.

8    Q    Do you see that person in the courtroom today?

9    A    Yes, ma'am.

10   Q    Can you please point him out for Judge Jenkins.  Are

11 you pointing at the man with the tan shirt?

12   A    Yes, ma'am.

13        MS. PETTIT:  I would ask that the record reflect

14 the witness has identified the defendant.

15        THE COURT:  The record will reflect the witness,

16 Ms. Hill, has identified the defendant, Mr. Walden.

17   Q    After the defendant hit you in the side of the head

18 twice, what happened?

19   A    I said I thought you were only going to do that

20 twice or -- I'm sorry.  I said I thought you were only going to

21 do that once.  And that's when he said, again, to stop playing

22 with him or the next thing I would see is my friend's brains on

23 the sidewalk.

24   Q    What did you take that to mean?

25   A    I took that to mean that I should stop with the

Hill - Direct                                                22

1   attitude, and I became more scared.  That's when I started to

2   shake and do exactly what he said without arguing.

3        Q     What happened next?

4        A     He said to tell me the PIN on my card and then ordered

5   me to exit the alley.

6        Q     When you say exit the alley, do you mean drive out of

7   the alley?

8        A     Yes, ma'am.

9        Q     Did you provide the PIN number for your debit card?

10       A     Not at that moment, I don't think.

11       Q     What happened when you drove out of the alley?

12       A     He directed me down the street and kept directing me

13  until we pulled up in front of an A.B.C. store.  That's what I

14  saw, but he was leading us to Ocean Grocery.

15       Q     Once you pulled up there, did you park?

16       A     Yes.

17       Q     And what happened when you parked?

18       A     He ordered me to get out of the car, which I did.

19       Q     Then what?

20       A     Then he opened the door, and he was sitting in my car

21  with his legs outside because I started to walk toward the

22  A.B.C. store and was obviously confused.  So he said that we

23  were going to Ocean Grocery.  That's when I got a good look at

24  his face, and I walked to the store.

25       Q     You mentioned that he was still sitting in the car.

Hill - Direct                                                23

1   Was he still sitting in the back seat still?

2       A    Yes, ma'am.

3       Q    Where was Sonya at that point that you initially got

4   out and walked towards the A.B.C. store?

5       A    The passenger seat.

6       Q    She was still in the car with the defendant?

7       A    Yes, ma'am.

8       Q    Were you concerned at that point for her safety if you

9   did not comply with the defendant's instructions?

10      A    Yes, ma'am.  I was not sure that he was exiting the car

11  with me, which is why I was hesitant to walk to the store

12  without him.  I thought he was planning on getting rid of me to

13  be alone with my friend.

14      Q    Now, obviously, there is a convenience store there, an

15  A.B.C. store.  Were there some people around at this point?

16      A    Yes, ma'am.

17      Q    Did you yell or scream for help?

18      A    No, ma'am.

19      Q    Why not?

20      A    I thought he had a gun behind me.

21      Q    Were you concerned for your safety or Sonya's if you

22  had tried to cause a scene?

23      A    Yes, ma'am.

24      Q    Once the defendant directed you into the Ocean Grocery,

25  what happened?

Hill - Direct                                                          24

1        A     I mouthed either "help me" or "call the police" to the

2   cashier.  He did not understand.  I continued to walk to the ATM

3   like directed.

4        Q     When you say "like directed," the defendant

5   specifically told you to go to the ATM?

6        A     Yes.

7        Q     Once you got to the ATM, where was he standing in

8   relation to you?

9        A     Directly behind me.

10       Q     And what did he tell you to do?

11       A     He told me to type in my PIN, and if I got it wrong, he

12  would hurt me.

13       Q     Base upon --

14             THE COURT:  I'm sorry.  Just for clarity, is the

15  ATM within the grocery store?  Can you clarify that?

16             MS. PETTIT:  Yes.

17       Q     Can you just describe for the Court where inside the

18  convenience store the ATM is?

19       A     Directly to the left.

20       Q     And is it towards the back of the store?

21       A     No.  It's by the front.  It's a very small store.

22       Q     I'm going to show you just to provide a little bit of

23  context what's been marked as Commonwealth's Exhibit 1 for

24  identification purposes.  I'm going to ask you to take a look at

25  this.  Do you recognize that aerial photograph?

Hill - Direct                                                    25

1      A     Yes, ma'am.

2      Q     Is that a fair and accurate representation of the area

3   of the city of Richmond that we've been talking about?

4      A     Yes.  It is.

5      Q     Now, do you see where Davinci's is actually already

6   marked on the map?

7      A     I do.

8      Q     Could you just then point out Ocean Grocery for the

9   judge?  You're pointing right near where it's also labeled Ocean

10  Grocery?

11     A     Yes, ma'am, with the shopping cart.

12     Q     Where did you park in front of Ocean grocery where you

13  then walked into the store?

14     A     Past it, on the same side of the street.

15     Q     So farther down this street right here?

16     A     Yes.

17     Q     North 25th street?

18     A     Yes, ma'am.

19     Q     All right?

20           MS. PETTIT:  Your Honor, I would introduce the

21  aerial map as Commonwealth's Exhibit 1.

22           THE COURT:  Any objection?

23           MS. FEINMAN:  No objection, Your Honor.

24           THE COURT:  The Court will receive into evidence

25  Commonwealth's Exhibit No. 1, which has been described as an

Hill - Direct                                              26

1    aerial map of the location where the incident occurred.

2         Q    Now, once you withdrew the money from the ATM, what did

3    the defendant do?

4         A    Directed me to leave the store.  Well, insisted that I

5    not touch the money.  He reached past me, grabbed the money, put

6    it in his pocket, and then directed me to leave the store.

7         Q    Did you see where he went at that point?

8         A    No, ma'am.  I immediately walked to the cash register

9    and never saw him.

10        Q    When you walked to the cash register, what did you do?

11        A    I began to cry and asked any men around me to call the

12   police.  I informed them that the man that was with me had

13   robbed me.

14             MS. PETTIT:  Your Honor, at this point I would ask

15   to play a brief surveillance video from inside of the store for

16   Ms. Hill.

17             THE COURT:  Any objection?

18             MS. FEINMAN:  If she can lay the proper

19   foundation, Your Honor, then no objection.

20             MS. PETTIT:  I do have to show it to her, but she

21   is in the video and be able to authenticate the event.

22             THE COURT:  All right.

23             MS. PETTIT:  Can you see the TV?

24             THE WITNESS:  Yes, ma'am.

25             MS. PETTIT:  And, Your Honor, does the Court have

Hill - Direct                                          27

1   good view here?

2                    THE COURT:  Yes, ma'am.

3                    MS. PETTIT:  I apologize, Your Honor.

4                    (Counsel is setting up the video.  Whereupon, the

5   proceedings continue as follows:)

6                    (Video is playing.)

7   Q    Do you recognizance yourself in that video?

8   A    Yes, ma'am.

9   Q    I know that is a very short clip, but is that a fair

10  and accurate representation of where the defendant stood behind

11  you once you got the money out of the ATM at the Ocean Grocery?

12  A    Yes, ma'am.

13                   MS. PETTIT:  I would move to introduce the DVD as

14  Commonwealth's Exhibit 2.

15                   THE COURT:  Any objection?

16                   MS. FEINMAN:  No objection, Your Honor.

17                   THE COURT:  All right.  The Court will receive the

18  DVD into evidence of portraying the incident which was

19  portraying the defendant standing behind Ms. Hill who was

20  standing at the ATM machine as Commonwealth Exhibit No. 2

21  without objection.

22  Q    Now, as that is a short clip, it does not -- does that

23  end prior to the money actually coming out of the ATM and the

24  defendant taking it?

25  A    Yes, ma'am.

Hill - Direct                                                    28

1      Q    I'm also going to show you a still photograph, which is

2   marked for identification as Commonwealth's Exhibit 3.  Do you

3   recognize these photographs as well?

4      A    Yes.

5      Q    Are they excerpts from the video that was just

6   introduced and placed into evidence?

7      A    Yes, they are.

8      Q    Is this you, obviously, with the hair?

9      A    That is me, yes.

10     Q    And the defendant behind you?

11     A    That is him.

12     Q    I'm going to point you directly towards the bottom left

13  picture.  There's an item in the defendant's hand.  Do you

14  recognize that?

15     A    It's Sonya's makeup bag.

16     Q    Thank you.

17          MS. PETTIT:  I would move to introduce the board

18  of still photographs as Commonwealth's Exhibit 3.

19          THE COURT:  Any objection?

20          MS. FEINMAN:  No objection, Your Honor.

21          THE COURT:  The Court will receive into evidence

22  Commonwealth Exhibit No. 3, still photographs which seem to have

23  four photographs of Ms. Hill standing at the ATM machine with

24  Mr. Walden standing behind her without objection.

25     Q    Now, just a few minutes after that I think is when you

Hill - Direct                                                    29

1    indicated you went and asked the clerk to call 9-1-1 and asked

2    for help?

3        A    Yes, ma'am.

4        Q    Did you observe someone start placing that call?

5        A    No, ma'am.  While the police were called, I had exited

6    Ocean Grocery to make sure that Sonya was in the car alone.

7        Q    What did you find when you went back out there?

8        A    She was alone.

9        Q    What did you do once you made sure Sonya was okay?

10       A    I had her exit the car with me because I knew the

11   police would want to talk to us.

12       Q    Did there come a time when you also got on the phone

13   and talked to the police?

14       A    Yes, ma'am.

15            MS. PETTIT:  At this point I would request

16   permission to play the 9-1-1 call related to the case.

17            THE COURT:  Any objection?

18            MS. FEINMAN:  I would object to that, Your Honor.

19   She -- Ms. Hill just testified that there was a time lapse

20   between when these incidents happened and when the 9-1-1 call

21   was placed, that Mr. Walden had already left, that Caitlyn had

22   left the store, had gone to her vehicle.  She's not who

23   (undecipherable) placed the initial 911 call.  I believe with

24   that gap in time, that this would be inadmissible hearsay.

25            MS. PETTIT:  Judge, there's plenty of case law

Hill - Direct                                                    30

1   indicating that a call placed to 9-1-1 is not considered

2   testimonial hearsay.  And, in fact, there is a statute that

3   expressly allows the admission of the call without a custodian

4   of records assuming that the call is certified, which this is.

5        What I can tell the Court and, frankly, I am happy to

6   feed forward much as is possible with the DVD player through the

7   portions of the call that is made by the clerk.  I'm really

8   offering it for what Ms. Hill said when she called the police.

9   I think it speaks to her frame of mind, the recency of the

10  report, and it's highly relevant for that purpose.  And, again,

11  it's just simply not testimonial hearsay.

12        MS. FEINMAN:  Your Honor, Ms. Hill testified she

13  went to retrieve Sonya before making the phone call because she

14  knew the police would want to speak with her as well.  She's

15  clearly anticipating talking to law enforcement at this point in

16  time, and I would say that this is testimonial.

17        THE COURT:  All right.  The portion that you are

18  seeking to play is Ms. Hill calling the police -- is that

19  correct -- or is it the clerk as well?

20        MS. PETTIT:  The beginning of the call is the

21  clerk.  I don't know the extent to which I can fast forward with

22  my remote issue.  I'm happy to ask the Court to disregard

23  anything said by the clerk and just to enter or admit the

24  statement from Ms. Hill.

25        THE COURT:  The purpose of hearing this phone call

1    is for what?

2              MS. PETTIT:  Judge, I think it goes to the recency

3    of the report.  It supports Ms. Hill's claim this is what

4    happened.  You've already heard in opening that the defendant

5    intends to testify to something very different.  So to the

6    extent to which her almost immediate call to 911 and her

7    testimony today is similar or identical, I can support the

8    Court's inference that this, in fact, the version of events

9    that --

10             THE COURT:  Is there a time on this clip?  Are you

11   able to determine what time it was that she called?

12             MS. PETTIT:  I believe the certification does

13   include a time.  So that will tell you exactly what time she

14   called.

15             THE COURT:  All right.  The Court will note your

16   objection for the record.  The Court will allow it to be played.

17             MS. PETTIT:  Thank you.  Ms. Hill, I would like

18   you to listen to this call and just tell me specifically the

19   part that gets to you, if that's your voice.

20             (Video is playing.)

21             THE COURT:  Cut that portion down so we don't have

22   to hear that.

23             MS. PETTIT:  Sure.  Your Honor.

24             MS. FEINMAN:  And just that my objection's noted

25   for the record.

Hill - Direct                                              32

1           THE COURT:  Yes.

2           MS. PETTIT:  And I'm perfectly happy for the Court

3    to disregard anything that's being said at this point as well.

4    I have no objection to that.

5           THE COURT:  All right.  We'll just let it play

6    out.

7               (Video is playing.)

8    BY MS. PETTIT:

9       Q    Ms. Hill, the call that we just listened to, was that

10   your conversation with 9-1-1 once you got on the phone?

11      A    Yes, ma'am.

12      Q    Is it A fair and accurate recording of that call?

13      A    Yes, ma'am.

14          MS. PETTIT:  Your Honor, I would move to introduce

15   the CD containing the 9-1-1 recording as Commonwealth's Exhibit

16   4.

17          THE COURT:  Any objection?

18          MS. FEINMAN:  Yes, Your Honor.  I would object to

19   the admission of the CD because it does contain inadmissible

20   hearsay as part of that.  And, Your Honor, I would just further

21   state that as far as Ms. Hill's statement, I believe that that's

22   the Commonwealth improperly bolstering their witness before her

23   credibility has been impeached on these matters.  So I just note

24   a continuing objection to that, but also I do object to the

25   admission of the CD.

Hill - Direct                                    33

1              THE COURT:  All right.

2              MS. PETTIT:  Your Honor, I think it's been made

3    very clear for the record that we've asked the Court to

4    disregard any statements that are not very clearly Ms. Hill, and

5    since this is a bench trial, it's not as if the jurors would be

6    taking the disc back in and potentially having access to

7    inadmissible hearsay.  I don't know that that's cause for

8    concern to the Court.

9              Again, it's not hearsay because it's nontestimonial

10   because it is a 9-1-1 call and corroborates her version of

11   events.  So I will ask the Court to accept it.

12             THE COURT:  The Court will receive the disc into

13   evidence as Commonwealth's Exhibit No. 4.  I will note defense

14   objection for the record.

15             MS. PETTIT:  Thank you, Your Honor.

16   Q    Now, at the end of that call, had police arrived?

17   A    Yes, ma'am.

18   Q    Did you report the same events to them that you

19   reported on the call?

20   A    Yes, ma'am.  I did.

21   Q    Was there --

22             MS. FEINMAN:  I object.

23             THE COURT:  I'm sorry?

24             MS. FEINMAN:  I would object to hearsay on that,

25   Your Honor.

Hill - Direct                                    34

1          MS. PETTIT:  I'll move on.

2          THE COURT:  All right.

3     Q    Did there come a time when the police asked you for a

4  description of the person who had robbed you?

5     A    Yes, ma'am.

6     Q    Do you recall what description you provided?

7     A    White t-shirt, white washcloth on his head.

8     Q    Did you at any point provide a description of shoes?

9     A    Yes.  I recall saying something that I later remembered

10  was wrong.  I believe I said sandals.  I'm not sure why.

11    Q    But did there come a time when you corrected what you

12  had initially said to the police?

13    A    Yes, ma'am.  I recalled tennis shoes later.

14    Q    Later that evening did there come a time when the

15  police asked you to look at some items they had recovered?

16    A    Yes, ma'am.

17    Q    And I'm going to ask you to take a look at a couple of

18  pictures on this board to be marked for identification as

19  Commonwealth's Exhibit 5.

20         I'm going to point you -- I've shown this to defense

21  counsel as well prior to trial.  Specifically towards the

22  photographs on the bottom, do you recognize any of those items?

23    A    Yes, ma'am.  I see my cell phone.

24    Q    Which one is yours?

25    A    The one with the pink wallet on the back.

Hill - Cross                                    35

1    Q    So the two pictures that are on the bottom left that

2    display the cell phone?

3    A    Yes, ma'am, bottom left.

4    Q    Thank you.  I just want to clarify one more thing then

5    I'll let defense counsel ask you a couple questions or the judge

6    if he has any to make sure were all on the same page.

7         At any point during this interaction, did you see,

8    physically observe, a firearm in the defendant's hand?

9    A    No, ma'am.

10   Q    Were their any times during the interaction where you

11   did not believe the defendant to have a firearm?

12   A    No, ma'am.

13   Q    So at all points you believed him to be armed based on

14   his statement?

15   A    I did.

16   Q    Thank you, Ms. Hill.  If you could, answer any

17   questions defense counsel or the Court has for you.

18                   THE COURT:  Defense?

19                   MS. FEINMAN:  Thank you, Your Honor.

20                         CROSS-EXAMINATION

21   BY MS. FEINMAN:

22   Q    Good morning, Ms. Hill.

23   A    Good morning.

24   Q    So prior to event's that you and the Commonwealth have

25   been talking about today, you were with Sonya; is that correct?

Hill - Cross                                                    36

1       A    Yes, ma'am.

2       Q    And she was your roommate at that time?

3       A    Yes, ma'am.

4       Q    You went out to pick up pizza?

5       A    Yes.

6       Q    And to pick up drugs?

7       A    No, ma'am.

8       Q    You went out to buy cocaine?

9       A    No, ma'am.

10      Q    So you parked outside Davinci's.

11      A    Yes, I did.

12      Q    You went inside?

13      A    Yes.

14      Q    Picked up pizza?

15      A    Yes, ma'am.

16      Q    You saw people inside the store?

17      A    Yes.

18      Q    And you saw Mr. Walden inside the store?

19      A    Yes.

20      Q    And you two walked out at about the same time.

21      A    He exited shortly before I did.

22      Q    Close enough in time that the door swung back on you?

23      A    Yes.

24      Q    And when you got in the car, he got in moments after

25  you?

Hill - Cross                                                          37

1      A     I would say a minute had passed.

2      Q     And after he got in the car, you stayed parked for a

3   couple minutes?

4      A     Yes, ma'am.

5      Q     And during that time you were discussing a drug sale?

6      A     No, ma'am.

7      Q     And did drugs change hands at that point in time?

8      A     No, ma'am.

9      Q     And eventually you pull out of your parking spot?

10     A     Yes, ma'am.

11     Q     And Mr. Walden is still in the vehicle?

12     A     Yes, ma'am.

13     Q     And then you made a left turn, I think you said?

14     A     I think so.

15     Q     And then you pulled over and let a second man in the

16  car?

17     A     No, ma'am.

18     Q     And that man told you to pull into the alley?

19     A     There was no second man.

20     Q     And then you testified that you never saw a gun?

21     A     Yes.

22     Q     And a gun was never fired?

23     A     Yes.

24     Q     And you testified earlier that -- let's see -- you saw

25  something in Mr. Walden's hand?

Hill - Cross                                        38

1       A    Yes.

2       Q    And that's the first time you ever mentioned seeing

3   something in his hand; is that correct?

4       A    I told police that there was a reason I believed he was

5   holding a gun.  It was probably his cell phone.

6       Q    You -- when asked by officers at what point did he show

7   you the gun, you told him that he didn't show you a gun, you

8   didn't see a gun.  I don't think he had one on him, but that's

9   what you said; is that correct?

10      A    Yes, ma'am.

11      Q    So this all started by Davinci's and the street by

12  Davinci's, you said you were parked right in front?

13      A    Yes, ma'am, directly across the street.

14      Q    And there are other businesses on that street as well?

15      A    Yes.

16      Q    And this was around 8 p.m.

17      A    Yes.

18      Q    And the other businesses, some were open as well?

19      A    I believe.

20      Q    And you testified, I believe, that their were people

21  inside the Davinci's other that Mr. Walden?

22      A    Yes, ma'am.

23      Q    And there were other people on the sidewalk?

24      A    Yes.

25      Q    And there were cars driving by?

Hill - Cross                                          39

1     A    Yes.

2     Q    And at no point during that time did you indicate to

3  anyone that you were in distress?

4     A    No, I did not.

5     Q    You didn't scream?

6     A    I was in the car when I realized I was in trouble.

7     Q    And you stayed in the car?

8     A    Yes.

9     Q    You didn't honk your horn?

10    A    No.

11    Q    And when you drove, you drove into an alley?

12    A    Yes.

13    Q    You were not in the alley for very long?

14    A    No, ma'am, not very long.

15    Q    And while you were in the alley, a woman walked

16  outside.

17    A    As we were exiting.

18    Q    So a woman walked by?

19    A    Yes.

20    Q    And you didn't scream at that point?

21    A    I made eye contact.  I did not scream or say anything.

22    Q    So other than eye contact, you didn't do anything to

23  indicate you were in distress?

24    A    No, ma'am.

25    Q    And you said at some point you were hit in the head?

Hill - Cross                                                    40

1      A    Yes, ma'am.  It was before we saw the woman.

2      Q    And that was with an open fist, you believe?

3      A    Yes.

4      Q    And you testified today that you were hit in the face;

5  is that right?

6      A    Yes.

7      Q    And previously when you testified and were asked about

8  this, you said that you were hit in the head; is that correct?

9      A    I still stand that it was both, as it was his open hand

10  and his arm making contact.

11      Q    Okay.  But your previous testimony was that he hit you

12  in the head; is that correct?

13      A    Yes.

14      Q    And that he -- that there were no marks from that hit?

15      A    Yes, ma'am.

16      Q    And there were no -- there was no blood?

17      A    No.

18      Q    There was no bruising?

19      A    No bruising.

20      Q    At some point you say a bag was taken and it was a

21  Victoria's Secret bag?

22      A    Yes, at the beginning of the altercation.

23      Q    And that belonged to Sonya?

24      A    Yes.

25      Q    And she got that back?

41

Hill - Cross

1    A    Yes, she did.

2    Q    And your phone was taken?

3    A    Yes, ma'am.

4    Q    And you got that back?

5         MS. PETTIT:  I'm just going to object to the

6    relevance as to whether or not they subsequently were returned

7    their property by the police.

8         MS. FEINMAN:  It would go to the elements of

9    robbery that their property was taken, as well as potentially to

10   the intent to steal.

11        THE COURT:  I'll allow it.  Go ahead.

12   Q    And so I believe you said that $20 was missing from

13   your phone case?

14   A    And my debit card.

15   Q    And the $20 that was in your phone case, you did not

16   give that to Mr. Walden?

17   A    No, I did not.

18   Q    You didn't hand it to him?

19   A    No, I did not.

20   Q    You didn't tell him it was in there?

21   A    No.

22   Q    And you had two debit cards?

23   A    Yes.

24   Q    And you later realized one of your debit cards was

25   actually still in your pocket?

Hill - Cross                                                    42

1      A      Yes, I did.  I put it in my pocket after the ATM.

2      Q      So after you left the alley, you drove a short

3  distance?

4      A      Yes.

5      Q      And then parked again?

6      A      Yes.

7      Q      And it's your testimony that Mr. Walden told you where

8  to drive?

9      A      Yes.

10     Q      And he told you where to park?

11     A      Yes.

12     Q      And he chose the parking spot?

13     A      Yes.

14     Q      And that parking spot was by Ocean Grocery?

15     A      Yes, it was.

16     Q      And that it is by the First Precinct?

17     A      Yes.

18     Q      It's actually less than a block from the First Police

19  Precinct.

20     A      Yes, it is.

21     Q      And this is a busy street?  There are people walking

22  by?

23     A      Yes.

24     Q      And there were cars driving by?

25     A      Yes.

Hill - Cross                                               43

1    Q    I'm going to show you a video.

2         MS. PETTIT:  I'm going to object to the showing of any

3    video at this point.  I'm not sure what the video shows, but in

4    order for extrinsic evidence to be admissible, the witness first

5    has to be asked about what's on the video and deny its existence

6    in order for this evidence to be admissible; I don't believe

7    that has happened.

8         THE COURT:  Ms. Feinman?

9         MS. FEINMAN:  Your Honor, I believe she's already

10   testified.  I'll proffer for the Court this is a video of the

11   vehicle driving and then parking where she is saying Mr. Walden

12   told her to drive and park.  I would ask her to just recognize

13   this is, in fact, her vehicle, and then she will appear in the

14   video.  I will ask her to confirm that that is, in fact, her,

15   and walk through what happened.

16        MS. PETTIT:  I'm not objecting on authentication

17   grounds.  My objection is that defense counsel is attempting to

18   impeach the witness about something that she has not yet asked

19   the witness about.  And in order for additional evidence to

20   admissible to impeach a witness, counsel first has to question

21   the witness, and if the witness admits what is said, which to me

22   it sounds she has at all points, then extrinsic evidence is not

23   admissible.

24        THE COURT:  Your response, then?

25        MS. FEINMAN:  Your Honor, I'm happy to ask her

Hill - Cross                                              44

1    more questions if that's what the Commonwealth would like.

2              THE COURT:  All right.

3    Q    So after you park the vehicle, you get out of the car?

4    A    Yes.

5    Q    You cross the street?

6    A    Yes.

7    Q    And you cross the street by yourself?

8    A    To the A.B.C. store.

9    Q    And how many people walk by while you're crossing the

10   street?

11   A    I didn't see anyone walk by.  I saw people in front of

12   the A.B.C. store.

13   Q    All right.  How many people were standing in front of

14   the A.B.C. store?

15   A    I would guess three.

16   Q    And how many people did you see inside the A.B.C.

17   store?

18   A    I don't recall looking into the store.

19   Q    How many vehicles drove by while you were crossing the

20   street?

21   A    Maybe two.

22   Q    If I were to play a video of you crossing the street,

23   would that refresh your recollection of how many cars and people

24   their were?

25   A    I suppose.

Hill - Cross                                          45

1          (Video was played.)

2          MS. FEINMAN:  I apologize, Your Honor.  If I could

3    use my computer.

4              (A discussion was held off the record.  Whereupon,

5    the proceedings continue as follows:)

6      Q    All right.  I'm going to ask you to watch this video

7    just for a moment, and then in a moment, I will ask you if you

8    can identify some things that you see.  Do you recognize this

9    area?

10     A    Yes.

11     Q    And is that Ocean Grocery?

12     A    Yes, ma'am.

13     Q    So the precinct is the angle from which we're seeing

14   the video?

15     A    Yes, ma'am.

16     Q    Do you recognize that vehicle?

17     A    That is my car.

18     Q    And so when you're parking right there, that's the spot

19   that Mr. Walden directed you to park in?

20     A    Yes.

21     Q    So at this point you're sitting in the car; is that

22   right?

23     A    Yes.

24     Q    Is that you exiting the vehicle?

25     A    Yes, ma'am.

Hill - Cross                                    46

1     Q     And at this point Sonya is the front passenger and

2   Mr. Walden is in the back seat; is that right?

3     A     Yes.

4     Q     Is that Mr. Walden?  Or can't you tell?

5     A     I can't tell.

6     Q     You see multiple vehicles drive by?

7     A     I do.

8     Q     So you're crossing the street over to the A.B.C. store?

9     A     Yes.

10    Q     Mr. Walden is standing here by the vehicle still?

11    A     I believe he was sitting.

12    Q     Is that him right there?

13    A     Yes.

14    Q     All right.  And you're walking back over, and you see

15   people over there?

16    A     Yes.

17    Q     And the vehicle is right there?

18    A     Yes.

19    Q     And those people are a few houses -- store fronts down?

20    A     Yes, ma'am.

21    Q     All right.  After you meet in the street, this is when

22   you two walk in the store together?

23    A     Yes, ma'am.

24    Q     And at this point, Sonya is still in the vehicle?

25    A     Yes, ma'am.

Hill - Cross                                          47

```
 1    Q    That's two people walking right there; is that right?

 2    A    Yes.

 3    Q    Another person right there?

 4    A    Yes.

 5    Q    And then several cars?

 6    A    Yes.

 7    Q    And at no point did you indicate to any of those

 8  people, including the ones you saw in front of the A.B.C. store

 9  that you were in any sort of distress?

10    A    That is correct.

11         MS. FEINMAN:  Your Honor, I would move to

12  introduce this video as Defense 1.

13         THE COURT:  Any objection?

14         MS. PETTIT:  No object.

15         THE COURT:  The Court will receive the video

16  showing Ms. Hill walking across the street to the A.B.C. store

17  then walking back to the grocery, the Ocean Grocery, as

18  Defendant's Exhibit 1 without objection.

19         MS. PETTIT:  Your Honor, I guess my only caveat to

20  that is it looks like maybe five percent of that video was just

21  played for the Court, and so we do need to put something on the

22  record if we're going to admit the disc in its entirety to

23  reflect which time stamps were observed and admitted into

24  evidence.

25         MS. FEINMAN:  I am happy to do that, Your Honor.
```

Hill - Cross                                                          48

1   I will tell you by the end of the trial I do expect you to

2   receive the entire disc.

3              THE COURT:  Well, for purposes right now, can we

4   identify the time, which shouldn't be too hard to do that.  For

5   the record, I believe it was -- began when Ms. Hill's vehicle

6   initially turned onto the street and parked across from the

7   A.B.C. store, and it ended with Ms. Hill and Mr. Walden walking

8   to the grocery store.

9              MS. FEINMAN:  Yes, sir.  And so that would have

10  begun at approximately 41 seconds into the video is when the car

11  turned into view.  And then we stopped the video at two minutes

12  54 seconds.

13             THE COURT:  All right.

14             MS. PETTIT:  I guess just also to make clear for

15  the record the time stamp on the video at the point at which we

16  stopped it, it's 8:52 p.m. and 55 seconds.

17             MS. FEINMAN:  If I may approach?

18             THE COURT:  Yes.

19  BY MS. FEINMAN:

20     Q    All right.  So as you're walking into to Ocean Grocery,

21  you testified today that you mouthed to a store clerk asking for

22  help; is that right?

23     A    Yes.

24     Q    And that's the first time you've mentioned that; is

25  that correct?

Hill - Cross                                49

1       A    Yes.

2       Q    And you walk inside, go up to the ATM, and you

3    testified you withdrew $100 from your account?

4       A    Yes.

5       Q    And that Mr. Walden specifically asked for $100?

6       A    Yes.

7       Q    He told you to push that $100 button?

8       A    Yes.

9       Q    He didn't tell you to empty your account?

10      A    No, ma'am.

11      Q    He didn't say, Give me everything you have?

12      A    No, ma'am.

13      Q    And the withdrawal limit on that ATM was $200?

14      A    Yes.

15      Q    And you had more that $100 in your account?

16      A    Yes.

17      Q    And when -- after you said he took the money directly

18   from the ATM, not from your hand; is that right?

19      A    Yes.

20      Q    So after he takes that, you two walk toward the door;

21   is that right?

22      A    Yes.

23      Q    And at that point in time as you are walking towards

24   the door, he was behind you?

25      A    Yes.

Hill - Cross                                                    50

1       Q     And he had his hand on your elbow?

2       A     Yes.

3       Q     He was guiding you towards the door?

4       A     Yes.

5       Q     And at that point that's when you spoke up and asked

6   the clerks for help?

7       A     I stepped towards the register and asked for help, yes.

8       Q     When he was behind you?

9       A     Yes.

10      Q     And then, after that, you exited the store; is that

11  right?

12      A     After --

13      Q     After you spoke with the clerk, you walked out of the

14  store?

15      A     Yes, ma'am.

16      Q     And you went to retrieve Sonya, you testified?

17      A     Yeah.

18      Q     And you had not spoken with law enforcement at that

19  point?

20      A     No, ma'am.

21      Q     And you spoke with Sonya at the car?

22      A     Yes.

23      Q     And after speaking with her, you came back to the Ocean

24  Grocery?

25      A     Yes, ma'am.

Hill - Redirect                                                51

1      Q    And at that point is that when you first spoke to law

2   enforcement on the phone?

3      A    Yes, ma'am.

4      Q    If I can have a few moments.

5           (A discussion was held off the record. Whereupon,

6   the proceedings continue as follows:)

7           MS. FEINMAN:  No further questions, Your Honor.

8           THE COURT:  All right.  Any redirect?

9           MS. PETTIT:  Yes, sir.

10                    REDIRECT EXAMINATION

11   BY MS. PETTIT:

12      Q    Caitlyn, you were asked a lot of questions about

13   whether or not you called out to people at various times during

14   this for help.  So I'm just going to start at the beginning.  At

15   Davinci's when the defendant first got into the back of your

16   car, why did you not run or honk the horn or try to call out to

17   anyone?

18      A    He specifically said, "If you make a sound, I will

19   shoot you.  If you do not do what I say, I will hurt you."

20      Q    What did you think might happen to you if you had

21   called out for help?

22      A    I thought that I would be hurt.

23      Q    And then you were asked about a woman in the alley.

24   Same question for her, why did you not call out to her for help?

25      A    It was dark.  I don't even think she could see me.

Hill - Redirect                                                      52

1       Q    At that point were you also concerned for your safety?

2       A    Yes, ma'am.

3       Q    And then when you first pull in and you walked toward

4  the A.B.C. store on that video, again, why did you not run for

5  help or flag down another car?

6       A    I was scared he would shoot me.

7       Q    And were you concerned for Sonya's safety as well?

8       A    Yes, ma'am.

9       Q    You didn't ever walk into the A.B.C. store, did you?

10      A    No, I'm not 21.

11      Q    So did he -- how did you realize that you were walking

12  towards the wrong store?

13      A    I don't recall exactly what he said, but he did speak

14  up to say not that store.

15      Q    Then at that point he followed you into the Ocean

16  Grocery?

17      A    I walked back to the car, and then after that, yes, we

18  walked to Ocean Grocery.

19      Q    Let's talk a little bit also about what happened inside

20  the Ocean Grocery.  You indicated that you withdrew $100 and you

21  were asked about the limit on the ATM.  Do you recall about how

22  much money you had in your bank account at that time?

23      A    115 or so.

24      Q    So it's safe to say that almost your entire bank

25  account was withdrawn during this incident?

Hill - Redirect                                             53

1       A    Yes, ma'am.

2       Q    At the point when the defendant was behind you after

3   you withdrew the money, were you able to see exactly where he

4   was?

5       A    I could see him out of the corner of my eye.

6       Q    But you weren't able to tell exactly where he went?

7       A    No.

8       Q    Were you able to tell exactly what he did after you

9   asked the clerk to call 9-1-1?

10      A    I know that he exited the store.  I didn't watch him

11  exit.

12      Q    Is that the point at which you went out to the car to

13  check on Sonya?

14      A    Yes.  I was scared he returned to the car.

15      Q    You were asked if you spoke with Sonya at the car.

16  What did the two of you talk about?

17      A    I said they're calling the police.  He ran away, and I

18  told her that she needed to come to the store with me because

19  they were calling the police.

20      Q    Did the two of you have any conversation were you

21  rehashed what just happened or did you just simply then walk

22  back into the store?

23      A    We walked to the store.

24      Q    At any point prior to initially talking to 9-1-1 and

25  then talking to the police, did you and Sonya get together to

Hill - Redirect                                                    54

1   discuss what happened in the car with the defendant?

2       A    No, ma'am.

3       Q    I want to ask you one more thing, and then I want to

4   get to the questions that you were asked about whether or not

5   this was some sort of drug purchase.  Could you describe for the

6   Court or show us specifically where you were struck by the

7   defendant in the alley?

8       A    The back of my head to about the edge of my eyebrow,

9   which is why I said face.

10          MS. PETTIT:  Just for purpose of the record, she

11  is indicating with an open right hand, essentially the palm of

12  her hand flat to her face with the pinky touching the edge of

13  her eyebrow and the thumb extending to the back of her head.  So

14  the side --

15          THE COURT:  Well, I don't know if that's what she

16  indicated.  I think your question was where she was struck, not

17  how she was struck.  So I think she was just pointing to the

18  area.  She started talking about the back of her head, but if

19  you could clarify that.

20          MS. PETTIT:  Yes.  We're on the same page there.

21  Perhaps I worded that inartfully.

22      Q    I don't want you to describe exactly how because we

23  know you didn't see the hand, but if you could just, I guess,

24  describe for us with your words the location on the side of your

25  head or face that was struck.

Hill - Redirect                                                    55

1     A     I would say I was struck on the side of my head to the

2   side of my face.

3     Q     At any point prior to the defendant getting in the

4   backseat of your car, had you spoken to him?

5     A     No, ma'am.

6     Q     At any point during this incident that we're here

7   about, did anyone other than the defendant get in the back seat

8   of your car?

9     A     No, ma'am.

10    Q     At any point was there any conversation about drugs?

11    A     No, ma'am.

12    Q     At any point did you willingly give anything to the

13  defendant?

14    A     No, ma'am.

15    Q     At any point did you purchase any drugs from the

16  defendant?

17    A     No, ma'am.

18    Q     Was any part of the interaction that you had with the

19  defendant on August 31st of last year voluntary or consensual?

20    A     No.

21          MS. PETTIT:  Thank you, Ms. Hill.  I don't have

22  any further questions for you.

23          THE COURT:  Ma'am, you may step down from the

24  witness stand.  Ms. Hill, before you step down, if you would,

25  I'm going to have you go back in the hallway because we may have

Sheldon - Direct                                              56

1    to recall you.

2            If you would not discuss your testimony with anyone

3    else because there may by others who may testify.  So please

4    don't discuss anything that you talked about today.

5                    THE WITNESS:  Yes, sir.

6                    THE COURT:  Thank you.  Next witness.

7                    MS. PETTIT:  Sonya Sheldon, please.

8                    SONYA SHELDON, called on behalf of the

9    Commonwealth, first being duly sworn, testifies as follows:

10                   THE COURT:  Be kind enough to take a seat in the

11   witness chair and if you would answer any questions that the

12   attorneys may have for you, okay?  Thank you.  Your witness.

13                        DIRECT EXAMINATION

14   BY MS. PETTIT:

15   Q    Good afternoon.  Could you please introduce yourself to

16   the Court.

17   A    I'm Sonya Sheldon.

18   Q    Ms. Sheldon, I'm going to turn your attention back to

19   the evening of August 31st of 2019.  Were you with your roommate

20   at that time, Caitlyn Hill?

21   A    Yes.

22   Q    Just after eight o'clock, in between eight and 9 p.m.,

23   what were the two of you doing?

24   A    We were going to pick up a pizza.

25   Q    Where had you ordered the pizza from?

Sheldon - Direct                                             57

1    A    Davinci's.

2    Q    That's Davinci's Pizza on North 25th here in the city

3    of Richmond?

4    A    Yes.

5    Q    And how did you get to Davinci's?

6    A    Caitlyn drove.

7    Q    Where were you seated in the car?

8    A    Passenger seat.

9    Q    When you got to Davinci's, what happened?

10   A    Caitlyn Hill got out of the car to go inside and pay

11   and pick up the pizza, and I waited for her.

12   Q    Did you wait in the front passenger seat of the car?

13   A    Yes.

14   Q    What were you doing in the car when you waited for

15   Caitlyn?

16   A    I was just playing on my phone, just waiting for her to

17   come back.

18   Q    At some point did Caitlyn come back with the pizza?

19   A    Yes.

20   Q    What did she do with that?

21   A    She put it up on the front dash, and she just got back

22   in the car.

23   Q    Did something unusual happen after that?

24   A    Yes.  Someone got in the back seat of the car after she

25   got in.

Sheldon - Direct                                    58

```
 1      Q    Now, when someone got in -- were you expecting anyone

 2  to get in the back seat of the car?

 3      A    No.

 4      Q    So when someone got into the back seat of the car, what

 5  did you do?

 6      A    I immediately turned around.  I said "get out."

 7      Q    When you say you turned around, do you mean that you

 8  turned around to look at the person in the back seat?

 9      A    Yes.

10      Q    How many people were in the back seat of the car?

11      A    One.

12      Q    Do you see the person who was in the back seat in the

13  courtroom today?

14      A    Yes.

15      Q    Can you please point him out to Judge Jenkins.  You're

16  indicating the gentleman on the right in the tan shirt and the

17  white long sleeves?

18              MS. PETTIT:  Your Honor, I ask the record to

19  reflect the witness has identified the defendant.

20              THE COURT:  For purposes of the record, the

21  witness, Ms. Sheldon, has identified the defendant, Mr. Walden.

22      Q    You've indicated that you told the defendant to get

23  out.  Did he comply with that request?

24      A    No.

25      Q    What did he do?
```

Sheldon - Direct                                         59

1       A    He told us to turn around and not look at him.

2       Q    He told you both to turn around and not look at him?

3       A    Yes.

4       Q    What else did he say?

5       A    He said that if I used my phone, I'd be dead.

6       Q    What were you doing with your phone when you realized

7    there was a stranger in the car?

8       A    I was attempting to use the emergency S.O.S. software

9    that's on my phone to call the police.

10      Q    And you were unable to do so based on what he said?

11      A    Yes.

12      Q    What else did he say?

13      A    He asked for all of our belongings that were in the

14   front of the car, we had our cell phones.  Then I started

15   handing everything back to him, like, my makeup bag and whatever

16   miscellaneous items that were --

17           THE COURT:  Ma'am, you're going to have to slow

18   down just a little bit and speak up just a little bit, okay?

19      Q    Is it fair to say you're a little nervous?

20      A    Yes.

21      Q    So you've indicated that he asked for the items, and

22   you started handing them back.  What all did you hand back to

23   the defendant?

24      A    I handed him my cell phone.  I handed him my pack of

25   cigarettes.  I handed him my makeup bag, and I believe there was

Sheldon - Direct                                          60

1   a blender in the front seat and a few other little items that

2   were just already in the car.  And then he proceeded to direct

3   Caitlyn to go to an alley way, and then we were in the alley way

4   he asked us both to strip off our clothes and we refused

5   immediately and then tried to negotiate from there.

6      Q    Okay.  I'm going to back you up a little bit.  When the

7   defendant got in your car and told you to be quiet, why did you

8   comply with that request?

9      A    Because he, like, essentially said he had a firearm

10  immediately off the bat.  The threats he was making indicated

11  that he had one.

12     Q    What do you mean when you say the threats that he was

13  making indicated that he had a firearm?

14     A    He was saying, like, if you use your phone, you're

15  dead.  And saying, like, I will shoot you.  So --

16     Q    When you turned around and looked at him prior to him

17  telling you to turn back around and face toward the front, did

18  you see anything about the way he was sitting that made you

19  think that perhaps he was armed with a firearm?

20     A    I saw he had, like, a wash cloth, like, on his hand,

21  like, on his side kind of.

22     Q    And were you concerned that that might be concealing a

23  firearm?

24     A    Yes.

25     Q    At any point -- and let's just be very clear about

61

Sheldon - Direct

1  this -- at any point during this interaction did you actually,

2  physically observe a firearm?

3      A    No.

4      Q    But based upon those actions and his statement, you

5  believed that he had one?

6      A    Yes.

7      Q    When you handed back your property, you mentioned a

8  phone and a makeup bag, was your phone inside your makeup bag?

9      A    No.

10     Q    Was Caitlyn's phone inside your makeup bag?

11     A    No.

12     Q    You also mentioned a pack of cigarettes that the

13  defendant took from you.  What kind of cigarettes were those?

14     A    Dark green America Spirit.

15     Q    The green America Spirit?

16     A    Yeah, that are green.

17     Q    The box is green?

18     A    Yes.

19     Q    You again indicated that the defendant directed Caitlyn

20  to drive somewhere.  How did he direct her to drive there?

21     A    Telling her where to pull off from where we were parked

22  and then was just telling her which ever right or left to take.

23     Q    Was he continuing to make statements that you

24  considered threatening during that time?

25     A    Yes.

Sheldon - Direct

62

1     Q     Where did he direct Caitlyn to drive?

2     A     Into an alley way.  I'm not exactly sure the exact

3     location.

4     Q     What happened once you pulled into the alley?

5     A     He asked us to strip off all of our clothes.

6     Q     Did you take your clothes off?

7     A     No.

8     Q     What did you do instead?

9     A     We basically tried to negotiate and see if there was

10    any possible other way or whatever he, like, wanted from us

11    essentially.

12    Q     When you said you were trying to negotiate, what sorts

13    of negotiation attempts did you make?

14    A     I was saying I could literally go to my apartment and

15    get my wallet for you if that would help or whatever it may be.

16    Was just basically freaked out at the -- at that very instant.

17    I was just trying to go through anything in my head I could

18    think of.

19    Q     Now, at this point did you make any attempts to run

20    from the car or flag anyone down?

21    A     No.

22    Q     Why not?

23    A     I was afraid that the defendant had a firearm.

24    Q     Now, ultimately did either you or Caitlyn remove your

25    clothing.

Sheldon - Direct                                        63

1      A    No.

2      Q    While you were in the alley, did there come a time when

3  things began to escalate or the defendant's level of frustration

4  seemed to become more apparent?

5      A    Yes.

6      Q    Describe for the Court what happened then.

7      A    So Caitlyn was -- well, we were both trying to ask

8  clarifying questions essentially of what was going on, the

9  situation, and he ended up asking her for her card number and

10 she was, again, trying to clarify, like, what he meant because

11 it was just very confusing.  And then he said well, I'm not

12 fucking playing with you all.  If you keep asking questions,

13 next thing you're going to see is your friend's brains splashed

14 on the sidewalk.

15     Q    After he said that, what did he do?

16     A    He hit Caitlyn twice.

17     Q    Were you able to see him hit Caitlyn Hill or hear it or

18 how do you know that he hit her?

19     A    Because I, like, he hit the side of her head twice with

20 his hand.  I saw him do it.

21     Q    After he threatened you would see a friend's brain

22 splattered on the sidewalk and he hit Caitlyn, what happened?

23     A    He then eventually got the PIN number from Caitlyn and

24 he directed me to keep my eyes closed.  He saw I was looking at

25 him through the mirrors.  Then we pulled out of the alley way.

Sheldon - Direct                          64

1    Q    All right.  You mentioned the mirrors.  Do you mean the

2  mirrors on the car that allow you to potentially look in the

3  back seat?

4    A    Yes.  Or, like, the side mirror.

5    Q    So when he instructed you to close your eyes, what did

6  you do?

7    A    I closed my eyes and had my head down.

8    Q    Did you hear him direct Caitlyn to pull out?

9    A    Yes.

10    Q    And at any point while you were in the alley, did

11  anyone actually exit the vehicle?

12    A    No.

13    Q    Were you able to see where Caitlyn drove or did your

14  eyes remain closed?

15    A    My eyes were -- they remained closed.

16    Q    But at some point were you able to tell that the

17  vehicle came to a stop?

18    A    Yes.

19    Q    What happened after that?

20    A    After that, I just heard Caitlyn get out of the car,

21  and I didn't hear anything that was going on.  I was just

22  sitting there, freaking out, I suppose.  (Undecipherable).

23    Q    Were your eyes still closed even after you parked and

24  then you didn't hear anyone else in the car?

25    A    Yes.

Sheldon - Direct                                              65

1    Q    Why did you keep your eyes closed the whole time?

2    A    Because I wasn't sure if he had gotten out of the car

3    with Caitlyn or if he was just standing outside of the car.

4    Q    What were you afraid might happen if he saw you with

5    your eyes open?

6    A    He might hurt me.

7    Q    What finally happened that caused you to open your

8    eyes?

9    A    Caitlyn coming out the door and knocking on it telling

10   me to come inside and she would call the police.

11   Q    And about how long would you say that you were sitting

12   in the car with your eyes closed?

13   A    Not even five minutes.  Probably, like, two or three.

14   Q    Relatively short period of time?

15   A    Yes.

16   Q    When Caitlyn came out to the car to let you know that

17   the police had been called, what did the two of you do?

18   A    We went and were speaking to them, or initially we went

19   inside and were staying until it would be safe, I suppose, and

20   then eventually talk to the police.

21   Q    Prior to you talking to police and telling them what

22   happened, did you and Caitlyn ever have a conversation between

23   the two of yourselves about what had happened?

24   A    No.

25   Q    So the first person that you told your story to was, in

Sheldon - Direct                                    66

1   fact, the police?

2        A    Yes.

3        Q    Did there come a time later that evening that the

4   police had you take a look at some items that were in their

5   custody?

6        A    Yes.

7        Q    I'm going to show you first a board that been marked

8   for identification as Commonwealth's Exhibit No. 5.  I'm going

9   to ask you to take a look first at this top middle photograph.

10  Do you recognize that item?

11       A    Yes.

12       Q    What is it?

13       A    It's my makeup bag.

14       Q    Then I want you to take a look at the middle row of

15  three photographs that are on the board horizontally.  Do you

16  recognize those items?

17       A    Yes.

18       Q    What are they?

19       A    Two of my makeup pallets and then --

20       Q    Are these other items that were inside of your makeup

21  bag?

22       A    Yes.

23       Q    All of these items were in your makeup bag at the time

24  you gave it to the defendant?

25       A    Yes.

Sheldon - Direct                                                67

1    Q    Finally, I'm going to point you towards the two bottom

2  right photographs of the black cell phone.  Do you recognize

3  that?

4    A    Yes.

5    Q    What is that?

6    A    My cell phone.

7    Q    And that's the cell phone that you had that evening

8  that the defendant took from you?

9    A    Yes.

10        THE COURT:  Are you pointing to the one on the end

11  at the bottom?

12    Q    Specifically, I'm asking you to take a look at these

13  two photographs, one with the cracked screen on the black phone

14  and the other -- the back of the phone with the yellow flowers.

15  They're both the same phone?

16    A    Yes.

17    Q    Also, Sonya, I'm going to ask you to take a look at

18  this board, which will be marked for identification as

19  Commonwealth's Exhibit 6.

20        And before I show you this, just because I know you

21  haven't taken a look at these pictures before yesterday, when

22  you talked to the police, did you provide them with a

23  description of what the defendant was wearing?

24    A    Yes.

25    Q    Could you tell the Court what that description was?

Sheldon - Cross                                    68

1      A     It was a t-shirt and denim shorts.

2      Q     Showing you the board that's been marked for

3  identification as Commonwealth's Exhibit 6, I'm going to ask you

4  to take a look at this middle right picture, a box of

5  cigarettes.  Do you recognize that box?

6      A     Yes.

7      Q     What is it?

8      A     The pack of dark green American Spirits I had on me

9  that night.

10     Q     Those are your cigarettes the defendant took from you?

11     A     Yes.

12     Q     Sonya, I don't have any other questions for you at this

13 time.  If you can answer any questions defense counsel or the

14 Court has for you?

15            THE COURT:  Defense?

16                      CROSS-EXAMINATION

17 BY MS. FEINMAN:

18     Q     Good afternoon.  So prior to the events that you've

19 been discussing with the Commonwealth, you were with Caitlyn

20 Hill?

21     A     Yes.

22     Q     She was your roommate?

23     A     Yes.

24     Q     And you two went out to buy a pizza?

25     A     Yes.

Sheldon - Cross                                              69

1     Q     And to buy drugs as well?

2     A     No.

3     Q     You were going out to find cocaine?

4     A     No.

5     Q     And Molly?

6     A     No.

7     Q     Did Caitlyn mention buying drugs that night?

8     A     No.

9     Q     So you pulled up outside of Davinci's and parked -- or

10    Caitlyn parked?

11    A     Right.

12    Q     And you waited in the car while Caitlyn went inside; is

13    that right?

14    A     Yes.

15    Q     And she was gone several minutes; is that right?

16    A     I don't know how long.

17    Q     How long was she gone?

18    A     Maybe less than five.

19    Q     Did you see anyone inside Davinci's?

20    A     No.

21    Q     And so you don't know if she spoke to anyone inside of

22    Davinci's.

23    A     She didn't as far as I know.

24    Q     So you don't know if she spoke to anyone inside

25    Davinci's because you weren't inside?

Sheldon - Cross                                          70

1     A    Right.

2     Q    And your first contact with Mr. Walden was when he got

3   into your vehicle or into Caitlyn's vehicle?

4     A    Right.

5     Q    And you had never met him before?

6     A    No.

7     Q    He sat down in the back seat?

8     A    Yes.

9     Q    And you sat there for -- how long did you sit there in

10   that parking spot?

11    A    Not very long.

12    Q    A minute or two?

13    A    Yes, not very long.

14    Q    And while you were sitting there, you and Caitlyn spoke

15   about a drug deal?

16    A    No.

17    Q    And so eventually Caitlyn pulled out of the parking

18   spot, and she drives down the road; is that right?

19    A    Right.

20    Q    And then she at some point pulls over and lets another

21   man in the car; is that right?

22    A    No.

23    Q    And that man ordered Caitlyn to pull into an alley?

24    A    No.

25    Q    And you testified earlier that you never saw a firearm

Sheldon - Cross                                    71

1  in this case?

2       A    No.

3       Q    You saw a wash cloth on top of his hand?

4       A    Right.

5       Q    And you only saw the hand; is that right?

6       A    Yes.

7       Q    And when he struck Caitlyn, that was with the same hand

8  with the wash cloth?

9       A    No.  It was the other hand.  It was the right hand.

10      Q    And the gun was never fired?

11      A    Yes.

12      Q    Yes, it was fired?

13      A    No, it was not fired.

14      Q    And there was no physical contact of any kind between

15 you and Mr. Walden?

16      A    No.

17      Q    And the street by Davinci's, that is a busy street; is

18 that right?

19      A    Fairly.

20      Q    There were cars driving by?

21      A    Yes.

22      Q    There were people driving by?

23      A    Yes.

24      Q    And there were cars and people passing by after

25 Mr. Walden got into the vehicle with you guys, correct?

Sheldon – Cross                                          72

1      A     I can't recall.

2      Q     And after he jumped in, you did not jump out of the

3  car?

4      A     No.

5      Q     And you didn't scream?

6      A     No.

7      Q     You didn't do anything that indicated you were in

8  distress?

9      A     No.

10      Q     When Caitlyn drove and you initially came to an alley,

11  that was not very far away; is that right?

12      A     As far as I know, no.

13      Q     And while you were in the alley, a woman walked out to

14  the alley; is that right?

15      A     Well, when we were pulling out, she was taking out her

16  trash.

17      Q     So you saw a woman there, and you didn't scream at that

18  point?

19      A     No.

20      Q     And you didn't signal to her?

21      A     No.

22      Q     So nothing to indicate you were in distress?

23      A     I couldn't.

24      Q     You mentioned the pack of cigarettes that were taken

25  from you.  Do you recall how many cigarettes were in that pack?

Sheldon - Cross                                73

1      A      Seventeen.

2      Q      The Victoria's Secret bag was taken from you, you had

3   testified; is that right?

4      A      Yes.

5      Q      And you received that back?

6      A      Yes.

7      Q      And you said there were some makeup pallets inside?

8      A      Yes.

9      Q      Those were returned to you?

10     A      Yes.  They were broken.

11     Q      I'm sorry?

12     A      They were also broken.

13     Q      Okay.  And you got your phone back?

14     A      Yes.

15     Q      So after you pulled out of the alley, you drove a short

16   distance again; is that right?

17     A      Yes.

18     Q      And Mr. Walden was telling Caitlyn where to drive?

19     A      Yes.

20     Q      And he told her where to park?

21     A      Yes.

22     Q      He picked the parking spot?

23     A      Yes.

24     Q      And that parking spot was by the Police First Precinct;

25   is that right?

Sheldon - Cross                                                    74

1       A    Yes.

2       Q    It's actually less than a block from the precinct?

3       A    Yes.

4       Q    And close to Davinci's as well?

5       A    Right.

6       Q    And this is also a busy street; is that right?

7       A    I suppose so.

8       Q    There were people walking by the vehicle after you

9  parked?

10      A    Yes.

11      Q    And there were cars driving by; is that right?

12      A    Right.

13      Q    And so at some point you hear Caitlyn get out the

14  vehicle; is that right?

15      A    Yes.

16      Q    And you heard Mr. Walden get out of the vehicle as

17  well?

18      A    I was in shock.  So I wasn't really sure if he had

19  gotten out.

20      Q    So you don't know whether he got out of the vehicle?

21      A    He did, but at that very second I wasn't sure, which is

22  why I kept my eyes closed.

23      Q    Okay.  So at some point you became aware that he was

24  not in the vehicle?

25      A    Yes.

Sheldon - Cross                                    75

1        Q     And you could still hear cars driving by?

2        A     No.  I don't remember.  I don't recall.

3        Q     You don't recall whether cars drove by?

4        A     I had my eyes closed; I was in shock.

5        Q     But you testified earlier that you had heard some cars

6    drive by.

7        A     Not -- after we had -- if there was cars driving up and

8    down 25th Street.

9        Q     All right.  So at some point Caitlyn and Mr. Walden are

10   both out of the vehicle, and you remain in the vehicle; is that

11   correct?

12       A     Yes.

13       Q     You kept your eyes closed the entire time?

14       A     Yes.

15       Q     And you didn't hear Mr. Walden or Caitlyn at that

16   point?

17       A     No.

18       Q     And that lasted for several minutes that you didn't

19   hear them?

20       A     Yes.

21       Q     So you knew they weren't in the car at that point?

22       A     Right.

23       Q     So you just sat there in the vehicle?

24       A     Yes.

25       Q     You didn't take any action?

Sheldon - Cross                                             76

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | You didn't call for help? |
| 3 | A | No. |
| 4 | Q | You didn't peek your eyes to see if anybody was nearby? |
| 5 | A | No. |
| 6 | Q | You didn't tell anybody to indicate you were in |

7    distress?

8        A    I didn't know what to do.

9        Q    You just sat in the vehicle quietly?

10       A    Yes.

11       Q    And then at some point Caitlyn came back to the

12   vehicle?

13       A    Yes.

14       Q    And she told you the police would want to talk to you;

15   is that right?

16       A    She said she had had the police called and to come

17   inside with me.

18       Q    Okay.  So you guys had a conversation at that point?

19       A    No.

20       Q    You spoke to Caitlyn at that point?

21       A    I spoke to her only about the police, that she called

22   them.

23       Q    Then you went back to Ocean Grocery together?

24       A    Yes.

25       Q    And once you get back to Ocean Grocery, that's when you

Sheldon - Redirect                                        77

1    speak to police for the first time?

2        A    Yes.

3              MS. FEINMAN:  I don't think I have any further

4    questions.

5              THE COURT:  Any redirect?

6              MS. PETTIT:  Yes, please.

7                      REDIRECT EXAMINATION

8    BY MS. PETTIT:

9        Q    Sonya, at what point were you sure that the defendant

10   had gotten out of the car once it was parked at Ocean Grocery?

11       A    Just before the door was slammed.  I don't honestly

12   recall.  I guess being in fear and shock just, like, messed me

13   up.

14       Q    And even having heard the door slam, did you know where

15   he would have been standing in relationship to the car?

16       A    No.

17       Q    So was it possible that he was standing directly

18   outside your window?

19       A    Yes.

20             MS. FEINMAN:  I would object as speculation, Your

21   Honor.

22             MS. PETTIT:  It's not being offered for the truth

23   of the matter, more for the affect on what she did.  So it's not

24   her speculation as to what he was necessarily doing.  In fact,

25   we've seen a video of what he was doing.  It just provides a

Sheldon – Redirect                                     78

1   reason for why she remained in the car with eye closed despite

2   having heard the door slam.

3                  THE COURT:  All right.  Move on.

4        Q    Now, at that point and earlier in the alley at

5   Davinci's, why did you not scream out to anyone for help?

6        A    Because I was afraid for my life.

7        Q    You were asked about some items that you eventually got

8   back, your phone and your makeup bag.  Who did you get them back

9   from?

10       A    The police.

11       Q    So the police eventually returned them to you after

12  this identification?

13       A    Right.

14       Q    At any point did anyone other than the defendant get in

15  the car with you and Caitlyn?

16       A    No.

17       Q    At any point did you have a conversation with anyone

18  other than the defendant inside that car?.

19       A    No.

20       Q    Was there ever any conversation about any sort of drug

21  sale?

22       A    No.

23       Q    Did you ever hear Caitlyn say anything to the defendant

24  about a drug sale?

25       A    No.

Sheldon - Redirect                                          79

```
 1       Q    Did you ever talk to him about a drug sale?

 2       A    No.

 3       Q    Did anyone purchase drugs from the defendant?

 4       A    No.

 5       Q    Was anyone purchasing drugs from anyone other than the

 6  defendant that night?

 7       A    No.

 8       Q    Would it be safe to say that the first you've heard

 9  about a drug deal between you or Caitlyn and the defendant was

10  in court?

11       A    Yes.

12       Q    Thank you, Sonya.  I don't have any more questions.

13            THE COURT:  Ma'am, you may step down from the

14  witness stand.  If you would remain in the hallway, we may have

15  to call you back to the witness stand.  Do not discuss your

16  testimony with anyone.

17            THE COURT:  Before we call the next witness, we're

18  going to a take five-minute recess.

19            (A recess was taken.  Whereupon, the proceedings

20  continue as follows:)

21            THE COURT:  Ready for the next witness?

22            MS. PETTIT:  Yes, sir.  Officer Khalid Harris,

23  please.

24            KHALID HARRIS, called on behalf of the

25  Commonwealth, first being duly sworn, testifies as follows:
```

Harris - Direct                                                   80

1                 THE COURT:  Good afternoon, sir.

2                 THE WITNESS:  Good afternoon.

3                 THE COURT:  If you would answer any questions that

4    the attorneys may have for you.

5                 THE WITNESS:  Yes, sir.

6                         DIRECT EXAMINATION

7    BY MS. PETTIT:

8        Q    Good afternoon.  Could you please introduce yourself to

9    the Court?

10       A    Yes.  I'm officer Khalid Harris, first name

11   K-h-a-l-i-d, last name H-a-r-r-i-s.

12       Q    How are you employed?

13       A    I work for Richmond City Police Department, First

14   Precinct.

15       Q    What is your specific assignment within the First

16   Precinct?

17       A    I'm on the public mission team, which focus on, like,

18   high crime, violent crimes in our precinct area.

19       Q    Is one of the tasks of that team also to be a team of

20   first responders when something like a violent crime happens?

21       A    Yes, ma'am.

22       Q    I'm going to turn your attention back to right around 9

23   p.m. on August 31st of 2019.  Where you working in that capacity

24   then?

25       A    Yes, ma'am.

81

Harris - Direct

1    Q   Did there come a time when you heard a dispatch for a

2  robbery that had just taken place at the Ocean Grocery?

3    A   Yes, ma'am.

4    Q   Based upon that description that you received, did you

5  circulate the area looking for people who matched that

6  description?

7    A   Yes, ma'am.

8    Q   Who did you come into contact with?

9    A   We came into contact with the gentleman sitting there.

10    Q   And you're indicating the defendant, Linwood Walden?

11    A   Yes, ma'am.

12         MS. PETTIT:  I would ask that the record reflect

13  the witness has identified the defendant.

14         THE COURT:  The record will reflect the witness,

15  Officer Harris, has identified the defendant, Mr. Walden.

16    Q   About how much time elapsed between you hearing the

17  dispatch and you coming into contact with the defendant?

18    A   I would say approximately three, four minutes.

19         MS. PETTIT:  Your Honor, if I may retrieve

20  Commonwealth's Exhibit 1.

21         THE COURT:  Yes, ma'am.

22         MS. PETTIT:  Thank you.

23    Q   Do you recall where you came into contact with him?

24    A   Yes, ma'am.

25    Q   Where was that?

Harris - Direct                                            82

1    A    In between the North 23rd and 24th street right at R

2  Street.

3            MR. EFIRD:  Judge, may I come around just so I can

4  see where that --

5            THE COURT:  Yes, sir.

6    Q    I'm going to hand you a pen.  On this aerial map that's

7  been introduced into evidence as Commonwealth's Exhibit No. 1.,

8  if you could place a mark on that map where you encountered the

9  defendant?

10   A    (Witness complied.)

11           MS. PETTIT:  Your Honor, the mark is here.  For

12  purposes of the record, it is towards the top of the map near

13  the middle on R Street in between 23rd and 24th Street.

14           THE COURT:  All right.

15   Q    What initially drew your attention to the defendant?

16   A    He matched the description of the white t-shirt and

17  shorts we just received over the radio.

18   Q    And where was the white t-shirt at the time when you

19  observed the defendant.

20   A    It was in his pocket.

21   Q    Which pocket?

22   A    I believe it was his right pants pocket.

23   Q    So it was in the pocket, but it was in one of the

24  pockets of his pants?

25   A    Yes, ma'am.

Harris - Direct                                                    83

1     Q    Do you recall what kind of shorts or shoes he was

2  wearing?

3     A    He had on Ashton Block Jean (phonetic) shorts, I

4  believe, and white tennis shoes.

5     Q    That first time when you came into contact with the

6  defendant, were you able to obtain his identification?

7     A    Yes, ma'am.

8     Q    Ultimately, did you place him under arrest or did you

9  let him continue on his way?

10    A    I believe I let him continue on his way.

11    Q    Did there come a time a few minutes later when you

12  received an updated description over the radio?

13    A    Yes, ma'am.

14    Q    Based upon that updated description, what did you and

15  your team do?

16    A    We went back and basically canvassed the area from the

17  direction we had last seen him walking from when we stopped him

18  the first time to see if we could locate him again.

19    Q    And were you specifically attempting to relocate the

20  defendant?

21    A    Yes, ma'am.

22    Q    Were you able to find him?

23    A    Yes, ma'am.

24    Q    Did there come a time when you were notified that he

25  was going to be transported to First Precinct?

Harris - Direct                                                      84

1      A    Yes, ma'am.

2      Q    Prior to the defendant being transported, did you

3  conduct a search of his person?

4      A    Yes, ma'am.

5      Q    What, if anything, did you find during that search?

6      A    Located U.S. currency, a box of cigarettes, and the

7  t-shirt that I described earlier.

8      Q    Did you take all of these items into your care and

9  custody?

10     A    Yes, ma'am.

11     Q    I'm going to show you a board.  It's been marked for

12  identification.  It's Commonwealth's Exhibit No. 6.  I'm going

13  to direct you first to the top two pictures, which are

14  photographs of the defendant.  Do you recognize those?

15              MR. EFIRD:  Judge, may I approach again?

16              THE COURT:  Yes, sir.

17     Q    Are those photographs a fair and accurate

18  representation of how the defendant appeared when you

19  encountered him on the evening of August 31st?

20     A    Yes, ma'am.

21     Q    I'm going to point you next to the middle left

22  photograph.  Do you recognize that item?

23     A    Yes, ma'am.

24     Q    What is it?

25     A    It's the t-shirt that he had in his pocket.

Harris - Cross                                                    85

1      Q     Did you yourself count the currency that was in the

2    defendant's pocket?

3      A     No, ma'am.

4      Q     Did you take that into your custody and turn it over to

5    Detective Jones?

6      A     Yes, ma'am.

7      Q     Then I'm going to point you toward this middle right

8    photograph.  Do you recognize those items?

9      A     Yes, ma'am.

10     Q     What are they?

11     A     Box of cigarettes that he had on his person.

12     Q     The defendant had on his person that night?

13     A     Yes, ma'am.

14     Q     Thank you.  And, again, all of those items were taken

15   into your custody and then given to Detective Jones?

16     A     Yes, ma'am.

17     Q     Thank you, Officer Harris.  If you could answer any

18   questions Mr. Efird or the Court has for you.

19               THE COURT:  Mr. Efird.

20                    CROSS-EXAMINATION

21   BY MR. EFIRD:

22     Q     Good afternoon, Officer Harris.

23     A     Good afternoon, sir.

24     Q     So as far as you're aware, you were the first officers

25   to encounter Mr. Walden that evening, correct?

Harris - Cross                                              86

1       A    Yes, sir.

2       Q    When you encountered Mr. Walden, he was walking down an

3    alley?

4       A    Correct.

5       Q    By himself.

6       A    Yes, sir.

7            MR. EFIRD:  Your Honor, if I may approach.  I

8    think it's the one on top, this one, marked Commonwealth's 1.

9       Q    Did -- so you indicated -- I'm pointing to the spot you

10   previously marked.  That's where you initially came into contact

11   with Mr. Walden?

12      A    Yes, sir.

13      Q    And, to be clear, that's where you, I guess, parked

14   your police car, correct?

15      A    Yes, sir.  We parked our police car on R Street.  So

16   right in front of the alley, if you will.

17      Q    And he was walking down this alley, which is somewhat

18   obscured by the trees; is that correct?

19      A    I mean, you can clearly see down the alley.

20      Q    Sure.  But from if picture here from in front of the

21   Court, on Commonwealth's Exhibit 1, you can't really see the

22   alley because of the trees?

23      A    Yes, sir.

24      Q    But the alley basically bisects that block, correct?

25      A    Correct.

Harris - Cross                                    87

1    Q    And he is walking down that alley towards you?

2    A    No, sir.

3    Q    He's not walking towards you?

4    A    No, sir.

5    Q    Is he walking away from you?

6    A    Yes, sir.

7    Q    Does he stop and turn to face you when you get his

8    attention?

9    A    Yes, sir.

10   Q    Okay.  And after you get his attention, how did you get

11   his attention?

12   A    We called out to him, said, "Hey, sir."

13   Q    And he stopped?

14   A    Yes.

15   Q    And he turned around?

16   A    Yes, sir.

17   Q    Okay.  And he did not run away?

18   A    No, sir.

19   Q    He didn't change direction again to try to walk away?

20   A    No, sir.

21   Q    Okay.  You were clearly -- you were dressed as a police

22   officer, correct?

23   A    Yes, sir.

24   Q    You had a flashlight that you were using?

25   A    Yes, sir.

Harris - Cross                                          88

1      Q    Did you identify yourself as a police officer?

2      A    Not right away, I don't believe so.

3      Q    Okay.  And as soon as you saw him, your attention was

4  directed on him, correct?

5      A    Yes, sir.

6      Q    And you used the flashlight to illuminate him, correct?

7      A    Yes, sir.

8      Q    You didn't see him throw anything?

9      A    No, sir.

10     Q    You didn't see him making throwing motions?

11     A    No, sir.

12     Q    When you approached Mr. Walden, he seemed calm to you?

13     A    Yes, sir.

14     Q    Didn't notice any heavy breathing?

15     A    No, sir, not that I can remember.

16     Q    You asked him for his name?

17     A    Yes, sir.  I believe we asked him for his

18  identification.

19     Q    Did he give you identification?

20     A    Yes, sir.

21     Q    Did he give you his identification?

22     A    Yes, sir.

23     Q    He said his name was Linwood Walden?

24     A    Yes, sir.

25     Q    Never gave you a false name?

Harris - Cross                                          89

1    A    No, sir.

2    Q    You ran his information, correct?

3    A    Yes, sir.

4    Q    He didn't have any warrants?

5    A    No, sir.

6    Q    All right.  When you came back after running his

7    information, you asked him if he would show you what was in his

8    pockets, correct?

9    A    Yes, sir.

10   Q    And he complied with that?

11   A    Yes, sir.

12   Q    In fact, at one point he pulled out a pack of

13   cigarettes and then admitted to you and the other officer there

14   that there was a stem in that pack of cigarettes, correct?

15              MS. PETTIT:  Objection.  Hearsay.  And

16   out-of-court statement made by the defendant offered by the

17   defense is inadmissible hearsay.

18              MR. EFIRD:  Okay.  I'll rephrase the question.

19              THE COURT:  All right.

20   Q    You asked him to show what was in his pockets, correct?

21   A    Yes, sir.

22   Q    He pulled out a pack of cigarettes?

23   A    Yes, sir.

24   Q    All right.  And what did you tell him to do with that

25   pack of cigarettes?

Harris - Cross                                                          90

```
 1     A     I believe I asked him could he open it.

 2     Q     Did you see anything in there?

 3     A     Yes, sir.

 4     Q     You saw a stem in there?

 5     A     Glass pipe --

 6     Q     A glass which is typically used to smoke cocaine?

 7     A     Yes, sir.

 8     Q     And what did you tell him to do with that pack of

 9 cigarettes?  Did you tell him to just toss the pack of

10 cigarettes?

11     A     I don't recall telling him to toss the pack of

12 cigarettes.  I believe we took it from him.

13     Q     Did you tell him to keep -- do you remember what kind

14 of cigarettes it was?

15     A     Not off the top of my head, no, sir.

16     Q     Okay.  But there was one pack of cigarettes and you

17 took that from him?

18     A     Yes, sir.

19     Q     Okay.  Now, at some point after what happened with the

20 cocaine stem or the glass pipe, another officer asked him about

21 becoming a paid informant with the police -- Richmond City

22 Police Department?

23           MS. PETTIT:  Objection.  Relevance.

24           MR. EFIRD:  Well, Judge, it's going to come out

25 that during the interview there was some reluctance on Mr.
```

Harris - Cross                                                91

1  Walden's part, and that is going to be directly relevant to the

2  fact that he was initially approached as being an informant.

3          We could recall him later after that, but I think

4  it's going to tie in when Mr. Walden explains why there were

5  certain parts of his story that were subsequently different.

6          THE COURT:  This is the Court's position:  I think

7  that because it's not a jury I can sift through this.  At this

8  point in time I don't see it to be relevant, Mr. Efird, but,

9  based on your proffer of something coming, I will allow it.  But

10  you are going to have to make that connection at some point.

11          MR. EFIRD:  Sure, and if we don't, I don't know

12  that it would be relevant --

13          THE COURT:  All right.

14          MR. EFIRD:  -- if it didn't come in that way.

15      Q    But there was a discussion with him about becoming --

16  working with the Richmond Police Department; is that correct?

17      A    Yes, sir.

18      Q    And he ultimately elected not to?

19      A    I don't think he said no.  I believe we gave him a

20  phone number.

21      Q    And then you let him go?

22      A    Yes, sir.

23      Q    That was because he did not match the initial

24  description you had received?

25      A    Yes, sir.

Harris - Cross                                        92

```
 1      Q    Then some time later you're searching for him again?

 2      A    Yes, sir.

 3      Q    About how much later was that?

 4      A    I believe the next time we encountered him was 15

 5   minutes between when we first stopped him and the second time.

 6      Q    And he's still in the same general area?

 7      A    He was a little ways away, yes, sir.

 8      Q    A couple blocks further away?

 9      A    Yes, sir.

10      Q    And, again, when you approached him, he did not run

11   from you?

12      A    No, sir.

13      Q    And when you approached him this time, you thought you

14   had him as a suspect, correct?

15      A    Yes, after receiving an updated description, yes, sir.

16      Q    So you placed him into handcuffs pretty quickly after

17   stopping him that time?

18      A    Yes, sir.

19      Q    Did he resist being placed in handcuffs?

20      A    No, sir.

21           MR. EFIRD:  I don't have any other questions.

22           THE COURT:  All right.  Any redirect for this

23   witness?

24           MS. PETTIT:  Just a brief clarification.

25           THE COURT:  All right.
```

Harris - Redirect                                             93

1                    REDIRECT EXAMINATION

2  BY MS. PETTIT:

3     Q    Now, do you recall what you told the defendant to do

4  with the glass pipe you just described?

5     A    I don't, no.

6     Q    Is it possible he was told to throw that out?

7     A    Yes.

8     Q    But that wasn't taken into your custody?

9     A    No, ma'am.

10    Q    Did you take anything into your custody other than the

11 items that you've identified in this photograph?

12    A    No, ma'am.

13              MS. PETTIT:  Thank you.  I don't have any other

14 questions.

15              THE COURT:  Sir, you may step down from the

16 witnesses stand.  May this witness be excused or does he need to

17 remain?

18              MS. PETTIT:  The Commonwealth is happy for him to

19 be excused.

20              THE COURT:  Any objection?

21              MR. EFIRD:  No objection, Your Honor.

22              THE COURT:  Sir, you may be excused or you may

23 have a seat in the audience if you like.

24              THE WITNESS:  Thank you, sir.

25              MS. PETTIT:  Officer Wayne Hartley.

Hartley - Direct                                  94

1              WAYNE HARTLEY, called on behalf of the

2    Commonwealth, first being duly sworn, testifies as follows:

3              THE COURT:  Good afternoon, sir.

4              THE WITNESS:  Good afternoon.

5              THE COURT:  If you could answer any questions that

6    the attorneys may have for you.

7              THE WITNESS:  Yes, Your Honor.

8              THE COURT:  Thank you.

9                   DIRECT EXAMINATION

10   BY MS. PETTIT:

11    Q    Good afternoon.  Could you please introduce yourself to

12   the Court.

13    A    I'm Officer Wayne Hartley with the Richmond Police

14   Department.

15    Q    Are you specifically assigned as a police officer in

16   the First Precinct here in the city of Richmond?

17    A    Yes, I am.

18    Q    I want to turn your attention back to the evening of

19   August 31st of 2019.  Did there come a time shortly after 9 p.m.

20   that you heard a call come over the radio for a robbery at Ocean

21   Grocery?

22    A    Yes, ma'am.

23    Q    Based upon hearing that dispatch, what did you do?

24    A    I drove to the area for where the call for service

25   initiated.  They stated that an offender was no longer on scene.

Hartley - Direct                                    95

1  So I circulated behind businesses to try and find a person and

2  anything I could do to be helpful.

3      Q    As you were circulating in that area, where did you go?

4      A    Behind the Ocean Grocery there's an alley way that's

5  connected with the next adjacent block.  In that alley way at

6  the corner of behind the Davinci's pizza store, there is a

7  dumpster.  Next to the dumpster I located a purse on the ground.

8      Q    I'm going to show you Commonwealth's Exhibit No. 1.  If

9  you could -- I've already got a mark up here.  If you could put

10  a star on this map in the area where you observed the purse that

11  you just mentioned.

12     A    (Witness complies.)

13     Q    A little more of an X than a star --

14     A    Oh.

15     Q    -- but you've indicated the alley way behind the

16  Davinci's pizza?

17     A    Yes, ma'am.

18     Q    What did you do when you observed the purse?

19     A    When I observed the purse, I stood over it and just

20  held my position until the air cleared up, at which point we

21  notified the detective and the investigating units what we had

22  found, and I helped with the purse until the detective notified

23  me that it was okay to retrieve that and bring it back to the

24  precinct.

25     Q    Prior to collecting it, did you photograph the location

Hartley - Direct                                              96

1   where you recovered the purse behind Davinci's pizza?

2       A    Yes, ma'am.

3       Q    Showing you a board of photos that's been marked for

4   identification as Commonwealth's Exhibit No. 5, I'm going to

5   point specifically first to the top three photographs.  Did you

6   take those?

7       A    Yes, ma'am.

8       Q    What do they show?

9       A    They show the location where the purse is located and

10  specifically where the purse and how the purse was on the

11  ground.  I did not disturb it when I got it.

12      Q    I'm going to specifically call your attention to this

13  top left photograph where you were.  You can actually see the

14  dumpster.  Which direction are you facing there?

15      A    At that point I'm facing -- that would be probably

16  about northbound.  It would be away from the Ocean Grocery.

17      Q    Ocean Grocery would be behind you, and then the gravel

18  road that we see right here is the alley that goes behind those

19  businesses?

20      A    Yes.

21      Q    And then the other two photos are just intermediate and

22  close-up range of the same purse?

23      A    Yes, ma'am.

24      Q    After photographing the purse, did you collect it and

25  take it to First Precinct?

Hartley - Direct                                    97

1      A    Yes.

2      Q    And ultimately did you turn that over to Detective

3  Jones who was the lead detective on this case?

4      A    Yes, ma'am.

5      Q    Prior to relinquishing the items to Detective Jones,

6  did you open the bag to see what, if anything, was in it?

7      A    The bag was as opened as it was in the picture.  Once

8  we got back to First Precinct, I believe she was speaking with

9  the victim, and the only thing I had pulled out of it at her

10  request was the phone that was visible as it was opened.  And

11  then at some point we saw there was a second phone in there,

12  which was also pulled out as well.

13      Q    Pointing you to the bottom row of photographs, were

14  those the two phones that you found inside of the bag in the top

15  three photos?

16      A    Yes, ma'am.

17           MS. PETTIT:  Your Honor, at this time I would move

18  to introduce the board as Commonwealth's Exhibit No. 5.

19           THE COURT:  Any objection?

20           MR. EFIRD:  No objection.

21           THE COURT:  All right.  Before we introduce that,

22  Ms. Pettit, this which was described by this witness as a purse,

23  is that the same thing that was previously described as a makeup

24  case?

25           MS. PETTIT:  Yes, sir.

Hartley - Direct                                98

1          THE COURT:  All right.  The Court will receive

2   into evidence as Commonwealth's Exhibit No. 5 a series of ten

3   photographs depicting items that were found, which items had

4   been previously taken from the victim.

5       Q    And, just to clarify, once you found both of those

6   phones, did you place them back into what you described as a

7   purse, some others have described as a makeup bag, and give

8   that -- the entirety of the bag to Detective Jones?

9       A    I don't recall if I placed them back in, but I knew

10  that all of it was turned over to Detective Jones.  I was

11  sitting at the desk right adjacent from her at the time.

12      Q    But you did give all of those items to Detective Jones?

13      A    Yes, ma'am.

14      Q    Thank you, Officer.  If you can answer any questions

15  defense counsel or the Court has for you.

16          MR. EFIRD:  No questions, Your Honor.

17          THE COURT:  All right.  Sir, you may step down

18  from the witness stand.  Watch your step coming off the stand.

19  May this witness be excused?

20          MS. PETTIT:  Yes, please.

21          THE COURT:  Any objection?

22          MR. EFIRD:  No objection.

23          THE COURT:  Sir, you may be excused or you may

24  have a seat in the audience, if you like.

25          THE WITNESS:  Thank you, Your Honor.

Jones - Direct                                        99

1            MS. PETTIT:  Detective Desiree Jones, please.

2            DESIREE JONES, called on behalf of the

3    Commonwealth, first being duly sworn, testifies as follows:

4            THE COURT:  Good afternoon.

5            THE WITNESS:  Good afternoon.

6            THE COURT:  Please answer any questions the

7    attorneys may have for you.

8            THE WITNESS:  Yes, sir.

9                    DIRECT EXAMINATION

10   BY MS. PETTIT:

11       Q    Good afternoon.  Could you please introduce yourself to

12   the Court?

13       A    Desiree Jones, Detective Desiree Jones.

14       Q    You're employed as a property crimes detective with the

15   Richmond Police Department First Precinct?

16       A    Yes, ma'am.

17       Q    Were you assigned as the lead detective for a robbery

18   that took place August 31st of 2019, with Caitlyn Hill and Sonya

19   Sheldon?

20       A    Yes, ma'am.

21       Q    I want to turn your attention back to that night.  Did

22   you respond to the scene that evening?

23       A    Yes, ma'am.

24       Q    Did you speak with Caitlyn and Sonya and view

25   surveillance footage at the Ocean Grocery?

Jones - Direct                                                    100

1     A     Yes, ma'am.

2     Q     Were you able to view -- I know we got a short clip of

3  photo -- or surveillance footage from the Ocean Grocery.  Were

4  you able to view a longer video that evening?

5     A     Well, I'm not sure what you have.  So I was able to

6  view when they initially came in the store, the time that

7  they -- the time that he left the store and when she was in the

8  store.

9     Q     At some point based upon what you saw and observed, was

10 an updated description sent out over the radio based on a

11 clothing description?

12    A     Yes, ma'am.

13    Q     At some time later, did you become aware that F.N.T.

14 unit had stopped Linwood Walden?

15    A     Yes, ma'am.

16    Q     Do you see Linwood Walden in the courtroom?

17    A     Yes, ma'am.

18    Q     Can you please point him out for the Court?

19    A     Right here.

20    Q     You're indicating the defendant in the tan shirt?

21    A     Yes.

22    Q     During your interactions with Mr. Walden that evening,

23 did you have occasion to take a photograph of him?

24    A     Yes.

25    Q     I'm going to show you what's been marked for

Jones - Direct                                    101

1   identification as Commonwealth's Exhibit No. 6.  Do these top

2   two photographs accurately portray the defendant's appearance on

3   the evening of August 31st, 2019?

4        A    Yes, ma'am.

5        Q    Did you also during the course of the evening receive

6   items from Officer Khalid Harris?

7        A    Yes.

8        Q    And were you able to photograph those items?

9        A    Yes.

10        Q    I'm going to show you Commonwealth's Exhibit 6 again.

11   I'm going to point you first to the middle left photograph.  Did

12   you take that photograph?

13        A    Yes, ma'am.

14        Q    Is that the shirt you received from Officer Harris?

15        A    Yes, ma'am.

16        Q    What about the photograph of the cigarettes?

17        A    Yes, ma'am.

18        Q    You took that as well?

19        A    I did.

20        Q    Now, pointing you towards the bottom two photographs,

21   did you take those?

22        A    Yes, ma'am, I did.

23        Q    Did they accurately depict the currency of -- that you

24   received from Officer Harris that had been found on the

25   defendant's person?

Jones - Direct                                          102

1      A    Yes, ma'am.

2      Q    Did you make note of the denominations of the currency

3   when you took those photographs?

4      A    Yes, ma'am.

5      Q    And how many of each denomination were there?

6      A    There were ten $10 bills and one $20 bill.

7           MS. PETTIT:  Your Honor, at this time I would move

8   to introduce the last board as Commonwealth's Exhibit 6.

9           THE COURT:  Any objection?

10          MR. EFIRD:  No objection.

11          THE COURT:  The Court will receive into evidence

12   Exhibit No. 6, a series of six photographs with the two at the

13   top depicting Mr. Walden.  There's one of the t-shirt that he

14   was allegedly wearing, cigarettes that were found on his person

15   the bottom two photographs on the left side shows the

16   denominations of $10 bills.  I believe there are ten, and I

17   believe there is one $20 bill.

18     Q    Now, I'm going to show you Commonwealth's Exhibit 5.

19   Did you also at some time receive what's been referred to as

20   either a purse or a makeup bag from Officer Hartley?

21     A    Yes, ma'am.

22     Q    And did you also through means of these photographs

23   document the contents of that purse?

24     A    Yes, ma'am.

25     Q    I'm going to refer you to the bottom seven photographs

Jones - Cross                                                    103

1   here.  Are those photos a fair and accurate representation of

2   the items removed from the purse or makeup bag pictured in the

3   top three photographs?

4        A    Yes, ma'am.

5        Q    Those are the items you received from Officer Hartley?

6        A    Yes, ma'am.

7        Q    I don't have any questions, Detective Jones.  If you

8   could answer any defense counsel or the Court has for you.

9        A    Yes, ma'am.

10                 THE COURT:  Mr. Efird?

11                 MR. EFIRD:  Yes, sir.

12                      CROSS-EXAMINATION

13  BY MR. EFIRD:

14       Q    Good afternoon, Detective Jones.

15       A    Good afternoon.

16       Q    You work out of First Precinct; is that correct?

17       A    Yes, sir.

18       Q    You were at First Precinct when you got this call?

19       A    Yes, sir.

20       Q    So you were able to actually just literally cross the

21  street, and you were on the crime scene?

22       A    Yes, sir.

23       Q    So it's fair to say that within a minute of getting the

24  notification, you were on the scene?

25       A    Yes, sir.

Jones - Cross                                    104

1      Q      And the two of -- alleged victims were there --

2      A      Yes, sir.

3      Q      -- correct?  Were they standing in front of Ocean

4   Grocery?

5      A      Yes, sir.

6      Q      Did you speak with them before you went into the

7   grocery or did you immediately go into the grocery?

8      A      I initially tried to get a description of the suspect

9   from the -- Caitlyn -- yes, and asked her what happened to her.

10     Q      Okay.  And then after speaking with them, you did go

11  into the grocery store, correct?

12     A      Yes.

13     Q      You spoke to the clerk?

14     A      Yes.

15     Q      And the clerk was able to provide you with actual video

16  from what happened in front of that ATM?

17     A      Correct.

18     Q      You reviewed that, correct?

19     A      Yes.

20     Q      And you actually used your phone to record what you

21  were seeing?

22     A      Well, I think I tried to use my phone and the

23  officer -- another officer used his phone as well.

24     Q      Did you -- were you able to review the recording that

25  you made?

Jones - Cross                                          105

1    A    I was -- reviewed the recording, yes.

2    Q    And you turned that over to the Commonwealth --

3    A    Yes.

4    Q    -- attorney?  Okay.  Now, you never did obtain the

5    actual video from the store?

6    A    No.

7    Q    And that -- to your knowledge, that video no longer

8    exists; it's been destroyed?

9    A    No.  It was never recorded from the actual

10   surveillance.

11   Q    Okay.  When you spoke with the two alleged victims, you

12   never searched their person, did you?

13   A    I didn't, no.

14   Q    You did not?

15   A    No.

16   Q    Okay.  You didn't see anybody else search them?

17   A    No.

18   Q    You didn't direct anybody else to do that?

19   A    No.

20   Q    You never searched the car they were in?

21   A    I didn't search the car.  I went into the car, but I

22   didn't search the car.

23   Q    Now, when you approached the area -- and, again, you

24   got there within a minute or two, at least, of when the call

25   came out -- their was numerous people outside, out and around,

Jones - Redirect                                        106

1   correct?

2      A    There was a couple of people, not numerous, about two

3   or three.

4      Q    About three?

5      A    Yes.

6      Q    And I'm talking -- I'm not talking about the alleged

7   victims or the store clerk, but there were other citizens out?

8      A    Correct.

9      Q    Okay.  Did you talk to them?  Did you interview them

10  about what they saw or what happened?

11     A    No, sir.

12     Q    Okay.

13          MR. EFIRD:  I don't have any other questions.

14          THE COURT:  Any redirect?

15          MS. PETTIT:  Very briefly.

16                  REDIRECT EXAMINATION

17  BY MS. PETTIT:

18     Q    Did you attempt to obtain the full copy of the

19  surveillance video from the Ocean Grocery?

20     A    I did.  Unfortunately, the clerk, store owner was out

21  on a wedding, I was not able to get it.  He was the only one who

22  knows the password and knows how to download the video footage.

23     Q    But you were able to watch it that evening physically

24  while you were in the store?

25     A    Correct.

Jones - Redirect                                           107

1     Q     And was that consistent with what you were told about

2     how the robbery occurred?

3     A     Exactly, yes.

4                 MS. PETTIT:  Thank you.  I don't have any other

5     questions.

6                 THE COURT:  Ma'am, you may step down from the

7     witness stand.  May this witness be excused?

8                 MS. PETTIT:  I would ask that Detective Jones

9     remain.

10                THE COURT:  Ma'am, if you could remain in the

11    hallway and not discuss your testimony with anyone.

12                THE WITNESS:  Yes, sir.

13                THE COURT:  Thank you.

14                MS. PETTIT:  And that is the Commonwealth's case

15    in chief.

16                THE COURT:  All right.  Any motions?

17                MS. FEINMAN:  Yes, Your Honor.  At this point we

18    would have a motion to strike the charges.

19                THE COURT:  Yes, ma'am.

20                MS. FEINMAN:  If I may approach the podium?

21                THE COURT:  Yes, ma'am.

22                MS. FEINMAN:  So as the Court's aware, Mr. Walden

23    stands charged with four counts of use of a firearm in

24    commission of a felony, which is that he did display in a

25    threatening manner, use or attempt to use a firearm and that

108

1   this display, use, or attempted use occurred while he was

2   committing or attempting to commit in this case a robbery or

3   abduction.

4           He also stands charged with abduction by force,

5   threat, or intimidation; that he took or transported, hid

6   Caitlyn and Sonya with the intent to deprive them of liberty but

7   also with the intent to obtain money or other benefit of value

8   without legal justification or cause.

9           In addition to that, as the Court's aware, he's

10  charged with robbery.  He intended to steal, stole from the

11  person or in their presence, against their will and it was

12  accomplished by violence, force, or threat against both Caitlyn

13  and Sonya, Your Honor, just so that we're on the same page about

14  the charges.

15          First, I'm going to address the use of a firearm

16  charge, which, of course, if either of the robbery or abduction

17  charges fall, then the use of a firearm charge that accompanies

18  that underlying offense would fall as well.  However, I do

19  believe that the Commonwealth has failed even at this stage to

20  prove the necessary elements for a firearm to be used and for

21  that conviction.

22          And to support that, Your Honor, I will start with

23  Holloman v. Commonwealth, and this is a Virginia Supreme Court

24  case from 1980.  It's, I believe, the first time that a Court

25  addresses what counts as a firearm for the purposes of this

109

1    specific code section.

2              And in that case they note that penal statutes

3    must be strictly construed against the Commonwealth and go on to

4    discuss the purpose of this code section.  Ultimately, Your

5    Honor, they decided that it's a firearm or something that gives

6    the appearance of having the capability to fire; that it doesn't

7    have to be a working gun if it appears to have the capability of

8    firing, and that is sufficient for a conviction for use of a

9    firearm.

10             From there, we go to Yarborough v. Commonwealth,

11   which is a 1994 case, Your Honor.  And, Yarborough, in this case

12   a person says, "This is a stickup."  They say that twice.

13   There's something in their pocket that the victim in that case

14   believes to be a firearm, but no gun is actually found or seen

15   and it later turn's out that the defendant in this case had a

16   can in their pocket, that there was, in fact, no firearm.

17             Yarborough goes on to say actual possession of a

18   firearm is a necessary element for the use of a firearm, and

19   that remains true today.  Now, actual possession can be proven

20   by circumstantial evidence, and that can include statements.

21   However, there still must be an actual possession of a firearm,

22   and the burden is on the Commonwealth to establish that

23   possession.

24             From Yarborough we go to Startin v. Commonwealth,

25   which is a 2011 Supreme Court of Virginia case.  And what this

110

 1    case focuses on is that a replica firearm counts.  This has the

 2    appearance -- this object has the appearance of a firearm.  It's

 3    not up to the victim to determine whether a gun actually fired

 4    or it can count as a firearm under this statute if it's an

 5    object that gives the appearance of being a firearm.

 6              And Startin confirms that there is no dispute,

 7    that the defendant must actually possess a firearm that is a

 8    necessary element, and it discusses Holloman again, that it

 9    either has to be capable of firing or giving the appearance of

10    being capable of firing.

11              And from there, Your Honor, we move on to Barney

12    v. Commonwealth, which was a Virginia court of appeals decision

13    that was decided January 8 of 2019.  This case goes on to

14    explain -- it walks through the history of use of firearm

15    charges in Virginia and the evolution of case law around this

16    offense.

17              THE COURT:  I'm sorry.  What was the name again?

18              MS. FEINMAN:  Barney v. Commonwealth.  And what

19    this case points out after examining the case history throughout

20    Virginia, is that the Commonwealth must prove that there is an

21    actual firearm or that individual possessed an object that gave

22    the appearance of a firearm.  Now, this can be proven by direct

23    or circumstantial evidence, but the court goes on to note that

24    this is a different burden of proof than required for a robbery

25    where the victim's perception is sufficient evidence of the