1  violence or intimidation necessary for a robbery, and that's a

2  different standard than use of a firearm.

3         And, Your Honor, the cases that discusses -- there

4  are cases that have talked about when no gun is seen, but a

5  firearm has been threatened; that they have made statements

6  implying that there may be a gun present.  But, Your Honor,

7  those cases discuss a pointing motion with a hand, someone

8  pointing to a pocket where they are indicating that they have a

9  firearm.

10        Those cases discuss a hand in a pocket that is

11  made to look like a firearm.  These cases discuss and object,

12  and it's not that the alleged -- the victims in these other

13  cases have to see an actual firearm.  They don't, but they

14  need -- they point to an object and gestures that are

15  intentionally done to lead the victim in the case to believe

16  that there is a firearm.  We don't have that in this case.

17        Your Honor, you heard Caitlyn and Sonya both

18  testify that they never saw a gun.  They didn't see anything

19  that appeared to be a gun, and you heard Caitlyn testify that

20  she never saw a gun.  He didn't show them a gun, and that she

21  didn't think he had a gun and that, given these facts, Your

22  Honor, there's no indication that there was intentional gestures

23  on his part.  He wasn't holding his hand in his pocket, shaking

24  his fist saying, oh, this is a firearm.

25        There is nothing coupled with this statement,

1 again, taken in the light most favorable to the Commonwealth,

2 there were statements that he threatened to shoot, but there are

3 no accompanying gestures that would support that. At this point

4 it is merely a statement.

5        And I would say, based on that, I would ask the

6 Court to strike the four use of firearm charges that the

7 Commonwealth put on, even a prima facie case that there was a

8 use of a firearm in this case.

9        Your Honor, to address the abduction charges, I

10 would argue that the Commonwealth has not met any of the

11 elements at this point in time that as far as the abduction

12 goes, something that case law discusses in some depth in that

13 it -- the alleged abduction can't be incidental to the other

14 crime that is taking place or another crime if there is another

15 crime taking place.

16        I would argue, first of all, that any detention of

17 Sonya is incidental to a detention of Caitlyn, if a detention is

18 found of Caitlyn, first of all. Sonya is the passenger in the

19 vehicle. She was never ordered to get in the vehicle. He --

20 Mr. Walden -- taking their testimony at face value, according to

21 the Commonwealth's evidence -- told Caitlyn to drive, told her

22 where to park, told her where to go, and Sonya was more or less

23 along for the ride.

24        However, Your Honor, case law talks about one of

25 the factors for abduction is that the movement must -- and this

 1   is an "and." This is not an "or" bracket. It's not

 2   disjunctive, Your Honor -- that the movement must make them less

 3   safe. In this case the testimony that we heard from the -- from

 4   Sonya and Caitlyn was that they were driven ultimately to a busy

 5   street. There were businesses on that street. There were

 6   people all over. There are cars driving by, and they are half a

 7   block from the police precinct.

 8        If anything, that alleged asportation of those two

 9   individuals would have made them safer by taking them to a

10   public location. So, based on that, Your Honor, I would ask the

11   Court to strike the abduction charges.

12        And, Your Honor, to address the robbery charges,

13   again, according to the Commonwealth's own evidence, these two

14   women were for much of this incident in public surrounded by

15   people, surrounded by other vehicles. They had multiple chances

16   to indicate they were in distress, to attempt to flee.

17        I would point out the point in time where Mr.

18   Walden is standing outside of the vehicle, Caitlyn is across the

19   street. She testified there were about three people in front of

20   the A.B.C store where she was standing.

21        I would say that that does not square up with a

22   robbery and that, given that evidence, and based on the

23   witnesses' credibility, that the Court find that there's not

24   sufficient evidence to sustain the charge of robbery and that,

25   based on their credibility, that the Court would strike all

1  these charges at this point.

2          THE COURT: All right. Ms. Pettit?

3          MS. PETTIT: The Commonwealth is asking the Court

4  to deny the defendant's motion to strike. Of course, at this

5  point, all inferences flow to the Commonwealth. I'm going to

6  start in reverse order. I think that's probably the easiest way

7  to decide these.

8          With regards to the robbery, the testimony, which

9  was very consistent, was that this defendant got in the car,

10  made threats to shoot both Caïtlyn and Sonya, threatened their

11  livelihood -- their lives. He demanded their property. He said

12  that if they didn't comply, they would be hurt. Both of them

13  very clearly testified that they were afraid for their lives.

14  They thought the defendant would hurt them if they did not

15  comply.

16          That is why they gave him their phones. That is

17  why they gave him the makeup bag, and that is why Caitlyn went

18  in and withdrew the $100 that the defendant also took from her.

19  So I would ask the Court, I think that's a very easy call, to

20  deny the motion to strike on the robbery charge.

21          The incidental detention doctrine under which an

22  abduction that doesn't require any restraint greater than that

23  which is required to complete the robbery is a doctrine that

24  applies only in an abduction by detention. What we have here is

25  an abduction by asportation. So there are two obviously

1  separate incidents.

2        The case law that the court considers, even when

3  it is an abduction by detention has looked at four factors that

4  it considers in determining whether an abduction is --

5  essentially merges with the underlying robbery, one of which is

6  the duration of the detention, if it's not much longer than the

7  amount of time required to complete the robbery.

8        Obviously, we don't have this here because

9  Caitlyn and Sonya were forced to go to multiple different

10  locations.  One of them is the existence of asportation.  You

11  know, there's a case where a clerk in a store is ordered to walk

12  ten feet to the register to get the money out of her register.

13  And the Court in that case said that that is an abduction that

14  merges into the robbery because it was a very slight distance,

15  and it was necessary in order for the clerk to get to the money.

16  That is not what we have here either.

17        The robbery of Caitlyn and Sonya are complete at

18  the point at which this defendant threatened to harm them and

19  take their personal property against their will.  So had they

20  never driven anywhere, we would have a completed robbery, and

21  instead they're forced to an alley, to the Ocean Grocery.

22  Caitlyn's forced to walk into the Ocean Grocery to the ATM.

23        The third factor, is there an abduction that is

24  separate and apart from the robbery?  Obviously, we do have that

25  here.  I would very much disagree that extending the amount of

1   time that you were in the car with someone who was threatening

2   that they will see their friend's brains splattered on the

3   sidewalk makes them safer, and I would be very surprised if

4   Caitlyn or Sonya told you that they felt safer because they

5   spent more time with the defendant.

6           There's the <u>Cardwell</u> case, and I have copies of

7   all of these if the Court would like for me to pass them up.

8   Cardwell is a Virginia Supreme Court case from 1994.  In that

9   case, the defendant robbed the victim, put the victim in a

10  vehicle, drove to another location, and then killed the victim.

11          The court of appeals -- I'm sorry -- the Supreme

12  Court of Virginia said that transporting the victim from the

13  scene of the robbery was separate and apart from the robbery and

14  greater than the restraint intrinsic in a robbery.  That takes

15  us to Phuong v. Commonwealth where a defendant and his

16  codefendant broke into a home.  They restrained the victim and

17  their daughter.  As the victim was tied up, they carried her

18  upstairs and then they robbed her.

19          They did not leave the house.  They simply went

20  from the downstairs to the upstairs where there were bedrooms.

21  The court says there that the detention there is greater than

22  the kind of restraint inherent in the act of robbery.

23  Asportation from one room to another is not an act inherent in

24  the crime of robbery and upheld the abduction conviction there.

25  Here we have a far greater asportation of the victims, and I

1  would ask the Court to deny the motion regarding the abduction.

2         With regard to conviction for use of a firearm,

3  and these I will certainly pass the cases up, in 1996 after the

4  Yarborough case, we have Elmore v. Commonwealth, which is from

5  the Virginia Court of Appeals.  It's 470 S.E.2d 588.  In Elmore,

6  the defendant robbed a bank with a note.  The note -- the

7  testimony regarding the note is that it mentioned a gun.  The

8  defendant pointed to his pocket.

9         The Court said that the evidence was sufficient to

10 convict use of a firearm in the commission of that robbery

11 because the note mentioned the gun and the defendant pointed at

12 his pocket and said that he didn't want to hurt anyone.  While

13 there was no testimony here that the defendant pointed at his

14 pocket, there was testimony that he had a washcloth over his

15 hand in a fashion that Sonya thought meant that he might be

16 covering up a firearm and there were multiple statements

17 regarding shooting someone, splattering brains onto the

18 sidewalk, all acts that would require the presence of a firearm

19 in order for the defendant to follow through.

20        In 2004, the Virginia Supreme Court in Powell v.

21 Commonwealth again affirmed a conviction where the defendant

22 said that he had a pistol.  He kept his hand in his pocket.  He

23 told the victims not to move and said nobody would get hurt.  No

24 one in that case saw a firearm.  The Court at that point said

25 that it's appropriate to consider the defendant's statements and

1 actions in determining whether he had a firearm at the time the
2 incident occurred.

3 And, finally, we have the Barney case that Ms.
4 Feinman mentioned in her argument. It is as recent as 2019. It
5 is an unpublished case, but also, I think, instructive for the
6 Court and certainly persuasive. The defendant in that case
7 conducted two robberies of Walgren's. In the first robbery,
8 Barney said that she provided a note that told the clerk to
9 provide money and to stay quiet if she wanted to live, Barney
10 made a motion like she had a weapon, but her hand never left her
11 pocket.

12 Barney goes to a second Walgren's where she said
13 that she had two guns and again kept her hand in her pocket.
14 Nobody ever saw a firearm in that case. That case was reversed
15 on other grounds, but specifically reversed for a retrial that
16 the Commonwealth be advised because the court specifically found
17 that the evidence was sufficient for a finding of guilt on a
18 conviction for use of a firearm in the commission of a felony.

19 So what these cases tell us is that, based upon
20 the defendant's own statements and the defendant's actions, one
21 can be convicted even when the victims did not specifically see
22 a firearm based upon their reasonable belief that the defendant
23 was in possession of a firearm at that time.

24 Part of the rationale behind that is that the
25 court, one -- the legislature, one, wants to criminalize the use

1   of a deadly weapon, but also the commission of violent crimes

2   through threats of a deadly weapon.  That's also in the case

3   that I passed up.  Even though notably different from cases

4   where someone indicates that they have a firearm then are found

5   with something other than a real gun, then we know that's what

6   they used.

7          We don't have that in that case.  Obviously, we

8   know that the purse or makeup bag that was taken from Sonya was

9   discarded.  The phones were discarded.  We don't know what else

10  the defendant discarded in between the time he ran out of the

11  Ocean Grocery and the time that he was ultimately searched by

12  Officer Harris some ten to 15 minutes later.  So we don't have a

13  can that we now know is what was used and then it wasn't

14  anything other than what this defendant said that it was, which

15  is a gun.

16         So particularly at this phase with all inferences

17  flowing to the Commonwealth, I would submit that the evidence is

18  sufficient.  I would ask the Court to deny the motion to strike.

19         THE COURT:  Let me ask you your understanding of

20  Powell.  I think that's the only -- is that the only case that

21  you have where the only -- there was a mentioning of a gun but

22  there was -- well, he had his hand in his pocket even in that

23  one.

24         MS. PETTIT:  He did have his hand in his pocket,

25  yes, sir.

1    THE COURT:  Okay.  So there's no case that you've
2  offered where the only evidence pertaining to a gun was just the
3  fact that there was a mentioning of a gun?
4    MS. PETTIT:  In all of them, the defendant at
5  least did have their hands in their pockets, yes.
6    THE COURT:  All right.  Thank you.  Anything else,
7  Ms. Feinman?
8    MS. FEINMAN:  Yes, Your Honor.  As the Court
9  rightfully pointed out in Powell, it's not just the statements.
10  There is an action.  What these cases consistently stand for is
11  a statement plus an action.  There is not an action in this
12  case.
13    I will tell the Court Holloman, which is the
14  origination of the Court's discussion, basically what counts as
15  a firearm.  I do have these cases.  I'll happily provide them to
16  the Court.  In Holloman, this is where it doesn't actually have
17  to fire.  It has to give the appearance of firing.  Here we're
18  talking about an object.  It was a BB gun.  The debate was over
19  the BB's are launched by a spring, not gun powder, did that
20  count?  And that does count as a firearm.
21    Yarborough v. Commonwealth is very strongly for
22  the fact that actual possession is a necessary element in this
23  case, and I'll provide this case as well.  The individual says
24  that this is a stickup twice, but has an object in their pocket
25  that the victim in the case believes to be a firearm.  However,

1  that wasn't found to be sufficient.  No gun was found; no gun

2  was seen.

3          In this case the Commonwealth has to exclude every

4  reasonable hypothesis and that the defendant's statement that

5  they have a firearm create mere suspicion that they do, in fact,

6  possess a firearm as is required by the statute.

7          Your Honor, then we go to Startin v. Commonwealth,

8  the 2011 Supreme Court of Virginia case, and this discusses that

9  it has to either be capable of firing or give the appearance of

10  being capable of firing.  This one deals with a commemorative

11  replica of a firearm.  In that case it is not capable of firing,

12  however, is sufficient.  So again, we have an object, not just

13  words.

14          And then Barney v. Commonwealth -- I do believe

15  this is published -- it can be found at 69 Virginia at 604, and

16  that case does discuss Powell and several other cases.  Again, a

17  threat plus a motion with the hand to a jacket pocket.  So,

18  again, as the Court rightfully pointed out, there is a threat

19  plus a motion, plus an object.

20          We don't have that in this case.  We have

21  statements at this point, to shoot.  There's no object.  There's

22  no pointing to a pocket.  There's no physical indication of a

23  weapon.  We're missing either the gesture or the object.  We

24  only have statements which create a mere suspicious that there

25  is a firearm in possession, but that's not sufficient.

1          So I would ask the Court to strike these charges.

2          THE COURT: All right. The Court will stand in

3    brief recess and be back very shortly.

4          (A recess is taken. Whereupon, the proceedings

5    continue as follows:)

6          THE COURT: All right. On the defense motion to

7    strike, we will start with the robbery first. I think clearly

8    there were threats of violence to both victims in this case. So

9    the motion is denied with respect to the robbery.

10         With respect to abduction, the traveling around in

11   a car went long past the actual robberies in this case. So I

12   think there's clearly been an asportation for abduction

13   purposes.

14         And, as far as the firearm charges are concerned,

15   that's where the Court takes a little pause. The only evidence

16   that the Court heard pertaining to a firearm was the fact that

17   he made -- insinuated he was going to shoot someone. I think

18   the word "shoot" was used. The case law seems to suggest that

19   there's at least some action whether it be making a reference to

20   your pocket or something, the only reference that could be

21   interpreted as something of that sort would be when the wash

22   cloth was alleged by, I believe, Ms. Sheldon to be in the left

23   hand of Mr. Walden. She said she saw a wash cloth over his left

24   hand.

25         We also know that that wash cloth apparently was

1  on his head at some point in time, but she never indicated that

2  he made a motion or a gesture to suggest that it was a gun under

3  there.  What the Court heard her say was she just made the

4  assumption that it could be a firearm under there, which is

5  different than my understanding of the case law itself.

6          Based on that, the Court will strike all four

7  firearm charges.

8          All right.  Does the defense wish to put on any

9  evidence?

10         MS. FEINMAN:  Yes, sir, Your Honor.  We will call

11 Mr. Linwood Walden.

12         LINWOOD WALDEN, called on his own behalf, first

13 being duly sworn, testifies as follows:

14         THE COURT:  Mr. Walden, if you would answer any

15 questions that the attorneys may have for you.

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Your witness, Ms. Feinman.

18         MS. FEINMAN:  Thank you, Your Honor.

19                   DIRECT EXAMINATION

20 BY MS. FEINMAN:

21     Q    Good afternoon.

22     A    How are you doing?

23     Q    Are you Linwood Walden?

24     A    Yes, ma'am.

25     Q    And you have been present in court today; is that

1  right?

2      A    Yes, ma'am.

3      Q    And you're aware that we are talking today about some

4  events that happened on August 31 --

5      A    Yes, ma'am.

6      Q    -- 2019?  All right.  So where I would like to start

7  is -- we'll start with the beginning of the day.  Where did you

8  wake up at that morning?

9      A    I woke up on the south side of Richmond.

10     Q    And at some point did you go to Church Hill?

11     A    Yes, ma'am.  I did.

12     Q    Tell me about that.  Where did you go?

13     A    I went to my Aunt Michelle's house.  She had a cookout

14  that day for the family.  So I got there about four, and we were

15  setting out preparing for the family to come over and do what

16  people do at cookouts.

17     Q    Where was that cookout located?

18     A    Right around O Street in Church Hill.

19     Q    At some point you left that cookout; is that right?

20     A    Yes, ma'am.  I did.

21     Q    Do you know when you left the cookout?

22     A    I can't tell you the exact time.  I know it was

23  nighttime.

24     Q    So it was already dark outside?

25     A    Yes, ma'am.

1     Q     Where were you headed?

2     A     I was headed towards Creighton Court with my son and

3  the mother of my son.

4     Q     And how were you traveling towards Creighton?

5     A     I was walking.

6     Q     Are you familiar with Ocean Grocery?

7     A     Yes, ma'am.

8     Q     When you were walking from your aunt's house toward

9  Creighton, how close is that to Ocean grocery?

10    A     That's probably two blocks away, two or three blocks

11  away at the most.

12    Q     And at some point on your walk, did you see someone

13  that you knew?

14    A     Yeah.  I seen at that time my homeboy.  His name is

15  Mark.

16    Q     What happened when you saw Mark?

17    A     I seen Mark.  He had walked up on me, asked me was I

18  straight, by meaning did I have any drugs on me.  I told him

19  yes.

20    Q     All right.  Where were you when you saw Mark?

21    A     It was a block -- right down Church Hill down the

22  street from Ocean Groceries, about a block or two away.

23    Q     All right.  And so after you said that you were

24  straight, and I think you said that that meant you had drugs on

25  you.  Is that what that meant?

1      A    Yes, ma'am.

2      Q    After you said that, what happened?

3      A    He told me he had somebody that needed some drugs.  So

4    I said, look, I got to make a stop.  Where are you all going to

5    be at?  Where are you all going to be at?  He told me Davinci's.

6    (Undecipherable) --

7           THE COURT:  I'm sorry.  He said what, sir?

8           THE WITNESS:  He held on to them for me.  I had to make

9    another stop before I went there.

10          THE COURT:  He held on to the drugs for you?

11          THE WITNESS:  No, no, no. He said the people.

12          THE COURT:  Oh, okay.

13     Q    So you made a plan to meet with Mark and the people at

14   Davinci's?

15     A    Yes, ma'am.

16     Q    And the people weren't there when you made this plan

17   with Mark?

18     A    No.

19     Q    All right.  So at some point did you go to the

20   Davinci's?

21     A    Yes, ma'am.

22     Q    What happened when you got to Davinci's?

23     A    When I got to Davinci's Mark was already in this store.

24   Caitlyn was already in the store awaiting at the register there

25   I went on inside the door, and I was just waiting and

1   conversated, you know what I'm saying.  I ended up getting her

2   attention, let her know it was me.

3       Q    And how did you get her attention?  I said Kay Kay.  I

4   call her Kay Kay.  I know her.  I know her since was like, 16.

5   Met her by the police by VCU.

6       Q    So how do you know her?

7       A    My homeboy, Chris, this is like two and a half years

8   ago, he's younger than me, like a caucasian dude.  We was there

9   one day.  We were kicking it.  She was there.  And he liked her.

10  I made him go get her number, you know what I mean?  So he got

11  her number, I mean.  At the time it was -- I don't want to talk

12  to much.  So just continue.

13      Q    So you had met her once several years ago?  Is that

14  what you're saying?

15      A    Yes, she was, like, 16 or something like that.

16      Q    And when you saw her in Davinci's, you recognized her?

17      A    Yes.

18      Q    So you two spoke briefly in Davinci's?

19      A    Yes.

20      Q    All right and then at some point you two left

21  Davinci's; is that right?

22      A    Right.

23      Q    Tell me how you guys left?

24      A    She was walking out the door.  I held the door open for

25  her, and she had stepped out when I stepped out.  She went

1   across the street.  I was going to cross with her.  A car was

2   coming so I waited.

3        Q    So she crossed the street, you waited --

4        A    Right.

5        Q    -- and then you crossed after her?

6        A    Right.  She got into to car, and I got in the car.  I

7   got in the back seat of the car.

8        Q    Was someone else in the car.

9        A    Yes, her friend.  I don't know her.

10       Q    You didn't know the friend?

11       A    No.

12       Q    After you guys get in the car, what happened.

13       A    We was sitting in the car and we go over --

14       Q    What do you mean when you say you go over --

15       A    Going over drugs going to be and how much.

16       Q    So it was your understanding she wanted to buy drugs

17  from you?

18       A    Absolutely.

19       Q    What did she want to buy?

20       A    I had $30 of something and then I had $30 of something

21  else.  I knew they were green, and when you're from the street

22  like me, and you have a person doesn't have a scale, they don't

23  know nothing about the streets so I charged her extra.  So I

24  charged her a hundred dollars.  You know what I'm saying?

25       Q    And that hundred dollars, what were you charging her

1    $100 for?

2       A    Because she --

3       Q    Not why.  It was for drugs?

4       A    Yes.

5       Q    Okay.  And at some point did drugs change hands?

6       A    Yes.

7       Q    Tell me about that.

8       A    Well, when we pulled up to make the left, my homeboy,

9    Mark waved the car there --

10      Q    Well, let me -- had drugs changed hands at this point?

11      A    Not yet.  Not until we -- we made the left turn.

12      Q    So just so we're all clear:  You were sitting in the

13   car talking business?

14      A    Right.

15      Q    Then she pulled out?

16      A    Right.

17      Q    Makes a left turn?

18      A    Right.

19      Q    Then someone -- you're saying someone flagged her down?

20      A    Yeah.

21      Q    What happened?

22      A    Then Mark flagged the car down, and upon him flagging

23   the car down, I handed the drugs to Sonya cause Caitlyn driving.

24      Q    Okay.

25      A    So I didn't want her to let Mark in the car because

1   he's heroin addict.  You know what I'm saying.  And she let him

2   in the car.

3        Q     So Caitlyn pulled over and let him in?

4        A     Yeah.  She stopped, making a left, you know what I

5   mean?

6        Q     So what happened after Mark gets in the car?

7        A     Once Mark got in the car about five seconds, ten

8   seconds of him being in the car, he starts the violence.  I

9   mean --

10       Q     What did he do?

11       A     Eventually from the start he told her to pull into the

12  alley.  And I wanted him to get out of the car.  You know what

13  I'm saying?  I felt like if I got out of the car more would

14  happen.  I stayed.  I know it sound stupid, but I stayed in the

15  car.  You know what I mean?  So he told them to pull into the

16  driveway.  Like she said, he requested the bag from her.  She

17  didn't want to give it up.  So he reached across himself which

18  is the money she already had in the console.  He grabbed that.

19  He said something else to Caitlyn.  He smacked her twice like

20  she said.

21       Q     Okay.  So you're saying that that did happen but Mark

22  had done that, and you were in the car as well?

23       A     Yes, I was.

24       Q     And you stayed in the car?

25       A     Yes, I did.

1     Q    All right.  And then what did Mark do after that?

2     A    Mark got out of the car and left.  After they was

3  distraught.  I can't believe that shit happened.  Oh, my God.  I

4  know that I've been robbed.

5     Q    All right.  So then after he got out of the car,

6  they're distraught, what do you do?

7     A    I still want my money, you know what I'm saying?

8     Q    That's because Sonya already had the drugs?

9     A    Yeah.  She already had the drugs.  So Caitlyn said you

10 know just don't worry about it.  I have money on my card.  Where

11 is the closest store?  So I told her to go over to Ocean

12 Groceries.  So we went.

13    Q    All right.  And then she drove around to Ocean Grocery?

14    A    Yes.

15    Q    And what happened once she drove around?  She parked;

16 is that right?

17    A    Yes.  She parked the car from -- at the video store.

18 She parked across from the liquor store.  She got out.  I don't

19 know why she got out and walked up the street, but that's what

20 she did.  So I got out --

21    Q    Let me pause you there for a second.  You referenced a

22 video.

23         MS. FEINMAN:  If I may, Your Honor, if I can recall

24 this is -- this is Exhibit 1.

25         (The video was played.)

1    Q    Mr. Walden, do you recognize this video?

2    A    Yes.

3         MS. FEINMAN:  If we could just note for the record

4    the time stamp on the video as it's starting now is 8:50 p.m.

5    and 41 seconds.

6         THE COURT:  All right.

7         MS FEINMAN:  And I believe the 41-second mark is

8    where we started the video previously as well.

9    Q    So, as it's shown now, do you recognize this video?

10   A    Absolutely.  Absolutely.

11   Q    So Ocean Grocery is over here?

12   A    Yes, ma'am.

13   Q    And the liquor store you talked about is over here to

14   the left?

15   A    Yes, ma'am.

16   Q    And the angle that we're watching this from is from the

17   First Precinct; is that correct?

18   A    Absolutely.

19        THE COURT:  Can you see that okay, sir?

20        THE DEFENDANT:  Yes, sir.

21   Q    So this vehicle, do you recognize that vehicle that

22   pulled around?

23   A    Yes, ma'am.

24   Q    All right.  And is that the vehicle that you were in

25   with Caitlyn driving?

1        A     Absolutely.

2        Q     All right.  So --

3              (The video was played.)

4        Q     Okay.  So that's the vehicle that you just testified

5    that you recognized?

6        A     Yes, ma'am.

7        Q     So what's happening here?

8        A     We're parking the car.

9        Q     So what happened after you parked the car?

10       A     She gets out of the car and walking across the street

11   toward A.B.C. store.  So I get out of the car and smoke a

12   cigarette.

13       Q     All right.  So right now, she's not out of the car yet;

14   is that right?

15       A     Right.

16       Q     Do you guys speak while you're out there?

17       A     No.

18       Q     Okay.  So is that Caitlyn getting out of the vehicle

19   right there?

20       A     Yes, ma'am.

21       Q     Where are you at this point?

22       A     I got out -- I was still sitting.

23       Q     So I think you said at this point in time she asked for

24   you to take her to an ATM?

25       A     She told me to take her.

1    Q    Prior to this?

2    A    Yes.

3    Q    You drove here to find an ATM?

4    A    Yes.

5    Q    All right.

6    A    The Ocean Grocery store.

7    Q    And that's Caitlyn stopped in the street; is that

8    right?

9    A    Yes.

10   Q    So that white right there, that's you?

11   A    Yeah.  I'm at the back of the car smoking a cigarette.

12   Q    Are you in the car or out of car?

13   A    I'm out of the car.

14   Q    And so you just wait there while she's crossing the

15   street?

16   A    Right.  Then she walked back up to me and asked me if

17   I'm ready.  I said yeah.  So --

18   Q    What did she ask you there?

19   A    Was I ready to go in the store.

20   Q    So then at this point you two -- that's you two?

21   A    Uh-huh.

22   Q    That's you walking down the sidewalk?

23   A    Yes.

24   Q    And the goal of that walk, you and Caitlyn had

25   discussed going into Ocean Grocery to use their ATM?

1    A    Absolutely.

2              MS. PETTIT:  At this point, I'm going to object to

3    the leading.

4              THE COURT:  Sustained.

5              MS. FEINMAN:  And I would just add he's previously

6    testified that that's why they were going into that store.

7    Q    All right.  So what's happening now that you're off the

8    screen?

9    A    Now that I'm on screen, she handed me a fanny pack.

10   The fanny pack, I don't know what it had in it, but it felt

11   like something.  But she handed me the bag.  I'm holding a pack

12   of cigarettes for her. (Undecipherable) up around the store.

13   I'm putting stuff on the counter, you know, cigarettes other

14   stuff like that.

15   Q    All right.  So that's -- all that's going on right now.

16   you're walking around the store, and then I think you said you

17   eventually went up behind her?

18   A    Yes.

19   Q    She asked you to hold the fanny pack?

20   A    It was a black -- it was the type of fanny pack with

21   the strap it just -- the fanny pack.

22   Q    Is that the item that's been described today --

23   A    Yes.

24   Q    -- as a makeup bag?

25   A    Yes, ma'am.

1      Q    So at some point you're going to exit the store; is

2   that right?

3      A    Yes, ma'am.

4      Q    All right.   When -- after -- tell me what happens at

5   the ATM?   What did she do?

6      A    At the ATM she's talking to people. I finished putting

7   stuff on the counter.   Then, I'm like, you know, I want to

8   always -- we got cigarettes.   I was going to get me a drink to

9   take to the cookout.   So I stand behind her.   She get her money

10  out of the ATM hand it to me.   (Undecipherable) And if you're

11  from the streets like me, I'm not going to stick around.   I

12  didn't give her back her fanny pack.   That's why I ended up

13  throwing her fanny pack.   I'm not going to lie.   I threw it.

14  (Undecipherable) that if you know anything about the hood or the

15  street, she owed me $100 for what I have her --

16            MS. PETTIT:   Your Honor, at this point I'm going

17  to object.   This answer's not responsive to any question.

18            THE COURT:   That's sustained.

19      Q    All right.

20      A    I apologize.

21      Q    So you're standing at the ATM with her, and you -- why

22  did she withdraw $100?

23            MS. PETTIT:   Objection.   Calls for speculation

24  unless he -- unless he asked her to.

25            THE COURT:   Well, can you lay a foundation and see

1  if he has knowledge as to why?

2           MS. FEINMAN:  Yes, sir.

3      Q    So you were at the ATM with Caitlyn.

4      A    Right.

5      Q    And you had previously testified that you had had

6  discussions about going to the ATM with Caitlyn.

7      A    Right.

8           MS. PETTIT:  Your Honor, I'm not trying to be

9  obstructionist, but I do, again, have to object to the leading

10 because it's mostly just becoming testimony.

11          THE COURT:  Sustained.

12          THE WITNESS:  Well --

13     Q    I'm sorry.  I have to ask you a question first.

14     A    Oh.  I'm sorry.

15     Q    That's all right.  That's what we're here for.  So you

16 had previously testified that there was a drug deal.

17     A    Yes.

18     Q    What was the amount she was to going pay you?

19     A    A hundred dollars.

20     Q    Then she had asked you where an ATM was?

21     A    Right.

22     Q    So what was your understanding why you were at the ATM?

23     A    To get the hundred dollars.

24     Q    Was the hundred dollars -- did she withdraw a hundred

25 dollars?

1      A     Yes, ma'am.  She did.

2      Q     And you saw that hundred dollars coming out of the ATM?

3      A     Yes, ma'am.  I did.

4      Q     And what happened to that hundred dollars?

5      A     She put it in my hand.  I put it in my pocket, went out

6 the door.

7      Q     When you went out of the store, what happened to the

8 fanny pack?

9      A     I was so wanting to get away that I had the fanny pack

10 in my hand.

11     Q     So you left the store with the fanny pack?

12     A     Yes.

13     Q     So I paused the video right here.  Do you recognize the

14 person in the white?

15     A     That is me.

16     Q     That's you?  And is this you exiting the store?

17     A     Yes, ma'am.

18     Q     When you go down that alley, do you know where that

19 area is?

20     A     Yes.

21     Q     How far did you take the fanny pack?

22     A     Probably about five minutes -- not even two minutes.

23     Q     And then you threw the fanny pack?

24     A     Yes, I did.

25     Q     All right.  And why did you throw it?

1      A      Because it was -- I had no need for it.  I just wanted

2   what was mine, which was the hundred dollars, you know, for the

3   drugs.  And I was trying to explain was, you know what I'm

4   saying, them phones on the streets you get a lot of money for

5   it, more than a hundred dollars cost.

6      Q      Did you know there were phones in those bags?

7      A      Yes, I did.

8      Q      Did you keep those phones?

9      A      No, I did not.

10     Q      All right.  At some point were you approached by law

11  enforcement?

12     A      Yes, ma'am.  I was.

13     Q      Let's see.  Those officers that approached you, can you

14  describe their appearance, what they were wearing?

15     A      They were wearing police uniforms.

16     Q      Did they have flashlights?

17     A      Yes, ma'am.

18     Q      When they approached you, did you run away?

19     A      No, ma'am.  I didn't.

20     Q      What did you do?

21     A      I did what they asked me to do, stop, come here, you

22  know, basically just do what the law asked.

23     Q      Did they search you?

24     A      They told me to empty out my pockets.

25     Q      Did you empty out your pockets?

1    A    Yes, ma'am, I did.

2    Q    What was in your pockets?

3    A    I had my pack of cigarettes.  I had a -- some other

4  pack of cigarettes, because I had two.  I had the money she had

5  gave me, and that's about it.

6    Q    And what did the -- how many times -- did you throw

7  something?

8    A    Yes.  I ended up throwing down my cigarettes pack

9  because I had something of use in there and I also had other

10 drugs in it, I mean, more drugs in it.  So I threw, which I did

11 tell the officer what it was in it.  He said don't worry about

12 it.  Get it off of you.  I throw it.

13   Q    Did the officer tell you to throw it?

14   A    No.

15   Q    Did you know whether he saw you throw it?

16   A    He told me to throw it right to his face.

17   Q    And then at some point did you have a conversation

18 about possibly becoming an informant?

19   A    Yes, ma'am.  I did.

20   Q    Tell me about that.

21   A    He was, did you stuff is like -- you here take the

22 number.  You know, can, you know, need us hear (Undecipherable)

23 so he gives me the number, put in my pocket there as well

24 because -- I put it in my pocket.  He let me go.

25   Q    Where you interested in becoming an informant?

1        A    No.

2        Q    Why not?

3             MS. PETTIT:  I'm going to object for the

4    relevance.

5             THE COURT:  Relevance.

6             MS. FEINMAN:  Your Honor, I think I would go back

7    to what was testified to earlier.  This will go to Mr. Walden's

8    state of mind.  I strongly anticipate the Commonwealth

9    introducing other statements of Mr. Walden.  This is frankly his

10   chance to testify about that.  Also, I think it would go to his

11   demeanor, his knowledge of guilt related to this offense that he

12   was so open with the law enforcement officer.

13            MS. PETTIT:  In that case it seems to me that she

14   could simply ask him how that conversation impacted his state of

15   mind or demeanor or approached the conversation rather than -- I

16   think what we're getting at now, which is irrelevant.  So until

17   we get to a point that he says that somehow that conversation or

18   a conversation he had earlier with police impacted what he told

19   police, I would submit that it remains irrelevant.

20            THE COURT:  I agree.  All right.

21       Q    And did that conversation with law enforcement impact

22   your state of mind during later interactions with law

23   enforcement?

24       A    Yeah.

25       Q    How did it do that?

1       A    Okay.  If you tell something of the street -- and I

2   don't mean keep -- if you tell something on the street where I

3   come from, you be killed.  Straight up.  You get killed.  If you

4   don't get killed, people come to see you get killed.  Your

5   family, your daughter, son.  Man, go ahead.

6       Q    And so that is how this conversation impacted you?

7       A    Yeah.

8       Q    I don't have any further questions.  If you can answer

9   any questions for the Commonwealth or the Court.

10              THE COURT:  Ms. Pettit.

11                  CROSS-EXAMINATION

12  BY MS. PETTIT:

13      Q    Good afternoon, Mr. Walden.  How are you doing?

14      A    How you doing?

15      Q    All right.  Now, I just want to start with you first on

16  a couple things that I think we all agree on.  We all agree you

17  took the hundred dollars from Caitlyn inside of the Ocean

18  Grocery?

19      A    I didn't take it.  It was given to me.

20      Q    Do you recall an interview with Detective Jones?

21      A    Yes.

22      Q    Do you recall telling her that you took the money

23  straight from the ATM?

24      A    I was intoxicated at the time.  Maybe so.  Maybe I did.

25      Q    In fact, you recall telling her that several times?

1      A    Maybe so.  I was intoxicated.

2      Q    And you would acknowledge that you took Sonya's

3  cigarettes?

4      A    I didn't take them.  I was asked to hold them.

5      Q    Why would Sonya need you to hold her cigarettes when

6  she stayed in the car?

7      A    She didn't ask me.  Caitlin asked me.  Caitlyn had the

8  fanny pack.  She had the cigarettes.  That's how I ended up with

9  that before we went into the store.

10     Q    So were the cigarettes inside of what you're calling

11 the fanny pack?

12     A    Yes.

13     Q    So is it your testimony that you opened the fanny pack

14 up, took some items out of it and kept what you wanted?

15     A    I wouldn't say I kept what I wanted.  I took the

16 cigarette out of it.

17     Q    You Kept Sonya's cigarettes, right?

18     A    (No response.)

19     Q    So at what point did you go into that pack?

20          THE COURT:  What was the answer to that question

21 that he took Sonya's cigarettes out because you just kind of

22 went like that.  Was that a yes or a no?

23          THE WITNESS:  No.  I didn't say.  I said they were

24 given to me before we entered the store.

25          THE COURT:  No.  She asked did you take the

1  cigarettes out of the fanny pack?  And what was your answer to

2  that?

3             THE WITNESS:  Yes.  I took it out of the fanny

4  pack.

5             THE COURT:  All right.

6      Q    So at what point did you go through the fanny pack and

7  take the cigarettes?

8      A    After leaving through the alley.

9      Q    So after you left through the alley, you opened up the

10  pack?

11     A    Yes.

12     Q    And you knew you had Caitlyn's phone and you had

13  Sonya's phone, and you knew you had Sonya's makeup, and it's

14  your testimony that --

15     A    I didn't have any makeup.

16     Q    Did you see what was in --

17     A    It was just phones and the cigarettes.

18     Q    Mr. Walden, were you paying attention earlier when all

19  of these items were identified as having been in that bag?

20     A    I didn't see that.  I just seen the phones and the

21  cigarettes.

22     Q    But you took the cigarettes and you kept them?

23     A    I didn't take the cigarettes.

24     Q    You took them out of --

25     A    Initially from the beginning I didn't take them.

1   That's what I mean.  After this fact -- yes.

2       Q    Now, I'm going to start back with you at the beginning

3   of your day.  You acknowledge you being interviewed by Detective

4   Jones?

5       A    Yes.

6       Q    Do you recall that she initially asked you what you

7   were doing earlier that night?

8       A    Yes.

9       Q    And you told her that you had been at a cookout at your

10  aunt's house?

11      A    Yes, ma'am.

12      Q    And that you left there maybe 30 minutes prior to your

13  conversation?

14      A    I don't know.  I was intoxicated.  I don't know if I

15  said that.

16      Q    And I believe you testified earlier -- please correct

17  me if I'm wrong -- that you went to your Aunt Michelle's house?

18      A    (No response.)

19      Q    Do you recall that when you were talking with Detective

20  Jones, you said you were at your Aunt Sandra's house?

21      A    Like I was saying, I was intoxicated.  I was drunk.

22  This why I didn't get other -- the other girl when I was in the

23  store.  I said that.  That's why I didn't never got that drink

24  because I was already too intoxicated.

25      Q    So, Mr. Walden, is it your testimony today that you

1   were too intoxicated to remember the details of your

2   conversation with Detective Jones?

3       A    Yes.

4       Q    But it's also your testimony that you remember

5   everything that happened earlier in the night when your blood

6   alcohol content would have been higher because you were closer

7   to the time that you were at the cookout?

8       A    I was at the cookout earlier that evening, but I was

9   not drinking.

10      Q    In the 15 minutes or so between when the police

11  arrested you and when you left the Ocean Grocery, what were you

12  doing?

13      A    Walking.

14      Q    You were not drinking then because you didn't get

15  another beer?

16      A    Right.

17      Q    So all of the intoxication that happened that night

18  happened prior to the incident where you met up with Caitlyn and

19  Sonya, but it's your testimony today that you remember all of

20  that very clearly, but you don't remember any of your

21  conversation with Detective Jones?

22      A    No, not really.

23      Q    I'm going to go through some and see if I can gibe your

24  memory.  Do you remember saying that after you left the cookout,

25  you went to a different aunt's house?

1      A      I went after.  That wasn't right after that.

2      Q      You were telling Detective Jones that.

3      A      Probably the 15 minutes after on the way back home I

4  believe I stopped.  This was before the second time the police

5  stopped me.

6      Q      And do you remember what you said you did there?

7      A      I think I dropped off some money for my baby mother to

8  her house, which is her aunt's house.

9      Q      All right.  Do you remember saying that the aunt gave

10  you $80?

11     A      No.

12     Q      Is it possible that you said that?

13     A      I don't know.

14     Q      Do you remember a point in the conversation where

15  Detective Jones asked you if you had been at Davinci's that day?

16     A      Yeah.

17     Q      You told Detective Jones that you -- well, first you

18  pretended that you weren't sure what Davinci's was.

19     A      I didn't pretend anything.

20     Q      And then you said you hadn't been at Davinci's; is that

21  right?

22     A      I don't know.  I don't know.  I don't know.

23     Q      Then do you recall the first time she asked you if you

24  were at Ocean Grocery?

25     A      Okay.  Yeah.

1    Q    You said you were their earlier in the day when it was

2  light outside, but that you hadn't been there since long before

3  7 p.m.?

4    A    Right.

5    Q    So you remember that you lied, and you said that you

6  hadn't been there?

7    A    I didn't lie.  Because it was leading back to where she

8  was trying to get me -- before that she was trying to get me to

9  tell on someone.  And that's why I was telling her I wasn't

10  there.  That goes back to the part of snitching.  That's why I

11  was telling her that.

12    Q    But you see that you lied when you told Detective Jones

13  that?

14    A    (No response.)

15    Q    Is that a yes or a no?

16    A    That's a yes.

17    Q    Do you recall when Detective Jones told you that there

18  was video surveillance of you behind the woman at the ATM at the

19  Ocean grocery?

20    A    She told me that.

21    Q    Do you recall that you told her, "That's not me.

22  That's not me.  That's not me"?

23    A    I don't remember that.  I don't remember that.

24    Q    And then, in fact, you continued to deny that it was

25  you, and you said you heard a description of a guy with a white

1   rag on his head and you didn't have a white rag?

2        A    I don't remember that either.

3        Q    Do you remember when she came in and showed you a

4   picture of you in the Ocean Grocery?

5        A    She came in and showed me that picture, yes.

6        Q    And you continued to deny that that was a picture of

7   you?

8        A    No.

9        Q    Mr. Walden, you seem to remember everything very

10  clearly when you were answering your attorney's questions.  Is

11  there a reason that you're having a hard time answering mine?

12       A    No.

13       Q    Do you recall denying that it was you in the picture.

14       A    Yeah.  I denied it was me in the picture.

15       Q    That's all I'm asking.  Just be honest with me now.

16       A    I've been honest.

17       Q    All right.  So you denied that it was you in the

18  picture, but you concede now that it is you?

19       A    Yes.

20       Q    And then Detective Jones asked you to tell the truth,

21  and you said that someone gave you a free pack of cigarettes

22  earlier; is that right?

23       A    Yeah, my homeboy.  Yes.  It was four packs actually.

24       Q    And then you said you went to the Ocean Grocery with

25  several of your friends?

1    A    No.  No.

2    Q    All right.  Do you recall then at that point without

3  any prompting from Detective Jones about any of that that you

4  kind of spontaneously said, oh, the white girl?

5    A    No.

6    Q    You deny that you said that?

7    A    Yes.

8    Q    And do you remember that then you said that Mark was

9  supposed to sell Caitlyn some drugs?

10    A    Mark had talked to her about the drugs.  There was

11  discussion about the Molly --

12    Q    You mentioned earlier on direct examination that you

13  had two kinds of drugs, $30 of one, $30 of another.  What did

14  you have?

15    A    I had cocaine and powder.

16    Q    So two kinds --

17    A    I had powder and --

18    Q    All right.  So you had powder cocaine and crack

19  cocaine?

20    A    Yes.

21    Q    You didn't mention anything about Molly on direct

22  examination.  Did you have any of that?

23    A    No.

24    Q    You remember that part clearly?

25    A    Yeah.  I talked to her.

1    Q    And at that point you told Detective Jones that Caitlyn

2  approached you in the alley behind Ocean grocery?

3    A    No.

4    Q    No, you didn't say that?

5    A    No.

6    Q    Would that be a lie if you told her that?

7    A    Yes.

8    Q    So you never at any point said that she approached you

9  back in the alley where a police officer had told you that it

10 was trespassing behind the Ocean Grocery?

11   A    No.

12   Q    Then at that point Detective Jones asked if Caitlyn

13 took money out of the ATM, and you said that you didn't know.

14 You left?

15   A    No.

16   Q    You didn't say that?

17   A    No, I did not.

18   Q    At that point Detective Jones asked you about the video

19 again.  Do you remember that?

20   A    No, I do not.

21   Q    And at that point you said she did get it out there.  I

22 grabbed the money to make sure she didn't run of there, but I

23 didn't do nothing.  I didn't rob her.  I didn't do nothing.

24   A    I never said that.

25   Q    At that point you told Detective Jones you took the

1   money directly out of the ATM?

2        A    No.

3        Q    No?

4        A    No.

5        Q    It's your testimony that you never said that?

6        A    I never said that.

7        Q    You seem to remember the second portion of the

8   interview a lot better than you remember the first portion of

9   the interview.  Did your level of intoxication change?

10       A    I can't answer that at this moment.  It's a different

11  time.  I just remember that part.  So some parts I do; some

12  parts I don't.

13       Q    Can you tell me what Mark was wearing that night?

14       A    He had on black shorts and black shirt.

15       Q    Do you recall that you changed your description of Mark

16  about six times?

17       A    Yeah.  I was intoxicated when it came to that.  I don't

18  know.  I was wasted, and then really not only was I wasted, I

19  wasn't really trying to give that description because of

20  snitching.  He knows where my family lives.  And I know what a

21  heroin addict does.  So I didn't really want to give up the

22  description.

23       Q    Do you remember then telling Detective Jones that you

24  didn't see any white girls in Davinci's?

25       A    I never said that.

1      Q     Your testimony is that you never said that?

2      A     I never said that.

3      Q     You said that you only got in the car to do the

4   transaction at Ocean Grocery?

5      A     I never said that.

6      Q     So you never told her that Caitlyn was coming from the

7   alley by Ocean Grocery?

8      A     No.

9      Q     Do you remember you told to Detective Jones that you'd

10  never met those girls before?

11     A     I never met Sonya before.

12     Q     Do you remember saying that you never met either of

13  them?

14     A     No.

15     Q     Later on during the interview, do you acknowledge that

16  you, finally, about 50 minutes in, told Detective Jones that you

17  had gone in Davinci's because you had ordered food?

18     A     No.  No.

19     Q     And at that point, that was the first time that you

20  ever mentioned that a robbery had occurred?

21     A     No.

22     Q     So at what point did you tell Detective Jones that a

23  robbery happened?

24     A     When we came out of Davinci's, I told her that somebody

25  hopped in the car.

1    Q    No.  At what point during the interview did you first
2  tell --

3    A    No.  I told her --

4         THE COURT:  Sir, wait for her to finish her
5  question so we can have a clear record.

6         THE WITNESS:  I apologize.

7         THE COURT:  All right.

8    Q    At what point during the interview did you first tell
9  the Detective Jones that a robbery happened?

10   A    I can't say whether it was the beginning or the middle.
11  I didn't want to tell -- I never gave no names.

12   Q    Do you remember providing the name Mark?

13   A    I provide it but I --

14   Q    Mr. Walden, have you reviewed the recorded video of
15  what you said to Detective Jones with your attorney to prepare
16  for trial today?

17   A    No.

18   Q    Not once?

19   A    Not that I can count.

20   Q    So it's your testimony that you don't know what you
21  said to police?

22   A    Half of it I was drunk.  Anything I was saying, I was
23  probably drunk.  I was drunk.

24   Q    When Mark robbed them in the car, what did he take?

25   A    First he was reaching for things in the front, but he

1    got the money out of the console.  Once he had that,

2    (undecipherable) he had other things he couldn't get.  He hit

3    her twice and took off.

4        Q    So it's your testimony that he was conducting this

5    robbery.  Did you do anything to stop it?

6        A    I wanted to but, like I say, I'm out there.  This

7    different you being out there and then me being there every day.

8    So I did not.

9        Q    But he didn't take their phones, right?

10       A    No.

11       Q    Even though they would bring a lot more money than what

12   was in the center console?

13       A    He wasn't going to find it.  He's a heroin addict.  He

14   going to go straight for the money and go buy some drugs.  And

15   at the time the phone was probably down on the floor.  It was by

16   her feet.  I'm sitting right in the back.  So I can see

17   everything.  No, he going to get gone.  Got out of the car and

18   go.  He's heroin addict.  You know what I'm saying?

19       Q    It's your testimony that you felt comfortable enough

20   with these girls to still do the rest of the drug transaction?

21       A    I didn't feel comfortable enough.  That's what I

22   already -- that's when I -- when I left (undecipherable).  I was

23   just as shaken as them.  I just wanted what was mine.

24       Q    And at what point did she ask you to handle the bag

25   that had all of their personal belongings in it?

1     A    Repeat the question.

2     Q    At what point did she ask you to handle the bag that

3 had all of her personal belongings in it?

4     A    She told me to get the bag before we went in the store.

5 She handed me the bag before we went in the store.

6     Q    And you held it all the way in?

7     A    Yes.

8     Q    Then you left with it?

9     A    Yes.  I --

10     Q    You didn't take her money and then give her the bag

11 back?

12     A    It wasn't intentionally.  I didn't take the --

13     Q    You didn't go to the car and give it back to Sonya on

14 your way out?

15     A    No.

16     Q    Instead you threw it by a dumpster?

17     A    Yes.

18     Q    After taking items out of it?

19     A    I wouldn't say I took the item out of it, but yeah.

20     Q    Did you or did you not take the items out of it?

21     A    I took the cigarettes, yes.

22     Q    Mr. Walden, have you ever been convicted of a felony?

23     A    Yes, ma'am.  I have.

24     Q    How many?

25     A    I have four misdemeanors and three felonies, all of

 1   them for lying and stealing and cheating.

 2        Q    I'm going to unpack that.  How many felonies?

 3        A    Three.  I have three felonies and four misdemeanors.

 4        Q    All right.  How many misdemeanors involving lying and

 5   stealing?

 6        A    Four.

 7        Q    The video that you watched earlier, did you watch that

 8   with your attorneys in preparation for trial today?

 9        A    Yes.

10        Q    Did you review all of the statements that were provided

11   written by Caitlyn and Sonya about what happened?

12        A    Most of them.

13        Q    But it's your testimony that you never watched the

14   recording of your interview?

15        A    I never watched the recording of the interview with

16   Detective Johnson.

17        Q    With Detective Jones.

18        A    No.

19        Q    You never watched the recording -- your recorded

20   statement?

21        A    Not with her, no.

22        Q    No?

23        A    No.

24             MS. PETTIT:  I don't have any further questions.

25             THE COURT:  Any redirect of this witness?

1          MS. FEINMAN:  Yes, Your Honor.

2                    REDIRECT EXAMINATION

3    BY MS. FEINMAN:

4      Q    All right, Mr. Walden.  So the Commonwealth talked a

5    lot about your interview with the detective in this case.  Prior

6    to that interview, you were stopped by law enforcement; is that

7    right?

8      A    Yes, ma'am.

9      Q    And that's the stop we had discussed earlier?

10     A    Yes, ma'am.

11     Q    And during that stop, the officers approached you about

12   being an informant; is that right?  Is that during the first

13   stop?

14     A    They didn't approach me about being an informant.  They

15   were trying to see would I be an informant for them.

16          MS. PETTIT:  At this point I'm going object, one,

17   as asked and answered, and, two, it's outside the scope on

18   cross.  I didn't ask anything about anyone asking him to be an

19   informant.

20          MS. FEINMAN:  Your Honor, it's within the scope of

21   her cross.  She asked multiple questions about inconsistent

22   statements that were given to the detective about inconsistent

23   descriptions of a man named Mark and Mr. Walden testified during

24   the cross-exam that he was not giving a consistent description

25   of Mark because he didn't want to snitch.  He said he was

1  worried about snitching, and all of that I think is the closer

2  quote.

3              THE COURT:  Anything else?

4              MS. PETTIT:  No.

5              THE COURT:  All right.  I'll give you some leeway.

6  Go ahead.

7              MS. FEINMAN:  Thank you.

8      Q    So you had been approached once by officers about --

9  well approached once and in that interaction discussed about

10  being an informant?

11     A    Yes, ma'am.

12     Q    And were you interested in being an informant?

13     A    No.

14     Q    Why not?

15     A    Because the consequences of where I come from.

16             THE COURT:  He did discuss that.

17     Q    Okay.  Then you were released after that encounter?

18     A    Yes, ma'am.

19     Q    Then you came in contact with officers again later that

20  day?

21     A    Yes, ma'am.

22     Q    And were those the same officers or different officers?

23     A    Same officers.

24     Q    And with those officers, at that point you were -- were

25  you handcuffed or released?

1      A     I was handcuffed.

2      Q     And were you immediately taken to the station or what

3   happened after you were handcuffed there?

4      A     They made me stand there for a while.

5      Q     How long is a while?

6      A     Probably about 20, 30 minutes.

7      Q     And when you say they made you stand there, where were

8   you made to stand?

9      A     I was standing in the middle of the street with the

10  cuffs on.

11     Q     And you were standing there for that whole 20 or 30

12  minutes?

13     A     Yes, ma'am.

14     Q     And were there other officer present?

15     A     There were, but they was parked at the corner dealing

16  with another car, parked with the lights being on.  With the

17  lights being on, I couldn't tell whether if it was a police

18  vehicle or other car.  I couldn't tell.

19     Q     So at some point after 20 or 30 minutes on the side of

20  the road, where -- what happened?  What happened after that?

21  Were you taken to the station?

22     A     They took me to the station.

23     Q     And when you were taken to the station at some point

24  you were interviewed by a detective it seems like?

25     A     Yes.

1    Q    Was that the same day or a different day?

2    A    That was the same day.

3    Q    And did that interview happen immediately after you

4    were taken to the station?

5    A    Yes, ma'am.  As soon as I got there, it was within five

6    or ten minutes, yes.

7    Q    All right.  And you were -- you spoke to the detective,

8    right?

9    A    Yes, ma'am.

10   Q    And how long did that interview last, if you recall?

11   A    About 40 minutes, 25 minutes.

12   Q    From what you remember?

13   A    Yes.

14   Q    All right.  And during that interview, did you tell one

15   inconsistent story?

16   A    No, ma'am.

17   Q    All right.  So you heard the Commonwealth ask you a lot

18   questions about Mark and your description of Mark.

19   A    Yes.

20   Q    Did you give her a consistent description of Mark that

21   you recall?

22   A    No, ma'am.

23   Q    Why not?

24   A    Because of the consequences you get for snitching.  So

25   I know who he is with.  I know what he's having.

1    Q    Do you have -- and correct me if I'm wrong -- did you

2  say he knows where your family lives?

3    A    Yes, he does.

4    Q    Do you have any reason to be afraid of Mark?

5    A    Yes, ma'am.

6    Q    What reason do you have?

7    A    He know where my family lives.  I'm out there with him.

8  I'm on a daily basis, I know he has guns.  I know he deal with

9  people has guns.  I know his family, I mean.

10    Q    And you actually -- you told the detective that you

11  didn't want to snitch, I think, was your words?

12    A    Yes, ma'am.

13    Q    And you told the detective that because you were

14  worried specifically about --

15           MS. PETTIT:  Objection.  Leading.

16           MS. FEINMAN:  Withdrawn.

17    Q    All right.  At some point during the interview, you did

18  tell the detective that there was a robbery --

19           MS. PETTIT:  Objection.  Leading.

20           THE COURT:  Sustained.

21    Q    All right.  At some point in the interview, what did

22  you tell the detective happened?

23    A    I answered, like -- as far I can I remember, I know I

24  ended up telling her by the end a little bit of the truth.

25    Q    Did you -- do you know if you told her the full truth

 1  or just a little bit of the truth or what that you can remember?

 2      A    As far as the people, no.

 3      Q    No what?

 4      A    No, I did not tell her the truth about, you know, about

 5  the people.  I gave her a name, but not a lot of description,

 6  nothing like that.

 7      Q    So you're talking about Mark here?

 8      A    Yeah.

 9      Q    What did you tell her, if anything, about Sonya and

10  Caitlyn?

11      A    I told her I knew Caitlyn about two and a half years

12  ago, but I never knew Sonya.  I don't know Sonya.

13      Q    All right.  Was it your understanding or do you know

14  whether you were under arrest or free to go at that point in

15  time?

16      A    No.  I didn't know.

17      Q    All right.  Were you handcuffed?  Do you recall?

18      A    I don't remember.

19      Q    All right.  Do you recall if they told you what they

20  were investigating?

21      A    I believe -- I think she said something about a

22  robbery.  That's all I can remember.

23      Q    And she had told you several times that she thought

24  you -- the detective told you several times that she thought you

25  had robbed these girls?

1    A    Yes.

2    Q    Did she tell you that?

3    A    Yes, she did.

4    Q    All right.  And when you were stopped by officers, how

5  many packs of cigarettes did you have on you?

6    A .  I had my pack of cigarettes and Sonya's pack of

7  cigarettes.

8    Q    All right.  And the Commonwealth asked you, you know,

9  about the connection between Mark and drugs and Molly.  What

10 drugs do you sell?

11   A    I sell crack cocaine and powder cocaine.

12   Q    Do you sell Molly?

13   A    No.  I do not.

14   Q    So the Commonwealth said that you felt comfortable

15 enough to continue the transaction after the robbery.  At the

16 point in time that you're at the ATM, where were the drugs that

17 were supposed to be sold?

18   A    They were in the car as far I know.

19   Q    Okay.  You had given them to someone?

20   A    I give them to Sonya before I left.

21   Q    Had you been paid at that point?

22   A    No.

23        MS. FEINMAN:  I have no further questions.

24        THE COURT:  All right, sir.  You may step down

25 from the witness stand.  Watch your step.

1        Any further evidence from the defense?

2        MS. FEINMAN:  No, sir.

3        THE COURT:  Rebuttal evidence?

4        MS. PETTIT:  Yes, sir.  Detective Jones, please.

5        THE COURT:  Ma'am, you're still under oath.

6        THE WITNESS:  Yes, sir.

7                         REBUTTAL

8                    DIRECT EXAMINATION

9    BY MS. PETTIT:

10       Q    Good afternoon again.  Did you conduct an interview of

11   the defendant the evening of August 31st?

12       A    Yes, ma'am.

13       Q    How do you start your interviews?

14       A    I usually start my interview by greeting myself, ask

15   them for their name and then I read them their (undecipherable).

16   First, I ask them, you know, if you have -- what's their

17   education level so to make sure they understand what I'm saying.

18   Once they give that information, then I read them the Miranda.

19       Q    When you are going through your introduction prior to

20   reading Miranda, do you take note of any signs of heavy

21   intoxication in the person that you are interviewing?

22       A    Yes.

23       Q    When you were interviewing Mr. Walden, did he -- did

24   you note him to be heavily intoxicated or so drunk that he might

25   not remember what was going on?

1    A    Yes, ma'am.  He did not display any signs of being

2 intoxicated.

3    Q    Okay.  So he did not appear intoxicated?

4    A    No, ma'am.

5         MR. EFIRD:  Judge, I'm going to object to her

6 opinion of his level of intoxication.  She already testified as

7 to certain indicia.  I think that's one thing, but for her to

8 testify that he was not intoxicated enough to properly represent

9 what has happened before I don't think is proper.

10        THE COURT:  Rephrase.

11   Q    Did you notice a strong odor alcohol --

12   A    No.

13   Q    -- on Mr. Walden's person?  Was he slurring his words

14 at all?

15   A    No, ma'am.

16   Q    Did he appear to be listing to one side or the other as

17 you spoke to him?

18   A    No, ma'am.

19   Q    Were his responses to questions that you asked

20 appropriate in a way that you would expect most conversations to

21 go?

22   A    Yes, ma'am.

23   Q    Prior to beginning the interview, did you tell him what

24 crime you were investigating?

25   A    No.  I just told him that -- I typically say, tell me

1  how your day went or something of that sort.  Let me -- tell me

2  what you did at seven o'clock today.

3      Q    So you did not tell him that he was being investigated

4  for a potential robbery?

5      A    No.

6      Q    What was the first thing that he told you he had been

7  doing that day?

8      A    He said he went to a cookout.

9      Q    Did you ask him if he had been at Ocean Grocery --

10     A    Yes.

11     Q    -- that evening?  What did he tell you?

12     A    Well -- okay.  So there was about three different types

13  of stories that was stated.  So I'm not sure which one you want,

14  the first one, the second or the third one.

15     Q    Well, if you could tell us all three with regard to

16  whether --

17     A    Okay.

18     Q    -- and when he was at the Ocean Grocery, that would be

19  great.

20     A    He stated that he was at the Ocean Grocery earlier.  It

21  was daylight because his excuse was, when I asked him what time

22  it was, around 7:30.  I said, around 7:30?  What were you doing

23  around seven o'clock?  I don't know.  I don't have a watch.  And

24  then he stated that it was daylight.  It was earlier in the day.

25  Some of his cousins went over to Ocean Grocery to get some

1  hotdog buns for his Auntie's barbecue.  That was one.

2      Q    Then what did he tell you about Ocean grocery later in

3  the interview?

4      A    Then he was stopped by police, as we stated, behind

5  Ocean Grocery for trespassing.  That was one of the incidents at

6  Ocean Grocery.  Then there was another excuse why he was at

7  Ocean Grocery -- oh.  That's right.  They went inside and Mark,

8  his friend, wanted to buy beer.  So they went inside to go get

9  beer.  And there could be possibly another incident that he

10  stated.

11      Q    Did you ask him if he had been at Davinci's that day?

12      A    Yes.

13      Q    What did he tell you about that?

14      A    Initially?  No.  He didn't even know what Davinci's

15  was.

16      Q    Then what happened?

17      A    He didn't know where Davinci's was at.  Then under

18  oath, "Okay, the pizzeria on 25th Street?" I said you didn't

19  know what that was.  Then he finally admitted that he was in the

20  Davinci's.  He ordered pizza from Davinci's.  The pizza wasn't

21  ready.  Then he left the store.

22      Q    At some point did you confront the defendant with a

23  picture of him standing behind Caitlyn Hill at the ATM inside

24  the Ocean Grocery?

25      A    Yes.

1    Q    Did he acknowledge that was a picture of him?

2    A    Yes, eventually.

3    Q    The first time that you presented him with a photograph

4    of himself, what did he tell you?

5    A    I believe he said that -- he didn't say it wasn't him.

6    He was just, like, that could be anybody.  That was kind of what

7    I've got.  Hold on a moment.  Because sometimes it was -- it was

8    up and down.  I can't recall totally what he said, but

9    eventually he did state that that was him.  He said -- okay.  So

10   he did say that he was going there so she could get money out of

11   the ATM for a drug deal.

12   Q    Now, when you asked him about Caitlyn, did the

13   defendant ever tell you that he had previously met her?

14   A    Okay.  So he stated that -- oh.  On a -- besides today?

15   Q    Yeah.  On a previous date --

16   A    No.  No.

17   Q    He never told you that this was someone he had met

18   before?

19   A    Not once previously.

20   Q    Prior to that date?

21   A    No, exactly.

22   Q    And how did he initially tell you he came into contact

23   with her?  Where did he say that occurred?

24   A    She approached him on the side of Ocean Grocery.  That

25   was the initial.

1    Q    Did he say the alley behind Ocean Grocery?

2    A    Exactly, or the alley behind Ocean.  It was from the

3    alley outside of Ocean Grocery to in front of the barbershop,

4    and then when I told him about the video cameras at First

5    Precinct, then it changed to a friend met him in front of Ocean

6    Grocery.  And then it went to the hair salon.  He could have

7    been by the hair salon and came through the alley, but there is

8    no alley between the hair salon and the Ocean -- and the

9    barber shop.  So when I confronted him with that, then it

10    changed again.

11    Q    Did the defendant admit to you that he took the money

12    that Caitlyn had withdrawn from the ATM?

13    A    Yes.

14    Q    Did he ever tell you that he had been asked to hold

15    what he would describe as a fanny pack?

16    A    No.

17    Q    Did he ever acknowledge to you that he was holding the

18    bag containing both Caitlyn and Sonya's phones and ran out of

19    the store?

20    A    No.

21    Q    In fact, what did he tell you that he did after Caitlyn

22    withdrew the $100 from the ATM?

23    A    He stood outside the store for five minutes.

24    Q    Were you able to review the video camera that showed

25    him leaving?

1     A    Yes.

2     Q    Did that video camera show him waiting for five minutes

3  outside the store?

4              MR. EFIRD:  Objection.  I think we've seen that

5  video.  I think it speaks for itself.  She's characterizing what

6  she saw.

7              THE COURT:  Ms. Pettit?

8              MS. PETTIT:  I was speaking about the video that

9  she was unable to actually obtain a copy of, but I would agree

10  that the Court has seen the video that shows the defendant

11  running out.

12     Q    About how many versions of events would you say the

13  defendant gave you during the interview?

14     A    Four.

15     Q    Thank you.  If you could answer any questions Mr. Efird

16  or the Court have for you.

17     A    Yes.

18              THE COURT:  Mr. Efird?

19              MR. EFIRD:  Thank you.

20                     CROSS-EXAMINATION

21  BY MR. EFIRD:

22     Q    So, Detective Jones, you met Mr. Walden -- is that at

23  the First Precinct to interview?

24     A    Yes, sir.

25     Q    Is it there in an interview room?

1     A    Yes, sir.

2     Q    And he was handcuffed?

3     A    In the front, yes.

4     Q    In the front, but he was handcuffed?

5     A    Yes.

6     Q    There was another officer present?

7     A    Yes.

8     Q    And you began the interview by reading him is Miranda

9  rights?

10    A    Correct.

11    Q    You had him sign a form?

12    A    Yes.

13    Q    And one of those rights that you told Mr. Walden about

14 was that he had the right to be silent?

15    A    Correct.

16    Q    Not to talk to you at all if he didn't want to?

17    A    Yes.

18    Q    And he chose to go ahead and speak with you?

19    A    Yes, and he signed the form.

20    Q    And he did tell you several times that he was reluctant

21 to give you names, correct?

22    A    Give me names of who?

23    Q    When you were talking about Mark, he had told you that

24 he was reluctant to give you any details about Mark.

25    A    At the end of the interview, he stated that.  But

1   during the interview, I just wanted him to give me information

2   about an alibi possibly.  So he was describing Mark and giving a

3   totally different description of Mark, and that I believe that

4   there was another -- three -- was another three individuals.  It

5   was a Mark, Antonio, and Adrian.  And he described those

6   individuals with three different descriptions each time he

7   described them.

8       Q    But, to answer the question, he told you that he was

9   reluctant to give information --

10      A    This was probably 15 -- ten minutes to the end of the

11  video -- end of the interview.  So it wasn't at the beginning of

12  the interview where he was reluctant to give me the information.

13  It was more at the end of the --

14      Q    He never gave you a last name?

15      A    No.

16      Q    All right.

17      A    He just stated Mark, Antonio, and Adrian.

18              MR. EFIRD:  Okay.  I don't have any other

19  questions.

20              THE COURT:  Any redirect?

21              MS. PETTIT:  No, sir.

22              THE COURT:  All right.  Ma'am, you may step down

23  from the witness stand.

24              May this witness be excused?

25              MS. PETTIT:  Yes.  And that is the Commonwealth's

1  case.

2          THE COURT:  Ma'am, you may be excused or you can

3  have a seat in the audience.

4          THE WITNESS:  Okay.  Thank you.

5          THE COURT:  All right.  Yes, ma'am.

6          MS. FEINMAN:  Yes, Your Honor.  At this point I

7  would have a renewed motion to strike the charges.

8          THE COURT:  All right.

9          MS. PETTIT:  Just before we get started, I have no

10  objection if the Court and defense counsel are amenable to

11  taking up both the motion to strike and closing argument at the

12  same time, and I'll just waive my first closing.

13          MS. FEINMAN:  I would prefer to keep them

14  separate, Your Honor.

15          THE COURT:  All right.

16          MS. FEINMAN:  Your Honor, I would move that these

17  charges be struck at this point in time.  The Court has the

18  benefit now of --

19          THE COURT:  Excuse me.  Can you call the witnesses

20  in.

21          THE DEPUTY:  Yes, sir.

22          THE COURT:  All right.

23          MS. FEINMAN:  Thank you, Your Honor.  I would ask

24  the Court to strike these charges at this juncture.  The Court

25  has now heard the entirety of the Commonwealth's evidence and

1     has had the benefit of hearing from Mr. Walden as well.

2           At this point in time, as the Court is aware, the

3     burden has shifted. The inferences are no longer solely taken

4     in favor of the Commonwealth, and they're at the stage where

5     they need to prove guilt beyond a reasonable doubt.

6           As far as the two robbery charges stand, I would

7     argue that the Commonwealth has failed to meet any of the

8     elements of robbery, but specifically I would argue that based

9     on the evidence the Court has heard today, Mr. Walden did not

10    have any intent to steal, which is clearly a necessary element.

11          You heard his testimony that -- well, ultimately,

12    the only items that remained in his possession was a packet of

13    cigarettes. You heard testimony that bag/fanny pack/makeup bag,

14    the black bag that he had, he did not intend to steal. He

15    didn't intend to steal. He didn't intend to take it or keep it

16    and that's supported by the fact that he didn't, in fact, keep

17    it; that there were cell phones in there that do have high

18    monetary value that were discarded. The only thing taken from

19    that bag was a pack of cigarettes, which would support the

20    argument that there was no intent to steal on Mr. Walden's

21    behalf.

22          Additionally, the only property taken was the

23    cigarettes, and he testified that it was Caitlyn Hill who asked

24    him to hold this bag that did contain the cigarettes. For it to

25    be a robbery, it has to be from the owner or the owner's

1  presence.  Sonya, the owner of the cigarettes, was not there and

2  did not have in her presence.  And so for those reasons

3  specifically, but also as a whole, I would ask the Court to

4  strike the robbery charges in this case.

5         And as far as the abduction goes, I would renew my

6  motion to strike that specifically any detention of Sonya is

7  incidental to a detention of Caitlyn if the Court were to find

8  that the detention of Caitlyn did take place.  I would also note

9  that the alleged asportation was to a public place, right by a

10 police station with numerous people and vehicles around, that,

11 if anything, that was a safer location.

12        And I would ask the Court to weigh the credibility

13 of the witnesses that you have heard today and find that the

14 Commonwealth has not met their burden and strike these charges.

15        THE COURT:  All right.  Ms. Pettit?

16        MS. PETTIT:  Your Honor, with regards to the

17 abduction, even if the defendant was mostly focused on forcing

18 Caitlyn to take money out of the ATM, that is not a legal

19 justification for his abduction of Sonya.  There is no doctrine

20 where the abduction of one victim somehow merges into the

21 abduction of a second victim when both were transported against

22 their will around the city, regardless of defendant's reason in

23 wanting to do that, although clearly here the reason for that is

24 pecuniary benefit because he wanted to go to the ATM.

25        So I would ask the Court certainly to deny the

1 motion based on those grounds.  I would join in defense

2 counsel's request that the Court weigh the credibility of the

3 witnesses.  Caitlyn and Sonya were unimpeached.  You heard no

4 testimony of any felony convictions or crimes of moral

5 turpitude.  Their story has remained consistent from the day

6 that his happened on August 31st to today, and their stories are

7 consistent with each other in what happened.

8         The defendant's testimony, I would submit, is

9 wholly incredible, and I would ask the Court to discard the

10 majority of his self-serving statements.  I think he was telling

11 the truth when he admitted that he took the money from the

12 store, that he did leave the store with the black bag that was

13 referred to as a makeup bag; he referred to as a fanny pack.

14 But certainly when confronted with the video and the evidence,

15 he has to acknowledge that those things occurred.

16         But conversely, the self-serving statements that

17 he made, I would submit, were inherently incredible.  He has

18 made countless inconsistent statements, both here today, in his

19 interview with Detective Jones and in statements that are

20 inconsistent with the evidence.  He has been impeached with his

21 criminal record of three felonies and four misdemeanor

22 convictions involving lying, cheating, or stealing.

23         I think his contention that while going to a ATM

24 Caitlyn would have asked him to hold a bag that contained, one,

25 a bag that didn't belong to her, but, two, a bag that contained

1   her cell phone, Sonya's cell phone, Sonya's cigarettes and

2   Sonya's makeup and would ask this defendant to hold it defies

3   all logic.

4           One, she could have left in the car if she didn't

5   need but, two, as the Court can see, she easily could have

6   tucked it under her arm.  There's no reason she would have asked

7   this defendant to hold it even if his story were true.  So I

8   think that cuts against him.

9           Then you have the fact that his testimony today is

10  that he remembers every detail of what happened before he ran

11  out of the store, very clearly, provided small details,

12  corrected people.  But as soon as he was questioned on what he

13  had said in that interview, a time when his level of

14  intoxication would have decreased, when the Commonwealth

15  attempted to elicit statements from him, he couldn't remember

16  anything.  He was so intoxicated, he had no idea what happened.

17          Frankly, I'm not sure in what other way Mr. Walden

18  could have been impeached in his testimony, but I would submit

19  that the story that he told and all of the different versions

20  that he has given were wholly uncredible.  I would ask the Court

21  to balance the credibility of clearly emotional victims in their

22  favor, to discard his testimony, and to deny the motion to

23  strike.

24          THE COURT:  Anything else on your motion, Ms.

25  Feinman?

1          MS. FEINMAN:  No, Your Honor.

2          THE COURT:  All right.  The Court feels that is,

3   again, the Commonwealth has met their burden.  I'm going to take

4   it up in closing, and I'll make a decision when I render my

5   opinion at the end.  So I'll deny your motion.

6          All right.  Commonwealth ready for closing?

7          MS. PETTIT:  Yes, sir.  I can wait to respond.

8          THE COURT:  All right.

9          MS. FEINMAN:  Your Honor, this case is about a

10  drug deal.  This is not a robbery.  This is not an abduction,

11  and I would say that the Commonwealth's version does not make

12  sense.  The only evidence of what was taken from Sonya is the

13  pack of cigarettes.  She got her phone back.  Caitlyn got the --

14  Caitlyn got her phone back.  The bag was given back.

15         The only thing that was taken was the pack of

16  cigarettes and, of course, the hundred dollars that was part of

17  the drug deal.  That makes sense.  That's why when they went to

18  the ATM Mr. Walden asked her to withdraw $100.  It was a

19  specific amount.  Again, she testified he didn't say give me

20  everything in your account.  He didn't say clean it out.  He

21  said $100.

22         You also heard Caitlyn testify she actually has

23  two debit cards.  He didn't say, okay, use your other debit

24  card.  Do you have any other accounts?  There was one card used,

25  one account, $100 that is a reasonable amount to be taken for a

1   drug transaction.  Those facts fit.  That she may have asked him

2   to hold this bag is not incredible.  Frankly, bags with straps

3   are hard to hold.  She probably could have wedged it under her

4   arm and worked the ATM that way, but it is not unreasonable for

5   a woman to ask someone to hold a bag for her while she works the

6   machine.

7            Your Honor, the Commonwealth has made a big deal

8   about Mr. Walden's story changing with the detective.  Of course

9   it did.  First of all, he was involved in a drug deal.  That's

10  not something you typically want to discuss with the police, to

11  admit to that.  Second of all, he had been approached by

12  officers the first time.  They released him, but before

13  releasing him, asked him if he wanted to be an informant.  He

14  said no.  He told you today he was worried about that; that in

15  his part of the world, it's not safe to be an informant.

16           He's approached by police a second time, is

17  detained, is held for 20 or 30 minutes on the side of the road.

18  Then he's taken back to the Precinct, and then he's interviewed

19  for 20-plus minutes by the detective.

20           Your Honor, it sounds like his initial story

21  denies all wrong during -- all wrong doing, but then at the end

22  of his statement to the detective, he does tell her, look, I was

23  involved in a drug transaction with Caitlyn specifically.  Sonya

24  was there and that there was a robbery.  He acknowledges that,

25  but that there was a different man who got in the vehicle, and

1   he does acknowledge that to the detective, and he's very clear

2   to the detective that he's not comfortable giving names.

3          He does change his description of Mark, and

4   you've heard from him.  It's because he knows Mark.  He knows

5   Mark has guns.  Mark knows where his family is.  He has a strong

6   vested interest in not being seen, as his words, a snitch in his

7   community for his -- for his own sake and for his family's

8   safety.

9          So, Your Honor, you've also seen the video from

10   the precinct.  Mr. Walden was supposedly in full control of

11   this.  He told the girls where to drive, where to pull, where to

12   park and then initially drove them -- told them you're going to

13   Ocean Grocery.  We're going to park right here, half a block

14   from a police station.  If he is in complete control of this and

15   yet have them park where they're actually on surveillance at the

16   police precinct.  There are thousands of ATMs in Richmond.

17          If this were a robbery and his intentions were to

18   rob Caitlyn or anyone at an ATM, logic would dictate you do not

19   pick in front of a police precinct, especially if he is in full

20   control over this.  And you also saw in that video that it's a

21   public street.  There are people walking by, up and down both

22   sides of the street.  There are cars driving up and down.

23          You heard Caitlyn testify.  She was across the

24   street, the other side of the road from Mr. Walden.  She was

25   looking into the A.B.C. store.  There were three people right

1  there in front of the A.B.C. store right where she was.  She

2  didn't do anything.  She did nothing to indicate she was in any

3  sort of distress.  She didn't scream.  She didn't run.  She

4  didn't so much as whisper.  And in that context she didn't even

5  attempt to make eye contact.

6       And you saw that repeatedly throughout this case,

7  Your Honor, that there were no indications of distress, even

8  when they are surrounded by other people, and you heard Caitlyn

9  testify initially that she -- when they first walked into the

10  Ocean Grocery, she made eye contact with the clerk and maybe

11  mouthed something, but then she did acknowledge that today's the

12  first time she ever mentioned that.

13       And further you heard her testify that despite

14  when she was on the street by herself with people around when

15  she and Mr. Walden were speaking in the middle of the street

16  with the car stopped beside them, she didn't do anything there

17  either.  They walked up the sidewalk.  They passed people on the

18  sidewalk that they're on, not the other side of the road.  Right

19  there.  They passed people.  She doesn't do anything, and you

20  can see in the video Mr. Walden's a little bit behind her, no

21  indication to them that she needed help, no eye contact or

22  mouthing anything.

23       But when she actually asks for help is when, after

24  they've been to the ATM she is exiting Ocean Grocery and she

25  testified that Mr. Walden was right behind her and that he had a

1  hand on her elbow, and I believe was guiding her out of the

2  store.  So all of those times when she's away from Mr. Walden,

3  she doesn't do anything, but when he is right behind her,

4  physically touching her is the time that she asks for help.

5  Your Honor, that doesn't make sense.

6          THE COURT:  Did you mention anything about the $20

7  that was missing from her cell phone case which happened to be

8  found on his person?

9          MS. FEINMAN:  I did not mention -- there was $20

10  found on his person.  I don't know that we've had anything to

11  identify that that was the same specific $20.  He did, in fact,

12  have $20; however, we have had -- money is fungible.  There's

13  been no evidence of a serial number or a particular fold that

14  they could recognize that $20 as the $20 that was taken out of

15  the phone case prior to that.  There is no evidence proving that

16  that is, in fact, the same $20.

17          He is allowed to have his own money, Your Honor.

18  So I would say Commonwealth has not tied that to be the same $20

19  that Caitlyn said.  And Caitlyn did testify that it was in the

20  phone case.  She did not tell him there was money in that phone

21  case.  So I do not believe there is sufficient evidence to show

22  that that was the same $20 bill at this point.

23          Your Honor, I would just submit that it doesn't

24  make sense.  That when you put these facts together, the

25  Commonwealth's version is just -- it doesn't track.  It makes

1   significantly more sense when you think of this as a drug

2   transaction.

3           And at this point they are required to prove guilt

4   beyond a reasonable doubt, and any reasonable doubt, Your Honor,

5   must be resolved in favor of Mr. Walden.  In this case, I would

6   say the Commonwealth has not met their burden, and I would ask

7   the Court to find him not guilty.

8           THE COURT:  All right.  Ms. Pettit?

9           MS. PETTIT:  Your Honor, the Commonwealth's

10  evidence has remained consistent from the time that this crime

11  was reported to police and from the time that Caitlyn Hill spoke

12  to dispatch on 9-1-1 and they reported that and both she and

13  Sonya reported.  And part of the reason I thought it was very

14  important to note the time stamps on that video, and the time

15  stamp that the Court called attention to on the 9-1-1 call is

16  there's only two or three minutes from the time that the

17  defendant exits the store to the time that the 9-1-1 call is

18  placed, if that.

19          I think perhaps he exited at 8:55, and the call is

20  placed at 8:56, and I think that is important in the context of

21  how the defendant is asking the Court to look at this because

22  they have been consistent from the beginning that they went to

23  pick up a pizza.  Caitlyn goes inside.  She comes back.  She

24  gets in the car, and this defendant gets in the back seat.

25          They both tell him to get out.  He says stay quiet and

1  turn around or you'll be dead and he demands their personal

2  property -- phone, makeup bag, the $20 as the Court pointed out

3  that is in the phone wallet that was attached to Caitlyn's

4  phone, which you can see in the picture. He takes those items.

5  He continues to make threats. He drives them into an alley.

6  Their recitation of events is consistent as to what happens in

7  the alley, that they refused to take their clothes off, despite

8  the defendant ordering them to strip.

9        Sonya Attempted to negotiate and essentially beg, that

10  they would give him money if he didn't force them to do that.

11  Then he hits Caitlyn twice on the side of the head and that then

12  as they pull out, there is a woman as they're leaving in the

13  dark who comes out. Those are not the sort of small details

14  that one makes up, unless one is paying attention and they are

15  true.

16        And essentially, what the defendant is asking the Court

17  to the find is that they've concocted this entire story because

18  they knew that they were going to buy drugs and wanted to make

19  something up. Because that's the only way in which this

20  sequence of events works, and I would submit to the Court that

21  that version of the events is not believable, is not credible,

22  and it's completely illogical.

23        Instead then they go to Ocean Grocery. The defendant

24  is continuing to threaten them, and they were both asked, had

25  you ever seen him before? Did anyone else ever get in the car?

1  Did anyone else ever threaten you? No. No. No. Finally, they

2  get to Ocean Grocery. Caitlyn goes inside, and a big deal has

3  been made about the fact that they did not immediately honk the

4  horn or try to yell or do something else for help.

5      But it is completely reasonable that when someone has

6  threatened that they will make you look at your friend's brains

7  splattered on the sidewalk, that you would be afraid that they

8  would follow through, that you might comply with their requests

9  instead of asking for help because that person is still close to

10 your friend, because you want to make sure that they don't hurt

11 you even further. It's notable that he didn't say I'll cut you.

12 He said, I'll shoot you. That is a weapon that can be used if

13 someone runs away from the car, if someone runs into a store.

14 If he is outside of the car, he can shoot into it. This

15 defendant was a danger to those girls.

16     And they did exactly what we would encourage anyone to

17 do, which is to comply with the demands of the person who is

18 threatening them, to do everything that they can to preserve

19 their lives, and that's what they did. So they go into the

20 Ocean Grocery and the defendant is clearly in possession of the

21 bag that was subsequently found behind Davinci's, and he's now

22 admitted that.

23     If this is a drug transaction with someone she doesn't

24 know after she has been robbed, it would be completely

25 unreasonable for Caitlyn to give all of their belongings to this

1  defendant to hold, and if he is a complete stranger, as they

2  say, it would, again, be completely unreasonable for her to give

3  the bag to him.  That portion of his story makes absolutely no

4  sense.

5      She immediately asks for help once she has the

6  opportunity to in the store.  She goes outside.  She checks on

7  the friend that she has been worried about the whole time

8  because this defendant has threatened to kill her, and then she

9  comes back in and she provides the exact, same story to the

10  police.  Neither of them were impeached with a prior statement

11  to police that was inconsistent.  They have always said this

12  defendant got in the car, only this defendant.  He took their

13  property.  He threatened them.  He forced them to drive around

14  the city.

15      I would submit to the Court that the evidence is

16  overwhelming, and, frankly, that the defendant's testimony

17  strengthens the Commonwealth's case because it is so inherently

18  incredible both in the version of events that he says and the

19  number of lies that he either admitted to telling to the police

20  or then subsequently on the stand said that he didn't say things

21  and it's revealed that he did, in the fact that he did not

22  appear intoxicated to Detective Jones, but subsequently when

23  asked questions when he was testifying, did not remember

24  anything in the interview, but remembered everything that led up

25  to it.

1    And, finally, with his criminal history, he is a
2  three-time convicted felon.  We know he has additional
3  convictions for crimes of moral turpitude.  There is no second
4  man.  There is no drug transaction.  They couldn't have been
5  clearer that they don't know this person.  There wasn't anyone
6  else, and there was never any attempt to purchase drugs.

7    So I would ask the Court to make a specific finding of
8  credibility on the part of Caitlyn and Sonya, to make a finding
9  of incredibility with regard to the defendant's version of
10 events, and to convict him.

11    THE COURT:  Let me ask you a question, Ms. Pettit.
12 So the defense is arguing that they had ample opportunity to
13 escape or seek out help, and, you know, that doesn't hold water
14 if, in fact, they do believe that he had some type of weapon or
15 something.  And he still has one, but at some point in time when
16 she goes to the A.B.C. store, the video shows her come back to
17 the car and the two of them are walking into the grocery store
18 together basically side by side, kind of like a little stroll.

19    And she can clearly see that he doesn't have a gun in
20 his hand at that time.  And even when they go into -- from these
21 pictures, when they go to the ATM machine, you know, he's not
22 looking over her shoulder to see how much money she has in her
23 account or anything.  He's looking around as if to say, you
24 know, hurry up and get this money that I asked for so that we
25 can get out of here.  You know, most people, you would think,

1 that's trying to take something from you would try to take as
2 much as you can. They're not trying to get a specific amount.
3 Like, I'm not robbing you to get $50. I'm robbing you to try to
4 get every dollar I can get from you.

5           So any response to the mannerisms as to how they
6 walked into the store together, the fact that she could clearly
7 see what's in his hand, which is what's been described as a
8 purse or makeup bag and the fact that he's just kind of casually
9 looking around in the store?

10          MS. PETTIT: Yes, sir. One, at that point he had
11 been continuously making threats to harm them, and it is wholly
12 possible that as far as either of these girls knew that he had
13 the gun and it was in his pocket, not just in his hand.
14 Regardless, even if he didn't have a firearm, he still poses a
15 physical danger to her because he's bigger than her and he has
16 threatened physical harm against her. So I think it is
17 completely reasonable that she would continue to comply with
18 that request, particularly in context of the fact that they had
19 been abducted and threatened for quite some time at that point.

20          They had been forced to drive away from Davinci's.
21 They've gone in an alley. He ordered them to take their clothes
22 off. As we heard from Sonya, she stayed there with her eyes
23 closed because she didn't know who was around and she was in
24 shock and she was afraid. So I think it's reasonable that
25 Caitlyn walked into the store that way. She came back. At that

1  point he was still with Sonya and then he was right next to her

2  and she didn't know what he would do and what he had they

3  couldn't see.

4          His actions, to the Commonwealth when he is standing

5  behind her at the ATM, are consistent with someone who is

6  looking around to make sure that no one is coming to apprehend

7  them because they are in the commission of a crime, that he can

8  keep an eye on her while simultaneously watching his back to see

9  if anyone is looking at him, if anyone is calling the police or

10  if anyone's doing anything else like that, which, quite frankly,

11  is almost the hallmark of someone who knows what they're doing

12  with something like this.  Because, if you're just looking one

13  way, the police might be able to apprehend you.

14          He's actually checking over towards First Precinct to

15  make sure no one is coming out the front of First Precinct to

16  run across to the Ocean Grocery.  I think the fact that he

17  immediately runs out of the store on that video and around the

18  corner and throws that bag is further evidence of his guilty

19  intent at that point as well.  If it were just that he was

20  waiting on some money that was owed to him, I don't think that

21  he would have come out at quite such a clip and immediately

22  appeared around the corner.

23          THE COURT:  All right.  Could you pass me that?

24  Defense -- I believe it's Defense Exhibit No. 1.  It's still on

25  the computer.  We will take a recess, go over the evidence and

1  be back to make a ruling.

2          (A recess was taken.  Whereupon, the proceedings

3  continue as follows:)

4          THE COURT:  All right.  The Court previously made

5  a ruling on the motion both the -- all four of the firearms

6  charges based upon the fact that there was really no evidence of

7  a firearm other that the fact that he said, "If you don't turn

8  around, I'm going to shoot you or blow your brains out" or words

9  to that effect, but there was no indication that he made a

10 further action towards any item that showed that he had a gun.

11         So that leaves us with two counts of robbery and

12 two counts of abduction for both Caitlyn Hill and Sonya Sheldon.

13 So going over the testimony also looking at the videos and other

14 documents that have been admitted into evidence, Ms. Hill

15 testified that she gave him -- when he jumped in the car and

16 when she came out of the Davinci's pizza, he entered into her

17 back seat.  She turned around, told him to get out.  Then later

18 Sonya Sheldon also told him to get out.  Once he made aggressive

19 statements to both of them, they both turned back around the

20 opposite way.

21         Ms. Hill went on to say he had requested from her

22 her cell phone and her wallet and that Sonya had given up her

23 phone and her makeup bag.  And then they went on to another

24 location that was described as a alley way whereby they were

25 asked to remove clothing.  Neither one complied with that, and I

1   think they more or less said they tried to negotiate with Mr.

2   Walden to try to get -- to send him in another direction, if you

3   will.

4           At some point in time after that, it wasn't quite

5   clear when the credit card, the debit card came forth.  And he

6   asked for the PIN number, and then that's when they went to the

7   grocery store to get money from the ATM machine.

8           So, looking at the exhibits, what the Court has

9   here and particular when you look at Plaintiff's Exhibit --

10  Commonwealth Exhibit No. 6, the items that were in this exhibit

11  were items that were taken off of Mr. Walden's person, namely

12  the ten $10 bills which adds up to $100, which is the amount of

13  money that was taken out of the ATM, $20, which Ms. Hill said

14  that she had in her cell phone case, the cigarettes, which Ms.

15  Sheldon says were her cigarettes and which Mr. Walden also

16  admits were her cigarettes -- these were all things that

17  belonged to these ladies that were on his person.

18          In addition, the officers found -- and is

19  Commonwealth's Exhibit No. 5 -- these items, and I believe

20  Detective Jones said that she found this bag and within this bag

21  it happened to be two cell phones.  Now, how did the cell

22  phones, both cell phones, get into that purse or makeup kit or

23  whatever you want to call it.  So that means someone had to put

24  them in there.  Who is the more likely person to put those items

25  in the bag, the person who actually received those items.

1    So within that bag we find two cell phones, all
2  the things they claim that they gave him that were missing were
3  found in the close proximity to the track in which he ran.  And
4  when you look at the video, you can clearly see him run around
5  the corner once he leaves the grocery store.  He makes a right
6  and then another right then starts to break out in a run.  You
7  can also see the grocery store attendant come out and
8  immediately look down after him as if he was going to go after
9  him or at least see where he was running to.  All of that
10  behavior leads to guilt as opposed to innocence.

11    The Court went over the testimony that you gave,
12  Mr. Walden, and, quite frankly, the Court found the testimony to
13  be incredible.  One thing that was key, the Court went back and
14  examined the video real closely and happened to notice that when
15  if you look at it frame by frame when you walked into the
16  grocery store, you actually had that purse in your hand when you
17  were walking in.  So she didn't give it to you in order to get
18  the money out of the ATM machine because her hands were empty.
19  That's too big to get in her pocket.  Her hands were absolutely
20  empty.

21    But in your left hand, you were cradling something
22  just like you're cradling something in this picture right here.
23  So it appeared to be the same object.  So that's contrary to the
24  testimony that you gave that she handed the purse to you once
25  she got up here.

1          So, as a result, the Court will find you guilty on

2    both counts of robbery as well as both counts of the abduction.

3          For the record, the robbery is case number

4    19F-3055, which is the robbery of Caitlyn Hill.  Case No.

5    19F-3056 is the robbery of Sonya Sheldon.  Case No. 19F-2888 is

6    the abduction of Caitlyn Hill, and Case No. 19F-2891 is the

7    abduction of Sonya Sheldon.  The Court finds you guilty as

8    charged.

9          Is there a request for a presentence report?

10          MS. FEINMAN:  Yes, sir.

11          THE COURT:  All right.  The Court will order the

12    preparation of a presentence report.

13          Madam Clerk, if you would schedule a presentence

14    date.

15          THE CLERK:  Judge, we found the date of April 24

16    at eleven.

17          MS. PETTIT:  That's available for the

18    Commonwealth.

19          MS. FEINMAN:  That's available, Your Honor.

20          THE COURT:  All right.  Sir, your next court date

21    will be April 24th at eleven.  Is that a Friday?

22          THE CLERK:  It is.

23          THE COURT:  So the probation will be in touch with

24    you to get further information regarding your family history.

25    It could be beneficial to you as well as the Commonwealth to

1    help for purposes of the presentence hearing.

2             You will be remanded to the custody of the

3    sheriff's department until that date and time.

4             Thank you.

5             MS. PETTIT:  Thank you, Your Honor, I believe that

6    concludes this case.

7             THE COURT:  Yes, ma'am.  Thank you.

8             (The proceedings end at 5 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF COURT REPORTER
 2

 3

 4        I, W. Michael Wade, hereby certify that I, having been duly
 5   sworn, was the court reporter in the Circuit Court of the City
 6   of Richmond, January 21, 2020, at the time of the hearing
 7   herein; further, that the foregoing is a true and accurate
 8   record, to the best of my ability, of the testimony and other
 9   incidents of the hearing herein.
10        Given under my hand this 9th day of January, 2021.
11

12

13

14                          W. Michael Wade
                            W. Michael Wade, Court Reporter
15                          Notary Public Commission # 7723898
16

17

18

19

20

21

22

23

24

25
```

January 12, 2021
Edward F. Jewett, Clerk
Richmond Circuit Court
Criminal Division
400 N. 9th Street
Richmond, Va 23219



In re: Commonwealth of Virginia vs. Linwood Gequan Walden
Case No. CR19F03055-00, 3056-00, 2888-00, 2889-00, 2890-00, 2891-00, 2892-00, 2893-00

Mr. Jewett:

Enclosed please find the Original and two transcripts of the above-referenced case from January 21, 2020. Please see that Annalisa Feinman, Esq., and William Efird, Esq., appointed defense counsel has received their Copy. Please see that Brooke Pettit, CA, receives her Copy. Please file the Original transcript with the other papers in this case.

Thank you or your assistance.


Respectfully Yours,



W. Michael Wade, Court Reporter



Enclosures

472

Virginia:

## In the Circuit Court of the City of Richmond, John Marshall Courts Building

## TRIAL ORDER

FIPS CODE: 760

Hearing Date: **January 21, 2020**
Judge: **Clarence N. Jenkins, Jr.**

COMMONWEALTH OF VIRGINIA

v.

**LINWOOD GEQUAN WALDEN, JR.**, DEFENDANT

The defendant was led before the Court for trial and appeared in person with appointed counsel, Annalisa Feinman and William Efird, public defenders. The Commonwealth was represented by Brooke Pettit.

The defendant was arraigned and pled NOT GUILTY.

After having been advised by counsel and by the Court of the right to trial by jury, the defendant knowingly and voluntarily waived trial by jury and with the concurrence of the attorney for the Commonwealth and of the Court, here entered of record, the Court proceeded to hear the evidence without a jury.

The Commonwealth' evidence was heard. The defendant moved to strike the evidence. Having heard argument, the Court strikes CR19-F-2889, CR19-F-2890, CR19-2892 and CR19-F-2893.

The Defendant's evidence was heard. The defendant renewed its motion to strike. Having heard argument, the motion was denied. The Court, having heard the evidence finds the defendant **GUILTY** of the following offense(s) indicated below, but refers the defendant to the Probation and Parole Officer of this district for the preparation of a pre-sentence report returnable on April 24, 2020 at 11:00 a.m.

| CASE NUMBER | OFFENSE DESCRIPTION AND INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VA. CRIME CODE |
|---|---|---|---|---|
| CR19-F-2888 | **Abduction with Intent to Obtain Pecuniary Benefit (F)** | 8/31/19 | 18.2-48 | KID1012F2 |
| CR19-F-2891 | **Abduction with Intent to Obtain Pecuniary Benefit (F)** | 8/31/19 | 18.2-48 | KID1012F2 |
| CR19-F-3055 | **Robbery (F)** | 8/31/19 | 18.2-58 | ROB1207F9 |
| CR19-F-3056 | **Robbery (F)** | 8/31/19 | 18.2-58 | ROB1207f9 |

79