The defendant was found NOT GUILTY on the following offenses:

| CASE NUMBER | OFFENSE DESCRIPTION AND INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VA. CRIME CODE |
|---|---|---|---|---|
| **CR19-F-2889** | **Use of Firearm in Commission of Felony (F)** | **8/31/19** | **18.2-53.1** | **ASL1323F9** |
| **CR19-F-2890** | **Use of Firearm, 2nd + Offense (F)** | **8/31/19** | **18.2-53.1** | **ASL1323F9** |
| **CR19-F-2892** | **Use of Firearm in Commission of a Felony (F)** | **8/31/19** | **18.2-53.1** | **ASL1323F9** |
| **CR19-F-2893** | **Use of Firearm, 2nd + Offense (F)** | **8/31/19** | **18.2-53.1** | **ASL1323F9** |

**Departure.** The defendant is remanded.

_____1/27/2020_____          ENTER: _____
       DATE                                                JUDGE

**DEFENDANT IDENTIFICATION:**
Alias: **n/a**
SSN: **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**     DOB: **3/15/92**          Sex: **Male**

Ybs/filming/probation

80



RECEIVED AND FILED
CIRCUIT COURT
SEP 1 8 2020
EDWARD F. JEWETT, CLERK
BY_____ D.C.

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND
## JOHN MARSHALL COURTS BUILDING

| | | |
|---|---|---|
| **COMMONWEALTH OF VIRGINIA** | ) | **Case No. 19-F-3055, -3056, -2888, -2891** |
| | ) | |
| **V.** | ) | **Hearing Date:** |
| | ) | |
| **LINWOOD GEQUAN WALDEN** | ) | **Honorable C. N. Jenkins** |
| **Defendant.** | ) | |

### NOTICE AND MOTION FOR RELEASE OF
### COURT FUNDS FOR EXPERT ASSISTANCE

COMES NOW, Linwood Gequan Walden, by counsel, and moves this Honorable Court to grant funds to retain an independent defense expert for consultation and evaluation of Mr. Walden to be presented at his forthcoming sentencing hearing.

This motion is based on Mr. Walden's constitutional and statutory rights under Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Article One, sections eight, nine, and eleven of the Virginia Constitution; Virginia Code §§ 19.2-163, 19.2-163.02, 19.2-332, 19.2-334; and the law and argument set forth in this motion and to be presented at a hearing on this motion. In support of this motion, Mr. Walden states the following:

### STATEMENT OF FACTS

1. Mr. Walden has been charged with two counts of robbery, two counts of abduction for pecuniary benefit, and four counts of use of a firearm in commission of a felony, second or subsequent offense.

2. Mr. Walden was tried before The Honorable C. N. Jenkins on January 21, 2020 and was found not guilty of four counts of use of a firearm in commission of a felony, second or subsequent offense, and was found guilty of two counts of robbery and two counts of abduction for pecuniary benefit.

3. Mr. Walden is indigent and is unable to pay for expert witnesses.

104

4. If Mr. Walden were able to provide the necessary funds, his counsel would retain the assistance of a doctor of psychology to examine Mr. Walden, consult with counsel, prepare a written report, and potentially testify on Mr. Walden's behalf at sentencing.

5. To aid in explaining mitigating evidence at sentencing, Mr. Walden is requesting funds to obtain an expert in clinical psychology.

6. The Defense is seeking to retain Dr. Sara Boyd (see Exhibit A – CV for Dr. Sara Boyd).

7. Dr. Boyd normally charges $350 - $375 an hour for clinical analysis with a minimum retainer fee of $4500 for a forensic evaluation and written report, as this usually requires 10-15 hours of work. If testimony is requested, those services are billed at $450 an hour (see Exhibit B – Court Appointed Reduced Fees and Expenses).

8. Dr. Boyd is offering a significantly reduced rate for this court appointed case. Her reduced rate offered for this case is $300 an hour for a forensic evaluation and written report for the Court. If testimony is requested, those services are billed at $350 an hour (see Exhibit C – Statement Governing Dr. Boyd's Forensic Evaluation and Consultation Services).

9. Mr. Walden is requesting approximately $6500 in expert funds to obtain the services of Dr. Boyd to assist in his defense (for clinical work and interviews, record analysis, and consultation with counsel).

## MEMORANDUM OF LAW

When a state brings its judicial power to bear on an indigent defendant in a criminal proceeding, the Court must take steps to assure that an indigent defendant has a fair opportunity to present a defense. Ake v. Oklahoma, 470 U.S. 68 (1985). The United States Supreme Court, in recognizing the imbalance between the resources available to a State versus an indigent defendant, found that the Constitution requires appointment and payment for the "basic tools of an adequate defense." Ake at 77.

The rationale of the court's decision in Ake applies to all experts reasonably necessary for an effective defense. In addition to Equal Protection and Due Process, compensation for experts has been required to satisfy the Sixth Amendment's entitlement to the effective assistance of counsel:

105

> [The] effective assistance of counsel guarantee of the Due Process Clause
> requires, when necessary, the allowance of investigative expenses or appointment
> of investigative assistance for indigent defendants to insure effective preparation
> of their defense by their attorneys.

Mason v. Arizona, 504 F.2d 1345, 1351 (9th Cir. 1974), cert. denied, 420 U.S. 936 (1975).

In Husske v. Commonwealth, 252 Va. 203 (1996), the Virginia Supreme Court held that to obtain the services of an expert at state expense, the defendant must "demonstrate that the subject which necessitates the assistance of the expert is 'likely to be a significant factor in his defense'. . .and that he will be prejudiced by the lack of expert assistance." Husske, 252 at 212, citing Ake, 470 U.S. at 82-83. The Husske Court found no error in the denial of defendant's motion for appointment of an expert because he had failed to meet that standard.

Mr. Walden seeks expert funds specifically to assist in the mitigation phase of his case. Under Va. Code § 19.2-264.4, a defendant is permitted to present evidence regarding "the history and background of the defendant, and any other facts in mitigation of the offense" and any other evidence the court deems relevant to the sentence. While this section pertains to capital cases, the factors in §19.2-264.4 can be considered by this Court in determining the presentment of evidence for his sentencing. Further, in Commonwealth v. Shifflett, 257 Va. 34 (1999), the Court interpreted Va. Code § 19.2-295.1 with regard to mitigation in non-capital cases. The Court held, "[w]e perceive no sound reason why the factors that may be considered by a jury in capital murder cases should not likewise be available for consideration by a jury in noncapital cases under § 19.2-295.1. The goal of having an informed jury assess appropriate punishment should be no less essential merely because a noncapital offense is involved." Shifflett at 43. In guiding the trial court in a non-capital jury, the Court further noted,

> we hold that a trial court, in determining what evidence is relevant to punishment
> under Code § 19.2-295.1 may be guided in the exercise of its discretion, subject to
> the rules of evidence governing admissibility, by the factors set forth in Code §

106

19.2-264.4(B), as interpreted in *Coppola* [v. Commonwealth, 220 Va. 243 (1979)]. The kind of evidence contemplated by § 19.2-295.1 bears upon the record of the defendant and the nature of his crime. Evidence of a good previous record, and extenuating circumstances tending to explain, but not excuse, the commission of the noncapital crime is admissible mitigating evidence.

<u>Shifflett</u> at 44.

Thus, this Court may consider any evidence relevant to sentencing, to include mitigation evidence and information regarding Mr. Walden's history and background. This Court has found Mr. Walden guilty of two counts of robbery and two counts of abduction for pecuniary benefit, which are considered violent felonies. Mr. Walden now faces a possible four life sentences. Investigation and testimony regarding Mr. Walden's particular background would be mitigating to the Court during the sentencing hearing. The expert requested is essential and a significant factor in Mr. Walden's mitigation, and his counsel does not have the necessary expertise to present his defense without it. Through interviews and preliminary investigation, counsel has uncovered information that Mr. Walden has been the victim of extensive domestic violence and familial trauma. The impact of this trauma and the extent of the psychological consequences are beyond the knowledge and expertise of counsel in this case, and therefore Mr. Walden requires the assistance of an expert witness to obtain a fair sentencing.

Mr. Walden submits that the assistance of this expert is "suitable for [this] particular case." <u>See</u> <u>Singleton v. Commonwealth</u>, 16 Va. App. 841, 842,(1993). Section 19.2-163 of the Virginia code authorizes compensation for "reasonable expenses incurred as it deems appropriate under the circumstances of the case" to an indigent defendant. "Thus, any such expense must be both 'reasonable' and 'appropriate under the circumstances of the case.'" <u>Singleton</u> at 842 (quoting Va. Code § 19.2-163). "Reasonableness addresses the amount of the expense. A trial court is not permitted to direct payment of such an expense if it is of an unreasonable amount.'

107

Singleton, 16 Va. App. at 842. "Appropriateness addresses whether the purpose of the expense is suitable for the particular case. An expense would not be justified, even if reasonable in amount, if it served little or no purpose in the particular case." Singleton, 16 Va. App. at 842.

Mr. Walden asserts that the request is both reasonable and appropriate. The fee of no more than $6500 is a reasonable amount based on the estimate of time to meet with Mr. Walden, do a full clinical evaluation, review his prior records, travel, consult with counsel, and prepare a written report. This rate is significantly reduced from Dr. Boyd's normal rate, which would be substantially more and would include an upfront retainer fee of $4500. Dr. Boyd is also committed to lessening costs for indigent clients where possible, and will be mindful of the timing in performing her duties. The request is likewise appropriate, given the admissibility of mitigation evidence at trial, the trauma Mr. Walden has sustained and the resulting impact on his life and decisions, the seriousness of the charges, the four life sentences Mr. Walden is facing now that he has been convicted, and pursuant to Va. Code § 19.2-264.4, Coppola, and Shifflett.

Mr. Walden will be prejudiced without the assistance of the requested expert. The requested expert assistance is essential for Mr. Walden to have a fair sentencing hearing and to present effective mitigation evidence on his behalf. Were it not for Mr. Walden's poverty, counsel would retain the expert requested. If Mr. Walden is not provided with this expert assistance, he will be deprived of Due Process of law, the Equal Protection of the laws, the effective assistance of counsel, and his right to present evidence on his own behalf. In these circumstances, the constitutions of the United States and Virginia, as well as other applicable Virginia law, require that funds for the expert assistance be provided. See Ake v. Oklahoma, 470 U.S. 68 (1985); Husske v. Commonwealth, 252 Va. 203 (1996).

WHEREFORE, the Defendant moves this Honorable Court to enter an Order authorizing

108

the payment of funds as laid out above so he may retain expert assistance in the preparation of

his sentencing mitigation.

Respectfully Submitted,<br>
LINWOOD GEQUAN WALDEN<br>
By Counsel

Annalisa S. Feinman, VSB #88017<br>
Assistant Public Defender<br>
Office of the Public Defender<br>
Oliver Hill Courthouse<br>
1600 Oliver Hill Courthouse, Suite C-287<br>
Richmond, VA 23219<br>
(804) 646-2958

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of September 2020, a copy of the foregoing Motion was hand-delivered to the Office of the Commonwealth's Attorney, City of Richmond, John Marshall Courts Building, 400 N. 9th Street, Richmond, Virginia 23219.

Annalisa S. Feinman<br>
Counsel for Defendant

109

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND
### JOHN MARSHALL COURTS BUILDING

| | | |
|---|---|---|
| **COMMONWEALTH OF VIRGINIA** | ) | **Case No. 19-F-3055, -3056, -2888, -2891** |
| | ) | |
| **V.** | ) | **Hearing Date:** |
| | ) | |
| **LINWOOD GEQUAN WALDEN,** | ) | **Honorable C. N. Jenkins** |
| **Defendant.** | ) | |

### <u>ORDER</u>

This day came the Defendant, by counsel, on his Motion to Secure Expert Funds. Finding said motion to be appropriate this Honorable Court ORDERS that funds not exceeding $6500 be made available to Mr. Walden and his counsel to retain a Forensic Psychologist for consultation with counsel, an evaluation of Mr. Walden, and potential testimony at trial.

Entered this _____ day of _____, 2020.

_____
Judge


I ASK FOR THIS:

_____
Annalisa S. Feinman
Assistant Public Defender

_____
SEEN AND _____
Brooke Pettit
Assistant Commonwealth's Attorney

110

- 238 -

RECEIVED AND FILED
CIRCUIT COURT
2:54

SEP 18 2020

EDWARD F. JEWETT, CLERK
BY_____D.C.

**EXHIBIT A**



# Sara Boyd, Ph.D. Licensed Clinical Psychologist

**ph:** 571.317.0979 | **fax:** 844.598.6534

*Institute of Law, Psychiatry, & Public Policy at the University of Virginia, &*
*Boyd Forensic Psychology Services, LLC*

## EDUCATION

**Graduate:**

**Doctor of Philosophy,** Clinical Psychology**,** University of Kentucky, August 2013.
Dissertation title: *Personality and Personality Disorder in Adults with Intellectual Disabilities.*

**Master of Science**, Clinical Psychology, University of Kentucky, 2010.

**Master of Science**, Counseling Psychology, University of Kentucky, 2005.

**Certificate in Developmental Disabilities**, University of Kentucky, 2005.

**Undergraduate:**

**Bachelor of Science**, Psychology, University of Illinois, May 2003.

## PROFESSIONAL LICENSES & CREDENTIALS

**Diplomate, American Board of Professional Psychology (ABPP), Forensic Specialty**, November 2019 to present.

**Licensed Clinical Psychologist**, Virginia Department of Health Professionals, July 3, 2014 to present. License number: 0810005036

**Licensed Clinical Psychologist**, District of Columbia Department of Health Professional Licensing, February 10, 2015 to present. License number: PSY1001030

**Licensed Clinical Psychologist**, West Virginia Board of Examiners of Psychologists, August 24, 2016 to present. License number: 1154

**National Register Health Psychologist #54431**

## CLINICAL EXPERIENCE & EMPLOYMENT

**Institute of Law, Psychiatry, and Public Policy, University of Virginia Health System, Licensed Clinical Psychologist/Forensic Evaluator.** Charlottesville, Virginia. June 2016 to Present.

113

Providing forensic evaluation and consultation in adult and juvenile criminal and civil matters. Supervising postdoctoral fellows and graduate students, and developing professional trainings for forensic evaluators and attorneys.

**Woodbridge Psychological Associates, P.C., Licensed Clinical Psychologist,** Woodbridge, Virginia, September 2014 to June 2016.
Providing forensic evaluation and consultation in adult and juvenile criminal and civil matters.

**Institute of Law, Psychiatry, and Public Policy, University of Virginia Health System, Forensic Psychology Postdoctoral Fellow,** Charlottesville and Staunton, Virginia, August 2013 to August 2014.
Postdoctoral fellowship was comprised of two primary assignments: Western State Hospital, and Institute of Law, Psychiatry, and Public Policy clinic at the University of Virginia.

*Western State Hospital—Virginia Department of Behavioral Health and Developmental Services*
- Conducted mental state at the time of offense and competency to stand trial evaluations in an inpatient forensic setting.
- Provide training and consultation on intellectual disability, forensic, domestic/sexual violence, and LGBTQ-related topics for mental health providers.

*Institute of Law, Psychiatry, and Public Policy*
- Conducted gender dysphoria evaluations for Virginia Department of Corrections, general psychological evaluations, sex offender risk assessment, violence risk assessment, mental state at the time of offense, and competency to stand trial evaluations in an outpatient forensic clinic.
- Developed and provided training and consultation services to private and public mental health professionals.

**Westchester Jewish Community Services, APA-Accredited Internship, Psychology Fellow,** Yonkers and Hartsdale, New York, July 2012 to July 2013.
Pre-doctoral Internship at community mental health agency comprised of rotations in a treatment and evaluation program for juvenile sex offenders, court assessment program, treatment center for survivors of trauma and abuse, a program for individuals with developmental disabilities (DD), an autism evaluation clinic, and a learning center. Provided consultation to multidisciplinary teams on such matters as psychological assessment, research, and empirically-based treatment.

*Treatment Center for Trauma and Abuse*
- Utilized Skills Training in Affective and Interpersonal Regulation/Narrative Story-Telling (STAIR/NST), Trauma-Focused Cognitive Behavioral Therapy (TF-CBT), Prolonged Exposure, behavioral activation, and other empirically-based methods to treat child, adolescent, and adult survivors of trauma, sexual and physical abuse, and domestic violence.
- Conducted focal and comprehensive psychological assessments to assist in treatment planning. Provided feedback to clients, families, and clinicians.

114

*Autism Evaluation Program*
- Assessed and determined diagnoses of adults and children referred due to suspected Autism Spectrum Disorders (ASDs). Utilized ADOS-2, adaptive functioning, intellectual ability, achievement and neuropsychological measures, in addition to in-depth clinical interview, collateral interviews, and record review.

*Developmental Disabilities Program*
- Utilized cognitive-behavioral therapy (CBT) and parent management training interventions with children and adults with intellectual and developmental disabilities (ID/DD) and their families.
- Provided diagnostic clarification, crisis management services, and psychotherapy to individuals recently discharged from inpatient settings.
- Co-led a social skills group for 5- and 6-year-old children with ASDs.

*Juveniles Starting Over Program*
- Conducted risk and safety assessments, including ERASOR, for adjudicated juvenile sex offenders and children and adolescents with sexual behavior problems.
- Provided individual and family therapy to adjudicated juvenile sex offenders and non-adjudicated youth with sexual behavior problems.

*Court Assessment Program*
- Co-evaluated custody/visitation, termination of parental rights, delinquency, abuse/neglect, and probation cases.
- Co-performed specialized evaluations of juvenile sex offenders.
- Consulted to psychiatrists, judges, court staff, and guardians. .
- Conducted brief psychoeducational screenings.

*Learning Center*
- Conducted comprehensive and focal cognitive, educational, and personality assessments of children, adolescents, and adults.
- Evaluated individuals with potential learning disabilities, executive function deficits, Attention-Deficit Hyperactivity Disorder (ADHD), and other psychiatric diagnoses.
- Developed comprehensive educational, social, and vocational recommendations as part of an integrative written report, and provided feedback to clients, families, and clinicians.

**Bluegrass Mental Health/Mental Retardation Board**, **Eastern State Hospital, Forensic/Inpatient Psychology Trainee**, Lexington, Kentucky, June 2010 to July 2011.
Provided forensic assessments to individuals with serious mental disorders in an inpatient setting. Assisted in evaluations of competency to stand trial and criminal responsibility for misdemeanors and felonies. Consulted to psychologists on forensic cases involving individuals with ID/DD. Administered adjunct malingering and neuropsychological testing for the supervising forensic psychologist. Other rotations included assessment and individual and group therapy on a high-risk unit, geriatric/medically fragile unit, and a day treatment program. Developed special expertise in intervention and testing of dually diagnosed consumers with ID/DD and severe mental illness.

**University of Kentucky**, **Harris Psychological Services Center, Graduate Student Therapist**, Lexington, Kentucky, July 2007 to July 2011.
Assessed risk as part of employment screening for weapons-handling personnel at an international security company. Conducted integrative assessments for ADHD and learning disabilities. Provided individual psychotherapy for clients with ASDs, major depression, adjustment disorder, conversion disorder, generalized anxiety disorder, post-traumatic stress disorder, and borderline personality disorder.

**University of Kentucky**, **Harris Psychological Services Center, Social Skills Group Co-Leader**, Lexington, Kentucky, September 2008 to December 2008.
Conducted intakes for potential group members, and co-led a manualized skills-based intervention group for children with social impairments. Met with parents to exchange feedback, and conducted pre- and post-intervention behavioral assessments. Group members had ASD and/or anxiety disorders.

**University of Kentucky**, **Harris Psychological Services Center, Assessment Coordinator**, Lexington, Kentucky, July 2007 to August 2008.
Responsible for all aspects of outpatient clinic testing. Supervised assessments; performed intakes; participated in administrative meetings to determine the appropriateness and disposition of potential clients; reviewed clinic policies and procedures; researched, identified, and ordered new instruments; engaged in community outreach; and maintained clinic assessment records.

**Bluegrass Rape Crisis Center**, **Crisis Counselor Trainee**, Lexington, Kentucky, September 2005 to September 2006.
Provided crisis counseling services at a community agency for survivors of sexual assault. Accompanied survivors (including survivors with disabilities) to the local emergency room, provided advocacy and support throughout the medical examination and detectives' questioning, and answered crisis line calls.

**Center for Women, Children, and Families**, **Counseling Psychology Trainee**, Lexington, Kentucky, January 2006 to May 2006.
Led psychoeducational groups for adult survivors of domestic violence who had lost custody of their children and were seeking reunification. Conducted intakes and provided individual CBT to children and adults. Diagnoses included Fragile X and other developmental disabilities, post-traumatic stress, adjustment, acute stress, and major depressive disorders.

## RESEARCH EXPERIENCE

**Westchester Jewish Community Services, Co-Principal Investigator**, "Sexual Knowledge and Attitudes of Adolescents and Young Adults with Developmental Disabilities, Before and After a Psycho-Educational Intervention." White Plains and Hartsdale, New York, July 2012 to July 2013.
Co-originated study concept, developed methodology, identified appropriate assessment instruments, and generated hypotheses for a study examining outcomes for adolescents and young adults with ASDs who participated in a psycho-educational healthy sexuality group.
Variables include sexual knowledge and attitudes, Axis I psychopathology, and intellectual functioning.

**University of Kentucky, Principal Investigator**, "General Personality, Personality Disorder, Psychopathology, and Adaptive Functioning in Adults with Intellectual Disabilities." Lexington, Kentucky, October 2011 to August 2013.
Wrote literature review, developed study methodology and hypotheses, obtained IRB approval, recruited participants from vulnerable populations, and collected, analyzed, and interpreted data. Dissertation.

**University of Kentucky, Co-Investigator**, "Gender Identity, Sexual Orientation, and Personality." Lexington, Kentucky, September 2012 to present.
This project is comprised of three studies examining the relations among non-normative gender identity, personality, and sexuality. Generated research idea, developed study methodology, obtained IRB approval, and collected, analyzed, and interpreted data for study one. Co-principal investigator: Tory Eisenlohr-Moul, Ph.D.

**University of Kentucky, Widiger Personality Laboratory, Graduate Research Partner**, Lexington, Kentucky, September 2005 to July 2012.
Administered the Personality Disorder Interview-IV and Structured Interview for the Five Factor Model to participants in studies of personality disorders; generated ideas for laboratory research; co-developed methodology for studies of Five Factor Model personality; coded semi-structured interviews for reliability; read and critiqued papers submitted for publication; and identified test items for use in Five Factor Model research. Principal Investigator: Thomas Widiger, Ph.D.

**University of Kentucky, Department of Behavioral Sciences, Graduate Research Assistant**, Lexington, Kentucky, June 2008 to May 2010.
Collected, analyzed, and interpreted data, co-authored manuscripts, and wrote annual reports for funding sources.

**University of Kentucky, Preservice Health Training Project, Research Assistant**, Lexington, Kentucky, August 2005 to June 2008.

117

Assisted in a project evaluating outcomes of online training modules for health professionals serving people with disabilities. Co-authored six manuscripts published in peer-reviewed journals; collected, analyzed, and interpreted data; co-developed study methodology; and coordinated and edited contributions by co-authors. Principal Investigator: Harold Kleinert, Ed.D.

**University of Illinois, Korol Sex Steroids and Behavior Rodent Laboratory, Research Assistant**, Lexington, Kentucky, May 2002 to August 2002.
Assisted in a study of rodent spatial navigation strategies, resulting in a *Neuroscience* publication. Performed rodent surgeries, including ovariectomy and cannulae implantation in the striatum and hippocampus, tested rodent behavior, and performed histology on frozen brain tissue. Principal Investigator: Donna Korol, Ph.D.

## PUBLICATIONS

**Boyd, S. E.** (2012). Five Factor Model personality functioning in adults with intellectual disabilities. In T.A. Widiger & P.T. Costa (Eds.), *Personality Disorders and the Five Factor Model of Personality* (3rd ed.) (pp. 209 - 217). Washington, D.C.: American Psychological Association.

Adams, Z., and **Boyd, S.E.** [shared first-authorship] (2010). Ethical challenges in the treatment of individuals with intellectual disabilities. *Ethics and Behavior, 20,* 407-418.

**Boyd, S.,** Sanders, C., Kleinert, H., Huff, M., Lock, S., Johnson, S., et al. (2008). Virtual patient training to improve reproductive healthcare for women with intellectual disabilities. *Journal of Midwifery and Women's Health, 53,* 453-460.

Kleinert, H. K., Fisher, S., Sanders, C., & **Boyd, S.** (2007). Improving physician assistant competencies in developmental disabilities using virtual patient modules. *Journal of Physician Assistant Education, 18,* 33-40.

Kleinert, H. K., Sanders, C. B., Mink, J., Nash, D., Johnson, J., **Boyd, S.,** et al. (2007). Improving student dentist competencies and comfort in delivering care to children with developmental disabilities using a virtual patient module. *Journal of Dental Education, 71,* 279-286.

Knudsen, H. K., Studts, J. L., **Boyd, S. E.,** & Roman, P. M. (2010). Structural and cultural barriers to the adoption of smoking cessation services in addiction treatment organizations. *Journal of Addictive Diseases, 29,* 294-305.

Knudsen, H. K., **Boyd, S. E.,** Studts, J. L. (2010). Substance abuse treatment counselors and tobacco use: a comparison of comprehensive and indoor-only smoking bans. *Nicotine and Tobacco Research, 12,* 1151-1155.

Sanders, C. L., Kleinert, H. K., Free, T. F., Slusher, I., Clevenger, K., Johnson, **S., Boyd, S.** E. (2007). Caring for children with intellectual and developmental disabilities: Virtual patient instruction improves students' knowledge and comfort level. *Journal of Pediatric Nursing, 22,* 457-466.

Sanders, C. L., Kleinert, H. K., Free, T. F., Slusher, I., Clevenger, K., **Boyd, S.,** et al. (2007). Caring for children with intellectual and developmental disabilities: Virtual patient instruction improves students' knowledge and comfort level. *Journal of Pediatric Nursing, 22,* 457-466.

Sanders, C. L., Kleinert, H. K., **Boyd, S. E.** Herren, C., Theiss, L., & Mink, J. (2008). Virtual patient instruction for dental students: can it improve dental care access for persons with special needs? *Special Care Dentistry, 28,* 205-213.

Sanders, C. L., Kleinert, H. K., Free, T. F., Slusher, I., Clevenger, K., **Boyd, S.,** et al. (2008). Developmental disabilities: improving competence in care using virtual patients. *Journal of Nursing Education, 47,* 66-73.

Widiger, T. A., & **Boyd, S.** (2009). Personality disorder assessment instruments. In J. N. Butcher (Ed.), *Oxford handbook of personality assessment (3rd ed.)(pp. 336-363).* New York: Oxford University Press.

Zurkovsky, L., Brown, S. L., **Boyd, S.,** & Korol, D. L. (2007). Estrogen modulates learning in female rats by acting directly at distinct memory systems. *Neuroscience, 144,* 26-37.

## TEACHING & TRAINING EXPERIENCE

**Capital Area Immigrants' Rights (CAIR) Coalition, Detained Children's Program webinar presenter: Detention Conditions, Health Impact of Detention on Children, & Legal Issues of Children's Detention.** Washington, DC, July 2019.
One of three presenters providing overviews of legal, health, and psychological realities and risks for immigrant children in detention. Webinar attendees were stakeholders and grant foundations.

**University of Virginia Health Services, Panelist: How Experience Might Inform Ethical Practice. Transgender Youth and Systems-Level Reforms for Girls.** Charlottesville, VA, April 2019.
One of three panelists reviewing potential ethical considerations, and responding to training participant questions, regarding forensic assessment of transgender and gender non-conforming individuals.

**District of Columbia Department of Behavioral Health, Training Presenter.** Washington, D.C., December 2018.
Developed training materials and presented on the topic of adjudicative competency restoration for adults with Intellectual Disabilities.

**National Legal Aid & Defender Association Presenter.** Philadelphia, PA, June 2018.
Developed training materials, and co-presented with Joette James, Ph.D., as well as presenting (solo) regarding accommodations-related assessments for defendants with cognitive and psychiatric disabilities, and about psychopathy and Antisocial Personality Disorder, respectively.

**Georgetown Juvenile Justice Initiative and National Juvenile Defender Center Symposium: Race and Juvenile Justice 50 Years after *Gault* Presenter/Panelist.** Washington, D.C., May 2017.
Co-panelist with Daniel Murrie, Ph.D., for discussion of race and risk assessment of juveniles.

**Georgetown Juvenile Justice Center Presenter.** November 2016.
Developed and presented a training for public defenders regarding common errors in risk assessment reports and strategies for critical reading of risk assessment evaluations.

**Superior Court Judicial and Senior Manager Spring Conference Presenter.** Washington, D.C., April 2015.
Developed and presented training materials for Superior Court Judges as part of a panel on risk assessment of juvenile and adult defendants.

**Training for Attorneys Preparing to Represent Defendants on the Prince William Mental Health Court Docket.** Manassas, Virginia, April 2015, April 2016, & April 2018.
Prepared and presented a training for attorneys and judges about psychiatric disorders and forensic psychology considerations relevant to defendants with suspected or confirmed psychiatric disorders.

**Institute of Law, Psychiatry, and Public Policy, Presenter.** Charlottesville, Virginia, 2014 to 2018.
Developed and presented training curriculum for forensic evaluators assessing risk-related online behaviors in juveniles.

**Institute of Law, Psychiatry, and Public Policy, Presenter.** Charlottesville, Virginia, October 2014 to 2017.
Developed and presented training curriculum for evaluating competency to stand trial and mental state at the time of offense in defendants with intellectual disabilities and borderline intellectual functioning.

**Institute of Law, Psychiatry, and Public Policy, Training Faculty.** Richmond, Virginia, and Charlottesville, Virginia, May 2015 and September 2014.
Developed and presented a one-day training curriculum on assessing online behavior of forensic evaluees, with emphasis on issues relevant to problematic sexual behavior online, applicable statutes, and recommendations for supervision.

**Washington, District of Columbia, Department of Behavioral Health, Presenter.** August 2014.
Developed and presented a training curriculum on evaluating adjudicative competency of defendants with intellectual disabilities. Trainees were forensic psychologists and psychiatrists employed by the Department of Behavioral Health.

**Department of Behavioral Health and Developmental Services, Presenter.** August 2014.
Developed and presented a grand rounds for mental health service providers at Western State Hospital; topic was introduction to internet culture, and how and why to query online activities of individuals with severe mental illness.

**Department of Behavioral Health and Developmental Services, Presenter.** July 2014.
Developed and presented Psychology Department inservice training concerning adapting empirically-supported PTSD treatments for inpatient forensic populations.

**Department of Behavioral Health and Developmental Services, Training Facilitator,** Richmond, Roanoke, and Newport News, Virginia, April 2014 to May 2014.

120

Developed and presented a training curriculum on customizing outpatient restoration of competency to stand trial services for individuals with intellectual disabilities. Trainees were community mental health providers.

**Institute of Law, Psychiatry, and Public Policy, Presenter.** Charlottesville, Virginia, March 2014.
Developed and presented training curriculum on assessing online behavior of forensic evaluees, with emphasis on issues relevant to problematic sexual behavior online.

**Western State Hospital, Department of Behavioral Health and Developmental Services, Presenter,** Staunton, Virginia, November 2013.
Developed and presented a grand rounds for mental health providers, concerning personality disorders in adults with intellectual disabilities, also developed and presented a psychology department inservice training focused on adapting evidence-based trauma treatment interventions for inpatient forensic populations.

**Westchester Jewish Community Services, Instructor**, Yonkers and Hartsdale, New York, September 2012 to July 2013.
Developed training curriculum on assessing online activity of children, adolescents, and young adults. Presented training to an outpatient trauma treatment center, a violence intervention and prevention program, and a program for teen parents.

**University of Kentucky, University Center for Excellence in Developmental Disabilities, Curriculum Development and Project Coordinator**, Lexington, Kentucky, January 2012 to July 2012.
Originated concept, generated learning objectives and teaching strategies, and developed content for an inter-disciplinary, multi-media online training for mental health professionals to provide more competent and ethical care to adults with ID/DD. Wrote scripts, cast actors, and filmed and edited illustrative video vignettes. Applied for and obtained continuing education credits from the Kentucky Psychological Association.

**University of Kentucky, Teaching Assistant**, Lexington, Kentucky, 2011.
Taught Learning and Cognition -- online section (Summer Session 2011); and, Introduction to Psychology -- four sections (Fall 2011).

**University of Kentucky, Human Development Institute, Instructor**, Lexington, Kentucky, 2008 to 2011.
Lectured on sexual abuse of adults with disabilities to students enrolled in the interdisciplinary Graduate Developmental Disabilities Certificate Program. Converted lecture to online format for the distance learning section of program.

**Migrant Network Coalition, Workshop Co-Leader**, Lexington, Kentucky, August 2010.
Researched and developed materials and co-led a training workshop on the intersection of disability and immigration status.

**University of Kentucky, Department of Behavioral Sciences, Graduate Student Trainee**, Lexington, Kentucky, August 2007 to May 2009.

Developed training materials and facilitated *in vivo* experiences to prepare medical students for treating patients with DD and their families. Developed student/family mentorship program, still in use by the medical school.

**University of Kentucky, Human Development Institute, Project Supervisor**, Lexington, Kentucky, November 2007 to July 2008.
Researched and developed instructional content of a multi-media online training package for direct service professionals who support adults with DD. Coordinated marketing and distribution of training program to Medicaid waiver providers. Funded by the Kentucky Department of Behavioral Health, Developmental and Intellectual Disabilities.

**University of Kentucky, Preservice Health Training, Project Assistant**, Lexington, Kentucky, August 2005 to June 2008.
Helped identify training needs of professionals (e.g., dentistry, nursing, women's health) treating individuals with ID/DD; researched and wrote content for training materials; and co-scripted video vignettes for an award-winning series of online, multi-media, interdisciplinary training modules.

**Project SAFE (Safety and Accessibility for Everyone), Coordinator**, Frankfort, Kentucky, September 2005 to September 2006.
Created and presented three trainings on the topic of sexual and domestic violence perpetrated against individuals with disabilities. Audience included team members from a coalition of state agencies dealing with sexual assault, domestic/interpersonal violence, disability rights, and crime victims' advocacy.

**Commonwealth of Kentucky, Coalition of State Disability and Employment Agencies, Training Facilitator**, Frankfort, Kentucky, April 2005 to June 2005.
Coordinated disability-awareness trainings, led by facilitators with disabilities, for state employees of Kentucky One-Stop Job Centers.

## PRESENTATIONS

**Boyd, S. (chair),** Brodsky, S., Murrie, D.M., & Stejskal, W.J. (2016, March). Bias in Forensic Mental Health Evaluations. Symposium at the American Psychology-Law Society Conference. Atlanta, Georgia.

**Boyd, S.,** Barretto, R., & Zelle, H. (2015, June). *Using Advance Directives for Self-Advocacy and Planning: An Overview and Example of the Process.* Presentation at the 14th Annual Philadelphia Trans Health Conference. Philadelphia, PA.

**Boyd, S.** (2010, November). *Personality, motives, and adaptive functioning in adults with intellectual disability.* Poster presented at the Association of University Centers on Disability conference, Crystal City, VA.

**Boyd, S.,** & Adams, Z. (2008, April; shared first authorship). *Ethical considerations in the treatment of individuals with Intellectual Disability.* Award Presentation session at the annual American Psychological Association conference ,Boston, MA.

Boyd, S. (2008, month) *Traits, motives, and behavior: comparing the NEO PI-R and the Reiss Profile*. Poster Presented on September 26 at the 2008 Society for Research in Psychopathology conference, Pittsburgh, PA.

Kleinert, H. K., Caldwell, S., **Boyd, S.** (2006, October). *Interactive virtual training for residential physicians and student dentists on caring for patients with developmental disabilities*. Concurrent session presented at the annual Association of University Centers on Disability conference, Washington, D.C.

## ADVOCACY & COMMUNITY SERVICE

**University of Kentucky, Department of Psychology, Diversity Committee Founding Member**, Lexington, Kentucky, February 2012 to August 2012.
Identified need, and assisted in assembling members and faculty support for, a graduate student-led committee to revise departmental policies relating to sexual and gender minority students and Psychology Department clinic clients. Advised faculty and community supervisors regarding training requirements, materials, and procedures. Developed multimedia training materials ultimately implemented in graduate curriculum.

**Project SAFE (Safety and Accessibility for Everyone), Coordinator**, Frankfort, Kentucky, September 2005 to September 2006.
Created project to increase physical and attitudinal accessibility of domestic violence shelters and rape crisis centers in Kentucky. Identified and invited representatives from state agencies addressing domestic and sexual violence, disability rights, and crime victim advocacy to provide project leadership. Scheduled and led meetings. Project SAFE became an ongoing organization and was awarded a three-year Department of Justice Violence Against Women Act grant for $750,000 in 2008.

**Consumer Advisory Council of Kentucky, Board Member**, Frankfort, Kentucky, November 2006 to November 2008.
Assisted in senior level decision-making regarding priorities and policies of the Human Development Institute, with special emphasis on creating an inclusive environment for people with disabilities. Reviewed and provided feedback on Institute research, funding, and grant applications. Monitored organization's compliance with the strategic plan.

## SUPERVISION

**Institute of Law, Psychiatry, & Public Policy Graduate Student and Postdoctoral Fellow Supervisor,** Charlottesville, Virginia. August 2017 to present.
Supervised graduate students and postdoctoral fellows in reviewing and conducting forensic psychological evaluations. Presented at case conferences for student and practitioner attendees.

**Westchester Jewish Community Services, Clinical Psychology Extern Supervisor**, Hartsdale, New York, September 2012 to July 2013.

Supervise a graduate-level psychology extern in providing evidence-based treatments to a clinic population. Discuss differential diagnoses, case formulations, treatment goals, interventions, and collateral services. Provide ongoing feedback and conduct formal written evaluations.

**University of Kentucky, Student Supervisor**, Lexington, Kentucky, May 2008 to June 2012.
Supervised four undergraduate student assistants in laboratories investigating psychopathology, personality, and self-regulation. Oversaw data collection and analysis, manuscript preparation, and conference presentations. Provided guidance on professional development, including graduate school applications.


## HONORS

**2012 Research Endowment Award**, from the Human Development Institute, University of Kentucky.

**2011 Research Funding Award**, from the Department of Psychology, University of Kentucky.

**2008 Winner, American Psychological Association (APA) of Graduate Students ethics paper contest**. Awarded at the APA annual conference in Boston, MA, August 2008. Paper, co-authored with Z.W. Adams, titled: Ethical Considerations in Psychotherapy with Adults with Intellectual Disabilities.

**2008 Research Funding Award**, from the Department of Psychology, University of Kentucky.

**2007 Burberry Award**, from the Human Development Institute, University of Kentucky, a University Center for Excellence in Developmental Disabilities.
This award recognizes outstanding academic achievement and advocacy efforts in graduate student trainees.

**2006 Travel Award**, from the Department of Psychology, University of Kentucky.

**2006 Anne Rudiger Award**, from the Association of University Centers on Disability (AUCD).
This national award recognizes academic and advocacy-related achievement among graduate student trainees in the AUCD network.

**1998-1999 James Scholar Honors Program**, University of Illinois.

## PROFESSIONAL MEMBERSHIPS

American Psychological Association (APA)
   APA Division 33: *Intellectual and Developmental Disabilities/Autism Spectrum Disorders*
   APA Division 35: *Society for the Psychology of Women*
   APA Division 46: *American Psychology-Law Society*
   APA Division 56: *Trauma Psychology*

Fellow, American Board of Forensic Psychology (ABFP)

124

# EXHIBIT B

| COURT APPOINTED REDUCED FEES & EXPENSES | |
|---|---|
| **SERVICE** | **RATE** |
| **SERVICES** including time reserved for legal and professional consultations, interviews, evaluation appointments, collateral appointments, broken and canceled appointments, testing, test scoring and interpreting, reviewing printed materials, reviewing documents, preparing and providing reports and affidavits.<br><br>Testimony and deposition rate: | $300/hr<br><br><br><br><br>$350/hr |
| **TRAVEL/ON-SITE TIME and TEST PROCTORING:**<br>➢ driving time – car<br>➢ air travel time – time to/from IAD – destination (includes time starting at take-off (IAD) and ending at landing (destination) – return: time starting at take-off from destination and ending at landing (IAD)<br>➢ On-site holding time – time on-site at service locality during business hours with no service/availability expectation by retaining party | $180/hr |
| **EXPENSES:**<br>➢ mileage – personal car .<br>.......................................................................<br>➢ car rental fees, gas purchase ..<br>...............................................................<br>➢ hotel stay ..................<br>...............................................................<br>➢ meals ........................<br>...............................................................<br>➢ parking (airport, hotel, destination, etc.) .....<br>...............................................................<br>➢ taxi/transportation from hotel/airport.....<br>...............................................................<br>➢ photocopying..........................................................................<br>......... | IRS rate<br>actual cost/<br>receipts<br>actual cost/<br>receipts<br>*per diem**<br>actual cost/<br>receipts<br>actual cost/<br>receipts<br>actual cost/<br>receipts |

126

**EXHIBIT C**

## STATEMENT GOVERNING DR. BOYD'S FORENSIC EVALUATION AND CONSULTATION SERVICES
*Effective date January 1, 2019*

**FEES**. Fees for service shall include, but not be limited to, charges for time reserved for legal and professional consultations, interviews, evaluation appointments, collateral appointments, broken and canceled appointments, testing, test scoring and interpreting, reviewing records or other documents, preparing and providing reports, affidavits, designations, and testimony.

The fee for all time and services by Dr. Boyd is **$350.00** per hour for services provided in offices, **$375.00** per hour for services provided after regular office hours or outside of office, and **$450.00** per hour for preparing for and reserving time to provide services for any legal proceeding, including declarations, affidavits, reports, depositions, and court testimony. Under certain conditions, expedited rates will apply (see below, and see *Fees and Expenses* Table on page 4 for summary).

Be aware that since evaluations, declarations, affidavits, depositions, consultations, and testimony require considerable preparation time, the reservation of multiple hours, and the likely need to reschedule other persons' appointment times, you are billed for the time that you reserve for these services and proceedings. Telephone consultations are billed at a rate of $90 per quarter of an hour or any portion thereof.

The financially responsible party shall be the attorney or law firm by whom Dr. Boyd is retained unless there is an agreement otherwise in writing. In the case of deposition of Dr. Boyd, the party conducting the deposition is responsible for payment, in advance. The responsible party shall pay the fees for all time and services, whether the time spent is initiated by that party, an attorney, the court, Dr. Boyd, or other persons or agencies relevant to the matter. This includes responsibility even if the time spent is on activities perceived as adverse to the interests of the responsible party. Timely payment for all services covered by this contract is required.

**RETAINER**. In matters that will not require work product or testimony from Dr. Boyd until at least four weeks following her engagement, there is a minimum initial retainer of $4500 for the first party in the matter plus an additional $3000 for each additional party. If Dr. Boyd's services are engaged within four weeks or less of the date at which work product or testimony is due, the initial retainer will be $5500 for the first party in the matter plus an additional $4000 for each additional party. Modifications of the initial retainer amount must be negotiated and confirmed in writing by Dr. Boyd. If Dr. Boyd's services are engaged within three weeks or less of the date at which work product or testimony is due, expedited rates apply (see *Fees and Expenses* Table on page 4 for summary). If a work product is requested with less than two weeks notice, regardless of when Dr. Boyd was retained, the expedited rates also apply. The retainer is to be paid by cash or check. The retainer is due at least 48 hours before the first consultation or evaluation session and before Dr. Boyd may be identified as having been consulted with or retained in the matter. Appointments will be automatically canceled without notice if this retainer is not paid at least 48 hours before the first session. The retainer is a credit balance

128

against which fees shall be charged. Half of the total retainer is non-refundable should the consultation or evaluation be canceled or not completed for any reason at any time by any party or attorney other than Dr. Boyd. Dr. Boyd shall return any unused remaining refundable portion of the retainer to the payer promptly when requested and when notified by the responsible party in writing that Dr. Boyd's services will no longer be required in the matter.

The actual final cost of forensic services varies tremendously depending on the amount of time spent by Dr. Boyd and the amount of contact with the parties and the attorneys, the number of other persons to be included, the amount of information to be read, and the degree of complexity of the matter. Dr. Boyd's fees may substantially exceed the initial retainer in which case additional retainers shall be required. Additional retainers and fees shall be paid promptly when requested by Dr. Boyd. Services will be suspended or terminated if future retainers or fees are not paid when requested.

**PAYMENT**. Payment is due and payable at the time of service. Service charges will accrue at 1.2% per month (or a minimum service charge of $20.00 per month), but not to exceed the amount permissible by law on any balance not paid within 30 days after the charge was incurred. Should the bank for any reason return a check whatsoever, a $5 returned check fee will be due, and all charges owing shall become immediately due and payable.

**FINANCIAL RESPONSIBILITY AND THIRD PARTY PAYMENTS**. The responsible party, who is usually the attorney or law firm, and not any third party, who is usually a party in the legal matter, assumes complete financial responsibility for all of the fee obligations contained herein even though reimbursement of these fees may be sought from another person or other third party. The use of insurance is not a substitute for the financial obligations described herein. The acceptance by Dr. Boyd of payments from a third party shall be construed only as payments made by a third party on the behalf at the financially responsible party and not as an indication that the third party is necessarily the financially responsible party.

In the case of a deposition, the deposing party must notify Dr. Boyd at least 5 business days in advance with respect to the anticipated length of deposition, either half-day (3.5 hours or less) or full day (3.5 hours to 7.5 hours). If the deposing party estimates a half day, and the deposition lasts longer than 3.5 hours (not counting breaks requested by Dr. Boyd), the rate automatically doubles plus a 30% penalty (i.e., $3990 for the day, rather than the standard $3000 full-day rate).

129

**APPOINTMENTS and CANCELLATIONS**. Because the scheduled appointment time is held exclusively for one person or task, advance notice of cancellation is required. Cancellation charges are calculated as per the table below:

| Time Reserved | Amount of Cancellation Notice | Amount of charge |
| --- | --- | --- |
| 50 min. or less | 24 hrs. | no charge |
| 50 min. or less | <24 hrs. but >2hrs. | 1/2 charge |
| 50 min. or less | <2 hrs. | full charge |
| >50 min & <4 hrs. | 72 hrs. | no charge |
| >50 min. & <4 hrs. | <72 hrs. but > 24 hrs. | 1/2 charge |
| >50 min. & < 4 hrs. | <24 hrs. | full charge |
| 4 hrs. or more | one week | no charge |
| 4 hrs. or more | <one week & > 72 hrs. | 1/2/charge |
| 4 hrs. or more | <72 hrs. | full charge |

Because Dr. Boyd participates in forensic matters, there may be occasions when appointments may have to be re-scheduled with minimal notice because participation is required in another legal matter. If Dr. Boyd fails to give notice of at least 48 hours that an appointment cannot with you be kept for any reason, a replacement appointment shall be at no charge.

**COLLECTION**. If an account is due for 60 days, it shall be sent for collection. The responsible party shall pay all reasonable costs of collecting the bill, such as reasonable collection agency charges that are 50% of the bill, reasonable attorney's fees, and court costs. The 50% collection agency charge shall be added to the bill and shall become part of the financial responsibility at the time the account is sent to the collection agency. In the event that legal action is instituted to collect fees and charges, the responsible party shall pay all additional reasonable costs and fees resulting from the suit, such as reasonable collection agency charges which are 50% of the bill, reasonable attorney's fees, and court costs.

**TERMINATION**. Dr. Boyd may immediately terminate services and contacts, and notify the court of such termination and the reasons therefore, at any time Dr. Boyd believes that any party is not fully complying with the provisions stated herein or with the orders of the court. Since Dr. Boyd's professional liaison with the court is an attorney, Dr. Boyd may, at her sole discretion, immediately terminate her service if any party related to this matter is not or ceases to be represented by counsel. Dr. Boyd may also terminate services at her discretion and in accordance with her judgment if the retaining parties violate professional or ethical standards.

130

No further services including reports, recommendations, or opinions will be provided after services are terminated.

**AGREEMENT**. All agreements and contracts with Dr. Boyd are in writing. There are no oral agreements that may supersede this written policy statement on this matter. Any modification of the terms of this statement must be in writing and signed by Dr. Boyd. Should Dr. Boyd, at her sole discretion, choose to waive any requirement under the terms of this contract, that waiver shall not be deemed a subsequent waiver of that requirement or any other requirement under the terms of this contract. Dr. Boyd, in agreeing to provide this consultation, is specifically relying on the responsible party's agreement to abide by all of the terms of this contract.

131

| FEES & EXPENSES | | |
|---|---|---|
| **SERVICE** | **RATE** | **EXPEDITED RATE\*** |
| **SERVICES PROVIDED IN-OFFICE,** including time reserved for legal and professional consultations, interviews, evaluation appointments, collateral appointments, broken and canceled appointments, testing, test scoring and interpreting, reviewing printed materials, reviewing documents, preparing and providing reports, affidavits, and testimony | **$350/hr** | **$425/hr** |
| **SERVICES PROVIDED AFTER HOURS OR OUT-OF-OFFICE,** including time reserved for legal and professional consultations, interviews, evaluation appointments, collateral appointments, broken and canceled appointments, testing, test scoring and interpreting, reviewing printed materials, reviewing documents, preparing and providing reports, affidavits, and testimony | **$375/hr** | **$475/hr** |
| **TESTIMONY AND REPORTS,** including preparing for and reserving time to provide services for any legal proceeding, including declarations, affidavits, reports, depositions, and court testimony | **$450/hr** | **$525/hr** |
| **DEPOSITIONS,** party conducting is responsible for fees. Units are half-days (i.e., 3.5 hours or less) and full days (commitments between 3.5 to 7.5 hours). Full days are twice the half-day rate, except in the case of estimated half-days running beyond the time originally estimated by the deposing party (see *Financial Responsibility & Third Party Payments* section, page 2). | **$1500/half day** | **$2500/half day** |
| **TELEPHONE CALLS/CONSULTATION** | **$90/0.25 hr.** | **$120/0.25 hr.** |
| **TRAVEL/ON-SITE TIME and TEST PROCTORING:**<br>➢ driving time – car<br>➢ air travel time – time to/from IAD – destination (includes time starting at take-off (IAD) and ending at landing (destination) – return: time starting at take-off from destination and ending at landing (IAD)<br>➢ On-site holding time – time on-site at service locality during business hours with no service/availability expectation by retaining party<br>➢ time supervising or proctoring self-administered psychological tests | **$250/hr**<br>**$250/hr**<br><br><br>**$250/hr**<br><br>**$250/hr** | **$300/hr**<br>**$300/hr**<br><br><br>**$300/hr**<br><br>**$300/hr** |
| **EXPENSES:**<br>➢ mileage – personal car<br>➢ car rental fees, gas<br>➢ hotel<br>➢ meals<br>➢ parking (airport, hotel, destination, etc.)<br>➢ taxi/transportation from hotel/airport<br>➢ photocopying | IRS rate actual cost/ receipts | |

\* Applies If Dr. Boyd's services are engaged within three weeks or less of the date at which work product, consultation, or testimony is due.

132

SIGNATURE PAGE

My signature below indicates that I have read and agreed to the terms of this written agreement. The terms of this agreement apply and billing for services may commence from the time that Dr. Boyd is identified as having been consulted with or retained in the matter, regardless of the date and time that the retaining party signs this form.

_____          _____

Signature of Retaining Party                              Date

RECEIVED AND FILED
CIRCUIT COURT

JAN 07 2021

EDWARD F. JEWETT, CLERK
BY_____D.C.

1  VIRGINIA:

2       IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

3          JOHN MARSHALL COURTS BUILDING

4

5  --------------------------------

                      I

6  COMMONWEALTH OF VIRGINIA,   I

                      I

7  v.                 I     CASE NO.  CR19-F-2888

                      I              CR19-F-2891

8  LINWOOD G. WALDEN,     I           CR19-F-3055

                      I              CR19-F-3056

9  --------------------------------

10

11

12  ************************************************************

13     Before:  HONORABLE CLARENCE N. JENKINS, JR., JUDGE

14  ************************************************************

15

16

17                 September 30, 2020

18                 Richmond, Virginia

19

20

21

22            CHANDLER and HALASZ, INC.

23       Registered Professional Reporters

                P. O. Box 9349

           Richmond, Virginia  23227

24               804-730-1222

        Reported by:  L. Diane Paarfus

25

1              APPEARANCES

2

3

4

5    THE COMMONWEALTH OF VIRGINIA
     By:  Brooke Petite, Esquire
6    Assistant Commonwealth's Attorney;

7

8

9

10   OFFICE OF THE PUBLIC DEFENDER
     701 East Franklin Street, Suite 600
11   Richmond, Virginia  23219
     By: Annalisa S. Feinman, Esquire
12   Counsel for the Defendant;

13

14

15

16   The Defendant, LINWOOD G. WALDEN, in person.

17

18

19

20

21

22

23

24

25

1    The hearing in this matter commenced at 11:41 a.m.;

2    the court reporter was sworn.

3                          *****

4    THE COMMONWEALTH:  Linwood Walden.

5    THE CLERK:  The case of the Commonwealth vs.

6    Linwood Walden, the defendant is present in court by video,

7    represented by Ms. Feinman.

8         Counsel, are you prepared to proceed?

9         MS. FEINMAN:  Yes, ma'am.

10        THE CLERK:  The Commonwealth is represented by

11   Brooke Petite.

12        THE COURT:  All right.  This matter, according to

13   the docket -- let's see, I saw it on the docket, now I don't

14   see it -- is it a request for a motion for expert funds; is

15   that correct?

16        MS. FEINMAN:  Yes, Your Honor.

17        THE COURT:  Yes, ma'am.

18        MS. FEINMAN:  Your Honor, we're asking that the

19   Court allocate expert funds in the case for Mr. Walden so

20   that we can hire a mitigation expert.  We have sent in a

21   detailed brief, or a motion to the Court, laying out the

22   grounds for the request as well as the specific expert that

23   we would be requesting to hire, Dr. Sarah Boyd, and for

24   legal justification for this motion, the Court -- courts

25   have found that the Supreme Court, state supreme court, have

1   found that the court has taken steps to assure indigent

2   defendants has a fair opportunity to present a defense.  In

3   Ackue vs. Oklahoma (phonetic), the court recognized --

4           THE COURT:  Well, let me stop you --

5           MS. FEINMAN:  Yes, sir.

6           THE COURT:  -- let me make sure it's contested

7   before you go any further.

8           Are you contesting this?

9           THE COMMONWEALTH:  Yes, sir.

10          THE COURT:  Okay.  Yes, ma'am.

11          MS. FEINMAN:  Thank you, Your Honor.

12          The court recognized the imbalance of resources

13   between the state and the indigent defendant and held that

14   the court needs to help assist indigent defendants with all

15   experts that are reasonably necessary for an effective

16   defense, and the court held that justice cannot be equal

17   where simply as a result of his poverty a defendant is

18   denied the opportunity to participate meaningfully in a

19   judicial proceeding in which liberty is at stake, and that's

20   the case here.  If Mr. Walden were able to hire an expert on

21   his own, there is no question but that we would hire this

22   expert.

23          THE COURT:  And if you could indicate to the Court

24   what's the purpose of the expert again.

25          MS. FEINMAN:  The purpose of the expert would be

1  to conduct a detailed psychological evaluation of Linwood

2  Walden.  He was previously, I believe, as a juvenile

3  diagnosed as having bipolar disorder.  He has gone through

4  very significant family trauma as a child and as an adult

5  including domestic violence, and this expert, I've spoken

6  with her and have been able to, you know, talk with her

7  about what value would she provide, what difference would it

8  make for Mr. Walden's case, and what she is able to do is

9  investigate the history of his trauma and how that history

10  contributes to the current situation, contributes to the

11  decisions that were made in this case leading him to be

12  before this court, and what can be done to prevent

13  recidivism, and I think that's the most important part is

14  that she can help this Court crack the plan.  We have to

15  understand how we got to where we are and understand where

16  we are so we know how to move forward in a way that

17  protects, not just Mr. Walden and not just for mitigation at

18  sentencing, but protects the community when he is eventually

19  released from incarceration, and what she can go into is his

20  experiences of trauma, the long-term affect that results

21  from that trauma, and that it impacts actions and ability to

22  understand actions, ability to understand how you impact

23  other people and ability to empathize with individuals, your

24  ability to inhibit impulses and control your own behavior

25  and that destructive behavior often is a result of an

1  attempt to mitigate emotional trauma.  So, you've been hurt
2  so you lash out at other people and as well as people who
3  have a limited tool box to deal with these tough issues in
4  their life, she can help evaluate what tools they have
5  available and expand that tool box, and those were her
6  words, so that they can more appropriately deal with these
7  emotions and feelings, and regarding physical trauma
8  especially as a child that can cause traumatic brain
9  injuries which further contribute to impulsivity and
10  impaired judgment.

11          So, what she can do is a comprehensive
12  psychological evaluation and can talk about the
13  developmental impact of psycho-social trauma and head
14  trauma, and I would bring up that the Department of
15  Corrections does mental health screening, but that is not a
16  mental health or psychological evaluation nearly of the
17  scope that we would be talking about here.  It's just a
18  screening for vague red flags, they don't do in-depth
19  analysis.  So, she was very clear that this is much, much
20  deeper and more meaningful than the quick screen they are
21  given when they become a resident of the Department of
22  Corrections.

23          THE COURT:  And what amount are you requesting?
24          MS. FEINMAN:  I'm requesting $6500, Your Honor.
25          In speaking with Dr. Boyd, she does reduce her

1    rates for indigent defendants and for court appointed work.

2    She is happy to do whatever she can to reduce her costs in

3    ways that are not typical for her work even to the extent of

4    allowing -- we have two, I guess, social workers, mitigating

5    experts in our office, and she will work with us in our

6    office so that we can do parts of the review and summarize

7    the very important documents so that we can reduce the time

8    that she needs spending reviewing everything to reduce the

9    costs to the state because we do recognize the cost of this

10   is to the state.

11           Your Honor, I would note that Mr. Walden's

12   guidelines call for about 22 years and 11 months at the low

13   end.  The high end is, I believe, 33 years and 11 months.

14   The midpoint is 29 years.  That is a hugely significant

15   amount of time.  I have the math up here somewhere.

16           According to a fiscal report that was done for

17   fiscal year '18 that was provided in November of 2019, the

18   average cost to house an inmate per day in the state of

19   Virginia is $87.20.  If we're talking about the low end of

20   the guidelines at 22 years, round it down to 22, it's really

21   22 and 11 months, the cost to incarcerate him at the low end

22   of the guidelines is over $660,000.  If we're talking about

23   the high end of the guidelines, the cost is $1,050,000 and

24   some change.  That is a tremendous amount of money.

25           Today, we're asking for $6500.  That is, even if

1   he is sentenced to the low end of the guidelines, that is

2   less than one percent than what the state would be paying to

3   incarcerate him.  I think that is a very minimal amount of

4   money to spend.  If it in any way, first of all, helps his

5   case and helps for when he is released to reduce the risk of

6   recidivism and to make the community safer, I think, that is

7   a cost the Commonwealth can very easily bear when it works

8   out to everyone's benefit in that way.

9            I do believe he'll be prejudiced if this expert is

10  not allowed to be retained.  The courts have been consistent

11  that characteristics of the person and attributes that lead

12  them to behave in certain ways that influence, you know, the

13  behavior that led to the criminal conduct that brings them

14  to court, that is absolutely relevant at sentencing.  I

15  don't believe there's an issue about the mental state and

16  personal characteristics are relevant at sentencing.  This

17  would give Mr. Walden the impact, the ability to have him

18  investigated, see what underlying mental health issues there

19  are or may be that have impacted his ability to function in

20  society that would impact his cognitive properties, just the

21  way he thinks, the way he sees the world and interacts with

22  it.  He would be significantly harmed by an inability to

23  explore that and present mitigation to the Court explaining

24  how this happened, how he came to be here, and, most

25  importantly, how we can fix it moving forward.

1    He has previously been incarcerated. He's

2 previously been incarcerated on a robbery charge. I'm sure

3 the Commonwealth will bring that up. In speaking with Dr.

4 Boyd about that prior history, she spoke in terms of a

5 physical illness or a medical issue when someone has a

6 problem and you prescribe the medicine, if the medicine

7 doesn't work and doesn't fix it, you don't just up the dose.

8 You re-evaluate, you check the diagnosis, and, then, you try

9 something else. We have tried that medicine. We are back

10 here again. The answer isn't to increase the dose and

11 increase the amount of time. It's to re-evaluate the

12 premise and to see what alternatives we can look at moving

13 forward so that we can actually get at the root issue.

14    The courts are, of course, about punishment and

15 that is obviously part of sentencing, but rehabilitation

16 should also be a focus and if there is a chance that we can

17 do such a minimal thing to help rehabilitate Mr. Walden to

18 make him better, more able to function in society and to

19 protect society when he is eventually released, I think,

20 it's absolutely imperative that the Court allow us to do

21 that.

22    THE COURT: All right. Ms. Petite?

23    THE COMMONWEALTH: Your Honor, the Commonwealth is

24 objecting to the request, and, essentially, I think what the

25 defense is asking for is an expert on diminished capacity on

1  what Ms. Feinman just said is a chance that there may be

2  something that that expert could uncover that would be

3  helpful to the defendant, and the case law on this is very

4  clear that the defendant must make a particular showing of

5  need.  The standard is that the request must include more

6  than a general statement that the expert is necessary or

7  important in more than an undeveloped assertion that the

8  requested assistance would be helpful.

9       In Husp vs. Commonwealth (phonetic), they stated

10  again it must be more than mere hope or suspicion that

11  favorable evidence is available.  In that case they said the

12  mere explanation that defense counsel didn't have the

13  technical knowledge that a scientist might to challenge DNA

14  evidence that was not a sufficient statement of need.  Here,

15  we have simply in the defense motion that the impact of the

16  trauma and extent of the psychological consequences are

17  beyond the knowledge and expertise of counsel in that case.

18  It is almost the exact statement that was made the Husp

19  (phonetic) case is what we have here.

20       I do have a case to pass up, and I have a copy for

21  Ms. Feinman as well, Hoverter vs. Commonwealth, which is 23

22  Va. App. 454, from 1996, in that case the Court of Appeals

23  upholding the denial of funds for a defendant to hire a

24  psychologist to prepare for sentencing.  It says the

25  defendant has failed to show a particularized need for the

1   requested services or what the actual prejudice would be

2   rather than merely an allegation that prejudice would exist

3   because in that particular case the defendant did not allege

4   mental illness, demonstrated no way that the services of the

5   expert might constitute a significant factor in his defense,

6   showed no prejudice resulting from non-appointing of an

7   expert; nor, did defendant in that case explain why a

8   detailed presentence investigation would not sufficiently

9   reflect any mitigation expert.

10          Your Honor, in this case we have a very detailed

11  presentence report that is dated July 1st of this year.

12  This is a trial that actually occurred in January, so I'm

13  not sure why we have an eight-month delay for the request of

14  appointment for this expert.  But I can tell you, in that

15  presentence report the defendant says that he received love,

16  guidance and discipline as a child.  He reported no type of

17  abuse, no alcohol use or drug abuse in his family.  This

18  defendant has reported no history of mental health treatment

19  which is concerning to the Commonwealth given that there is

20  now an allegation of a mental health diagnosis but this

21  defendant says that there has been no mental health

22  treatment in his life.

23          The only traumatic experience that this defendant

24  reports in the presentence report is the loss of his

25  daughter in 2016, and, certainly, the Commonwealth does not

1  want to minimize the seriousness of that loss, but I don't

2  know that an expert is required for the Court to understand

3  that that is a significant loss to anyone.  There's been no

4  explanation as to why other evidence does not adequately

5  address the question.  Certainly, testimony from a family

6  member or from the defendant about that loss or about his

7  family history would be sufficient to do that.  There's been

8  no explanation why that couldn't occur particularly given

9  the defense counsel has now acknowledged that her office has

10  two people who specialize in mitigation, two social workers

11  who meet with clients, who do investigations in the

12  community with the defendant's family and who could testify

13  as to these same factors that Ms. Feinman has mentioned.

14       I would note, Your Honor, that one of the elements

15  of the statute governing the appointment of experts is

16  reasonableness, and defense counsel has previously cited

17  Singleton which states if a reasonableness requirement of

18  Code Section §19.2-163.2 addresses specifically the amount

19  of the expense.  This is a case where we have a defendant

20  who can testify about the trauma he's experienced, a case

21  where the public defender's office has two employees of

22  their office who specializes in mitigation and they're

23  asking for $6500.  That is an extremely high amount of

24  expert funds.  So, I'd submit that the reasonableness

25  requirement here does not balance in favor of the Court

1  granting that request.

2          In terms of aid to the defendant, a psychological

3  evaluation would still require to be of any use at

4  sentencing for that person to come in and testify,

5  essentially, to diminish capacity which has been staunchly

6  rejected by the courts in this Commonwealth, so I'd submit

7  that the age of the defendant is not as great as it might

8  sound because the testimony from this expert is likely not

9  admissible at sentencing.  So, I do think that there are

10 other ways for the Court certainly to hear evidence about

11 this defendant's childhood and any trauma that he received,

12 certainly, for him to testify about the changes in his

13 personality, and the Commonwealth can seize that testimony

14 from the defendant on that issue or from family members

15 would be admissible.

16          But I would object to the motion on that basis.  I

17 think Hoverter is, essentially, directly on point in the

18 reasons why the request should be denied, and I would ask

19 the Court to deny the motion.

20          THE COURT:  Anything else, Ms. Feinman?

21          MS. FEINMAN:  Yes, Your Honor.

22          As to why this is -- well, first of all, let me be

23 clear, we're not trying to argue a diminished capacity

24 defense at the sentencing.

25          Mental state and mental acuity is relevant the

1    courts have held repeatedly that that is a relevant

2    consideration for sentencing and it's relevant to

3    mitigation, that it's admissible and it is appropriate.

4          As far as why there's a particularized showing of

5    need in this case, the Commonwealth relies only on the

6    presentence report.  The presentence report may be detailed

7    in that the Commonwealth provided the probation officer a

8    great deal of information about Mr. Walden.  However, from

9    Mr. Walden's perspective, a probation officer comes and

10   talks to him maybe by video, maybe by phone, one time, and

11   says, hey, tell me about your life, tell me about all of

12   your deepest, darkest secrets, what has caused you the most

13   pain in your life.  Of course he doesn't tell them every

14   single story or mention every single trauma especially in

15   regards to his parents.  He loves his parents.  They remain

16   close to this day.  They are deeply important to him.  I

17   will tell the Court that Mr. Walden has had a particularized

18   history of trauma.  He was initially born into a stable

19   two-parent household.  His parents worked, they lived in a

20   home together as a family.  When he was about six years old,

21   his mother was sexually assaulted and robbed in an alley.

22   As a result of that, she contracted HIV.  The HIV caused her

23   to -- she coped with that by starting to use crack cocaine.

24   That caused a split in his family.  His mom was in and out

25   of his life for years.  Dad moved on with his stepmom.

1       Eventually, when he was about 13 years old, he got

2  in an argument with his stepmom and went to live with an

3  aunt.  His aunt was very physically abusive, would beat him

4  with her fist, with frying pans, and with switches including

5  switches that he would pick himself soak in water for a few

6  days, and, then, be beaten with.  At one point when he was

7  14, he says he was kicked out of his house for two weeks and

8  he was sleeping in alleys around town.  He went back to her

9  house, stayed with her till he was about 15 or 16, at that

10  point was able to move back in with his father, his mother

11  and his mother's boyfriend.  An unusual living arrangement,

12  but it was the four of them in the house together.  That was

13  when he was able to get away from that childhood abuse.

14       As an adult as he did mention in the presentence

15  report, and the Court may remember this case, Latrice

16  Walden, she was a three-year-old girl who was horrifically

17  beaten over four days.  Ms. Turner was the defendant in that

18  case, it was heard in this courtroom, and she was sentenced

19  to 30 years for the murder of his daughter.  That was his

20  trial that trauma.  He was actually in the hospital with

21  Latrik (phonetic) and his significant other at the that

22  abuse was taking place while Latrik was giving birth.  So,

23  that was a very traumatic event for him.

24       THE COMMONWEALTH:  I don't mean to interrupt, but

25  to clarify, the defendant was incarcerated at the time that

1  happened.  He could not have been at the hospital.  He was

2  notified by the police while incarcerated.

3      MS. FEINMAN:  I apologize.  I did misspeak on my

4  part, Your Honor, but that's why the daughter was with the

5  grandmother was because his significant other was given

6  birth at that point in time.

7      He had a one-year-old son that, from my

8  understanding, he didn't find out he had this son until

9  after the son had passed away, he had drowned while with the

10  maternal grandmother and that he had a daughter,

11  (phonetic)     , who in April of 2018, passed away of SIDS

12  in her crib when she was about three months old.  That he

13  didn't share this with the probation officer who spoke with

14  him once is not surprising.  This is something, as Ms.

15  Petite pointed out, this case has been going on for a long

16  time.  I've spent a great deal of time with  Mr. Walden as

17  well as other folks in my office.  It's taken a long time to

18  get through this and get to know him and find out these

19  things about him.

20      This is a great example of why you can't rely on

21  the presentence report to get to the heart of the issues

22  especially when it comes to trauma and mental health issues.

23  They are probation officers.  They work very hard.  They do

24  their best, but that is not their speciality.  That's the

25  same with the two mitigating people in our office.  They are

1  wonderful. They work very hard and they do excellent work,

2  but they are not trained in mental health, this is not their

3  speciality. They are not the appropriate people to engage

4  in this way. Dr. Boyd is a trained psychologist. She has

5  extensive experience working within the criminal justice

6  system, mostly, I believe, in her words, on the sides of

7  victims of domestic abuse. She has the ability to diagnose

8  specific mental health issues. It's my understanding

9  according to his mother, he was diagnosed with bipolar when

10  he was a juvenile, so there is a specific allegation of

11  underlying mental illness. His mother also has bipolar,

12  and according to Dr. Boyd, childhood trauma and familiar

13  history of mental health exacerbate and is much more likely

14  that someone will suffer from mental health issues in their

15  own way.

16      THE COURT: And, yet, he told the probation

17  officer that he had no history of mental health treatment.

18  Did he have any treatment for the bipolar?

19      MS. FEINMAN: So, my understanding from Mr.

20  Walden, he thought he maybe was diagnosed as a juvenile, he

21  wasn't really sure. Molly O'Rourke, our mitigation person

22  in the office, spoke with his mother who said that he was

23  diagnosed with bipolar as a child.

24      THE COURT: But she did not give you any

25  documentation to support that?

1          MS. FEINMAN: She did not. So, we're working on

2     that. It's my understanding in speaking with Ms. O'Rourke

3     that she doubts they have records going back that far.

4          THE COURT: Well, let me just tell you why,

5     because, you know, Ms. Feinman, these words are thrown out

6     very loosely now and people -- everybody who comes before

7     the Court all of a sudden is bipolar and it used to be ADHD,

8     everybody when I was in the juvenile court system, not one

9     person wasn't. So, without there being some, you know, some

10    physician indicating that that was a diagnosis, and I'm not

11    going to base it on the mother who had a substance abuse

12    issue, but, of course, this is part of his mitigation so she

13    has a self-interest, but I don't think that's sufficient.

14    Okay.

15          MS. FEINMAN: I will say we're trying to get those

16    records from RBHA. It's my understanding that maybe they

17    don't keep stuff from that far. His mother is diagnosed as

18    bipolar, and Dr. Boyd did say that that increases the

19    likelihood as well as childhood trauma that he would have it

20    as well, and I do know that his mother has been in and out

21    of  psychiatric hospitals throughout the duration of this

22    case. She does have serious documented mental illness.

23          THE COURT: And, so, there were questions within

24    the presentence report I know about your family history and

25    is there any indication that he said anything about the

1　trauma of his mother throughout this presentence report?

2　　　　MS. FEINMAN:  He did not throughout the

3　presentence report, Your Honor.

4　　　　But, again, I will point out that this -- and I'm

5　not clear, I should have asked him about this -- the

6　probation officers typically meet with the defendant one

7　time.  Sometimes they go in person.  At this point, it would

8　probably be over the video screen when you meet with

9　somebody at the jail.  Other times, they send the

10　individuals a written questionnaire and they'll just fill it

11　out and send it back.  This is not an in-depth lengthy

12　heart-to-heart that they have.

13　　　　THE COURT:  I just want to find out one thing in

14　particular.  This is the domestic and environmental summary,

15　it says he was provided at -- he was raised by both parents

16　in Blackwell area, Richmond, a single family dwelling,

17　he was provided adequate food, clothing and shelter.  He

18　received love, guidance and discipline.  Education and

19　religion were emphasized in his household.  No type of abuse

20　reported.  He reports no alcohol or drug use in his family

21　life.  He reports a traumatic experience of loss of a

22　three-year-old daughter, but that was just recently.

23　　　　So, the Court is inclined to deny your motion

24　based upon that, ma'am.  I understand your argument, but the

25　Court does not feel that a particularized need has been

1    shown and as such your motion will be denied.

2              THE DEFENDANT:  And, excuse me, Judge Jenkins.

3              THE COURT:  No, sir.

4              THE DEFENDANT:  May I speak, please?

5              THE COURT:  No, sir.  You can talk to your

6    attorney when she sees you.

7              THE COMMONWEALTH:  We do need to set a date for

8    sentencing, and one matter the Commonwealth would like to

9    address that it's my understanding that it's become the

10   practice of the public defender's office in anticipation of

11   sentencing to submit a mitigation memorandum that contains

12   numerous facts that are not in evidence, and, then, I would

13   like to object to that being submitted without the agreement

14   of the Commonwealth.  I would ask if the witnesses whose

15   statements would have been contained in that memorandum do

16   appear and cross-examine at trial.  I'm sorry, at

17   sentencing.

18             MS. FEINMAN:  Your Honor, I don't think that's a

19   timely request or motion at this point.  I think the

20   Commonwealth --

21             THE COURT:  The Court -- yeah, I have no knowledge

22   of that, Ms. Petite, and there's nothing on the table for me

23   to even entertain at this time.

24             THE COMMONWEALTH:  I understand.  I simply wanted

25   to make the Court aware because it is my understanding that

1    they're submitted to the Court and the Court reviews them

2    prior to the Commonwealth having an opportunity to object.

3    There's been several instances in which the witnesses who

4    are quoted in those memorandums ultimately appear at

5    trial and deny making those statements. I'm sorry, at

6    sentencing. I don't know why I keep saying trial.

7          THE COURT: All right. Madame Clerk, we need a

8    date.

9          THE CLERK: Is this for a jury or --

10         THE COURT: I'm sorry. Mr. Walden, did you say

11    something?

12         THE DEFENDANT: Yeah, I just wanted to say, man,

13    it's not easy getting on this (indecipherable). It's not

14    easy to tell your like trauma about your family. It's --

15         THE COURT: I gotcha, sir. You can step out --

16         THE DEFENDANT: -- that's something you don't

17    understand. You gotta do that. The woman came to see me

18    yesterday and I told her the truth. That's all I can do.

19         THE COURT: All right. Thank you, sir.

20         THE CLERK: How far out? How much in court time?

21    I have November 19th.

22         THE COMMONWEALTH: I have a number one priority

23    jury that day.

24         THE CLERK: Okay. How about the 20th?

25         THE COMMONWEALTH: The Commonwealth is available.

1    MS. FEINMAN:  I'm available.

2    THE COURT:  All right.  You're going to have to

3 give him the date because the Court was not going to let him

4 continue talking while I was trying to get the date.  So,

5 you'll have to give that to him.

6    THE COMMONWEALTH:  And I will request that he be

7 transported on that date.

8    THE COURT:  Well, that request can be made, but

9 I'm not going to make a determination at this time whether

10 or not that will be granted, you know, given the COVID

11 situation and given whatever his circumstances with respect

12 to the jail over there, we'll make that determination later,

13 and that's November the what?

14    THE CLERK:  20th at 11.

15    THE COURT:  All right.  November 20th at 11:00.

16    How long do you think that pretrial will last,

17 probably pretty lengthy?

18    THE COMMONWEALTH:  Commonwealth would have at

19 least one witness that, I think, would be 10 to 15 minutes,

20 and --

21    THE COURT:  All right.  Go into next week.

22    THE COMMONWEALTH:  -- then, just argument.

23    THE CLERK:  How about November -- October --

24    THE COURT:  What's wrong with the November week,

25 the next week?  We shouldn't have any juries going on now so

1    it shouldn't be an issue.  Should be one of those days next

2    week should be available.

3          We'll do the 20th at 11.

4          Thank you all.

5          THE COMMONWEALTH:  Thank you.

6          MS. FEINMAN:  Thank you.

7

8

9

10

11

12

13

14

15                   HEARING CONCLUDED

16

17          (The hearing concluded at 12:05 p.m.)

18

19

20

21

22

23

24

25

# CERTIFICATE OF COURT REPORTER

1

2

3

4      I, L. Diane Paarfus, hereby certify that I,

5  having been duly sworn, was the Court Reporter in the

6  Circuit Court of the City of Richmond, on the 30th

7  day of September, 2020, at the time of the hearing herein.

8      I further certify that the foregoing transcript

9  is, to the best of my ability, a true and accurate record

10  of the incidents of the hearing herein.

11      Given under my hand this 28th day of December,

12  2020.

13

14

15

16

17

18                     L. Diane Paarfus
                       Court Reporter
19

20

21

22

23  Notary Registration Number:  269677

24

25

Virginia:

## In the Circuit Court of the City of Richmond, John Marshall Courts Building

## CONTINUANCE ORDER

FIPS CODE: **760**

Hearing Date: **September 30, 2020**
Judge: **Clarence N. Jenkins, Jr.**

COMMONWEALTH OF VIRGINIA

vs.

**LINWOOD GEQUAN WALDEN,** DEFENDANT

The defendant was led by video before the bar of this Court represented by appointed counsel, Annalisa Feinman, public defender. The Commonwealth was represented by Brooke Pettit.

The Court proceeded on defendant's Motion for Expert Funds. Having heard argument, the motion was denied. The cases were continued to November 20, 2020 at 11:00 a.m.

| CASE NUMBER | OFFENSE DESCRIPTION AND INDICATOR (F/M) | OFFENSE DATE |
|---|---|---|
| **CR19-F-3055** | **Robbery (F)** | **8/31/19** |
| **CR19-F-3056** | **Robbery (F)** | **8/31/19** |
| **CR19-F-2888** | **Abduction with Intent to Obtain Pecuniary Benefit (F)** | **8/31/19** |
| **CR19-F-2891** | **Abduction with Intent to Obtain Pecuniary Benefit (F)** | **8/31/19** |

The defendant is remanded.

_10/16/2020_
DATE

ENTER: _____
JUDGE

1-filming
ybs/pb

1   VIRGINIA:

2          IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

3              JOHN MARSHALL COURTS BUILDING

4

5   -------------------------------

                                    I

6   COMMONWEALTH OF VIRGINIA,        I

                                    I

7   v.                               I    CASE NO.  CR19-F-2888

                                    I              CR19-F-2891

8   LINWOOD G. WALDEN,               I              CR19-F-3055

                                    I              CR19-F-3056

9   -------------------------------

10

11

12  ****************************************************************

13      Before:  HONORABLE CLARENCE N. JENKINS, JR., JUDGE

14  ****************************************************************

15

16

17                  November 20, 2020

18                  Richmond, Virginia

19                                          ORIGINAL

20

21

22              CHANDLER and HALASZ, INC.

               Registered Professional Reporters

23                  P. O. Box 9349

                Richmond, Virginia  23227

24                  804-730-1222

            Reported by:  L. Diane Paarfus

25

RECEIVED AND FILED
CIRCUIT COURT
JAN 1 1 2021
EDWARD F. JEWETT, CLERK
BY _____ D.C.

184

- 287 -

APPEARANCES

THE COMMONWEALTH OF VIRGINIA
By:  Brooke Petite, Esquire
Assistant Commonwealth's Attorney;

OFFICE OF THE PUBLIC DEFENDER
701 East Franklin Street, Suite 600
Richmond, Virginia  23219
By: Annalisa S. Feinman, Esquire
Counsel for the Defendant;

The Defendant, LINWOOD G. WALDEN, in person.

1

TESTIMONY

2

3

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LaShaun D. Manuel | 12 | 21 | 26 | |
| Ernestine Thorn-Acres | 31 | 34 | | |
| Latrika Brown | 35 | 39 | 41 | |
| Molly O'Rourke | 42 | 54 | | |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    The hearing in this matter commenced at 1:00 p.m.;

2    the court reporter was sworn.

3                    *****

4        THE COMMONWEALTH:  Good afternoon, Your Honor.

5    If we could take up Linwood Walden.

6        THE COURT:  All right.  Before we get started, I

7    just wanted to tell counsel, in the future when you

8    technological stuff, you need to let the Court know in

9    advance so we can have it set up.  That's issue one, and,

10   issue two, because of the COVID situation, we're not letting

11   family members in unless we have advance notice.  So,

12   whatever the public's interest in looking at this has

13   changed because of COVID as has changed everything.  So, we

14   need prior permission prior to that.  Okay.

15                    *****

16       NOTE:  The Defendant is led to the Bar by the

17   Sheriff and is accompanied by his attorney.

18                    *****

19       THE CLERK:  In the case of Commonwealth vs.

20   Linwood Walden, the Commonwealth is represented by Brooke

21   Petite.

22       The defendant is present in court represented by

23   Annalisa Feinman and Nasha Jefferson-Reece.

24       Counsels, are you ready to proceed?

25       MS. FEINMAN:  Yes, ma'am.

1            THE CLERK:  The probation officer is present, and

2    a report has been filed.

3            THE COURT:  All right.  Are the parties ready to

4    proceed on presentence today?

5            THE COMMONWEALTH:  Yes, sir.

6            THE COURT:  MS. Feinman and Ms. Jefferson-Reece,

7    have you all had an opportunity to review the presentence

8    investigation report with your client?

9            MS. FEINMAN:  Yes, Your Honor.

10           THE COURT:  Are there any additions or

11   corrections?

12           MS. FEINMAN:  Your Honor, I -- Ms. Petite and I

13   were discussing this before, I would note for the Court that

14   the answers given in this presentence report were

15   abbreviated or -- especially regarding family history.  Mr.

16   Walden didn't get into his family history with the probation

17   officer, so, I believe, the testimony today will be

18   different in that regard as far as his family life and

19   background.  However, I do believe it was the answers that

20   he gave to Ms. Thorn-Acres.

21           THE COURT:  All right.

22           MS. FEINMAN:  I would just note that, and, Your

23   Honor, I will say, I do have an objection to including the

24   portion on the presentence report, it's on page four of the

25   narrative of the adult criminal history, and the portion of

1  that that I would object to is where it says related to the

2  2012 convictions following with an excerpt from a motion

3  to consolidate offenses.  I would object to that portion of

4  the presentence report --

5        THE COURT:  Where -- where are you, again, now?

6        MS. FEINMAN:  Oh, I'm sorry.  It's listed page

7  four of adult criminal history at the bottom, and about half

8  way down that page there's a section labeled narrative of

9  adult criminal history.

10       THE COURT:  All right, and what are you pointing

11  to specifically?

12       MS. FEINMAN:  The portion of the narrative, it

13 starts on June 28, 2012, in the city of Richmond, that

14 paragraph goes on to describe three alleged robberies that

15 Mr. Walden was accused of --

16       THE COURT:  Yes, ma'am.

17       MS. FEINMAN:  -- he ended up pleading guilty to

18 one of the three robberies, and, I believe, he received a

19 four-year active sentence.  The other two robbery

20 allegations that are included in there are mere allegations,

21 and I don't believe the Commonwealth has any witnesses

22 present today to testify to those facts, and, I believe, it

23 would be included in violation of his right to confront his

24 witnesses, witnesses against him, Your Honor.  I recognize

25 that it's admissible in sentencing arguments; however, it

1   has had some indicia of the liability and when you peel back

2   all the layers on this specific paragraph, it's statements

3   that were given from individuals to a police officer who put

4   that presumably in a report, a prosecutor took that

5   information, drafted a motion, filed that in 2012, and,

6   then, I believe, this Commonwealth or someone -- it says it

7   was provided to the probation officer who then put it in the

8   report.  My concern is with that many layers of hearsay,

9   that we're getting pretty far away from having indicia of

10  liability for that portion, and, I believe, prejudicial to

11  Mr. Walden.

12          THE COURT:  Ms. Petite, you wish to respond?

13          THE COMMONWEALTH:  Just briefly.

14          Judge, this indictment, as the Court can see from

15  the summary of presentence report, were all brought together

16  in a single presentment.  There was a motion to consolidate

17  the offenses, and, as the Court I'm sure noted, the

18  similarities, the defendant ultimately pled guilty to the

19  robbery of Autro Zunego (phonetic) which occurred on June

20  28, 2012, but I will have just a clerical correction when

21  it's my time to make corrections to the presentence report,

22  but he was also ordered to pay restitution to the other

23  victims.  Given that he was convicted of the one robbery in

24  a plea agreement with the Commonwealth that dropped other

25  charges but he did agree to pay restitution to those other

1    victims, I think that is an appropriate summary for the

2    Court to consider in considering the defendant's -- or the

3    underlying factual related to the criminal history.

4            Ms. Feinman is correct, I don't intend to present

5    any evidence about those cases or any evidence other than

6    the presentence report here today.  So, I'll submit on that.

7            THE COURT:  So, Ms. Feinman, I will note your

8    exception for the record and I will also note that the Court

9    noticed that in looking through the criminal history, there

10   was only one conviction for the three charges of robbery, so

11   I knew something wasn't quite right with that.  So, now that

12   you've explained it, so I'm able to sift through that and

13   just see it as one sentencing event.

14           MS. FEINMAN:  And I would have at the appropriate

15   time after the presentence report, just a brief motion,

16   renewed motion, for expert funding in this case.  I don't

17   know if the Court wants to complete the sentencing, the

18   presentence report --

19           THE COURT:  Well, that probably should have

20   preceded this, but let me ask Ms. Petite if she has any

21   additions or corrections.

22           THE COMMONWEALTH:  My only correction to the

23   presentence report, Your Honor, are clerical.  If we go to

24   page 10, first page of page 10, I guess, which is the

25   criminal history attachment, about halfway down in that

1  chart there's the conviction for use of a firearm in

2  commission of the felony, the offense date there should be

3  June 28, 2012, rather than 2011.

4      THE COURT: So, some of these pages are numbered

5  the same, so when you say "page 10" --

6      THE COMMONWEALTH: The very first page, it starts

7  at the top prior record with his name.

8      THE COURT: And which one are you talking about

9  use of a firearm?

10      THE COMMONWEALTH: Use of a firearm, the offense

11  date year should be 2012, rather than 2011.

12      THE COURT: Okay.

13      THE COMMONWEALTH: And, then, if the Court goes to

14  the next page, up from the bottom is the conviction for

15  robbery, again, that offense date should be June 28, 2012.

16      THE COURT: All right.

17      MS. FEINMAN: And we don't object to those

18  changes.

19      THE COURT: All right.

20      THE COMMONWEALTH: Those are the only corrections

21  for the Commonwealth.

22      THE COURT: Okay. So, Ms. Feinman, you have a

23  motion for expert funds, you said?

24      MS. FEINMAN: Yes, Your Honor.

25      If the Court may recall, we previously had a

1 motion where we argued over my request for experts funds in
2 this case. Specifically, we were asking for a psychiatrist
3 to be appointed to evaluate Mr. Walden and to dig into
4 mental health issues, and, particularly, his history of
5 trauma and mental health while occurring and how that can
6 impact decision-making behavior and what measures can be put
7 in place in the future to address those issues. We do think
8 that would be a significant part of his defense.

9         THE COURT: Was that motion denied?

10         MS. FEINMAN: It was denied, Your Honor. I'm just
11 renewing that motion today.

12         THE COURT: All right. Ms. Petite?

13         THE COMMONWEALTH: Judge, I'll rely on my previous
14 argument. The Court heard a fairly extensive argument and
15 considered the statements of the defendant in the
16 presentence report explicitly disavowing all of the reasons
17 that were given. Obviously, Ms. Feinman has indicated there
18 are witnesses here today who are prepared to testify to each
19 of those facts. So, I don't think that there's any specific
20 or particularized need for a psychiatrist as the Court ruled
21 previously.

22         THE COURT: All right. Anything else on your
23 motion, Ms. Feinman?

24         MS. FEINMAN: No, Your Honor,

25         THE COURT: So, I have very little recollection of

1    that motion.  So, the Court's going to have to rely on the

2    arguments that were previously made, and since I don't have

3    any further information today, the Court will have to deny

4    that motion.

5           All right.  Any evidence from the Commonwealth

6    regarding sentencing?

7           THE COMMONWEALTH:  None other than the presentence

8    report.

9           THE COURT:  Would you like to make this report an

10    exhibit?

11           THE COMMONWEALTH:  Yes, please.

12           THE COURT:  Any objection to that?

13           MS. FEINMAN:  No, Your Honor.

14           THE COURT:  All right.  The Court will receive the

15    presentence investigation report as Commonwealth's exhibit

16    number one, without objection.

17           Any evidence from the defense?

18           MS. FEINMAN:  Yes, Your Honor.

19           If I may have one moment --

20           THE COURT:  Yes, ma'am.

21           MS. FEINMAN:  And, Your Honor, just for purposes

22    of noting it on the record, Mr. Walden just informed me that

23    he had written out an allocution statement while he was back

24    at the jail and that he was not permitted to bring his

25    written statement with him today due to COVID concerns.  He

1    has indicated that he would like to proceed with the

2    sentencing today without his written statement.  I just

3    wanted that to be noted on the record that he was not

4    allowed to bring it.

5            THE COURT:  Yes, ma'am.

6            MS. FEINMAN:  Your Honor, first we would call

7    LaShaun Manuel.

8            THE COURT:  All right.

9                        *****

10                  LASHAUN D. MANUEL

11           was sworn and testified as follows:

12                  DIRECT EXAMINATION

13   BY MS. FEINMAN:

14       Q.   Good morning.

15            Can you state your name for the Court, please?

16       A.   LaShaun Danette Manuel (phonetic).

17       Q.   And what is your relationship to Linwood Walden,

18   Jr.?

19       A.   I'm his mother.

20       Q.   All right, and, so, when he -- to go back a little

21   bit to Linwood's childhood.

22            Can you just very briefly for the Court describe

23   the first few years of his early childhood?

24       A.   He was a playful child.  He was just a comedian

25   like.  He was just a pleasure to be around.

1     Q.   And was his father present in his life?

2     A.   Yes.

3     Q.   And did you all live together?  How was your

4  family set up?

5     A.   We all lived together.

6     Q.   And that was in the Blackwell neighborhood?

7     A.   Yes.

8     Q.   At some point, did that change?

9     A.   Yes.

10    Q.   What happened?

11    A.   I was working and I was coming home form work and

12 I had got beaten and raped that I couldn't be recognized,

13 and from that they told me that he had HIV, and a couple of

14 years later I contracted HIV from the rape.

15    Q.   Okay, and that all happened to you?

16    A.   Yes.

17    Q.   And was Linwood aware of that?

18    A.   Yes, he was.

19    Q.   What did he see for himself?

20    A.   He was, well, you know, I was not safe and stuff,

21 and, you know, he was a child, and, you know, you could see

22 the hurt.  He just didn't know what was wrong, and, so, it

23 took effect on him.

24    Q.   And do you know about how old he was when that

25 happened?

1       A.   Yes, he was about five.

2       Q.   All right, and, so, after you were attacked, what

3  happened with you and your relationship to the family?

4       A.   We were all -- we became separated.

5       Q.   Why did you separate?

6       A.   Well, 'cause I had a nervous breakdown.  I had a

7  nervous breakdown.

8       Q.   And did you -- were you using any substances

9  because of that?

10      A.   Yes.

11      Q.   Tell me a little bit about that.

12      A.   When I had the nervous breakdown, I just self --

13  what's the word -- medicate, 'cause that's all I knew 'cause

14  that's all I was around, and that's what I grew up with

15  'cause my family self-medicate, so that's what I was used to

16  seeing so that's what I just thought that I would do until I

17  knew better and seek professional help.

18      Q.   And, so, since then -- I know this was a long time

19  ago -- have you had professional help since then?

20      A.   Yes, I have.  I been clean since January the 9th,

21  this year.

22      Q.   Congratulations.

23      A.   Thank you.

24      Q.   All right, and while you were in the thick of your

25  mental breakdown and the drug use, how did that impact

1    Linwood?

2        A.    It impacted him very much because he was very

3    depressed.  He just -- actually, he didn't know how to state

4    his feelings.  He had problems communicating his feelings.

5    He mostly held -- held it in.

6        Q.    And do you know if he got counselling or any

7    therapy while that was happening?

8        A.    No, he did not.

9        Q.    All right, and were you able to be involved in his

10   life while that was happening?

11       A.    A little.  Linwood was mostly with his father.

12       Q.    Okay, and, so, when he was living with his father,

13   can you tell me about his life with his father?

14       A.    It wasn't that very good 'cause he was staying

15   with his aunt which is his brother -- his daddy sister, and

16   she was abusive to them when he wasn't aware of it.

17       Q.    When you say she was "abusive" to Linwood, what

18   type of abuse are you talking about?

19       A.    She used to beat them with cords.

20       Q.    And when you say "them," was his sister there as

21   well?

22       A.    Yes.

23       Q.    Do you know how long he lived with his aunt?

24       A.    Approximately, about three years.  Yeah,

25   approximately, three years.

1    Q.   And during that time, are you aware of any gangs

2   Linwood may have been involved in?

3    A.   No.

4    Q.   Did he ever talk to you, or did you ever find out

5   something about a gang?

6    A.   No, I did not.  The only thing I knew is that he

7   had a lot of friends, but I don't know if they was in gangs.

8   No, I do not know nothing about that.

9    Q.   Okay, and, so, at some point, did you guys' all

10  move back in together?

11   A.   Yes, we did.

12   Q.   How much later was that, do you remember?

13   A.   I can't approximately say.  Oh, I can't

14  approximately say.

15   Q.   And, so, he didn't get any counselling after what

16  happened to you.  Did he get any counselling dealing with

17  the physical abuse from his aunt?

18   A.   No, he did not and he needed it.

19   Q.   And, at some point, did he get some sort of mental

20  health diagnosis?

21   A.   Yes, he did.

22   Q.   How did that happen?

23   A.   He went to Richmond Behavior and they diagnosed

24  him with bipolar.

25   Q.   All right, and do you remember how old he was when

1    that happened?

2         A.    No, I can't recall.

3         Q.    And do you know whether he was ever committed to

4    the hospital as a result of that?

5         A.    No, I do not.

6         Q.    Now, at some point, Linwood had a daughter; is

7    that right?

8         A.    That is correct.

9         Q.    Can you tell me about his daughter?

10        A.    Her name was                    , and she was beat to

11   death two months before his release, and a lot it took a

12   drastic on our family and to him 'cause it was two months

13   before his release date.  That's all he talked about was to

14   be with his daughter when he got out.

15        Q.    And, so, tell me about it.  What did he talk about

16   as far as being with his daughter when he --

17        A.    You know, getting a job, and, you know, spending

18   time with her.  He really didn't know how to remorse 'cause

19   he wasn't able to see or view the body at the time 'cause of

20   his level, so it was a lot for him to take.

21        Q.    Did he get any counselling or help after that?

22        A.    No, he did not.

23        Q.    Now, what changes did you notice in him after her

24   death?

25        A.    Oh, goodness, after the death, he just -- he

1   didn't -- he needed professional counselling to learn how to

2   mourn of me, of his childhood and his daughter.  He just

3   need professional help to -- to deal with the situations

4   that he was going through.

5        Q.   And to your knowledge after that happened, did he

6   start using drugs at all?

7        A.   Yes.

8        Q.   Tell me about that.

9        A.   He just didn't know how to handle it.  Just like I

10  say, that's what he been around, that's what he see through

11  the family, the self-medicate.

12       Q.   And is that something that he'd been into before

13  as far as using drugs?

14       A.   No.

15       Q.   And when you say -- when we're talking about the

16  drugs --

17       A.   No more than the marijuana.

18       Q.   Okay.  So, he had smoked marijuana before?

19       A.   Yes.

20       Q.   But not hard drugs?

21       A.   No.

22       Q.   Okay, and Linwood now, does he have a son?

23       A.   Yes, he do.

24       Q.   Can you tell me about his relationship with his

25  son?