1      A.   He has a relation with his son.  He video FaceTime

2 him.  Before he had got incarcerated this time, he was

3 spending time with him doing things with him as a father

4 should do.

5      Q.   And he has nieces and nephews as well; is that

6 right?

7      A.   Yes, he do.

8      Q.   Can you tell me about his relationship with his

9 nieces and nephews?

10      A.   They look up to him.  He very playful, so they

11 just -- when he come around, they just -- they enjoy play

12 time 'cause he very playful with them.

13      Q.   All right, and I'd like to show you a few pictures

14 and have you explain those to the Court.

15           Who is in that picture?

16           THE WITNESS:  Can I stand up?

17           THE COURT:  Yes, ma'am.

18                     *****

19      A.   That's Linwood and Daquan.  That's his son.

20      Q.   And what about that one?

21      A.   That's Linwood and his son, again.  That's a

22 picture that he had drawn for Daquan of him that he paid

23 for.

24           That's another picture at his house with his son,

25 and that's Quan trying to put him -- I mean, Linwood, but we

1    call him Quan.  Anyway, Linwood trying to put him to sleep.

2          Q.   You guys call him Quan?

3          A.   Yeah.

4          Q.   Because his middle name's Gequan?

5          A.   Yeah.

6          Q.   Is that Linwood in --

7          A.   Yes, it is.

8          Q.   And what is this?

9          A.   That is a gift of both of his children of

10   and        .

11             That's        and that's          That was he two

12   children that he have.

13         Q.   And what about this?

14         A.   That is          birthstone, I mean, stone.  This

15   is her obituary.  That's her, that's him at the grave site

16   with his other -- she call him dad, too, but that's

17   (phonetic), mother of the child, and she calls him dad, too.

18         Q.   That's his son's half sister?

19         A.   Yes.

20         Q.   And is he involved in her life?

21         A.   Yes, he is.  She calls him dad.  That's the only

22   dad she knows was him.

23             MS. FEINMAN:  I have no further questions.

24             If you could answer question from the

25   Commonwealth.

1       THE COURT:  Ms. Petite, do you have questions for

2  this witness?

3       THE COMMONWEALTH:  Yes, sir.

4                    *****

5                CROSS-EXAMINATION

6  BY THE COMMONWEALTH:

7       Q.   Good afternoon.

8       A.   Good afternoon.

9       Q.   I just want to go back through this time line a

10  little bit with you.

11       When your son was young, you and his father lived

12  together?

13       A.   That is correct.

14       Q.   And does it surprise you that your son told the

15  probation officer, who is sitting to my right, that you and

16  your husband raised him together until he was 19?

17       A.   No.  That was not quite right, no.

18       Q.   Okay.  I'm very sorry to hear about what happened

19  to you when he was about five.

20       A.   Right.

21       Q.   You said that he was aware of what happened?

22       A.   Yes.

23       Q.   As he became older, did he seem to understand that

24  that awful event that happened to you --

25       A.   Yes, 'cause I had --

1      Q.    -- was a result --

2      A.    -- to tell him I was HIV positive.

3            THE COURT:  Ma'am, you need to wait for her to

4      finish the question --

5            THE WITNESS:  Okay.

6            THE COURT:  -- so that we have a clear record --

7            THE WITNESS:  Oh, okay.

8                            *****

9      BY THE COMMONWEALTH:

10     Q.    As he grew older, did he seem to understand that

11     that awful event that you went through was a result of

12     violence committed by a stranger?

13     A.    Yes.

14     Q.    And was that hard for him to cope with?

15     A.    Yes, it was.

16     Q.    Understandably very hard for you to cope with as

17     well?

18     A.    Yes.

19     Q.    Now, you indicated that at some point you and your

20     son's father separated?

21     A.    That is correct.

22     Q.    When was that?

23     A.    That was a couple years after the rape, maybe, two

24     or three years after that before they move me -- broke up

25     with his father and they moved to his aunt's house.

1      Q.    So, your son would have been about eight?

2      A.    Yes.

3      Q.    And did you still maintain contact with him

4 through that time?

5      A.    Oh, yes.

6      Q.    And you were a part of his life?

7      A.    Yes.

8      Q.    At what point did you and Mr. Walden's father

9 become aware of the allegation that his aunt was physically

10 abusive?

11     A.    One day -- see, he worked.  He worked and he --

12 she used to keep him while he worked.  I lived somewhere

13 else.

14     Q.    Mr. Walden's father worked?

15     A.    Yes, he worked.  He lived with Devon, but that

16 happened while he was at work and I had came over there with

17 my daughter 'cause I saw a burn on her knee, and he

18 confronted her about it, and she said you know how children

19 act, you know, 'cause she had other children in the house of

20 her own, too.

21     Q.    After learning about that, did you and the

22 defendant's father take some steps -- I know you said he

23 didn't go to professional counselling, but to make him

24 understand that the way he was treated was wrong?

25     A.    Right, and, then, my record -- we moved in

1  together again, again.

2      Q.   So, then, all of you moved back in together?

3      A.   Right.

4      Q.   You've indicated that your son was diagnosed with

5  bipolar at some point.  About how old was he then?

6      A.   I'm not sure.

7      Q.   And has he continued any sort of treatment for

8  that?

9      A.   No, he has not.  He never did go back to where he

10 can get medication.

11     Q.   Now, again, I'm terribly sorry about your

12 granddaughter.  That's a really horrific thing that

13 happened, and I know your son was incarcerated when that

14 occurred?

15     A.   Yes.

16     Q.   Is it fair to say that he deeply regrets being

17 incarcerated at the time that that happened?

18     A.   Of course.

19     Q.   He was incarcerated for robbery at that time?

20     A.   Yes.

21     Q.   As a family, have you all tried to work through

22 the trauma of being victims of that senseless and violent

23 event?

24     A.   Yes.

25     Q.   That's been pretty hard?

1        A.   Yes, it has been pretty hard on the family 'cause

2   it was just hard on the family 'cause, to me, it was just

3   senseless and just to beat a little child being hurt like

4   that.

5        Q.   I completely agree with you.

6             Now, you mentioned that after that time, your son

7   start using drugs, and I just wasn't sure, were you

8   indicating marijuana or were you indicating something else?

9        A.   I was indicating something else.  That was after

10  -- that was after        passed, he was doing more than

11  marijuana.

12       Q.   More than marijuana.  I just wanted to make sure

13  because I wasn't sure.

14            His son,      , was four on             of 2017?

15       A.   That is correct.

16       Q.   And the offense date in this case is August of

17  2019, so        would have been just two?

18       A.   Right.

19       Q.   Are you familiar with any of the allegations in

20  this case of what you son was convicted of?

21       A.   No.

22       Q.   Okay.  One last thing, ma'am, and I don't mean to

23  be rude to you at all, I just want to clarify between

24  something I've got on one sheet and something I've got on

25  another.

1          The presentence report indicates that you didn't

2   have a history of alcohol or substance abuse and that you

3   don't have any criminal record, and I've got another

4   document here that Ms. Feinman gave me that indicates

5   otherwise.  Which of those is correct?

6          A.   Well, I have -- you said -- I have a criminal

7   history, yes.

8          Q.   All right.  So, the second one, not what your son

9   told the probation officer?

10         A.   Yeah, I have a criminal history.

11              THE COMMONWEALTH:  Okay.  Thank you, Ms. Manuel.

12  I appreciate you talking to me.

13              THE WITNESS:  Okay.  Thank you.

14              THE COURT:  Any redirect for this witness?

15              MS. FEINMAN:  Yes, Your Honor.

16                          *****

17                   REDIRECT EXAMINATION

18  BY MS. FEINMAN:

19         Q.   We'll take up where the Commonwealth just left

20  off.

21              So, has any member of Linwood's family been

22  convicted of a felony, do you know?

23         A.   Yes.

24         Q.   And is that you?

25         A.   Yes.

209

- 312 -

1        Q.   All right, and if he said you have no history of
2   substance abuse, do you have a history of substance abuse?
3        A.   Yes.
4        Q.   And that started after you were attacked; is that
5   right?
6        A.   Right.
7        Q.   I think you said it was a coping mechanism?
8        A.   Right.  You see, a lot of it was he might say that
9   'cause a lot of it was he was mostly with his father when I
10  used.
11       Q.   All right.  As far as Linwood's father, is that
12  Linwood, Sr.?
13       A.   Yes.
14       Q.   How old is he, do you know?
15       A.   He's 83 yeas old.
16       Q.   And is he in good health?
17       A.   No, he is not.
18       Q.   What's going on with him?
19       A.   He has prostate cancer, and he did contact some
20  COVID when he had a stroke about two months ago.
21       Q.   And did he --
22       A.   And that's why he's not being here.
23       Q.   I'm sorry?
24       A.   I said that's why he's not being -- not able to be
25  here 'cause he's critical ill.

1      Q.   Do you know whether Linwood and his father are

2   close?

3      A.   Oh, yes.

4      Q.   And if he could be here, would he be here?

5      A.   Yes, he would.

6      Q.   Does his father have any history of substance or

7   alcohol abuse?

8      A.   No, he do not.

9      Q.   Any criminal record?

10     A.   No, he do not.  He never been arrested in his

11  life.

12     Q.   All right.  So, the Commonwealth asked you whether

13  your family tried to work through the trauma of what

14  happened to          and you said that you guys did try to

15  work through that?

16     A.   Yes.  It just --

17     Q.   Did you guys see a counselor or therapist?

18     A.   Yes, I -- I -- I-- I did.  But when he got

19  released, he was just doing his own thing when he, you know.

20     Q.   Okay.  So, you got some help for that?

21     A.   Yeah.

22     Q.   Did he?

23     A.   No, he did not.

24     Q.   So, he wasn't included in that part?

25     A.   No.

1      Q.   All right, and, let's see, I believe you testified

2   that you were originally a two-parent household a big part

3   of Linwood's life?

4      A.   Yes.

5      Q.   Then you were attacked and fell into your mental

6   breakdown and your substance issues?

7      A.   Yes.

8      Q.   And during that point, you were more in and out of

9   his life?  Is that fair to say?

10     A.   Yes.

11     Q.   And during that period, where you were in and out,

12   is that when he lived with his -- he didn't immediately move

13   in with his aunt; is that right?

14     A.   Right.

15     Q.   He bounced around, maybe?

16     A.   Right.

17     Q.   Okay, and at the time he moved in with his aunt,

18   at some point you became aware that there was physical abuse

19   happening?

20     A.   Yes.

21     Q.   And once you became aware that he was being

22   abused, I think you said his sister was also being beaten by

23   his aunt?

24     A.   Yes.

25     Q.   And I think you told him it wasn't okay to be

212

- 315 -

1  treated like that?

2      A.   Right, and they moved.

3      Q.   But he didn't get any help?

4      A.   No, he did not.

5      Q.   And you weren't able to take him out of the home

6  immediately when you found that out?

7      A.   No, I was not.

8      Q.   And is that because you were still dealing with

9  your own mental health and substances?

10     A.   Yes.

11     Q.   And, so, do you know about how long he lived with

12 that aunt?

13     A.   Probably three years if I recall.

14     Q.   And, then, at the end of that period when you guys

15 all moved back together, who all moved in together?

16     A.   Linwood, me, my significant other, Tyler and I

17 think that was it, and his dad.  It was just us and him.

18     Q.   So, Linwood, Sr., Linwood, Jr., you --

19     A.   And Don Tyler.

20     Q.   Is that --

21     A.   Yes.

22     Q.   And, then, who was the last person?

23     A.   His dad.

24         MS. FEINMAN:  Could I have one moment, Your Honor?

25         I have no further questions.  Thank you for coming

1    here today.

2            THE COURT:  You may step down, ma'am.  Watch your

3    step coming off.

4            THE WITNESS:  Thank you, Judge.

5                    (The witness stood down.)

6                        *****

7            THE COURT:  Anything else from the defense?

8            MS. FEINMAN:  Um --

9            THE COURT:  Well, before we call the next witness,

10   let him come in.  We're going to clean the witness box.

11           So that the family understands what's going now,

12   this has nothing to do with you all.  What we're doing is

13   cleaning because of COVID every time someone takes the stand

14   just to make sure that you all are kept safe as possible.

15   I didn't want you all to think it was for some other reason.

16           Next witness.

17           MS. FEINMAN:  Thank you, Your Honor.

18           I would very briefly call Ms. Thorn-Acres, the

19   probation officer who prepared the presentence report.

20                        *****

21                ERNESTINE THORN-ACRES

22           was sworn and testified as follows:

23                DIRECT EXAMINATION

24   BY MS. FEINMAN:

25       Q.   Good afternoon.

1      A.    Good afternoon.

2      Q.    Are you Ernestine Thorn-Acres.

3      A.    Yes, ma'am.

4      Q.    And your a probation officer for the city of

5   Richmond?

6      A.    Yes, ma'am.

7      Q.    All right, and did you have the opportunity to

8   prepare this presentence report on behalf of Linwood Walden,

9   Jr.?

10     A.    Correct.

11     Q.    And to prepare his presentence report, how did

12  that work?  What do you do?

13     A.    Well, during these times I've been mailing the

14  questionnaire to the person at the Richmond Justice Center,

15  and, then, I go down to the justice center to go over that

16  with them.

17     Q.    All right, and Mr. Walden, did he complete these

18  questions in advance?

19     A.    He did not.  When I went down, I had another blank

20  copy so we did the video and he answered the questions

21  through the phone and video at the jail.

22     Q.    Okay.  So, you were present in person, but it was

23  still on video screen?

24     A.    Correct.

25     Q.    All right, and do you have any idea about how long

1    you met with Linwood?

2        A.    It usually takes about 30 minutes to an hour.  If

3    I remember correctly, the phone cut off so we had to start

4    another session.  But I can't say a hundred percent.

5        Q.    Okay, and was this all completed in one session or

6    multiple sessions?

7        A.    One session.

8        Q.    And how long have you been a probation officer?

9        A.    Thirty years.

10       Q.    And have you made presentence reports several

11   times?

12       A.    Yes, ma'am.

13       Q.    All right.  In your experience, is it unusual for

14   someone to not give you full information in a presentence

15   report?

16       A.    Yes.  I mean, I don't really know if they're not

17   giving it to me.  Whatever they tell me is whatever I write

18   down or whatever they fill out on the paper, and come to

19   court and hear different stuff.

20       Q.    So, you can't say whether it's unusual for someone

21   to say their parents' don't have mental health issues?

22       A.    Yeah, I can say that it may have happened in the

23   past.

24       Q.    Okay, and what about their parents' having

25   criminal records, substance abuse, things like that?

216

- 319 -

1      A.   Yes, I've had people tell me they didn't have

2   records, and, then, in my research I see they do have a

3   record.

4      Q.   And do you know in your policy doing research

5   regarding history what Mr. Walden told you?

6      A.   I have to look at my notes.  I don't see anything

7   listed.

8           MS. FEINMAN:  All right.  I have no further

9   questions.  Thank you.

10          THE COURT:  Ms. Petite, do you have questions?

11          THE COMMONWEALTH:  Very briefly.

12                          *****

13                    CROSS-EXAMINATION

14   BY THE COMMONWEALTH:

15      Q.   Did you accurately report in the presentence

16   report what the defendant told you during your interview

17   with him?

18      A.   Yes, ma'am.

19          THE COMMONWEALTH:  Thank you.

20          I have no further questions.

21          THE COURT:  All right.

22          MS. FEINMAN:  No redirect.

23          THE COURT:  Ma'am, you may step down from the

24   witness stand.

25               (The witness stood down.)

                              *****

2     THE COURT:  Next witness.

3     MS. FEINMAN:  Latrika Brown.

4                              *****

5                          LATRIKA BROWN

6          was sworn and testified as follows:

7                       DIRECT EXAMINATION

8    BY MS. FEINMAN:

9     Q.   Good afternoon.

10         Please state your name for the Court.

11    A.   Latrika Brown.

12    Q.   And how do you know Linwood Walden?

13    A.   He's the father of Latrice Walden.

14    Q.   And, so, at some point, were you two in a

15   relationship?

16    A.   Yes.

17    Q.   When was that?

18    A.   In 2000 and, like, nine, 10.  We had our daughter

19   in 2012.

20    Q.   So, the relationship started around 2009, 2010?

21    A.   Yes.

22    Q.   All right, and what happened -- at some point,

23   Linwood went to jail; is that right?

24    A.   Yes.

25    Q.   Prior to that during your relationship, did you

1    ever know him to be violent, or can you describe your

2    relationship?

3          A.    We had a wonderful relationship.  We didn't have

4    any problems, he never put me in any situation that would

5    hurt or harm me.  He was never physical with me, never any

6    incidents.  We just always talked about us having a family

7    and us being together and stuff like that, and Linwood

8    wanted to be a great dad.

9          Q.    So, you never experienced him being violent?

10         A.    I haven't experienced anything like that.

11         Q.    All right, and at some point you guys had a

12   daughter.  When was that?

13         A.    That was -- I was pregnant in 2012, yes, and he

14   was there for about half of the pregnancy, but during the

15   part that he was there he was very helpful, made every

16   appointment --

17         Q.    Well, let me --

18         A.    -- he was very excited -- okay.

19         Q.    So, for that first half, he was very helpful?

20         A.    Yes.

21         Q.    And went to appointments with you?

22         A.    Uh-huh.

23         Q.    Did he seem excited?

24         A.    Very, very excited.  He wanted a girl, and we

25   found out we was having a girl, so he was very excited to be

1    a father.

2        Q.    And, so, the second half of your pregnancy, where

3    was he?

4        A.    He was incarcerated.

5        Q.    All right.  Was he incarcerated when she was born?

6        A.    Yes.

7        Q.    So, during his incarceration, was he able to have

8    any relationship with her?

9        A.    Yes.  What we were able to do as far as telephone

10   visits, going down to -- take her down there to see him

11   until he was shipped to Sussex, that's when we went to the

12   contact visits.

13       Q.    And how often were you and         able to visit?

14       A.    Well, we was going there every week for a while,

15   but when I started moving around a little bit, it became a

16   little distant, we would still write every day, we would

17   still talk, but we just wasn't able to go down to the jail

18   to see him as much as was.

19       Q.    How often were you talking?

20       A.    Every day, every other day.  He was writing every

21   other day.

22       Q.    Did he find any way to be involved with        ?

23       A.    Always.  Any type of holidays, birthdays, he would

24   always send, and, you know, just try to do his part as a

25   father without actually being there, but being there.

1       Q.   As much as he could do?

2       A.   Yes.

3       Q.   All right, and did he have any plans for when he

4   was released?

5       A.   Well, yes.  He wanted to, of course, be with his

6   daughter, be a father to her, but, you know, something

7   happened so that stopped it.

8       Q.   What happened?

9       A.   She died at three.  She was beat to death.

10      Q.   And when did that happened?

11      A.   February 9th.

12      Q.   And do you know when Linwood was supposed to be

13  released?

14      A.   He was supposed to be released in May and she died

15  in February.

16      Q.   Was he able to go to the funeral --

17      A.   Oh yeah.  No, he was not able to go.  His record

18  there, I guess, his level was too high, so he was unable to

19  go to the funeral.

20      Q.   And do you know how he -- if you're able to say

21  how he coped with her death?

22      A.   I can't really say, 'cause, you know, I don't know

23  how he feels.  I don't know what it feels like to be

24  incarcerated this whole time and lose a daughter.  So, but,

25  he's probably coping with it just in his own way.  I just

1   don't know, 'cause I dealed with it in my own way.

2       Q.   So, are you two still in a relationship?

3       A.   No.

4       Q.   Okay.  But do you still have a relationship?

5       A.   Oh, yeah, we still have a relationship.  We still

6   friends and I'll always be there for him, you know.

7       Q.   And are you aware of any changes in his behavior?

8       A.   I haven't seen any changes in any of his behavior.

9   We speak, like, you know, I have my own thing going on, he

10  has his own life, but we still communicate as a far as

11       , we go out to the grave site and see her, stuff like

12  that.  It was always about          .  It was nothing never

13  bad or anything.

14      Q.   All right, and, so, it was mostly about          ,

15  then?

16      A.   Yes.

17      Q.   And prior to his incarceration, did you ever know

18  him to be using, we'll say, hard drugs?

19      A.   No, never known him to do any hard drugs, any of

20  that.

21          MS. FEINMAN:  I have no further questions.

22          If you could answer questions from the

23  Commonwealth.

24          THE COURT:  Ms. Petite?

25                      *****

1                    CROSS-EXAMINATION

2    BY THE COMMONWEALTH:

3        Q.   Ma'am, I am incredibly sorry for your loss.

4             Was it difficult for you when halfway through your

5    pregnancy with        , the defendant became incarcerated?

6        A.   Yes, 'cause I was by myself but I was still able

7    to communicate with him through the phone.  So, and he was

8    writing and stuff like that.  So...

9        Q.   And did he understand that it was hard for you to

10   go through that by yourself?

11       A.   Yes, he did.  He was very understanding.  He

12   understood, you know, the proper things that I had to do to

13   make sure that she was okay even though he was not with us.

14       Q.   And once she was born and you were trying to, was

15   it hard to parent her by yourself?

16       A.   Yes, it was, 'cause that was my first baby.  So,

17   yeah, it was hard.

18       Q.   And pretty hard to also travel back and forth to

19   Sussex once a week and live the rest of your life?

20       A.   Yes, but it was all for him so he could see his

21   daughter, so it was all worth us going every bit of every

22   trip we had to do for him to see her.

23       Q.   Did Mr. Walden seem to understand the amount of

24   sacrifice and work it took for you to keep him involved in

25   Latrice's life in the situation he was in?

1      A.   Yes, he understood that.

2      Q.   And did he understand during that time that being

3   incarcerated made him unable to really be a present father

4   for

5      A.   Yes.

6      Q.   And during        's life, he was incarcerated and

7   serving a sentence for robbery and use of a firearm?

8      A.   Yes, but he still was able to do what he could for

9   her even though he wasn't there.

10     Q.   Is it fair to say that if he had been free and

11  home with you, he would have been able to spend more time --

12     A.   Oh, yes, yes.

13     Q.   -- and do more for you and for

14     A.   Yes.

15          THE COMMONWEALTH:  All right.  Thank you.

16          I don't have anymore questions.

17          THE COURT:  Any redirect for this witness?

18                        *****

19                  REDIRECT EXAMINATION

20  BY MS. FEINMAN:

21     Q.   So, it was hard on you when he was incarcerated

22  during your pregnancy.  Do you know whether it was hard on

23  him?

24     A.   Yes, 'cause he wasn't able to be there physically

25  and actually to know unless we were able to speak on the

1    phone or write letters.

2         Q.   And, so, he never got to see          while he was

3    not incarcerated; is that right?

4         A.   Right.

5              MS. FEINMAN:  I have no further questions.

6              Thank you.

7              THE COURT:  Ma'am, you may step down from the

8    witness stand, and the Court is also sorry to hear about

9    your loss.

10                  (The witness stood down.)

11                            *****

12             MS. FEINMAN:  Your Honor, we do have one final

13   witness.

14             THE COURT:  Yes, ma'am.

15             MS. FEINMAN:  Molly O'Rourke

16                            *****

17                     MOLLY O'ROURKE

18             was sworn and testified as follows:

19                   DIRECT EXAMINATION

20   BY MS. FEINMAN:

21        Q.   Good afternoon.

22        A.   Good afternoon.

23        Q.   Can you state your name for the Court?

24        A.   Yes.  Molly O'Rourke.  O-apostrophe, capital,

25   R-O-U-R-K-E.

1        Q.    And, Molly, what do you do for a living?

2        A.    I'm employed with the Richmond Public Defender's

3    office as a mitigation specialist.

4        Q.    And how long have you been in the role?

5        A.    For over three years.

6        Q.    And what education and training makes you

7    qualified for that position?

8        A.    I received my master's in social work from VCU in

9    2017, and as part of that I did a one year internship with a

10   federal public defender's office in Norfolk, Virginia.

11       Q.    And, so, as a mitigation specialist, what does

12   that mean?  What do you do?

13       A.    I help gather background information on our

14   clients, reach out to family members, get records, create

15   release plans, and anything in that kind of general area.

16       Q.    And is that how you came to know Linwood Walden?

17       A.    Yes.

18       Q.    How long have you been involved with Mr. Walden?

19       A.    The first time I met him at the jail was in

20   September of 2019.  So, over a year.

21       Q.    And that was part of this case?

22       A.    Yes.

23       Q.    All right, and do you have any idea about how much

24   time you spent with him?

25       A.    Many, many hours and many, many visits.

1       Q.   And what about his family, have you been able to

2  meet family members?

3       A.   Yes.

4       Q.   Who have you met?

5       A.   I've met his mother, Ms. Manuel; his mother's

6  partner, Mr. Tyler; Ms. Brown, the mother of his child,

7         .  I have also spoken to his father, Linwood, Sr.,

8  over the phone several times; and, then, his sister, Ms.

9  Mitcha (phonetic).

10      Q.   And as part of your work on this case, have you

11 also been able to obtain medical records?

12      A.   Yes.

13      Q.   Do you know where all you've obtained records

14 from?

15      A.   Yes, from MCV; from RBHA; and from Daily Planet.

16      Q.   And using those records, were you able to compile

17 the trauma time line?

18      A.   Yes.

19      Q.   What is a trauma time line?

20      A.   A trauma time line is using social work as kind of

21 a visual depiction of a person's life and the trauma points.

22 So, we can recognize how closely certain things happened and

23 kind of the compounding impacts of that trauma.

24           THE COMMONWEALTH:  Your Honor, I'm going to object

25 at this point to introduction of the time line.   These

1  medical records that are being referenced have not been

2  provided to the Commonwealth.  I don't know the veracity of

3  them.  I don't know that I have an objection to the records,

4  but, certainly, testimony from a person with a master's in

5  social work who is then going to interrupt medical records,

6  I think is not within the rules of evidence.  So, I would

7  object.

8          MS. FEINMAN:  And, Your Honor, I would note that

9  we did have a full motions hearing where we asked for an

10 expert witness who would have the training and opportunity

11 to review these records and conduct their own investigation

12 to give specific medical testimony related to this.  That

13 motion was denied.  I point out that motion was denied --

14 the mitigation specialist who have been helping gather

15 information and raise the need for such expert and the

16 Commonwealth stated that it sounded like we had someone that

17 would be able to do that.

18          I'll also note for the Court that I don't believe

19 that she will be doing any interpreting of medical records,

20 and that hearsay is admissible at sentencing hearings, and

21 if we are admitting this part of the presentence report,

22 paragraph is copied and pasted from a motion that was filed

23 eight years ago, here we have an individual who has done

24 mitigating investigation as herself requested and received

25 records from providers that she works with regularly, there

1   is indicia of reliability to this information coming in, so

2   we would ask the Court to allow this testimony.

3           THE COMMONWEALTH:  Where are the medical records,

4   we could all review the medical records, then I might have

5   no objection to Ms. O'Rourke's testimony, but without

6   knowing the contents of these records we're relying on a

7   summary from someone who doesn't have a medical degree.

8   That's the concerns of the Commonwealth.

9           THE COURT:  So, Ms. Feinman, it sounds like Ms.

10  Petite's concern is that she never received the actual

11  medical records.

12          THE COMMONWEALTH:  And I would note that I asked

13  Ms. Feinman in the hallway if there were medical records to

14  be produced and was told no.

15          MS. FEINMAN:  And I told her I wasn't sure if we

16  were going to introduce them, but I do believe at this

17  point that they are --

18          THE COMMONWEALTH:  I'm able to withdraw my

19  objection once they've reviewed them.  That's why I brought

20  it up in the hallway --

21          THE COURT:  All right.  So, what you intend on

22  introducing, Ms. Feinman, is a summary that this witness

23  prepared from the medical records?

24          MS. FEINMAN:  Effectively, Your Honor, we have

25  this trauma time line and what I'm going to ask Ms. O'Rourke

1 to do is just walk us through it. It covers some of the

2 things we've already heard. It's just a demonstrative, it

3 walks through Linwood's life, and, then, the stair steps of

4 what happened and when, and, frankly, the medical records

5 would just be to corroborate testimony we've already heard

6 about his mental health diagnosis, his bipolar --

7          THE COURT: I understand, but I think the

8 Commonwealth is also entitled to at least see the records.

9          THE COMMONWEALTH: Thank you.

10                    *****

11          NOTE: A brief pause during the hearing for the

12 Commonwealth to review documents. Afterwards, the hearing

13 continues as follows:

14                    *****

15          THE COMMONWEALTH: I'll withdraw my objection now

16 that I've had a chance to review the records.

17          Thank you.

18          THE COURT: All right. You may continue, Ms.

19 Feinman.

20          MS. FEINMAN: Your Honor, I'd like to hand --

21          THE COURT: Is that the records or is that them

22 summary?

23          MS. FEINMAN: This is the records. So, the

24 summary is on the screen. This is a copy of the records.

25          THE COURT: And you've seen those, I take it?

 1              THE COMMONWEALTH:  Yes.  As long as it's what I

 2    just looked at, I don't have an objection to, either, Ms.

 3    O'Rourke's summary or to the introduction.

 4              THE COURT:  It is what you just gave --

 5              MS. FEINMAN:  Yes, it is.

 6              THE COURT:  You may continue.

 7                              *****

 8    BY MS. FEINMAN:

 9         Q.   And, so, you said you obtained medical records

10    from several different providers?

11         A.   Yes.

12         Q.   And that includes RBHA?

13         A.   Yes.

14         Q.   And do you know about how many different records

15    you got from RBHA?

16         A.   I believe it was about 50 pages total.

17         Q.   Okay, and do you recognize the portion of the

18    record that's in front of you?

19         A.   Yes.

20         Q.   Is this one that you received?

21         A.   Yes.

22         Q.   And just to summarize these records, what were you

23    able to learn from these records?

24         A.   That Mr. Walden had been diagnosed with bipolar

25    disorder in 2012, he was at the age of about 15 at that

1   time, and, then, he also was diagnosed with alcohol

2   dependence.   The records also mention suicidal ideations and

3   experiencing auditory hallucinations.

4        Q.    And that was part of what helped you form your

5   opinion and create this time line?

6        A.    Yes.

7        Q.    And is this the trauma time line you were speaking

8   about?

9        A.    Yes.

10       Q.    All right.  So, just walk us through this.

11             MS. FEINMAN:  And is the Court able to read that?

12             THE COURT:  No, ma'am, I can't fairly read it.

13             MS. FEINMAN:  I have a printed copy, but it cut

14   off just the edges of the two triangle time line.  I can

15   provide you with that.  I can provide it to the Commonwealth

16   as well.

17             THE COMMONWEALTH:  I have a copy.

18                         *****

19   BY MS. FEINMAN:

20       Q.    All right.  So, this bottom left where it says

21   when Linwood's parents' separated it was drug use?

22       A.    Yes.

23       Q.    Do you have any knowledge or information about the

24   affect of parental drug use on children?

25       A.    Yes, and I do believe Ms. Manuel said it very well

1    herself, you know, I think when a child sees a parent coping

2    with stress or anxiety from the difficulties of life using

3    substances, very often children will learn to mirror that

4    and use that as a way to deal with those stressful

5    situations and traumatic situations themselves.

6         Q.   And, so, then, the next block is that Linwood.

7    Mother was absent during the majority of his childhood and

8    was -- off as a result of drug use.  Do you recall, would

9    that have contributed to any mental health or issues for Mr.

10   Walden?

11        A.   Yeah, I mean, I think Ms. Manuel was doing in her

12   capacity being involved as she could, but, obviously, that

13   does have a toll on a child and just not having their mother

14   there present and sober, you know, that can definitely

15   impact a person's mental health or behavior and it can

16   increase the likelihood for a risky behavior.

17        Q.   All right, and, so, moving on to the next block.

18   Throughout his childhood, Linwood moved frequently and often

19   attended many schools, rarely stayed in one home for more

20   than two years.  Can you tell me a little bit about the

21   circumstances surrounding that?

22        A.   I do think part of it was his father moving based

23   on the separation, and, then, moving a bit to protect

24   Linwood from his mother's substance abuse is my

25   understanding.  But, on top of that, his father was very

1    hardworking, he was a truck driver and because of that he

2    was gone, you know, for long periods of time, and, so,

3    Linwood would have to stay with family members while his

4    father was away.

5         Q.   All right, and when you say that that's your

6    understanding, is that your understanding from speaking with

7    the family, the family members?

8         A.   Yes.

9         Q.   And, so, then, we get to age 13, Linwood moved in

10   with an aunt and was physically abused by her from his time

11   there.  Have you been able to speak with Linwood's sister?

12        A.   Yes.

13        Q.   And she is not here today; is that right?

14        A.   Yes.

15        Q.   Do you have any information about the abuse that

16   happened here?

17   ·     A.   She just corroborated the abuse and said, you

18   know, that similar abuse had been done to herself and

19   she witnessed Linwood's abuse as well.

20        Q.   And do you know if there are any effects that

21   physical abuse have on children?

22        A.   Yeah, I mean, outside of just medical issues that

23   it can cause, it can cause a lot of psychological damage as

24   well to a child's self-esteem, their ability to develop

25   healthy and meaningful relationships with others, and,

1   again, it can increase a person's likelihood to abuse

2   substances or to engage in risky or criminal behavior.

3       Q.   All right, and, so, Linwood was diagnosed with

4   bipolar and cannibus abuse at age 15?

5       A.   Yes.

6       Q.   And that was corroborated by the records?

7       A.   Yes.

8       Q.   And the next year is when he's diagnosed with

9   alcohol dependence?

10      A.   Yes.

11      Q.   All right, and, so, the next step in his time line

12  is he was experiencing frequent auditory hallucinations and

13  suicidal ideations.  What is your foundation for that?  How

14  are you aware of that?

15      A.   Well, it's in the records.  It was in RBHA records

16  and RBHA reflected on other records as well, and Mr.

17  Linwood's report himself.

18      Q.   And, then, moving on to when he was 19, he was

19  admitted to the hospital.  Do you have any information on

20  that?

21      A.   Yes.  He was admitted into MCV, I believe, for a

22  suicide attempt.

23      Q.   All right.  Are you aware of how old Linwood was

24  when he was incarcerated for the robbery conviction?

25      A.   I believe he was around 19 years old.

1      Q.   And, then, next, his daughter was born.  We've

2  heard about that.  Then in 2016, we've heard about this

3  daughter passing away.

4      A.   Uh-huh.

5      Q.   And after his release, what information do you

6  have about him and substance abuse, if any?

7      A.   From what I can gather, I think, Linwood used it

8  as a coping mechanism for, what we say in social work,

9  compounding or complex trauma.  So, just traumatic events,

10  just like kind of compounding on top of each other and not

11  having the tools or the coping mechanisms to be able to

12  process that in a healthy way.  So, I think he did turn to

13  substances as a way to cope.

14      Q.   And for someone with a history of trauma and

15  mental health issues and substance abuse issues, are there,

16  within your knowledge, are you aware of any programs or

17  treatments that may be available?

18      A.   Yes.  So, RBHA has a program called PAT and that

19  program is specifically designed for people who have been

20  incarcerated or hospitalized for long periods of time, so

21  that kind of institutionalized mind-set.  It's wrap-around

22  services, there's a psychiatrist, there's a nurse, a social

23  worker, and it's really designed to address every area of

24  that person's needs whether that's housing, transportation,

25  getting a job, mental health, substance abuse to really help

1    them successfully integrate into society.

2         Q.   And can you tell us about the mental health

3    treatments specifically?

4         A.   Yes.  So, he would have the opportunity to do

5    therapy which in his case very likely like his mother also

6    suggested would be helpful to be able to verbally process

7    all of that, all of his trauma.  In addition to that, he

8    would be able to do medication management with a

9    psychiatrist to address his bipolar disorder diagnosis.

10             MS. FEINMAN:  I have no further questions.

11             If you could answer any questions from the

12   Commonwealth.

13             THE COURT:  Ms. Petite.

14                          *****

15                    CROSS-EXAMINATION

16   BY THE COMMONWEALTH:

17        Q.   Good afternoon, Ms. O'Rourke.

18        A.   Good afternoon.

19        Q.   You're employed by the public defender's office;

20   right?

21        A.   Yes, ma'am.

22        Q.   And your job is to go through records and find

23   portions of them that the attorneys can then use to try to

24   mitigate the sentence when we get to proceedings like this?

25        A.   Yes, ma'am.

1     Q.   What we're looking at today is this a complete

2   list of all the records that you had access to in relation

3   to Mr. Walden?

4     A.   No.  As I mentioned, we had his RBHA and Daily

5   Planet records as well.

6     Q.   So, you spent more time of these than I have,

7   obviously, I had just a few minutes to read them and some of

8   the handwriting can be a little difficult.  Can you point me

9   to the portion of these medical records that reference the

10  part in the time line you created about when Mr. Walden was

11  15?

12    A.   So, the records indicate in 2012 that's when he

13  was diagnosed.

14    Q.   All right, and he was born in 1992?

15    A.   I believe so.

16    Q.   All right.  So, that doesn't date back to age 15,

17  this is when he was actually age 19?

18    A.   Okay.  Thank you for that correction.

19    Q.   I just wanted to make sure I wasn't missing

20  anything.

21         So, then, the same thing about at age 16, he was

22  diagnosed with alcohol dependence.  That's in his records

23  from when he was 19?

24    A.   Yes.  All these records are from 2012.

25         THE COMMONWEALTH:  Okay.  I just wanted to make

1   sure I wasn't missing something in relation to the time

2   line.

3           THE COURT:  I'm glad you indicated that because I

4   got confused on the math.  I thought maybe I had misheard.

5           THE COMMONWEALTH:  That's why I wanted to know.

6                           *****

7   BY THE COMMONWEALTH:

8       Q.   So, these two things in green that say when he was

9   19 and the one below about auditory hallucinations, those

10  stem from these records that the Court has in front of him?

11      A.   Yes, ma'am.

12      Q.   Do we have any records here today about this thing

13  that says when he was 26, he was revived by paramedics?

14      A.   Not today, no.  Those are in his MCV records.

15      Q.   But we don't have those here today?

16      A.   No, ma'am.

17      Q.   You mentioned that you spoke with a number of Mr.

18  Walden's family members and a number of people here in

19  support of him today.  Did you speak with          :

20  (phonetic) mother?

21      A.   I did reach out to her, yes.

22      Q.   And what was the result of that?

23      A.   She is not here today.  I don't think I got a

24  response if I recall correctly.

25      Q.   So, from the time that you spent looking into his

                                                        239

                            - 342 -

1   family history and current support, what did he find about

2   his current relationship with          mother?

3        A.   I know they're in touch.  I know they had a video

4   chat just the other day where he got to see his son.

5        Q.   All right.  But she's not here today?

6        A.   Yes.

7        Q.   And, of course, we can see there's not a

8   two-year-old baby outside, either?

9        A.   Yes.

10       Q.   Is it fair to say that a large portion of your

11  work focuses on the way traumatic events impact the public

12  defender's office's clients?

13       A.   Could you repeat that?

14       Q.   Sure.  It was kind of a conducive question.

15            You've talked a lot today about traumatic events?

16       A.   Yes.

17       Q.   And you focussed on how those events impact the

18  people who suffer trauma?

19       A.   Uh-huh.

20       Q.   Events like the ones that you've described, losses

21  in the family, observing violence to Mr. Walden's mother, is

22  it your opinion that those exposures to incidents of

23  violence have contributed in large part to Mr. Walden's

24  struggles?

25       A.   Yes.

1          THE COMMONWEALTH:  Thank you.

2          I don't have any other questions.

3          THE COURT:  Ms. O'Rourke, just for clarification,

4     so the medical records that you were able to get for Mr.

5     Walden have him being diagnosed with bipolar at what age,

6     again?

7          THE WITNESS:  So, that would have been in 2012.

8          THE COURT:  So, whatever age he was, which, I

9     believe, they said he was 19 at that time, I just want to

10    make sure I understand the age.

11         MS. FEINMAN:  Well, Your Honor, I actually was

12    going to clarify that.  The record that we've been looking

13    at today is the one that has the most complete history

14    of his diagnosis.  In the presenting crisis situation, there

15    is a portion where the records that patient had a diagnosis

16    of bipolar since at least 2007, and cannibus abuse as early

17    as -- so, he's been diagnosed at least since 2007.

18         THE COURT:  All right.

19         MS. FEINMAN:  One second, Your Honor.

20         I have no further questions, Your Honor.

21         Thank you.

22         THE COURT:  All right.  You may step down from the

23    witness stand.  Watch your step coming out.

24              (The witness stood down.)

25                        *****

1          MS. FEINMAN: And that would be the end of the

2    defense's evidence, Your Honor.

3          THE COURT: All right. Any rebuttal evidence?

4          THE COMMONWEALTH: No, sir.

5          THE COURT: Are you ready for arguments now?

6          THE COMMONWEALTH: Yes, sir, and I'll respond at

7    this late hour.

8          THE COURT: All right. Ms. Feinman?

9          MS. FEINMAN: Thank you, Your Honor.

10         Of course we're here today for the sentencing of

11   Linwood Walden in this case, and we've talked a lot today

12   about Mr. Walden. We haven't revisited many of the facts of

13   the underlying case. As the Court's aware, Mr. Walden has

14   previously testified in this matter and the Court,

15   at this point, has chosen to find him guilty and brought us

16   to this stage.

17         I would like to remind the Court when we are

18   talking about the offenses that brought us here and the

19   facts of those cases that he's charged with two counts of

20   robbery and two counts of abduction in the underlying facts

21   of that at the heart of it the amount of money was $120 and

22   a pack of cigarettes. Cell phones and a purse were taken,

23   those were returned to the two women involved in the case.

24   But as far as the property that was taken goes, it was $120

25   and a pack of cigarettes, and, I think the most important

1  part of that is that no one was hurt.  There was no physical

2  injury or no medical treatment, there was no hospitalization

3  of anybody, that everyone got to go home at the end of that

4  day and be with their families, and I think that's the most

5  important thing that we're talking about, and that no one in

6  that case lost anything irreplaceable.

7       I will tell the Court, you've heard a great deal

8  today about Mr. Walden and his life, and I think it's so

9  important for the Court to understand who Mr. Walden is, how

10 he came to be here, and where he's going from here and that

11 there is a future ahead of him.  He started off in a loving

12 two-parent household.  It was stable.  He had a mom and dad.

13 Things were good.  Then this horrific trauma happened to his

14 mother.  She was beaten in an ally on her way home from

15 work, raped, and later contracted HIV.  You heard the

16 testimony about her spiral and that she had a mental

17 breakdown.  She's been dealing with those demons ever since.

18 She's fell into substance abuse and Linwood was around for

19 that and saw the physical attack and saw the substance

20 abuse, and you heard her testify about how that -- she copes

21 that way because that's how her family copes, and when you

22 see your family cope that way, that's how you leard and then

23 that's how you handle things, and that's what she saw and

24 learned and that's what Linwood saw as well.  He didn't get

25 help.  He didn't get therapy.  I'm sure that was horrific as

1   a young child to see your mother in that situation, and I

2   can't imagine knowing how to deal with that as a child.

3   That is what tore his family apart.  He went from a stable,

4   loving household to mom in and out having her own problems.

5   Dad is doing the best he can trying to be stable but a truck

6   driver is out of town a lot.  Linwood was handed out to

7   family members, and, then, eventually, ends up living with a

8   very physically abusive aunt.  He was there for somewhere

9   around three years.  You heard his mom talk about at some

10  point she did find out that he was being beaten, that there

11  was this physical abuse, and his sister was being abused as

12  well.  But she wasn't stable enough at that point.  She

13  wasn't in a place that she could remove him from that house

14  or take care of him in the way that he really needed, and,

15  instead, we have a child who is pushed off on an aunt,

16  dealing with terrible abuse of his own after the trauma from

17  dealing with his mother.  He didn't get help for that.  He

18  didn't have anyone really capable, frankly, of getting him

19  some help in that situation because his own parents' were

20  dealing with their own problems.  That is deeply traumatic

21  and carries a life-long impact.  It carries mental health

22  impact.  It carries behavioral impact, how your whole

23  thought process works is molded especially in those tender

24  years and it's trauma that needs to be dealt with.  So, when

25  it's not dealt with we see things like unhealthy behavior.

1   Then you compound that by losing his daughter.  You heard

2   testimony from his mother and also from Latrika, the mother

3   of        , that Linwood loved her, that little girl, that he

4   was incarcerated and it was all he could talk about.  He saw

5   her as often as they were able to, called almost every day,

6   was writing letters every day.  It was not a good situation,

7   obviously.  Obviously, everyone would have been happier and

8   better off if he'd been home and been able to be with his

9   daughter, but they played the hands that they had at that

10  point and he did what he could at that stage to be involved

11  as much as he was able, and you heard testimony about his

12  plans for the future, and that, sure, he had put himself in

13  a bad situation, was incarcerated, but he had plans for the

14  future and those were through his daughter, that he was

15  going to get out, that he was going to get a job, provide

16  for his family, and that he just wanted to be there for

17         , and, then, a few months before he was released, she

18  was murdered in a brutal murder, I believe that case was

19  decided before this court, and suddenly he was about to be

20  released from prison.  All of his plans for the future are

21  gone, and his daughter is gone, he had never gotten to see

22  her when he wasn't in a prison jumpsuit.  He never got the

23  opportunity to go to her funeral.  He never got the

24  opportunity to grieve her.  He does what he can, he goes to

25  her grave, has a locket with his son's,        (phonetic),

1 and another locket with Latrice on it. But he was not able

2 to have the time with her or the grieving process. He

3 doesn't come from a family where they seek treatment or get

4 therapy when they have these problems. This is another case

5 where he didn't receive that. This in itself on its own

6 will be enough for someone to need help, but he wasn't able

7 to get that, didn't ever get that, and, instead, coped at

8 that point in the same way that his mother had, the same way

9 that her family had, and that's when he turned to

10 substances.

11       I think it's worth noting that you heard, I

12 believe, from his mother and also      that prior to

13 her -- Latrik, I apologize -- prior to Latrice's death, that

14 they didn't know him to use drugs other than marijuana, and

15 I believe I did point out in the presentence report also

16 where it talks about he has a prior history of marijuana and

17 while he was on probation he was testing positive for some

18 harder drugs, if the Court will allow that term, and, so,

19 that was his coping method. He was in, it sounds like, a

20 dark place emotionally and wasn't dealing with it well. He

21 has bipolar disorder. That's hard enough to deal with. The

22 courts frequently see reoccurring mental health and

23 substance abuse issues and pile on trauma after trauma after

24 trauma.

25       But, Your Honor, there are things that can be done

1  about that and it can help.  So, as this Court knows, there

2  are medications for physical issues, and as the Court is

3  very well aware there is treatment and support and help that

4  can be available for substance abuse issues and for mental

5  health issues and for dealing with these types of deep

6  trauma, and, so, this isn't a case where there's nothing

7  that can be done.  There are services available.  There's

8  help that is available to him.  But he is still a young man,

9  he's 28 years old, Your Honor.  He does have a future ahead

10 of him.  You can see in the courtroom even during COVID

11 times, he has family members here to support him and to be

12 there for Mr. Walden.  So, there is a future for him.  With

13 his family and their loving support, and we certainly hope

14 with these treatments that are available, that can help him.

15         Your Honor, he's had a very, very hard road,

16 absolutely, and we're not saying that to excuse any type of

17 behavior.  We are asking the Court to think about what

18 you've heard today from his family, think about how he got

19 here and where we're going from here.  We're asking the

20 Court to take that into consideration, and we're also asking

21 the Court to listen to Linwood during his allocution and

22 take that to heart.

23         We're not asking for a specific sentence in this

24 case.  We're just asking the Court to use everything you've

25 heard today and fashion what the Court believes to be an

1    appropriate sentence in this case.

2         Thank you.

3         THE COURT:  Yes, ma'am.

4         Ms. Petite?

5         THE COMMONWEALTH:  Judge, we've heard a lot today

6    about Mr. Walden.  So, I'll start with his criminal history

7    and I'll begin there, then I'll move to the facts of this

8    particular case.

9         In 2011, it looks like his first contact he was

10   charged with grand larceny and that was taken under

11   advisement.  At the end of that year, contempt of court.

12         Then in 2012, he's convicted of robbery and use of

13   a firearm in a global plea agreement that covers the three

14   incidents that were all covered in that one plea agreement

15   date.

16         He's released from the Department of Corrections

17   on May 2nd of 2016.  He is referred to probation where they

18   referred him to a peer support group.  They referred him to

19   a relapse prevention group.  They tried to give him the

20   tools so as to not reoffend.

21         He was back on a probation violation in April of

22   2017 where seven months are revoked.  He is released then,

23   looks like, in late 2017, likely.

24         During that time he is convicted in June, 2018, of

25   petty larceny, contempt of court, convicted October of 2018.

1          Then in January of 2019, he has a felony receipt

2     of stolen goods reduced to a misdemeanor and a felony credit

3     card larceny reduced to a misdemeanor.  Each of those

4     sentences he received 12 months with nine months suspended,

5     and he's also convicted that same date of fleeing from law

6     enforcement, petty larceny, where he received 12 months with

7     nine months suspended on each of those.

8          So, January of 2019, he received a six month

9     sentence to serve once you factor in the good time that he

10    would have had.  That is not worthy because our offense date

11    is August 31st of 2019.  Now, I realize that we tried this

12    case in, I believe, January and it has been some time so

13    it's easy to look back at those dates and things, but, you

14    know, he had a stretch there, but August 31st of 2019, is

15    our offense date.  Very shortly after, he would have been

16    released on these convictions in 2019 where he again had the

17    benefit of the Commonwealth reducing those charges, and I

18    know that because I was the Commonwealth who did it.

19         So, we have a history here of someone who has

20    prior convictions for robbery.  He does have a prior

21    conviction for assault, and the Court, I'm sure, saw and

22    noted in the presentence report that he is a documented

23    gangster, Disciple gang member, and he was on gang probation

24    because of that involvement.

25         Now, that is not to minimize the consequence of

249

1    his history.  Obviously, what happened to his mother was a

2    horrific event and one that she told you and everyone that

3    testified on his behalf today, Judge, and, I think, frankly,

4    this weighed against him, seems like lovely people.  I think

5    they were honest with the Court, and, I think, they did

6    their best to answer the questions truthfully, and, I think,

7    they've been supportive of this defendant as he tries to

8    navigate through his release from incarceration and trying

9    to do the right thing.  But this defendant witnessed what a

10   stranger's attack on his mother did.  He's had time to grow

11   with the effect and the permanent affects that it's had on

12   her, and we're here because of an attack on two strange

13   women.  He suffers though the awful, awful loss of his

14   daughter,            and, I think, it is worth noting that he

15   committed the last robbery while she was still in utero, and

16   he was still incarcerated serving that sentence, and that's

17   why I asked Ms. Brown what I did, did he realize the impact

18   that his actions took?  He was incarcerated for Latrice's

19   entire life because he committed a robbery.  He missed out

20   on that, and I can't, frankly, imagine a better reason to

21   never reoffend, to never want to find yourself incarcerated

22   again than to miss the entire life of your daughter, and

23   here we are again.

24          Now, you've heard that the defendant now has a

25   two-year-old son named Zana (phonetic).  I would think that

1    that occurrence in his history would put that in the back of

2    his head. I'm not going to do something like this, the same

3    thing could happen with        that did with       , I

4    won't be there for his life, I'll be in Sussex, I'll see

5    them when they find the time, I'll be leaving Zaveon's

6    mother to parent him alone, I won't be a supportive father,

7    and here we are again.

8          On August 31st of 2019, and I know it was a while

9    ago so if the Court will bear with me while I go through the

10    facts, Kaitlyn and Sonya had gone to pick up a pizza at

11    DeVinci's Pizza. Kaitlyn picked it up, got back in the car,

12    the defendant got into the backseat, both testified they had

13    never seen him before, he was a stranger, and he told them

14    if they did not give him their wallets he would shoot them.

15    He threatened that if they didn't comply, Sonya would see

16    her friend's brains splattered on the sidewalk. He made

17    multiple threats to kill them. He ordered them to pull into

18    an ally and take off their clothes. When they refused to do

19    that, he struck Kaitlyn physically on the side of the head.

20    If the Court will recall, she gestured towards the side of

21    her face right along her cheek by her ear, and, then,

22    continuing to threaten their lives, he forced them to go to

23    the Ocean Grocery where the defendant followed Kaitlyn in,

24    ordered her to remove money from the ATM, took the money and

25    her purse containing the phones and everything else and ran.

1   He was subsequently found with Sonya's cigarettes with
2   currency but the phones and the purse had been dumped, and,
3   quite frankly, although I think all the witnesses who
4   testified here today were very credible, their testimony was
5   directly in contradiction to what the defendant said in the
6   presentence report, and, the Court, when the defendant
7   testified at trial, specifically found his testimony wholly
8   incredible based upon the story that he told the Court, and
9   I do think that that is something to consider because if
10  this is someone saying I'm ready to change my behavior, I
11  don't know how the Court trusts that given this documented
12  black and white history of him being untruthful with the
13  Court.

14          The amount of money that he took from Kaitlyn and
15  Sonya, the fact that they got their phones back is not why
16  we're here today.  It's not why these guidelines are what
17  they are.  We have heard so much about the trauma to this
18  defendant.  What about the trauma he inflicted on two girls
19  who were just trying to pick up a pizza?  They were young
20  women, and if the Court recalls, Sonya cried the entire time
21  she testified and could barely look at the defendant and had
22  to have several breaks to compose herself.  Kaitlyn talked
23  about how this has impacted her life, she afraid to answer
24  her phone for a strange number now.  It's not the money.  It
25  is the emotional trauma and the emotional pain this

1 defendant inflicted for apparently no reason.  There's no

2 explanation.  He has been punished for this crime before.

3 He has missed the life of his daughter, and it was not

4 enough to tell him to stop grabbing people, don't abduct

5 strangers, don't threaten to blow their brains out.  You

6 know, Ms. Feinman summarized it very well, this is a deep

7 and lifelong impact.  It is lifelong trauma that has been

8 caused by this defendant's actions and what his actions have

9 shown the Court is that despite having a supportive group of

10 people, despite having folks who want to help him, and

11 despite having been given every deterrent previously that I

12 can possibly think of, he is unwilling to stop committing

13 violent crimes against strangers.

14       As the Court knows, he was convicted previously

15 grabbing a stranger.  These were two strange women.  It is a

16 violent crime and it is one that permanently scars the soul

17 of the victim because it is so traumatic.  In addition to

18 just the robbery, we have the abduction where he forced them

19 to drive around.  He orders them to take off their clothes.

20 He says they'll watch their friends be murdered, you know,

21 obviously, he was not found guilty of using a firearm and

22 one was not recovered but for a robbery and an abduction

23 without a firearm, this is about as bad as it gets.

24       I have not made up my mind prior to hearing the

25 defense evidence today of what I was going to ask for, and

1    I'm not going to recommend a specific sentence.  The

2    Commonwealth is not asking for the high end in that case --

3    in this case, and at this point the Commonwealth has not

4    elected to show cause the considerable amount of suspended

5    time over the defendant's head.  I would suggest that a

6    sentence somewhere between the low end and the midpoint is

7    appropriate here.  The defendant's personal experience with

8    trauma, I think, is an added reason for why going below the

9    guidelines is not appropriate because he knows how bad it is

10   and he chose to do that to other people, and he's not going

11   to stop when he's released.

12            Thank you.

13            THE COURT:  All right.  Mr. Walden, if you would

14   stand, please.

15            All right.  Sir, again, this is referred to as

16   your presentence hearing.  This is a time where you were

17   given an opportunity to give the probation officer

18   information that could be helpful to the Commonwealth, it

19   could also be helpful to you in order that the Court could

20   kind of get a better picture of who you are.  Okay.

21            You were previously tried before the Court on the

22   charges of abduction, two counts of abduction to gain

23   pecuniary benefit in violation of Virginia Code Section

24   §18.2-48 subsection I, to which you pled not guilty to both

25   counts, and, then, there were two counts of robbery in

1    violation of Virginia Code Section §18.2-58 to which you

2    pled not guilty.

3              As you've heard today and as I'm sure you

4    remember, the Court heard, by way of bench trial, the Court

5    heard the evidence and found you guilty on all four counts,

6    and at that point in time counsel reminded me of this other

7    motion for expert funds, I hadn't remembered that.  I have

8    some remembrance of it now but I do remember looking at this

9    presentence report and kind of comparing the presentence

10   report to these other things going on and the information

11   was completely different, and I think that had a bearing --

12   we almost -- in order for the Court to consider something

13   like that, I would almost need an evidentiary hearing with

14   witnesses to explain why someone could be -- could give

15   information so completely opposite of what was happening.

16   After hearing from your mother, I can clearly understand why

17   you might not want to disclose something like that,

18   obviously.  It still doesn't explain why you didn't mention

19   anything about, you know, being abused by your aunt, you and

20   your sister, because that wasn't mentioned, either.  It did

21   mention in here about your daughter, which the Court is very

22   sorry to hear about it.  Even though you never got a chance

23   to know your daughter, no one should have to endure that.

24   So, it's a double whammy for you because you had a daughter

25   that you never even got to meet and hold except through a

1   screen, I guess, I don't know if they gave you time whereby

2   you could see her and hold her when you were being held or

3   maybe you did.

4       But, anyway, the Court has thoroughly looked

5   through this presentence hearing, but, again, the

6   information, I'm getting a different picture today than what

7   I got from when I read the presentence report, and I do

8   agree with Ms. Petite, I think you're fortunate to have

9   support of family that are willing to come forward with

10  their honesty today, and, in particular, your mother.  To

11  get on the stand and disclose some of the things that she

12  had to disclose had to be very difficult, not only for her

13  but for all the family who had to witness it including

14  yourself.

15      But, be that as it may, the Court has previously

16  made a decision and now the determination is what's

17  appropriate given all the things that I've heard, the two

18  different pictures that I have of kind of the situation, and

19  as Ms. Petite said, there's some absent people who also have

20  to be considered and those are the victims from the

21  robberies that you were convicted of and the abductions.

22      But please understand that the Court has reviewed

23  all of this and now I want to get to the back of the

24  presentence report.  You may have heard someone, and I don't

25  think there's been very much mentioning of the sentencing

1  guidelines, but they do come into play in these cases

2  whenever somebody is sentenced.

3       Sentencing guidelines are basically prepared by --

4  Ms. Thorn-Acres put this together but she's got it by

5  figures in a grid that the Virginia Sentencing Commission

6  puts together, and they take into consideration your prior

7  criminal history, what you stand before the Court on, what

8  you've been convicted of, and it comes up with a set of

9  numbers so that courts around the state if you're tried in

10 Roanoke versus Northern Virginia versus Norfolk, you know,

11 we're not shooting darts at a board, we have a grid, and

12 this is the range which someone with this criminal history

13 and these convictions, this is the range for which they

14 should be sentenced in.

15      Now, these are not mandatory guidelines which

16 means that the Court must sentence you within these

17 guidelines.  They're discretionary.  But in order for the

18 Court to go below the guidelines, or even go above, I have

19 to give my explanation to the Virginia Sentencing Commission

20 because they'll look at it, and they'll say, well, if the

21 guidelines called for 21 years 11 months on the low end, you

22 know, why did you go down and give him five years, what was

23 your thinking, I mean, what were you thinking about?  Well,

24 we said we felt it should be 21 years 11 months, and, then,

25 on the high side if the guidelines on the high side which

they are 33 years 11 months and I gave you 50 years, I would also have to give the reasons for departure upward because they, again, would say, well, why are you giving this man this much time when the high end said this, what's your rationale for doing that? That's why when you go outside the bounds, you've got to explain it.

So, your sentencing guidelines in this case is exactly what I just said, 21 years 11 months on the low end based upon the calculations, that's what it comes up to, with a range midpoint of 29 years three months. Then the high end of the guidelines are 33 years 11 months. Your prior robbery has a lot to do with the guidelines --

Yes, ma'am?

MS. FEINMAN: Your Honor, I apologize, I just want to be clear, Mr. Walden does want to exercise his right to allocution.

THE COURT: Yes, ma'am. I'm not sentencing him now. I just giving my speech.

MS. FEINMAN: Thank you, sir. I apologize.

THE COURT: So, 33 years 11 months on the high end. So, in order for the Court normally on a given set of facts, unless there is some particularly egregious reason this case is so far beyond the pale that the Court feels that 33 years 11 months is just not enough time, then we would have to go upward.

1        On the flip side, if I could say this seems

2   awfully high and I think this person's had a bad past, maybe

3   that's how the guidelines got up that high, but for this set

4   of facts I would have to be able to justify in writing why

5   I'm doing what I'm doing to go lower.  Okay.  So, that's

6   where we are.  Otherwise, you find yourself somewhere within

7   those numbers.

8        All right.  You will be given the opportunity at

9   this time to make a statement.  I'm going to step off the

10  bench and consider what's appropriate once I hear from you.

11  You have an opportunity to make a statement, if you so

12  choose, to the Court prior to the Court pronouncing what

13  your sentence will be.  Your attorney has already told the

14  Court that you had written something out and they wouldn't

15  allow you to bring it today, so I'm sorry that happened and

16  I hope, you know, I will give you as much time as you need

17  to say whatever you want to say.  So, this is your

18  opportunity right now.

19        THE DEFENDANT:  Yes, sir.

20        Good evening to you first of all.

21        Today, I'm saying, I feel that as if, you know

22  what I'm saying, I'm, you know, being judged on my past, you

23  know what I'm saying, my past don't define who I am.  You

24  know, the things that is coming up a part of this case, and

25  I apologized to what happened to Ms. Kaitlyn and Sonya, and

1    I also apologized to the courts and to you, too.

2            I'm just gonna -- I'm speaking from my heart, Your

3    Honor, it's gonna take some time, it's a lot of time --

4            THE COURT:  Yes, sir.

5            THE DEFENDANT:  -- I ain't never, I mean, had to

6    face no time like this, you know, so it kinda got my tongue.

7    The things that did occur and I told you in the beginning

8    that, you know, I pled not guilty, you know, certain things

9    that wasn't seen or certain things that wasn't, you know,

10   just acknowledged, you know, like the fact that if a person

11   is saying that I robbed them and you are 20 seconds across

12   across the street from the first precinct or you walking to

13   the store where there's many people, you know, or being

14   robbed by this person or to where your friend sits in the

15   car that's not a lot of time, you know, then I understand

16   it and the actions that I took, like I said before, I mean,

17   it shows that I'm (indecipherable), and even I was shaken

18   up from the incident so that's why even with, you know, the

19   things that were in my, you know, in my property I was so

20   shooken up that I did not go back.  I mean, I tossed those

21   things and proceeded to head home, and a part of me

22   proceeding to head home I was stopped by the police and let

23   go, and I was stopped again, and, then, locked up.  I don't

24   feel the, I mean, since I been locked up, Your Honor, I had

25   time to reflect on things, like, the valuable things and

1   what I know now is the things that are valued most are the

2   small things in life, like those times spending with your

3   children and playing with your child and enjoying sitting on

4   your front porch and enjoying the freedom of being able to

5   move and do the things that you love to do with your family

6   or by yourself or something.  I also learned to, you know,

7   find myself back on my path (indecipherable), I mean, it's

8   my way of life which is to be humble, I mean,

9   (indecipherable) the meek shall inherit the earth, the

10  humble shall inherit the earth, and, so, I lost

11  that on my path.  I agree, I lost my way when I lost my

12  daughter, I mean, and I'm still dealing with that, you know

13  what I'm saying.  Can't nobody tell me how to deal with it.

14  I did deal with it, like, I didn't tell her the truth,

15  know what I'm saying, 'cause I didn't want to get up here

16  and degrade myself as well as my family.  So, I was going

17  to wait for today to do it, you know what I mean, but I

18  didn't want to tell her or anybody else about me.  It's not

19  nobody else's job to tell you about my life.  Who better to

20  tell you about me then me.  So, everything's going on, like,

21  everything is looking bad in my position, and this ain't who

22  I am, and, you know what I'm saying, the things that you

23  people say I did, I didn't even do.  I put myself on the

24  scene.  Yeah, I put myself there, and, so, the person that

25  did do this and gets away, it falls on me, but I can't do

nothing about it. All I can do is try to get you to
understand that's not who I am. I'm not a robbing person.
But a lot of things that was going on, I decided to accept
it because I was born and raised with my mother saying don't
you tell nobody about it, don't you snitch on nobody, you
know what it'll do to your family. So, I accept it, and it
may seem wrong, but see how I am now I accepted it again.
Something I do not deserve. I didn't ask you to take it in
consideration, I mean, this is not who I am, and the thing
that you have to hear about he's a robber and that is not
who I am. I mean, even if I get the chance to go home and
be with my family, I know what I have plan, and as of right
now, I'm trying to build a non-profit organization called
Live To Save The Youth. This is the thing I'm trying to do
for in here. Being in here even before in my last
incarceration, I completed the (indecipherable) program.
I got my certificate for that, the two I'm seeing now, the
people that put it in the forefront but it was behind the
scenes, too, Your Honor, that you do not know. I'm a good
man. I'm a good father, and I am an honest man. I guess, I
have the tools to survive my life 'cause nobody -- it's just
like when they go by the Bible, when God said, well, whoever
I sent cast the first stones, it stands. Nobody can stand
in this room. All I ask you is to see me for the better
person that I can be, 'cause I'm not what these people are

1  trying to make me out to be, that's not what I am.  That's

2  not who I am.  I am a father.  I am a son.  I'm a brother,

3  and I just ask that you see deeper into it, you know, and,

4  also, you know, just see passed what you're hearing and

5  see me as a person and not an animal.

6          Thanks for allowing me to share.

7          THE COURT:  Yes, sir.

8          The Court will stand in brief recess and be back

9  to make a decision very shortly.

10                          *****

11          NOTE:  A recess was taken at 2:40 p.m., and

12  reconvened at 3:07 p.m. as follows:

13                          *****

14          THE COURT:  All right.  So, Mr. Walden, now that

15  the Court has heard all the evidence, and, obviously, the

16  Court recalls the facts somewhat from when the case was

17  tried, and the Court felt that the evidence was proven

18  beyond a reasonable doubt to find you guilty on the two

19  counts of abduction and the two counts of robbery.

20          I will note, sir, that, you know, it's very

21  important for you part of the humility that you have to deal

22  with in life and particularly when you have to face

23  consequences is it's not productive to ever blame a victim

24  in a case.  Okay.  So, people never ask to be put in a

25  situation where they're put in harms way.  There are very

1  few people that what to do that.  So, with respect to those

2  young ladies that had to undergo that, you know, you don't

3  want them to have a lifelong feeling like what your mom

4  experienced, and, so, you never know the affects that

5  something could have on them.  So, I'm just saying that so

6  that just gives you something to think about, you know, you

7  always want to just make sure, you know, and as men in

8  particular we need to protect women and protect everybody.

9  So, you should never say that they should have taken a

10  different action.

11        Also, whenever you -- even if you don't use a gun

12  to tell somebody that you're going to take their life,

13  that's a strong word and that was the evidence and that's

14  what the Court had to go on, okay, and, so, those are strong

15  words for people and that's why we get to this case.

16        Now, so, there are robberies that are used with a

17  gun where somebody gets hit over the head with a gun.  There

18  are robberies where someone snatches a chain.  There are

19  robberies where people make threats.  Okay.  This was a

20  threat on the ladies and physical violence was used because

21  they were hit in the head.  I'm saying all that to say that

22  the Court has considered all the trauma that you've endured

23  and I think you should receive some credit for that, but the

24  Court can find no basis for departing below the sentencing

25  guidelines based upon the actions that were taken on that

1 particular day, and, so, I just want to make one thing clear

2 with you, when you say that you feel that your past is being

3 held against you, and I try to explain this to young people,

4 your past is held against you, all our pasts are held

5 against us.  We are accountable for all the things we do in

6 life.  That does not mean that we can't be better people in

7 the future.  So, we always hope that we've learned and

8 become better people for what has happened to us.  But

9 that's what these guidelines are based upon.  They're based

10 upon what you did in the past, and, so, that's what the

11 calculation is for.

12           So, this is where we are.  On the abduction, which

13 is case number 19F2888, in violation of §18.2-48, the Court

14 will sentence you to a term of 20 years incarceration in the

15 Department of Corrections, with 19 years suspended for a

16 period of 40 years.  So, that's a one year active sentence

17 on that particular paper.

18           On case number 19F2891, which is also abduction in

19 violation of §18.2-48, you'll be sentenced to a term of 20

20 years, with 19 years suspended for period of 40 years.  So,

21 that's another year for that.

22           On case number 19F3055, which is robbery in

23 violation of §18.2-58, you'll be sentenced to a term of 20

24 years with 10 years suspended for a period of 40 years.  So,

25 that's a 10 year active sentence on that particular robbery.

1    On case number 19F3056, which is robbery in

2    violation of §18.2-58, you'll be sentenced to 20 years with

3    10 years suspended for 40 years.  So, that's 10 years for

4    that which comes out to a total of 22 years.  That's the

5    very bottom end of your sentencing guidelines.  It's just

6    one month off.

7        The reason the Court sentences you to the bottom

8    end of the sentencing guidelines, the Court actually felt

9    that this should be at the midterm level which is 29 years

10   11 months or 29 years three months, but I have to tell you,

11   your mom's testimony weighed heavily on the Court and I

12   thought that you should be given consideration given the

13   fact that you were a five-year-old when she had to undergo

14   that, and, in addition, what you had to deal with with your

15   daughter, I thought consideration should be given for that.

16   But with respect to what the young ladies had to endure, the

17   Court couldn't find a basis for going below the guidelines.

18       So, that's where we are, and because you have pled

19   not guilty, you are entitled to appeal these convictions if

20   you so choose.  If you wish to appeal, the Court will

21   provide a transcript of all proceedings to you at no cost if

22   you can't afford them.  We will note the public defender's

23   office for purposes of noting an appeal because there's a

24   time line from which you have to do that.  So, that has to

25   be done.

1        In addition, upon your release from incarceration

2  you will be required to report to supervised probation

3  within three business days for a length of time to be

4  determined by the Department of Probation.

5        You will also be responsible for costs of court.

6        The Court will also order that you have no contact

7  with the victims in this case which means don't send a

8  message to them, no social media contact, no contact through

9  another person.  If the Court finds that that has happened,

10  you have a lot of time that could be revoked as a result of

11  that.

12        Anything else from the Commonwealth?

13  THE COMMONWEALTH:  No, sir.

14  THE COURT:  Any thing else from the defense?

15  MS. FEINMAN:  No, sir.

16  THE COURT:  Thank you.

17  THE COMMONWEALTH:  Thank you, Your Honor.

18  Have a nice weekend.

19  THE COURT:  You as well.

20

21

22        HEARING CONCLUDED

23

24        (The hearing concluded at 3:10 p.m.)

25

CERTIFICATE OF COURT REPORTER

1

2

3

4    I, L. Diane Paarfus, hereby certify that I,

5 having been duly sworn, was the Court Reporter in the

6 Circuit Court of the City of Richmond, on the 20th

7 day of November, 2020, at the time of the hearing herein.

8    I further certify that the foregoing transcript

9 is, to the best of my ability, a true and accurate record

10 of the incidents of the hearing herein.

11    Given under my hand this 7th day of January,

12 2021.

13

14

15

16

17

18    L. Diane Paarfus
     Court Reporter

19

20

21

22

23 Notary Registration Number:  269677

24

25

# CHANDLER & HALASZ
## STENOGRAPHIC COURT REPORTERS

ROUGH COPY • LIVENOTE • TRANSCRIPTS VIA EMAIL • CONDENSED/WORD INDEX
DAILY COPY AND EXPEDITED DELIVERY • DEDICATED TO EXCELLENCE

January 7, 2021

RECEIVED AND FILED
CIRCUIT COURT

JAN 1 1 2021

EDWARD F. JEWETT, CLERK
BY_____ D.C.

The Honorable Edward Jewett, Clerk
Richmond Circuit Court
400 North 9th Street
Richmond, Virginia 23219

RE: Commonwealth vs. Linwood G. Walden
    Case No.: CR-F-2888; 2891; 3055; 3056
    Transcript of June 12, 2020

Dear Mr. Jewett:

Enclosed please find the original transcript of the above-styled case taken in the matter on November 20, 2020, to be read as evidence in the case.

Please file this among the other papers in this matter.

Very truly yours,

L. Diane Paarfus
Court Reporter

P.O. BOX 9349 RICHMOND, VA 23227
804.730.1222
www.chandlerhalasz.com
vickiehalasz@gmail.com

269

- 372 -