

RESPONDENT'S
EXHIBIT
2

# In The
# Court of Appeals of Virginia

RECORD NO. 1376-20-2

**LINWOOD GEQUAN WALDEN, JR.,**

*Appellant,*

v.

**COMMONWEALTH OF VIRGINIA,**

*Appellee.*

BRIEF OF APPELLANT

**Meghan Shapiro (VSB No. 79046)**
**VIRGINIA INDIGENT DEFENSE COMMISSION**
**1604 Santa Rosa Road, Suite 200**
**Richmond, Virginia 23229**
**(804) 662-7249 (Telephone)**
**(804) 662-7359 (Facsimile)**
**mshapiro@vadefenders.org**

*Counsel for Appellant*

**THE LEX GROUP** ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

NATURE OF THE CASE ............................................................................. 1

ASSIGNMENT OF ERROR ......................................................................... 2

STATEMENT OF FACTS ............................................................................ 2

ARGUMENT ............................................................................................... 7

I.     Standard of Review ...................................................................... 7

II.    Summary of Argument ................................................................ 10

III.   The defense met its burden: a threshold showing ................................. 11

      A.    The law requires only a threshold showing beyond mere hope or suspicion ......................................................... 11

      B.    Mr. Walden's public defender far surpassed "mere hope or suspicion" with a detailed proffer ................................ 13

           a.    Proffer of Mental History................................... 14

           b.    Proffer of Anticipated Expert Testimony ....................... 14

           c.    The defense articulated a particularized need for the expert ............................................................... 14

IV.   Deference is not owed the trial court's decision to reject defense counsel's proffer ................................................. 16

V.    The absence of Mr. Walden's mental health history from the PSR was further evidence of the need for a defense expert ........................... 16

VI.   Mr. Walden was prejudiced by the denial of his psychologist .............. 17

CONCLUSION ............................................................................................ 20

CERTIFICATE ........................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ake v. Oklahoma,*
    470 U.S. 68 (1985) ................................................................................ *passim*

*Britt v. North Carolina,*
    404 U.S. 226 (1971) ........................................................................ 17

*Caldwell v. Mississippi,*
    472 U.S. 320 (1985) ........................................................................ 12

*Commonwealth v. Sanchez,*
    268 Va. 161 (2004) ......................................................... 8, 11, 12, 13

*Dang v. Commonwealth,*
    287 Va. 132 (2014) ................................................................... 9, 15

*Dowdy v. Commonwealth,*
    278 Va. 577 (2009) ............................................................... *passim*

*Henderson v. Commonwealth,*
    285 Va. 318 (2013) ........................................................................ 9

*Hoverter v. Commonwealth,*
    23 Va. App. 454 (1996) ............................................... 8, 12, 13, 16

*Husske v. Commonwealth,*
    252 Va. 203 (1996) ............................................................... *passim*

*In re Josephson,*
    218 F.2d 174 (1st Cir. 1954) ........................................................ 9

*Johnson v. Commonwealth,*
    292 Va. 772 (2016) ......................................................... 8, 12, 13

*Koon v. United States,*
    518 U.S. 81 (1996) ........................................................................ 9

*McWilliams v. Dunn,*
    137 S.Ct. 1790 (2017) ................................................................... 8

*Porter v. Commonwealth,*
276 Va. 203 (2008) ................................................................................... 9

*Price v. Commonwealth,*
72 Va. App. 474 (2020) ............................................................................. 8

*Ross v. Moffitt,*
417 U.S. 600 (1974) ........................................................................... 11, 17

*United States v. Burr,*
25 F. Cas. 30, 1807 U.S. App. LEXIS 492
(Circuit Court, D. Virginia, June 13, 1807) ........................................ 10, 15

*Wilkins v. Commonwealth,*
292 Va. 2 (2016) ....................................................................................... 9

## OTHER AUTHORITY

Henry Friendly,
*Indiscretion about Discretion*, 31 Emory L.J. 747 (Fall 1982) ................... 9, 15

## NATURE OF THE CASE

Mr. Walden, indigent and represented by the public defender, was denied expert services of a psychologist for sentencing. He was thereafter sentenced to 22 years of active incarceration with an additional 58 years of suspended time, for an unarmed abduction and robbery in which no one was wounded and all property was recovered. Mr. Walden suffered from complex mental diseases including bipolar disorder and repeated significant traumas from age five or six, through adulthood, including suffering childhood neglect and abuse, losing his own three-year-old daughter to homicide (she was beaten to death by a caregiver), and losing a three-month-old daughter to SIDS. His expert would have explained the connection between his mental health and trauma history, and his criminal behavior; and that his conditions could be successfully treated, greatly reducing his risk for recidivism.

Mr. Walden was convicted of two counts each of abduction and robbery in a bench trial on January 21, 2020. J.A.33 *et seq*. Before his sentencing hearing, Mr. Walden, who is indigent, moved for appointment of an expert psychologist under *Husske v. Commonwealth*, 252 Va. 203 (1996), and *Ake v. Oklahoma*, 470 U.S. 68 (1985). J.A.232-37 (written motion). In support, counsel made detailed factual proffers supporting particularized need, including that the expert would diagnose and evaluate Mr. Walden's mental illnesses, review his history of highly sympathetic traumatic experiences both during childhood and recent adulthood, and craft a mental health treatment plan that would greatly reduce his likelihood of recidivism.

In a hearing preceding his sentencing, he unsuccessfully argued in support of a Motion for Release of Court Funds for Expert Assistance. J.A.232 *et seq.* (written motion); J.A.262 *et seq.* (argument on September 30, 2020). He unsuccessfully renewed that motion at the beginning of his sentencing hearing, on November 20, 2020. J.A.287 *et seq.* The final order issued on December 8, 2020, J.A.281, sentencing Mr. Walden to 22 years active incarceration plus 58 years suspended. The Court of Appeals granted Mr. Walden's petition as to his second assignment of error.

## ASSIGNMENT OF ERROR

The trial court erred in denying Mr. Walden's motion for expert funds. J.A.232-37 (written motion); 266-80 (argument); 280-81 (denial); 286 (written denial); 295-96 (renewed motion); 296-97 (denial).

## STATEMENT OF FACTS

When Mr. Walden was six years old, a beating and rape by a stranger left his mother mentally unstable and drug-dependent, transforming what could have been a supportive home environment into a dangerous and upsetting one. J.A.275-76. Under various caregivers, young Mr. Walden was exposed to drug abuse, neglected, and physically abused. J.A.275-76; 266. As a teen, he developed bipolar disorder (which ran in his family). J.A.266, 278. He received no mental health treatment or other interventions at any point, and was left to suffer on his own without any of the coping mechanisms that nurtured children develop.

As a young adult, he became a father; but his beloved three-year-old daughter was murdered by another caregiver in a highly-publicized incident. J.A.276. Another daughter of his, an infant, died from SIDS at three months old. J.A.277. Reeling from

grief, he self-medicated and became addicted to drugs. Within a year, after unsuccessfully trying to kill himself,[1] he committed the present felonies.

All of this was proffered by Mr. Walden's public defender in support of her motion for an expert psychologist to assist the defense at sentencing. Trial counsel specifically proffered that the requested expert psychologist would offer expert opinions on two significant issues: she would explain the connection between Mr. Walden's mental health and trauma history, and his behavior; and she would rebut concerns over whether Mr. Walden would recidivize. Recidivism would clearly be a significant issue in Mr. Walden's sentencing proceeding, given a prior robbery, his youth, and his untreated mental illness. The expert would have addressed that, however, by explaining that Mr. Walden's mental health would improve with treatment; and that his past criminal behavior was attributable to symptoms of his untreated mental illnesses.[2]

---

[1] The detail that Mr. Walden tried to commit suicide was not part of counsel's proffer, but is included here because it was later introduced as uncontroverted evidence in the sentencing hearing, and is pertinent to the issues herein. *Infra.*

[2] J.A. 266-67 ("I think that's the most important part is that she can help this Court crack [*sic.*] the plan. We have to understand how we got to where we are and understand where we are so we know how to move forward in a way that protects, not just Mr. Walden and not just for mitigation at sentencing, but protects the community when he is eventually released from incarceration . . . .what she can go into is his experiences of trauma, the long-term affect that results from that trauma, and that it impacts actions and ability to understand actions . . . to inhibit impulses and control your own behavior and that destructive behavior often is a result of an attempt to mitigate emotional trauma."); J.A.267 ("she can help evaluate what tools [traumatized people] have available and expand that tool box . . . so that they can more appropriately [behave.]"); J.A.269 ("He would be significantly harmed by an inability to explore that and present mitigation to the Court explaining how this happened, how he came to be here, and, most importantly, how we can fix it moving

The trial court rejected counsel's proffers, although they were unobjected-to. It believed they conflicted with a summary recitation of Mr. Walden's psychosocial history found in the presentence report. J.A. 280-281. That report, for purposes of Mr. Walden's motion for expert assistance, the court viewed cold and without testimony. It stated that Mr. Walden's childhood was fine and that he had no history of mental health treatment or childhood abuse. J.A.392 ("He was provided adequate food, clothes, and shelter."); *id.* ("No type of abuse reported."); *id.* ("He reports no alcohol or drug use in his family life."); J.A.396 ("Walden reports no history of mental health treatment."); *id.* ("He does not feel that he has a drug problem and does not feel that he needs treatment."). It contained this vastly incomplete information because it was based on a probation officer's single, remote, brief, non-private interview of the incarcerated Mr. Walden, during which he declined to tell that officer about his family's complex dysfunction and his darkly traumatic childhood. J.A.275-76. *See also* J.A.318-19 (probation officer later testifying at sentencing that she completed the PSR interview during one 30-60 minute remote visit with Mr. Walden).

---

forward."); *id.* ("helps his case and helps for when he is released to reduce the risk of recidivism and to make the community safer"); J.A.270 ("to make him better, more able to function in society and to protect society when he is eventually released"); *id.* (expert will "see what alternatives we can look at moving forward so that we can actually get at the root issue"); J.A.278 (expert would diagnose Mr. Walden's underlying mental illness, in light of his childhood bipolar diagnosis and family history of bipolar disorder, plus childhood trauma); J.A.296 ("to evaluate Mr. Walden and to dig into mental health issues, and, particularly, his history of trauma and mental health while occurring and how that can impact decision-making behavior and what measures can be put in place in the future to address those issues.").

Counsel argued the PSR's shortcomings to the court,[3] along with her far-more-detailed proffers of Mr. Walden's actual psychosocial history. *Supra.* Mr. Walden even personally tried, on the record, to correct the error, explaining how hard it was to speak about his past. J.A.282 ("I just wanted to say, man, it's not easy getting on this (indecipherable.) It's not easy to tell your like trauma about your family. It's . . . that's something you don't understand.").

As the trial court would later agree, Mr. Walden held back his history from the PSR officer for understandable and "obvious" reasons. J.A.358 ("After hearing from your mother, I can clearly understand why you might not want to disclose something like that, obviously.").[4] In denying the pre-sentencing motion, however, the trial court overlooked these numerous indicators of bona fide defense need for expert psychological assistance, and relied solely on the PSR's one-sentence summaries over counsel's detailed proffers. On that basis, the trial judge found no "particularized need," J.A.280-81; J.A.296-97, and denied Mr. Walden his expert. The trial court did not evaluate the prejudice of the expert's absence to Mr. Walden's sentencing defense.

---

[3] J.A.275-76 (officer talked to him one time, remotely, and "[o]f course he doesn't tell them every single story or mention every single trauma especially in regards to his parents. He loves his parents. They remain close to this day. They are deeply important to him. [But] I will tell the Court that Mr. Walden has had a particularized history of trauma. . . ."); *id.* at 277 ("This is a great example of why you can't rely on the presentence report to get to the heart of the issues especially when it comes to trauma and mental health issues."); *id.* at 280 (PSR interview is "not an in-depth length heart-to-heart"); *id.* at 291 (he didn't share his family history with the officer)

[4] *See also* J.A.364 (Appellant's allocution: "I didn't want to get up here and degrade myself as well as my family. So, I was going to wait for today to do it, you know what I mean, but I didn't want to tell her or anybody else about me. It's not nobody else's job to tell you about my life. Who better to tell you about me than me.").

Mr. Walden renewed his motion for expert assistance at the beginning of the sentencing hearing. J.A.295-96. The court again denied it, accepting the arguments and bases for the denial of the original motion (although noting that he did not recall them). J.A.296-97.

At the sentencing hearing, the defense presented live witness testimony confirming everything counsel had earlier proffered (and more). Testimony was taken from Mr. Walden's mother about his childhood and adult traumas, J.A.298-317; from the mother of his deceased daughter about their loss, J.A.321-328; and from a mitigation specialist who assembled Mr. Walden's social history records and interviewed him over many hours. The mitigation specialist testified to the existence of his teenage bipolar diagnosis, lack of treatment, childhood abuse and instability, uncounseled grief, substance addiction, and suicide attempt. J.A.328-344. Summaries of his medical records were admitted, J.A.333, including his bipolar diagnosis at age 19, along with alcohol dependency, auditory hallucinations, suicidal ideations, and a suicide attempt. J.A.334, 338, 341. The mitigation specialist could not testify to the meaning of the records, Mr. Walden's diagnoses, or his potential for treatment.

The defense argued for a mitigated sentence based on Mr. Walden's compelling childhood mitigation, and the heartbreaking loss of his daughter, which exacerbated his mental instability and substance dependency and led to his crimes. J.A.346-49. Counsel could not explain why or how Mr. Walden's future behavior would be better, because the record was bereft of that evidence. J.A.350 (summarily stating that there is "treatment" for Mr. Walden's problems, with no basis in the record).

The Commonwealth's argument focused on Mr. Walden's criminal history, J.A.351-52, and its position that "he is unwilling to stop committing violent crimes against strangers." J.A.356. They closed by stating "he's not going to stop when he's released." J.A.357.

The trial court found the defense testimony compelling, and concluded Mr. Walden deserved "credit" and "consideration" for his sympathetic social and psychological mitigation. J.A.367, 369. The court even expressed its understanding as to why Mr. Walden did not share his full history with the PSR officer. J.A.282.

But the court agreed with the guidelines' incorporation of Mr. Walden's criminal history, and saw no reason to depart from that. J.A.368. Therefore, despite his compelling mitigation, the court sentenced Mr. Walden to 22 years of active incarceration, with another 58 years suspended.

## ARGUMENT

### I.    Standard of Review

The state must provide necessary expert assistance to indigent persons facing criminal charges, pursuant to the Due Process Clause. *Ake v. Oklahoma*, 470 U.S. 68 (1985). The Supreme Court of Virginia has interpreted *Ake* to implicate both the Due Process and Equal Protection Clauses. *Husske v. Commonwealth*, 252 Va. 203, 205, 213 & 220 (1996).

A defense expert must be appointed if necessary to "an adequate opportunity to present [defense] claims fairly within the adversary system," as part of the "basic tools of an adequate defense." *Ake*, 470 U.S. at 77. This rule applies with full force to

sentencing proceedings. *Id.* at 84. *See also McWilliams v. Dunn*, 137 S.Ct. 1790, 1798 (2017) (listing the conditions that "trigger application of *Ake*[,]" including that "[h]is mental condition was relevant to . . . the punishment he might suffer") (internal quotations omitted).

Virginia implements *Ake* using this test: if the subject matter is likely to be a significant factor in the defense; and the accused will be prejudiced by the lack of expert assistance. 252 Va. at 212. Put another way, the defense must show that the expert would materially assist in the preparation of the defense, and that its denial would result in a fundamentally unfair trial. *Id.*

A finding against "particularized need" is often reviewed for abuse of discretion, and has been upheld where the defense presented "mere hope or suspicion that favorable evidence is available[.]" *Commonwealth v. Sanchez*, 268 Va. 161, 165 (2004) (quoting *Husske*, 252 Va. at 212-13). *See also Johnson v. Commonwealth*, 292 Va. 772, 778 (2016) (same); *Dowdy v. Commonwealth*, 278 Va. 577, 595 (2009) (same); *Hoverter v. Commonwealth*, 23 Va. App. 454, 466-67 (1996) (same).

But Mr. Walden brings his claim not only pursuant to *Husske*, but also the Due Process and Equal Protection Clauses directly. The ordinary "abuse of discretion" standard is inadequate to review constitutional error; *de novo* review is therefore necessary. *See Price v. Commonwealth*, 72 Va. App. 474, 488 n.5 (2020) ("However, whether a defendant's due process rights are violated . . . is a question of law, to which we apply a de novo standard of review. Therefore, the application of the abuse of discretion standard of review is inappropriate when considering this due process

issue. Rather, while accepting the historical facts, we apply a de novo review to determine whether the [trial court erred].") (*quoting Henderson v. Commonwealth*, 285 Va. 318, 329 (2013)) (brackets in original). This may be a distinction without a difference, however, as an error of law is *de facto* an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996) (a trial court "by definition abuses its discretion when it makes an error of law"); *Porter v. Commonwealth*, 276 Va. 203, 260 (2008) (same).

To the extent the trial court made any necessary factual findings, those may be left undisturbed unless plainly wrong. *Wilkins v. Commonwealth*, 292 Va. 2, 7 (2016). In ruling on an *Ake/Husske* claim, however, a trial court need only determine whether the defense has made a threshold showing of "particularized need"; that is not a factual finding, but a legal conclusion. Legal conclusions are not susceptible to the "plainly wrong" standard; they are reviewed for either abuse of discretion or *de novo*, as explained above.

If an abuse of discretion standard is employed, it is met by a "clear error of judgment." *Dang v. Commonwealth*, 287 Va. 132, 146 (2014). *See also* Henry J. Friendly, *Indiscretion about Discretion*, 31 Emory L.J. 747, 765 (Fall 1982) ("'Abuse of discretion' is a phrase which sounds worse than it really is. All it need mean is that, when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.") (*quoting In re Josephson*, 218 F.2d 174, 182 (1st

Cir. 1954)). Although the law places certain decisions within the trial court's discretion, this court's review must be a safeguard when poor judgment is exercised below. *See United States v. Burr*, 25 F. Cas. 30, 35, 1807 U.S. App. LEXIS 492, *14 (Circuit Court, D. Virginia, June 13, 1807) (Marshall, J., ruling as a trial judge prior to appointment to the Supreme Court) ("But a motion to its discretion is a motion, not to its inclination, but to its judgment[.]").

Finally, the prejudice prong of *Husske* "merely directs a trial court to determine, based on the facts of the particular case, the probable value of providing the requested assistance and the risk of error in the criminal proceeding if such is not provided." *Dowdy*, 278 Va. at 593. The Supreme Court of Virginia has found this requirement consonant with *Ake*, as it is "nothing more than another way of asking whether the denial of expert assistance would result in a fundamentally unfair trial, thereby bringing into question the accuracy of the criminal proceeding." *Id.* at 594.

## II.    Summary of Argument

Mr. Walden had a particularized need for an expert psychologist at sentencing; and he was prejudiced by the expert's absence. The absence of Mr. Walden's mental health history from the PSR was more evidence -- not less -- of the need for the defense expert. Because the defense made a sufficient threshold showing under *Ake* and *Husske*, it was error to deny the expert assistance in this case under either a *de novo* or abuse-of-discretion standard.

## III. The defense met its burden: a threshold showing.

### A. The law requires only a threshold showing beyond mere hope or suspicion

All that is necessary under *Ake* and *Husske* is that the defense make a "threshold showing." *Ake*, 470 U.S. at 82. This is akin to a burden of production, rather than a burden of proof -- that an expert is "**likely** to be a significant factor in his defense[.]" *Husske*, 252 Va. at 211 (quoting *Ake*, 470 U.S. at 82-83) (emphasis added). The accused must "demonstrate" (rather than prove) that the expert "will contribute to the formulation and perfection of a viable defense" (rather than prove the defense itself). *Husske*, 252 Va. at 218. This threshold demonstration by counsel has also been discussed in terms of "articulat[ion]" -- again, rather than proof. *Sanchez*, 268 Va. at 167. Any steeper requirement risks denying the accused the ability to "evaluat[e,] prepar[e,] and present[] the defense." *Id*. (quoting *Ake*, 470 U.S. at 83. (In other words, denying the "**opportunity** to present [his] claims fairly within the adversary system." *Husske*, 252 Va. at 211 (*quoting Ross v. Moffitt*, 417 U.S. 600, 612 (1974)) (emphasis added).)

In short, although a burden for the defense, *Ake*'s is a burden to show likelihood, need-for-evaluation, and need-for-preparation, rather than proof of the ultimate issue. It would be a Catch-22 to require more of the indigent accused, before "making certain that he has access to the [very] raw materials integral to the building of [his] effective defense." *Ake*, 470 U.S. at 77.

Virginia cases have consistently recognized the parameters of the threshold *Ake* showing, rejecting claims for expert appointment only when the defense

presented just a "mere hope or suspicion that favorable evidence is available," beginning with *Husske* itself. *See Sanchez*, 268 Va. at 165 (quoting *Husske v. Commonwealth*, 252 Va. 203, 212-13 (1996)). *See also Johnson*, 292 Va. at 778 (same); *Dowdy*, 278 Va. at 595 (same); *Hoverter*, 23 Va. App. at 466-67 (same). *See also Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985) ("Mere hope or suspicion that favorable evidence is available is not enough to require that such help be provided.") (internal quotations omitted). In all of these cases, the defense made conclusory assertions that the sought-after expert or investigator would yield information favorable to the defense; or merely generalized statements that an expert would assist them.

In *Husske*, the defense asserted, "[a]t best," that it needed a DNA expert because "DNA evidence is 'of a highly technical nature'" and "it was difficult for a lawyer to challenge DNA evidence without expert assistance[.]" 252 Va. at 213. These were "generalized statements [that] simply fail[ed] to show a particularized need." *Id.* In *Sanchez*, defense counsel's proffer "rest[ed] only on conclusory assertions[.]" 268 Va. at 166. The "trial court was left only to guess whether the unknown, unexplained potential testimony of Sanchez' expert would be a significant or material factor in his defense[.]" *Id.* And in *Johnson*, counsel sought an expert "with no idea what evidence might be developed or whether it would assist him in any way." 292 Va. at 778-79. *See also Caldwell*, 472 U.S. at 323 n.1 ("petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial").

*Hoverter* offers a perfectly diametric comparison to Mr. Walden's case, and is discussed in the next subsection.

**B.    Mr. Walden's public defender far surpassed "mere hope or suspicion" with a detailed proffer.**

Mr. Walden's counsel made a detailed proffer not only of the factual basis for the psychologist's relevance to the case, but also of the expert's anticipated testimony. This record starkly contrasts with the cases above, particularly *Hoverter*.

In *Hoverter*, defense counsel moved for a mental health expert to assist the defense at sentencing, stating they needed "to determine if psychological or mental health mitigation evidence exists[.]" 23 Va. App. at 466. The trial court denied the motion, and this Court affirmed, explaining that Hoverter "alleged no existing mental illness. He demonstrated no way that the services of an expert might constitute a significant factor in his defense. . . . nor did he explain why the detailed presentence investigation would not sufficiently reflect any 'mitigation evidence.'" *Id*. at 467.

In contrast to *Hoverter*, counsel for Mr. Walden clearly surpassed the "hope or suspicion" threshold. She alleged an existing mental illness, and demonstrated several reasons the expert would constitute a significant factor in Mr. Walden's defense. Unlike counsel in *Hovert* (as well as *Husske*, *Sanchez*, and *Johnson*), Mr. Walden's public defender made a detailed factual proffer. And finally, there is no question that Mr. Walden's PSR did not sufficiently reflect his mitigating evidence, particularly concerning his mental health.

### a. Proffer of Mental Health History

Defense counsel made a rich, detailed proffer of Mr. Walden's mental health history, from age five through adulthood. The argument, in support of a six-page written motion, spans 15 pages of transcript. J.A.232-37; J.A.266-280. As detailed in the Statement of Facts above, Mr. Walden's stability was obliterated at a tender age, victimizing him and leaving him exceedingly vulnerable to being derailed by bipolar disorder in his teens, the unbearable grief of losing his three-year-old daughter as a young adult, and substance dependencies. *Supra.* Without treatment for any of these burdens, his mental health plummeted. There was no question that this background was material and significant to his sentencing hearing.

### b. Proffer of Anticipated Expert Testimony

Defense counsel further made specific proffers about the substantial, relevant contribution the expert psychologist would make at the sentencing hearing, as detailed in the Statement of Facts, *supra.* Of particular significance, the expert would opine as to Mr. Walden's mental health diagnoses, their symptoms, their effect on his behavior, and his future prognosis; and she would craft an effective treatment plan that would reduce Mr. Walden's likelihood of recidivism. *Supra.*

### c. The defense articulated a particularized need for the expert.

All of this information was before the court in support of Mr. Walden's motion for expert assistance. This unquestionably demonstrated a "particularized need," and that the assistance was likely to be a significant factor for the defense. *Husske.* It also demonstrated the need for an expert psychologist "to present [defense] claims fairly

within the adversary system," as part of the "basic tools of an adequate defense." *Ake*, 470 U.S. at 77. Under this record, it was error for the trial court to deny the expert assistance.

Even if this Court applies an abuse-of-discretion standard, the court below denied Mr. Walden expert assistance despite a record replete with particularized need and prejudice, based solely on its absence from the face of the PSR. It was unreasonable to accept that conclusory paper record over the detailed proffers and argument of defense counsel, the defendant's personal protestation, and common sense. (And, as discussed *infra*, the absence of Mr. Walden's mental health history from the PSR should have been seen as further evidence of the need for a defense psychologist -- not as less.)

On this record, the trial court simply exercised a "clear error of judgment" in finding no particularized need for expert assistance, meeting the abuse-of-discretion standard. *Dang*, 287 Va. at 146 ("clear error of judgment" is an abuse of discretion); Friendly, *Indiscretion about Discretion*, 31 Emory L.J. at 765 ("Abuse of discretion is a phrase which sounds worse than it really is. All it need mean is that, when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.") (internal quotations omitted); *Burr*, 25 F. Cas. at 35, 1807 U.S. App. LEXIS 492, *14 (Circuit Court, D. Virginia, June 13, 1807) (Marshall, J.) ("But a motion to its discretion is a motion, not to its inclination, but to its judgment[.]").

**IV.    Deference is not owed the trial court's decision to reject defense counsel's proffer.**

Under *Ake* and *Husske*, and as detailed above, defense counsel is tasked with articulating a particularized need; not with proving or establishing any facts. In this case, defense counsel did exactly as required, surpassing her threshold burden.

The trial court, in turn, is tasked with evaluating whether counsel met her threshold burden under *Ake* and *Husske*. That is not a factual determination, but a legal one. It would therefore be inappropriate to apply factual deference to the trial court's actions in this case.

**V.    The absence of Mr. Walden's mental health history from the PSR was further evidence of the need for a defense expert.**

Under *Hoverter,* the absence of Mr. Walden's mental health history from the PSR should have been further reason to provide the requested expert, not less. 23 Va. App. at 467 (affirming denial of expert psychologist for sentencing because, in part, "nor did [counsel] explain why the detailed presentence investigation would not sufficiently reflect any 'mitigation evidence.'").

The conclusory, written, hearsay, non-contextualized statements of the PSR could not cancel out counsel's detailed proffers, particularly in light of attempts by counsel and Mr. Walden to explain the PSR's inaccuracy. For purposes of a motion for expert assistance, under *Husske* and *Ake*, counsel's proffers should be evaluated for particularity on their own two feet, precisely because their very purpose is demonstrating **need for assistance in an upcoming adversarial proceeding**. It can therefore be expected that the expert's opinions, as well as the factual foundation

underlying them, will be disputed. It is illogical to deny the defense their expert due to the very reason they need that expert; that violates the holding of *Ake* that defense experts are necessary to a fundamentally fair adversarial system. 470 U.S. at 77 (citing *Ross*, 417 U.S. at 612; *Britt v. North Carolina*, 404 U.S. 226, 227 (1971)).

The trial court acted contrary to *Ake* by instead placing a higher burden on the defense to overcome the lack of information in the PSR. The trial court later commented that, "in order for the Court to consider something like" Mr. Walden's true mental health and trauma history, given an absence of that information from the PSR, "I would almost need an evidentiary hearing with witnesses to explain why someone could be -- could give information so completely opposite of what was happening." J.A.358. This statement demonstrates that the trial court was applying something much higher than the "hope or suspicion" threshold of *Ake* and *Husske*.

## VI.    Mr. Walden was prejudiced by the denial of his psychologist.

The prejudice prong of *Husske* "merely directs a trial court to determine, based on the facts of the particular case, the probable value of providing the requested assistance and the risk of error in the criminal proceeding if such is not provided." *Dowdy*, 278 Va. at 593. The Supreme Court in *Ake* spoke of defenses being "devastated by the absence of" the expert assistance, 470 U.S. at 83; this will occur when, based on the facts of a particular case, the probable value of the defense evidence and the risk of error without it combine to outweigh the state's "interest in economy," *i.e.* the state's desire not to pay for the resource. *Dowdy*, 278 Va. at 593.

The prejudice prong is met here. Under the particular facts of this case, a young, poor man was unable to defend himself against strong arguments that he would re-offend. As a result, he was sentenced to an elevated sentence despite his positive prognosis for treatment; despite a digestible explanation for his past criminal conduct; and despite having committed a non-aggravated offense.

Mr. Walden's counsel proffered two main reasons why Mr. Walden would be prejudiced by the denial of his requested expert. First, the expert would have rendered her own mental health diagnoses and explained their relevance to Mr. Walden's past behavior. Second, the expert would have designed a treatment plan to reduce Mr. Walden's risk of recidivism, "get at the root issue," and rehabilitate this still-young man, whose untreated psychological trauma and mental illness had led to commit crimes. *Supra.*

Without a defense expert, none of this evidence could be presented. At the sentencing hearing, the trial court spoke of the actions Mr. Walden took on the day of his crime, seemingly drawing no connection between his mental health and his behavior. J.A.367-68. The court had previously expressed skepticism of the legitimacy of bipolar disorder, J.A.279 ("these words are thrown out very loosely now and people -- everybody who comes before the Court all of a sudden is bipolar and it used to be ADHD . . . So, without there being some, you know, some physician indicating that that was a diagnosis . . . I don't think that's sufficient."), something the expert unquestionably would have addressed. Mr. Walden was therefore prejudiced by the

lack of expert testimony confirming and explaining his diagnoses, and linking his mental illness and trauma history to his behavior.

But Mr. Walden was particularly prejudiced by his inability to address recidivism. From the start, that promised to be a significant pitfall for the defense, given a prior robbery, Mr. Walden's youth, and his untreated mental illness. This was one of defense counsel's main bases for requesting expert assistance. J.A.270 ("He's previously been incarcerated on a robbery charge. I'm sure the Commonwealth will bring that up. In speaking with Dr. Boyd about that prior history . . . you re-evaluate, you check the diagnosis, and, then, you try something else. . . . The answer isn't to increase . . . the amount of time. It's to re-evaluate the premise . . . so that we can actually get at the root issue. . . . to make him better, more able to function in society and to protect society when he is eventually released, I think, it's absolutely imperative that the Court allow us to do that."). During the sentencing proceeding, the Commonwealth heavily argued this point, J.A.351-52 (discussing Mr. Walden's criminal history); J.A.356 ("he is unwilling to stop committing violent crimes against strangers"); J.A.357 ("he's not going to stop when he's released").

The expert would have addressed those concerns directly, by explaining that Mr. Walden's mental health would improve with treatment; and that his past criminal behavior was attributable to symptoms of his untreated mental illnesses. *Supra.*

But without those expert opinions, there was simply no evidence before the trial court to legitimize Mr. Walden's mental illnesses, connect the dots between them

and his behavior, or mitigate in any way the fear of his recidivism. Thus, even though the trial court found the defense mitigation witnesses compelling, J.A.367&369 (noting that Mr. Walden deserved "credit" and "consideration" for his sympathetic history), it saw no reason to depart from the guidelines' incorporation of Mr. Walden's criminal history. J.A.368. Therefore, despite his compelling mitigation, the court sentenced Mr. Walden to 22 years of active incarceration, with another 58 years suspended.

The value of the requested assistance was thus high, and the risk of its absence -- borne out by the utter inability of the defense to mitigate the spectre of recidivism -- significant. *See Dowdy*, 278 Va. at 593. Mr. Walden's defense was "devastated by the absence" of the expert assistance, *Ake*, 470 U.S. at 83; and his fundamental need for the assistance clearly outweighed the state's "interest in economy." *Dowdy*, 278 Va. at 593.

## CONCLUSION

For the reasons stated above, the trial court erred when it denied Mr. Walden's motion for an expert psychologist to assist the defense at sentencing. Mr. Walden had a particularized need for expert assistance; and he was prejudiced by the expert's absence. It was thus error to deny the expert assistance in this case under either a *de novo* or abuse-of-discretion standard.

Accordingly, Mr. Walden respectfully requests that this Court grant him relief in the form of vacating his sentence, ordering the trial court to grant his motion for expert assistance, and ordering a new sentencing hearing.

Respectfully Submitted,

Mr. Linwood Walden, by counsel:

Meghan Shapiro
Va. Bar No. 79046
Senior Assistant Public Defender, Appellate Cohort
Virginia Indigent Defense Commission
1604 Santa Rosa Rd., Suite 200
Richmond, VA 23229
Tel: 804.662.7249
Email: mshapiro@vadefenders.org

# CERTIFICATE

I hereby certify that on this 25th day of October, 2021, pursuant to Rules

5A:19(f) and 5A:25(b), electronic copies of the Brief of Appellant and Appendix have

been filed with the Clerk of the Court of Appeals of Virginia, via VACES.  On this

same day, an electronic copy of the Brief of Appellant was served, via email, and

electronic copies on CD of the Brief and Appendix were served, via UPS Ground

Transportation, upon:

> Susan B. Wosk (VSB No. 87343)
> OFFICE OF THE ATTORNEY GENERAL
> 202 North Ninth Street
> Richmond, Virginia  23219
> (804) 786-2071 (Telephone)
> (804) 371-0151 (Facsimile)
> oagcriminallitigation@oag.state.va.us
> *Counsel for Appellee*

This Brief contains 5,550 words, excluding those portions that by rule do not

count toward the word limit.

Counsel for the Appellant respectfully requests oral argument.

> /s/ Meghan Shapiro
> Meghan Shapiro
> *Counsel for Appellant*

**IN THE**

**COURT OF APPEALS OF VIRGINIA**

---

**RECORD NO. 1376-20-2**

---

**LINWOOD GEQUAN WALDEN, JR.,**

**Appellant,**

**v.**

**COMMONWEALTH OF VIRGINIA,**

**Appellee.**

---

**BRIEF OF THE COMMONWEALTH**

---

MARK R. HERRING
Attorney General of Virginia

SUSAN BROCK WOSK
Assistant Attorney General
Virginia State Bar No. 87343

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 phone
(804) 371-0151 fax
oagcriminallitigation@oag.state.va.us

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF THE CASE ..................................................................... 1

ASSIGNMENT OF ERROR ....................................................................... 3

STATEMENT OF FACTS ........................................................................... 3

    *Facts Adduced at Trial* ........................................................................ 3

    *Defense Request for Expert Funds* ..................................................... 6

ARGUMENT ............................................................................................. 11

    1.    THE TRIAL COURT DID NOT ERR IN DENYING
          WALDEN'S MOTION FOR EXPERT FUNDS .................... 11

          A.    Standard of Review ...................................................... 12

          B.    Where Walden failed to demonstrate a particularized
                need for an expert, the trial court did not err in denying
                Walden's motion for expert funds. ............................... 13

                *Merits* ........................................................................ 13

                *Harmless Error* ......................................................... 19

CONCLUSION ......................................................................................... 22

CERTIFICATE OF TRANSMISSION AND SERVICE ................... 23

# TABLE OF AUTHORITIES

**Cases**

*Ake v. Oklahoma,*
  470 U.S. 68 (1985)........................................................................ 13

*Angel v. Commonwealth,*
  281 Va. 248, 704 S.E.2d 386 (2011)............................................ 20

*Bethea v. Commonwealth,*
  297 Va. 730, 831 S.E.2d 670 (2019)............................................ 16

*Bloom v. Commonwealth,*
  262 Va. 814, 554 S.E.2d 84 (2001) ............................................. 17

*Botkin v. Commonwealth,*
  296 Va. 309, 819 S.E.2d 652 (2018)............................................ 19

*Brown v. United States,*
  411 U.S. 223 (1973) ...................................................................... 20

*Chapman v. California,*
  386 U.S. 18 (1967)........................................................................ 20

*Clay v. Commonwealth,*
  262 Va. 253, 546 S.E.2d 728 (2001)............................................ 20

*Commonwealth v. Sanchez,*
  268 Va. 161, 597 S.E.2d 197 (2004) ........................................... 12

*Commonwealth v. White,*
  293 Va. 411, 799 S.E.2d 494 (2017)...................................... 19, 20

*Hoverter v. Commonwealth,*
  23 Va. App. 454, 477 S.E.2d 771 (1996) ...............12, 14, 16, 18

*Husske v. Commonwealth,*
  252 Va. 203, 476 S.E.2d 920 (1996) .....................12, 13, 14, 17

*Johnson v. Commonwealth,*
    292 Va. 772, 793 S.E.2d 326 (2016) ......................12, 15, 17, 18

*O'Dell v. Commonwealth,*
    234 Va. 672, 364 S.E.2d 491 (1988) ........................................ 12

*Shifflett v. Commonwealth,*
    289 Va. 10, 766 S.E.2d 906 (2015) ........................................ 20, 22

*Stamper v. Commonwealth,*
    228 Va. 707, 324 S.E.2d 682 (1985) ................................................ 2

*State v. Mills,*
    332 N.C. 392, 420 S.E.2d 114 (1992) ................................ 12, 13

*Thomas v. Commonwealth,*
    44 Va. App. 741, 607 S.E.2d 738 (2005) ................................ 13

*United States v. Hasting,*
    461 U.S. 499 (1983) ................................................................ 20

**Other Authorities**

Section 8.01-678, Code of Virginia ...................................................... 19

Section 18.2-48, Code of Virginia ........................................................ 1

Section 18.2-53.1, Code of Virginia ...................................................... 2

Section 18.2-58, Code of Virginia ........................................................ 1

Section 19.2-299(A), Code of Virginia .......................................... 15, 18

Henry J. Friendly, *Indiscretion about Discretion*, 31 Emory L.J. 747, 754
    (1982) ........................................................................................ 13

IN THE

COURT OF APPEALS OF VIRGINIA

RECORD NO. 1376-20-2

LINWOOD GEQUAN WALDEN, JR.,

*Appellant,*

v.

COMMONWEALTH OF VIRGINIA,

*Appellee.*

BRIEF OF THE COMMONWEALTH

STATEMENT OF THE CASE

Following a bench trial in the Circuit Court for the City of Richmond on January 21, 2020, Appellant Linwood Gequan Walden, Jr. (hereinafter "Walden") was found guilty as charged of two counts of Abduction with Intent to Obtain Pecuniary Benefit, in violation of Virginia Code § 18.2-48 (KID-1012-F2) and two counts of Robbery in violation of Virginia Code § 18.2-58 (ROB-1270-F9). (J.A.

226, 230–31).[1] After Walden was convicted,[2] defense counsel mentioned for the first time that there could be psychological concerns and filed a written motion entitled, "Notice and Motion for Release of Court Funds for Expert Assistance" on September 18, 2020. (J.A. 232–61). Following a hearing on September 30, 2020, the trial court denied Walden's motion, stating that "the Court [did] not feel a particularized need [had] been shown." (J.A. 280–81, 286). Prior to commencement of his sentencing on November 20, 2020, Walden renewed his motion for expert funds, without any additional information or argument from counsel; the trial court again denied the motion. (J.A. 294–97).

Thereafter, Walden presented extensive mitigation testimony at sentencing, including testimony by Molly O'Rourke, a "mitigation specialist" with the Richmond Public Defender's Office, who walked the trial court through Walden's "trauma timeline." (J.A. 328–44). The trial court commented that Walden's mother's testimony "weighed heavily on the Court," and that Walden was "given consideration" for the trauma he endured. (J.A. 369) Thus, despite aggravated facts

---

[1] After the Commonwealth had presented its evidence, the trial court granted Walden's motion to strike on four counts of Use of Firearm, Second or Subsequent Offense in violation of Virginia Code § 18.2-53.1 (ASL-1323-F9). (J.A. 154–55, 230–31).

[2] Absent an insanity defense, the trial court cannot consider expert opinion of a defendant's mental state at the guilt phase of trial; "there is no sliding scale of insanity." *Stamper v. Commonwealth*, 228 Va. 707, 717, 324 S.E.2d 682, 688 (1985).

and a criminal history that included a previous robbery, Walden was sentenced to just one month over the low end of the sentencing guidelines: a total of eighty years with fifty-eight years suspended, leaving twenty-two years of active incarceration. (J.A. 368–69, 373–74, 383–84). On appeal, Walden argues the trial court erred in denying his motion for expert funds.

## ASSIGNMENT OF ERROR

Walden's assignment of error is as follows:

> The trial court erred in denying Mr. Walden's motion for expert funds. J.A. 232–37 (written motion); 266–80 (argument); 286 (written denial); 296–96 (renewed motion); 296–97 (denial).

(Appellant's Br. 2).

## STATEMENT OF FACTS

*Facts Adduced at Trial*

On August 31, 2019, Caitlin Hill and Sonya Sheldon drove to pick up pizza from DaVinci's in the City of Richmond. (J.A. 46, 88–89). Sheldon waited in the front passenger seat of the car while Hill went into the restaurant to get the food. (J.A. 47). A man with a washcloth on his head walked out in front of Hill, and he drew her attention because he did not hold the door for her, despite the fact that her arms were full. (J.A. 47). After Hill returned to the car, the man with the washcloth on his head, who was unknown to both women and who was later identified as 27-year-old Linwood Gequan Walden, Jr., got into the back seat of their car. (J.A. 48).

Hill repeatedly told Walden to get out of the car. (J.A. 48). Walden, however, did not get out; instead, he told the women not to look at him, told them he had a gun and to do what he said, or he would hurt them. (J.A. 49, 51, 91–92). He cautioned them not to use their phones or he would shoot them. (J.A. 92). Walden then demanded their phones and wallets; he took their cell phones, Sheldon's cigarettes and make up bag, and other miscellaneous items. (J.A. 50, 91–92).

While continuing to threaten to shoot the women, Walden ordered Hill to drive. (J.A. 50). He told her to pull into an alley, where he ordered both women to remove their clothing. (J.A. 51–52). The women attempted to negotiate with Walden, and Walden asked if they had anything else in the front seat of the vehicle. (J.A. 52, 94). As Walden already had most of their miscellaneous items, including a blender, Hill offered him bug spray. (J.A. 52, 92). Walden got angry, told Hill to "stop effing playing" with him and that he was "going to do something once to show [her] that he was serious." (J.A. 52). At that point, Walden hit her on the side of the head and face twice with an open hand. (J.A. 52). Hill questioned Walden, saying, "I thought you were only going to do that once," to which Walden responded "to stop playing with him or the next thing [Hill] would see [would be] [her] friend's brains on the sidewalk." (J.A. 53).

Walden then ordered Hill to tell him the PIN for her debit card and, because Sheldon was using the sideview mirrors to look at Walden, he further ordered

Sheldon to keep her eyes closed. (J.A. 54, 95–96). In response, Sheldon closed her eyes and put her head down; Sheldon did not lift her head or open her eyes until Hill knocked on the car door to retrieve her at the conclusion of the robbery, as she was afraid Walden would hurt her if he saw Sheldon with her eyes open. (J.A. 97).

Walden next ordered Hill to drive out of the alley and directed Hill until they pulled up in front of an ABC store and parked. (J.A. 54). Walden informed Hill that they would be going to Ocean Grocery. (J.A. 54). As they walked in, Hill mouthed "help me" or "call the police" to the cashier, but the cashier did not understand. (J.A. 56). Walking behind Hill, Walden instructed her to go to the ATM, where he stood directly behind her; he told Hill to type in her PIN and "if [she] got it wrong, he would hurt [her]." (J.A. 56). Once Hill withdrew the money, Walden reached past her, grabbed the money, put it in his pocket, and directed Hill to leave the store. (J.A. 58). Ultimately, Walden left the store, while Hill went to the cash register for help, and she did not see where he went. (J.A. 58). Surveillance video and still photos from Ocean Grocery, as well as the 911 call were introduced into evidence at trial. (J.A. 58–65).

Walden gave multiple conflicting versions of events to both police and the trial court; his stories included a drug deal gone wrong, a prior friendship with one of the victims, Hill, who he calls "Kay Kay," as he has known her "since she was

like, 16," and different iterations of a heroin user named Mark,[3] who Walden identified as the person who *actually* struck Hill in the face and head. (J.A. 158–63, 197–205). In finding Walden guilty, the trial court expounded that "[t]he Court went over the testimony that you gave, Mr. Walden, and, quite frankly, the Court found the testimony to be incredible." (J.A. 225).

*Defense Request for Expert Funds*

Approximately nine months after Walden was found guilty, on September 18, 2020, Walden filed a "Notice and Motion for Release of Court Funds for Expert Assistance" for a mitigation expert at sentencing. (J.A. 232–61). Specifically, the motion requested an expert in clinical psychology on the basis that "[t]hrough interviews and preliminary investigation counsel has uncovered information that Mr. Walden has been the victim of extensive domestic violence and familial trauma." (J.A. 233, 235). There is no mention of a mental health diagnosis in the written motion.

Indeed, at no point during the proceedings, up until the motion argument on September 30, 2020, was there any indication that Walden suffered from any type of mental illness. The record is completely devoid of any competency or sanity

---

[3] At trial, Walden testified to the perpetrator being "Mark," but when discussing his alibi and the participation of this third party, he told Detective Jones about the involvement of one person, each time giving a different description and different names: Mark, Antonio, and Adrian. (J.A. 204–05).

evaluations, or any requests for the same. From the beginning, when Walden was arrested on September 30, 2019, the checklist for bail determinations filled out at the magistrate painted a picture of a stable individual: Walden grew up in Richmond where he and his family still resided, had completed his GED, maintained his current place of residence for the past three years, and maintained employment at Cookout for the past year. (J.A. 5).

At trial, Walden provided explanations unrelated to mental health to explain any issues with or inconsistencies within his statements. He testified that some of the statements he gave to police were intentionally inconsistent and given out of fear for his safety, as it related to "snitching" while working as a drug dealer:[4]

> Okay. If you tell something of the street—and I don't mean keep—if you tell something of the street where I come from, you be killed. Straight up. You get killed. If you don't get killed, people come to see you get killed. Your family, your daughter, son. Man, go ahead.

(J.A. 174, 365). On cross examination, Walden had a diminished recollection of any subject matters on which the prosecutor inquired; he blamed his memory issues on being intoxicated, stating, "Half of it I was drunk. Anything I was saying, I was probably drunk. I was drunk." (J.A. 186). Walden did not, at any point, allege or describe any kind of mental defect that otherwise impaired his memory or influenced his behavior on the date of offense. In fact, Walden testified to having a pleasant

---

[4] Walden testified that he sells both crack and powder cocaine. (J.A. 182, 196).

day, where earlier he had gone to his Aunt Michelle's house for a family cookout. (J.A. 156). At the conclusion of the trial and upon setting the matter for sentencing, the trial court stated directly to Walden, "probation will be in touch with you to get further information regarding your family history. It could be beneficial to you as well as the Commonwealth to help for purposes of the presentence hearing." (J.A. 226–27).

The Presentence Investigation Report, with the date of preparation listed as July 1, 2020, was also devoid of any information suggesting Walden had any mental health issues: "Walden reports no history of mental health treatment." (J.A. 396). There is similarly no indication of any type of disruption or trauma during his childhood: Walden reported he was raised by both parents in a single-family dwelling; "[h]e was provided adequate food, clothes, and shelter. He received love, guidance and discipline. Education and religion were emphasized in the household. No type of abuse reported. He reports no alcohol or drug use in his family life." (J.A. 392). The report does include that he lost his three-year-old daughter to homicide on February 15, 2016.[5] (J.A. 392).

---

[5] Walden had been incarcerated for the duration of his daughter's life for his 2012 convictions for Robbery and Use of a Firearm. (J.A. 19, 276–77). Walden also lost two other children, one from "SIDS" (sudden infant death syndrome) and one from drowning, but his daughter was the only one mentioned in his PSR and at sentencing. (J.A. 306, 310–11, 364, 392).

Two months after the Presentence Investigation Report was prepared, the defense filed a motion and the trial court conducted a hearing on Walden's motion for expert funds on September 30, 2020. (J.A. 262–83). It was at this hearing that, for the first time, the defense mentioned Walden's mental health diagnosis: "[Walden] was previously, I [defense counsel] believe, as a juvenile diagnosed as having bipolar disorder"; "[i]t's my [defense counsel's] understanding according to his [Walden's] mother, he was diagnosed with bipolar when he was a juvenile, so there is a specific allegation of underlying mental illness." (J.A. 266, 278). Walden was unable to provide any supporting documentation, and indeed, Walden himself only "thought he was maybe diagnosed." (J.A. 278). The trial court commented that "these words are thrown out very loosely now and people—everybody who comes before the Court all of a sudden is bipolar."[6] (J.A. 278–79). The trial court declined to rely solely on information provided by Walden's mother, who had a history of both substance abuse and "serious documented mental illness." (J.A. 278–79).

In argument, Walden's counsel clarified that she sought an expert to conduct "a comprehensive psychological evaluation and . . . talk about the developmental

---

[6] Walden incorrectly asserts that "[t]he court had previously expressed skepticism of the legitimacy of bipolar disorder." (Appellant's Br. 18). The trial court expressed skepticism at accepting a *diagnosis* of bipolar disorder without any supporting documentation—much less where the only source of the information pertaining to the diagnosis is a defendant's mother, who has significant red flags with regards to reliability—not to the "legitimacy of bipolar disorder," itself. (J.A. 278–79).

impact of psycho-social trauma and head trauma."[7] (J.A. 266–67). In addressing any prejudice that would result from the denial of Walden's motion for expert funds, Walden's counsel argued,

> This [expert] would give Mr. Walden the impact, the ability to have him investigated, to see what underlying mental health issues there are or may be that have impacted his ability to function in society that would impact his cognitive properties, just the way he thinks, the way he sees the world and interacts with it. He would be significantly harmed by an inability to explore that . . .

(J.A. 269). The Commonwealth aptly responded that there are "other ways for the Court certainly to hear evidence about [Walden's] childhood and any trauma that he received, certainly, for him to testify about the changes in his personality, and the [defense] can [obtain] testimony from [Walden] on that issue or from family members [which] would be admissible." (J.A. 274).

On November 20, 2020, Walden's counsel renewed the motion for expert funds; she did not incorporate any new information or argument. (J.A. 294–96). At sentencing, Molly O'Rourke, a Mitigation Specialist employed by the Richmond Public Defender's Office testified, "I help gather background information on our clients, reach out to family members, get records, create release plans, and anything in that kind of general area." (J.A. 329). With all of the information she compiled, she produced a "trauma timeline," in which she identified Walden's significant life

---

[7] At no point prior to or after this was "head trauma" referenced again.

events and described the compounding impacts of trauma. (J.A. 328–44). Walden's mitigation specialist testified that she had uncovered medical records confirming a prior diagnosis of bipolar disorder. (J.A. 334).

During argument at the conclusion of the sentencing hearing, Walden's counsel noted, "The courts frequently see reoccurring mental health and substance abuse issues and pile on trauma after trauma after trauma." (J.A. 349). During his allocution, Walden addressed his failure to be truthful with probation when interviewed for his Presentence Investigation Report, stating, "It's not nobody else's job to tell you about my life. Who better to tell you [than] me." (J.A. 364). He also questioned why, if he had indeed robbed them, the two women failed to walk "20 seconds across the street [to] the [F]irst [P]recinct" or ask for help in the "store where there [were] many people." (J.A. 363).

## **ARGUMENT**

1. **THE TRIAL COURT DID NOT ERR IN DENYING WALDEN'S MOTION FOR EXPERT FUNDS.**

The trial court did not abuse its discretion in finding that Walden failed to demonstrate a particularized need for an expert for the purposes of mitigation at sentencing, where the record, including Walden's Presentence Investigation Report (hereinafter, "PSR"), was devoid of any mention of mental health concerns, and the

trial court found a proffer of a prior mental health diagnosis insufficient. Thus, the judgment of the Circuit Court for the City of Richmond should be affirmed.

### A.     Standard of Review

A trial court's decision to deny expert funds to an indigent defendant is reviewed for an abuse of discretion. *E.g., Johnson v. Commonwealth*, 292 Va. 772, 778, 793 S.E.2d 326, 330 (2016) ("[w]hether a defendant has made the required showing of particularized need is a determination that lies within the sound discretion of the trial court." (alteration in original) (quoting *Commonwealth v. Sanchez*, 268 Va. 161, 165, 597 S.E.2d 197, 199 (2004))); *Husske v. Commonwealth*, 252 Va. 203, 212, 476 S.E.2d 920, 926 (1996) ("The determination . . . whether a defendant has made an adequate showing of particularized necessity lies within the discretion of the trial judge." (alteration in original) (quoting *State v. Mills*, 332 N.C. 392, 399, 420 S.E.2d 114, 117 (1992))); *Hoverter v. Commonwealth*, 23 Va. App. 454, 466, 477 S.E.2d 771, 776 (1996) ("Whether to provide a defendant expert assistance at state expense lies within the sound discretion of the trial court, and the burden is on the defendant to show that this discretion has been abused." (citing *O'Dell v. Commonwealth*, 234 Va. 672, 687, 364 S.E.2d 491, 499 (1988)).

"This standard [abuse of discretion], if nothing else, means that the trial judge's 'ruling will not be reversed simply because an appellate court disagrees.' Only when reasonable jurists could not differ can we say an abuse of discretion has

occurred." *Thomas v. Commonwealth*, 44 Va. App. 741, 753, 607 S.E.2d 738, 743 (2005) (quoting Henry J. Friendly, *Indiscretion about Discretion*, 31 Emory L.J. 747, 754 (1982)).

**B.     Where Walden failed to demonstrate a particularized need for an expert, the trial court did not err in denying Walden's motion for expert funds.**

<u>Merits</u>

An indigent defendant seeking the appointment of an expert witness must affirmatively demonstrate that the subject matter which demands the assistance of the expert is "likely to be a significant factor in his defense" and that the defendant will be prejudiced by the lack of expert assistance. *Husske*, 252 Va. at 211–12, 476 S.E.2d at 925–26 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 82–83 (1985)). That is, "[t]he indigent defendant who seeks the appointment of an expert must show a particularized need." *Id*. at 212, 476 S.E.2d at 925.

> Mere hope or suspicion that favorable evidence is available is not enough to require that such help be provided . . . This particularized showing demanded . . . is a flexible one and must be determined on a case-by-case basis . . . The determination . . . whether a defendant has made an adequate showing of particularized necessity lies within the discretion of the trial judge.

*Id*. (alteration in original) (quoting *Mills*, 332 N.C. at 399, 420 S.E.2d at 117) (internal quotation marks omitted). "An indigent defendant may satisfy this burden by demonstrating that the services of an expert would materially assist him in the

preparation of his defense and that the denial of such services would result in a fundamentally unfair trial." *Husske*, 252 Va. at 212, 476 S.E.2d at 925.

This Court's decision in *Hoverter*, is instructive. *See* 23 Va. App. 454, 477 S.E.2d 771. There, the trial court denied an indigent defendant's request for funds for a mental health expert to prepare for sentencing on charges of murder and abduction. *Id*. The trial court conducted a hearing wherein the defendant requested "a mental health expert to conduct a psychological evaluation." *Id*. at 465, 477 S.E.2d at 776. In his request, the defendant's counsel "stated that they needed the expert 'to determine if psychological or mental health mitigation evidence exists,' and, if so, 'to aid him in the development and presentation of such evidence for the sentencing proceeding.'" *Id*.

This Court affirmed, noting that the defendant did not allege an existing mental illness, did not demonstrate that an expert would constitute a significant factor in his defense, did not show prejudice from the non-appointment of an expert, and did not explain why the PSR was insufficient. *Id*. at 467, 477 S.E.2d at 776. "At most, we surmise, [the defendant] hoped that a psychological examination would support a decision for leniency at the sentencing hearing. However, a mere hope or suspicion that favorable evidence may result from an expert's services does not create a constitutional mandate." *Id*. at 467, 477 S.E.2d at 777.

Subsequently, in *Johnson*, an indigent defendant, who was a juvenile at the time of the offense, was convicted by a jury of eight felonies, including first degree murder. 292 Va. at 775, 793 S.E.2d at 328. The defendant requested expert funding for a neuropsychologist, who studied maturation of the brain and its functioning, so as to provide "relevant facts specific to [the defendant] so as to 'fully advise the court' of all matters specific to [the defendant]" and assist in fashioning an appropriate sentence. *Id*. at 775, 793 S.E.2d at 328. At a hearing on the motion, the defendant's counsel argued that the probation officer compiling the PSR would not have the "ability to collect the necessary details about what is happening in [the defendant's] mind," or how the defendant's mind had developed. *Id*. Defendant's counsel asserted that the neuropsychologist would be able to develop "other relevant facts needed to individualize the punishment." *Id*.

The trial court denied the motion, finding the defendant had not shown a particularized need—indeed, caselaw "did not require such an evaluation in every case where the accused was a juvenile at the time of the offense"—and nothing in the defendant's record supported the position that such an evaluation was needed. *Id*. at 776, 793 S.E.2d at 328. The Supreme Court of Virginia affirmed the judgment of the trial court, noting that Virginia Code § 19.2-299(A), which relates to PSRs, clearly "does not envision the appointment of a neuropsychologist to augment the presentence report. That said, however, if information regarding a defendant's

physiology or psychology exists in a defendant's history, that information might well be included as 'other relevant facts.'" *Id*. at 779–80, 793 S.E.2d at 330.

In the case at hand, just as the defendant in *Hoverter* requested expert assistance "'to determine if psychological or mental health mitigation evidence exists,' and, if so, 'to aid him in the development and presentation of such evidence for the sentencing proceeding,'" Walden's counsel reasoned that an expert was needed "*to see what underlying mental health issues there are or may be* that have impacted his ability to function in society that would impact his cognitive properties, just *the way he thinks*, the way he sees the world and interacts with it." 23 Va. App. at 465, 477 S.E.2d at 776; (J.A. 269). Indeed, there had been no mention or indication of any previous mental health issues until the motion hearing on September 30, 2020, where Walden's counsel proffered that, according to Walden's mother, who had a noted history of trauma, hospitalization for mental health issues, and substance abuse issues, Walden had been diagnosed with bipolar disorder as a juvenile.[8] (J.A. 266, 278). The trial court found the proffer to be "insufficient," in light of the lack of medical documentation, as well as Walden's mother's self-interest and apparent credibility issues. (J.A. 279); *see also Bethea v. Commonwealth*, 297 Va. 730, 756 n.13, 831 S.E.2d 670, 683 (2019) (noting that even if a proffer is properly admitted,

---

[8] Walden was twenty-seven years old at the time of the offense, meaning a juvenile diagnosis would be a minimum of ten years old.

the rules of evidence "say[] nothing about the evidentiary weight the factfinder may or should give to the proffer" (citing *Bloom v. Commonwealth*, 262 Va. 814, 821, 554 S.E.2d 84, 87 (2001))).

Just as the Supreme Court in *Johnson* noted that there does not need to be a neuropsychological evaluation "in every case where the accused was a juvenile at the time of the offense," it is similarly incongruous to appoint a psychological expert to evaluate every defendant who has suffered some type of trauma or childhood upheaval, every defendant with a mental health diagnosis, or any combination thereof. 292 Va. at 776, 793 S.E.2d at 328; *see also Husske*, 252 Va. at 212, 476 S.E.2d at 925 ("This particularized showing demanded . . . is a flexible one and must be determined on a case-by-case basis." (alteration in original)). Walden's case is not extraordinary; indeed, after enumerating Walden's experiences, Walden's counsel commented, "[t]he courts frequently see reoccurring mental health and substance abuse issues and pile on trauma after trauma after trauma." (J.A. 349).

The Court in *Johnson* also noted that "[n]othing in the plain language of Code § 19.2-299(A) [Presentence Investigation Reports] specifically requires a probation officer to investigate a defendant's current physiology or psychology," but a defendant might offer that information to be included as "other relevant facts." 292

Va. at 779, 793 S.E.2d at 330. Walden now[9] argues that "[t]he absence of Mr. Walden's mental health history from the PSR was more evidence—not less—of the need for the defense expert." (Appellant's Br. 10). However, it was not just Walden's PSR that was bereft of evidence of mental health issues, it was the entirety of the case file; there had been no requested or completed evaluations for competency or sanity and Walden's checklist for bail determinations showed he maintained a stable residence and employment. (J.A. 5). Where Virginia Code § 19.2-299(A) does not require an investigation into each defendant's psychology, Walden's proposition flies in the face of the Code, as the suggestion that a defendant's denial of a mental health history is, in itself, indicative of a mental health history demonstrates a need for an expert in every case where a defendant denies having a mental health history, in order to ascertain whether that denial is cause for concern. *See Johnson*, 292 Va. at 779, 793 S.E.2d at 330; (J.A. 5).

Ultimately, Walden failed to express a particularized need for an expert. Walden sought to explore any mental health issues he may have had, in hopes that "that a psychological examination would support a decision for leniency at the sentencing hearing. However, a mere hope or suspicion that favorable evidence may result from an expert's services does not create a constitutional mandate." *Hoverter*,

---

[9] The specific argument that Walden's inability to adequately complete the PSR demonstrates his mental illness was never raised to the trial court.

23 Va. App. at 467, 477 S.E.2d at 777. The trial court found the weight of the proffer about Walden's prior bipolar diagnosis to be "insufficient" and ultimately found that Walden failed to demonstrate a particularized need. (J.A. 279). Even Walden's counsel acknowledged that courts "frequently" see this situation: "reoccurring mental health and substance abuse issues and pile on trauma after trauma after trauma." (J.A. 349). Thus, the trial court did not err in denying Walden's motion for expert funds.

<em><u>Harmless Error</u></em>

The trial court's evidentiary ruling concerns the sentencing phase[10] of Walden's trial and is subject to harmless-error analysis because "Code § 8.01-678 makes 'harmless-error review required in *all* cases.'" *Commonwealth v. White*, 293 Va. 411, 420, 799 S.E.2d 494, 498 (2017) (emphasis in original) (citation omitted). Under Code § 8.01-678, "no judgment shall be arrested or reversed" if "it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." "The harmless-error concept is no mere prudential, judge-made doctrine of appellate review," but rather, it "is a legislative mandate, which has been part of our statutory law since the

---

[10] An error at the sentencing phase would result only in a new sentencing hearing, not a new trial. *See, e.g.*, *Botkin v. Commonwealth*, 296 Va. 309, 317, 819 S.E.2d 652, 656 (2018).

early 1900s, and limits the adjudicatory power of Virginia appellate courts." *White*, 293 Va. at 419, 799 S.E.2d at 498.

Even errors "arising from the denial of a constitutional right are subject to a harmless error analysis." *Angel v. Commonwealth*, 281 Va. 248, 264, 704 S.E.2d 386, 395 (2011). A criminal defendant "'is entitled to a fair trial but not a perfect one,' for there are no perfect trials." *Brown v. United States*, 411 U.S. 223, 231–32 (1973) (citation omitted). "[I]t is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations," lest such courts "retreat from their responsibility, becoming instead 'impregnable citadels of technicality.'" *United States v. Hasting*, 461 U.S. 499, 509 (1983) (alteration and citation omitted). A constitutional error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967). A different standard applies for non-constitutional error such as "evidentiary errors that were harmless to the ultimate result." *Shifflett v. Commonwealth*, 289 Va. 10, 12, 766 S.E.2d 906, 908 (2015). The standard for non-constitutional harmless error is that "such error is harmless if [the appellate court] can be sure that it did not 'influence the [judge]' or had only a 'slight effect.'" *Id.* (quoting *Clay v. Commonwealth*, 262 Va. 253, 260, 546 S.E.2d 728, 731–32 (2001)).

Here, Molly O'Rourke, a Mitigation Specialist employed by the Richmond Public Defender's Office testified, "I help gather background information on our clients, reach out to family members, get records, create release plans, and anything in that kind of general area." (J.A. 329). With all of the information she compiled, she produced a "trauma timeline," in which she identified Walden's significant life events and described the compounding impacts of trauma. (J.A. 328–44). Walden's mitigation specialist testified that she had uncovered medical records confirming a prior diagnosis of bipolar disorder, and even recommended a program that would be beneficial for Walden upon release. (J.A. 334, 339).

The defense, through its in-house mitigation specialist, presented the very testimony that the defense moved for an expert to present. The Public Defender's Mitigation Specialist explored the limited psychological or mental health mitigation evidence in the case and presented that evidence without objection or limitation during the sentencing proceeding. All of Walden's mitigation evidence was taken into account by the trial court: "the Court [] considered all the trauma that you've [Walden] endured and I think you should receive some credit for that, but the Court can find no basis for departing below the sentencing guidelines based upon the actions that were taken [on August 31, 2019]." (J.A. 367–68). Thus, the trial court sentenced Walden to just one month over the low end of the sentencing guidelines. (J.A. 368–69, 373–74, 383–84). The court highlighted that, "the Court actually felt

that this should be at the mid[] level [of the sentencing guidelines] which is [] 29 years three months." (368–69). However, "your [Walden's] mom's testimony weighed heavily on the court," and consideration was given for Walden's traumatic experiences as a child as well as an adult, as laid out in the trauma timeline. (J.A. 335–39, 369). Thus, any error in the trial court's evidentiary ruling was harmless. *Shifflett*, 289 Va. at 12, 766 S.E.2d at 908.

## CONCLUSION

For the foregoing reasons, the judgment of the Circuit Court for the City of Richmond should be affirmed.

Respectfully submitted,

COMMONWEALTH OF VIRGINIA

Appellee herein.

By: _____
                    Counsel

Mark R. Herring
Attorney General of Virginia

Susan Brock Wosk, VSB No. 87343
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, Virginia 23219
phone (804) 786-2071
fax (804) 371-0151
email oagcriminallitigation@oag.state.va.us

## CERTIFICATE OF TRANSMISSION AND SERVICE

On November 19, 2021, the required copies of this brief were filed electronically with this Court and sent to opposing counsel, Meghan Shapiro, Esquire, Virginia Indigent Defense Commission, 1604 Santa Rosa Rd., Suite 200, Richmond, Virginia 23229, as well as via email, in compliance with Rule 5A:1(c). In accordance with Rule 5A:4(d), I certify that this document contains 5,275 words, in compliance with Rules 5A:19(a) and 5A:21(g). The Commonwealth desires to present oral argument in this case.

Susan Brock Wosk
Assistant Attorney General

# In The
# Court of Appeals of Virginia

---

## RECORD NO. 1376-20-2

---

## LINWOOD GEQUAN WALDEN, JR.,

*Appellant,*

v.

## COMMONWEALTH OF VIRGINIA,

*Appellee.*

---

## REPLY BRIEF OF APPELLANT

---

**Meghan Shapiro (VSB No. 79046)**
**VIRGINIA INDIGENT DEFENSE COMMISSION**
**1604 Santa Rosa Road, Suite 200**
**Richmond, Virginia 23229**
**(804) 662-7249 (Telephone)**
**(804) 662-7359 (Facsimile)**
**mshapiro@vadefenders.org**

*Counsel for Appellant*

**THE LEX GROUP** ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

ARGUMENT ........................................................................................ 1

    I.    The error here was harmful to Mr. Walden ........................... 1

        A.    This Court must apply the constitutional harmless error standard ................................................................. 1

        B.    The Commonwealth entirely fails to mention the significant role of recidivism in this case ...................... 3

            a.    Defense counsel extensively proffered how their requested expert would address recidivism ............................................................. 3

            b.    The Commonwealth made powerful recidivism arguments against Mr. Walden .......... 5

            c.    Mr. Walden suffered significant harm from his inability to rebut recidivism concerns ............ 6

    II.    Mr. Walden's constitutional right to expert assistance does not rise and fall with his counsel's ability to prove a prior diagnosis .................................................................... 9

        A.    *Hoverter* does not require an existing diagnosis ........... 9

        B.    The proffer in this case satisfied every factor identified in *Hoverter* .................................................. 10

        C.    The *Ake/Husske* standard is a threshold test, not a standard of proof ....................................................... 13

D. Mr. Walden's satisfaction of the *Ake/Husske* threshold was not invalidated by the trial court's erroneous rejection of his bipolar diagnosis ............... 14

III. Mr. Walden demonstrated a particularized need for expert assistance, markedly distinguishing him from the defendant in *Johnson* .................................................... 15

IV. Mr. Walden moved for expert assistance at the appropriate time ................................................................... 17

CONCLUSION ............................................................................... 18

CERTIFICATE ............................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ake v. Oklahoma,*
    470 U.S. 68 (1985) ........................................................... 1, 9, 13, 14

*Bethea v. Commonwealth,*
    297 Va. 730 (2019) ................................................................... 14

*Chapman v. California,*
    386 U.S. 18 (1967) .................................................................. 2, 8

*Commonwealth v. Sanchez,*
    268 Va. 161 (2004) ................................................................... 14

*Crawford v. Commonwealth,*
    281 Va. 84 (2011) .................................................................. 2, 8

*Hoverter v. Commonwealth,*
    23 Va. App. 454 (1996) ................................................... 3, 9, 10, 12

*Husske v. Commonwealth,*
    252 Va. 203 (1996) ........................................................... *passim*

*Johnson v. Commonwealth,*
    292 Va. 772 (2016) ................................................................... 15

*McWilliams v. Dunn,*
    137 S. Ct. 1790 (2017) ................................................................ 1

## ARGUMENT

## I. The error here was harmful to Mr. Walden.

Mr. Walden was harmed by the trial court's denial of expert psychological assistance, as it left him with no evidence rebutting the Commonwealth's powerful recidivism argument, legitimizing his mental illnesses, nor connecting the dots between his mental health and criminal behavior.

### A. This Court must apply the constitutional harmless error standard

Under the Due Process Clause, the state must provide necessary expert assistance to indigent persons facing criminal charges. *Ake v. Oklahoma*, 470 U.S. 68 (1985). The Supreme Court of Virginia has interpreted *Ake* to implicate both the Due Process and Equal Protection Clauses. *Husske v. Commonwealth*, 252 Va. 203, 205, 213 & 220 (1996). Mr. Walden brings his claim under both constitutional Clauses, and notes further that this fundamental constitutional doctrine applies equally to sentencing experts. *Ake* at 84; *McWilliams v. Dunn*, 137 S. Ct. 1790, 1798 (2017) (listing the conditions that "trigger application of *Ake*[,]" including that "[h]is mental condition was relevant to . . . the punishment he might suffer") (internal quotations omitted).

The Commonwealth does not appear to actually take a position on the proper standard of harmfulness error review, citing both the constitutional and nonconstitutional standards, and referring to Mr. Walden's claim as "evidentiary." But the indisputable test for evaluating the harmfulness of a constitutional error is whether "beyond a reasonable doubt [] the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967). *See also Crawford v. Commonwealth*, 281 Va. 84, 101 (2011) (same). That is the test that this Court must apply in this case.

The harm to Mr. Walden in this case was significant. Among other prejudice to the defense, and as detailed *infra*, Mr. Walden was left with no way to rebut the Commonwealth's powerful recidivism arguments. The constitutional *Chapman* standard was clearly met in this case, because it cannot be said that the trial court's error did not contribute to the sentencing verdict obtained.

**B. The Commonwealth entirely fails to mention the significant role of recidivism in this case.**

**a. Defense counsel extensively proffered how their requested expert would address recidivism.**

The Commonwealth argues that defense counsel's proffers were insufficient to establish particularized need for their requested expert, likening them to the "mere hope[s] or suspicion[s]" proffered in *Hoverter* and other cases. *Hoverter v. Commonwealth*, 23 Va. App. 454, 466-67 (1996). In doing so, the Commonwealth cherry-picked a single, misleading quote that it included repeatedly in its brief, *Commonwealth's Brief* at 10, 16; and failed entirely to mention counsel's proffers concerning the expert's specific purpose in this case to rebut recidivism concerns.

In fact, trial counsel's proffers spanned fifteen pages of transcript, J.A.232-37 & 266-280, and included much more than the single sentence quoted by the Commonwealth.

In particular, and unaddressed by the Commonwealth, counsel made the following statements about the need for an expert to rebut the recidivism concern in this case:

- "I think that's the most important part is that she can help this Court crack [*sic*.] the plan. We have to understand how we got to where we are and understand where we are so we know how to move forward in a way that protects, not just Mr. Walden and not just for mitigation at sentencing, but protects the community when he is eventually released from incarceration . . . .what she can go into is his experiences of trauma, the long-term affect that results from that trauma, and that it impacts actions and ability to understand actions . . . to inhibit impulses and control your own behavior and that destructive behavior often is a result of an attempt to mitigate emotional trauma." J.A. 266-67.

- "[S]he can help evaluate what tools [traumatized people] have available and expand that tool box . . . so that they can more appropriately [behave.]" J.A.267.

- "He would be significantly harmed by an inability to explore that and present mitigation to the Court explaining how this happened, how he came to be here, and, most importantly, how we can fix it moving forward." J.A.269.

- "[It] helps his case and helps for when he is released to reduce the risk of recidivism and to make the community safer." *Id.*

- "He's previously been incarcerated on a robbery charge. I'm sure the Commonwealth will bring that up. In speaking with Dr. Boyd about that prior history . . . you re-evaluate, you check the diagnosis, and, then, you try something else. . . . The answer isn't to increase . . . the amount of time. It's to re-evaluate the premise . . . so that we can actually get at the root issue. . . . to make him better, more able to function in society and to protect society when he is eventually released, I think, it's absolutely imperative that the Court allow us to do that." J.A.270.

- ". . . to evaluate Mr. Walden and to dig into mental health issues, and, particularly, his history of trauma and mental health while occurring and how that can impact decision-making behavior and what measures can be put in place in the future to address those issues." J.A.296.

Recidivism was thus one of defense counsel's main bases for requesting expert assistance.

### b. The Commonwealth made powerful recidivism arguments against Mr. Walden.

Sure enough, at sentencing the Commonwealth heavily argued that Mr. Walden would recidivize. J.A.351-52 (discussing Mr. Walden's criminal history); J.A.356 ("he is unwilling to stop committing violent crimes against strangers"); J.A.357 ("he's not going to stop when he's released"). As the defense expert would have been the only witness situated in this case to effectively address the subject, the Commonwealth's recidivism arguments went unrebutted. Defense counsel was left with no evidence upon which to base any argument against recidivism.

### c. Mr. Walden suffered significant harm from his inability to rebut recidivism concerns.

The missing defense expert would have rebutted these arguments directly, by explaining that Mr. Walden's mental health would improve with treatment; and that his past criminal behavior was attributable to symptoms of his untreated mental illnesses. *Supra*.

But without those expert opinions, there was simply no evidence before the trial court to mitigate in any way the fear of Mr. Walden's recidivism. None of the testimony cited in the Commonwealth's brief could even begin to address that issue.

The defense witnesses included Mr. Walden's mother, who spoke about her and her son's traumatic experiences and mental health struggles, J.A.298 *et seq.*; and the mother of Mr. Walden's murdered three-year-old daughter, who spoke of his love for the girl and the depth of his grief following her death. J.A. 321 *et seq.* Offering only lay testimony about Mr. Walden's past experiences, neither could allay any worries that Mr. Walden would recidivize in the future.

Mitigation specialist Molly O'Rourke testified as a fact witness (she was not offered as an expert witness) to introduce some of Mr. Walden's medical records and a timeline of his traumatic experiences. J.A.330, 333.

The records reflected Mr. Walden was diagnosed with bipolar disorder and substance dependency, J.A.334-35, and experienced suicidal ideations (and a suicide attempt) and auditory hallucinations. *Id;* J.A.338. Ms. O'Rourke then offered this limited testimony:

- Parental drug use can influence a child to also use drugs. J.A.336.

- Parental absence can lead to risky behaviors. *Id.*

- Child abuse can damage self-esteem and lead to criminal behaviors. J.A.337.

- Mr. Walden turned to substance use to cope with his complex traumatic experiences. J.A.339.

- Finally, she identified a wrap-around treatment facility where, upon release, Mr. Walden could receive mental health services and medication for his bipolar disorder. J.A.340.30, 333.

Ms. O'Rourke could not, and did not, offer any expert opinions about the features or treatment potential of Mr. Walden's bipolar disorder, concerning Mr. Walden's future potential to recidize, nor how mental health treatment might reduce that risk. If anything, her testimony invited the conclusion that Mr. Walden's childhood experiences and substance dependency left him an ongoing risk to society. Her identification of a general treatment facility was nonspecific to Mr.

Walden's actual prognosis. She did not identify specific therapeutic techniques or medications that were appropriate for his disorders, or could reduce his risk of criminal behavior; nor was she (as a non-expert, non-psychologist) qualified to do so.

Thus, even though the trial court found the defense mitigation witnesses compelling, J.A.367&369 (noting that Mr. Walden deserved "credit" and "consideration" for his sympathetic history), it saw no reason to depart from from the guidelines' incorporation of Mr. Walden's criminal history. J.A.368.

Therefore, despite Mr. Walden's compelling family mitigation, the spectre of recidivism was left untouched by the defense; as was the important connection between his untreated mental illnesses and behavior. The court sentenced him to 22 years of active incarceration, with another 58 years suspended. Beyond any reasonable doubt, the denial of Mr. Walden's expert psychologist harmed him. *Crawford*, 281 Va. at 101. On this record, it cannot be said that it did not contribute to the verdict obtained. *Chapman*, 386 U.S. at 24.

**II.  Mr. Walden's constitutional right to expert assistance does not rise and fall with his counsel's ability to prove a prior diagnosis.**

The recidivism rebuttal evidence aside, the Commonwealth seems to argue that Mr. Walden's right to expert assistance in this case rose and fell with his teenage bipolar diagnosis; but that is an unfair portrayal of the proffers and record in this case, a selectively misleading reading of this Court's *Hoverter* opinion, and a misunderstanding of the threshold showing required by *Ake* and *Husske*.

**A.  *Hoverter* does not require an existing diagnosis.**

This Court's ruling in *Hoverter* mentioned the absence of any allegation of existing mental illness. But the full discussion went on to explain that counsel's proffer was insufficient for a panoply of reasons: Hoverter "alleged no existing mental illness. He demonstrated no way that the services of an expert might constitute a significant factor in his defense. . . . nor did he explain why the detailed presentence investigation would not sufficiently reflect any 'mitigation evidence.'" *Id*. at 467.

**B.** **The proffer in this case satisfied every factor identified in *Hoverter***

In this case, in addition to countering recidivism, counsel specifically alleged an existing mental illness diagnosis; discussed multiple indicators of mental illness (family history, trauma exposure); and argued that the presentence investigation had wholly failed to reflect this significant aspect of Mr. Walden's life and behavior. That is a far cry from counsel's statement in *Hoverter* that they merely wished "to determine if psychological or mental health mitigation evidence exists[.]" 23 Va. App. at 466.

Opposing counsel places outsize significance on the proffer of Mr. Walden's historical bipolar diagnosis, as discussed further *infra*. But the record before the trial court contained several clear indicators that Mr. Walden likely had bipolar disorder, and needed an expert evaluation and a new diagnosis. Counsel proffered that Mr. Walden's mother reported her son had a childhood bipolar diagnosis; that Mr. Walden himself mentioned a possible bipolar diagnosis from his past; that Mr. Walden's mother had documented and severe bipolar disorder; and that Mr. Walden had other risk factors for mental illness (e.g., childhood trauma). J.A. 266, 278-279. The trial court, and the Commonwealth in their

briefing here, cite Mr. Walden's mother's bipolar diagnosis as a reason to doubt her reporting of Mr. Walden's own bipolar diagnosis; but both entirely failed to appreciate that bipolar disorder can be hereditary, and thus that very fact was an additional reason why Mr. Walden needed expert evaluation and diagnosis. *See* J.A.279 ("His mother is diagnosed as bipolar, and Dr. Boyd did say that that increases the likelihood as well as childhood trauma that he would have it as well[.]"); J.A. 278 ("His mother also has bipolar, and according to Dr. Boyd, childhood trauma and familiar history of mental health exacerbate and is much more likely that someone will suffer from mental health issues in their own way.").

Add to the obvious red flags for bipolar disorder the fact that counsel's proffer established several independently severe traumatic experiences -- some during childhood, some adulthood -- each of which increased the likelihood of traumatic brain injury (childhood physical abuse, J.A.267), PTSD (multiple forms of childhood abuse, violent death of three-year-old daughter, death of infant daughter due to SIDS, *e.g.* J.A. 276-278), or depression (all of the above). *See* J.A. 278 (noting increased risk of mental health issues due to Mr. Walden's specific family and trauma histories).

With regard to the presentence investigation, defense counsel argued that it was insufficient in this case, and thus further demonstrated the need for the defense expert. *See* J.A.275-76 (officer talked to him one time, remotely, and "[o]f course he doesn't tell them every single story or mention every single trauma especially in regards to his parents. . . . [But] I will tell the Court that Mr. Walden has had a particularized history of trauma. . . ."); *id.* at 277 ("This is a great example of why you can't rely on the presentence report to get to the heart of the issues especially when it comes to trauma and mental health issues."); *id.* at 280 (PSR interview is "not an in-depth length heart-to-heart"); *id.* at 291 (he didn't share his family history with the officer).

The PSR itself notes that the officer did not speak with Mr. Walden's mother, nor any other family member. J.A.392. Contrary to the Commonwealth's characterization, this is not an argument that every defendant who fails to mention a mental health history to a PSR officer should receive funds for an expert; but under the particular record of this case, as compared to *Hoverter*, the absence of this information from the PSR is clearly relevant to the Court's analysis on review.

In addition, the record of this case demonstrates another particularized need for the requested expert assistance: the trial judge's skepticism of bipolar disorder claims in general, and of Mr. Walden's in particular. This inherent suspicion highlights the important role the missing expert would have played in this particular case. J.A.279 ("these words are thrown out very loosely now and people -- everybody who comes before the Court all of a sudden is bipolar and it used to be ADHD . . . So, without there being some, you know, some physician indicating that that was a diagnosis . . . I don't think that's sufficient."). Mr. Walden thus particularly needed a mental health expert to legitimize and explain the significance of his mental illnesses to the trial court.

**C.** **The *Ake/Husske* standard is a threshold test, not a standard of proof.**

The Commonwealth's emphasis on Mr. Walden's old bipolar diagnosis, and the trial court's skepticism of it, also ignores the threshold nature of the *Husske* test. As discussed in more detail in Mr. Walden's Opening Brief, at 11-12, all that is necessary under *Ake* and *Husske* is that the defense make a "threshold showing," *Ake*, 470 U.S. at 82, that an expert is "**likely** to be a significant factor in his defense[.]" *Husske*, 252 Va. at 211 (quoting *Ake*, 470 U.S. at 82-83) (emphasis added). The

accused must "demonstrate," *Husske*, 252 Va. at 218, and "articulate" this need, *Commonwealth v. Sanchez*, 268 Va. 161, 167 (2004), not prove the ultimate claim. That is precisely what Mr. Walden's counsel did in this case.

**D.** **Mr. Walden's satisfaction of the *Ake/Husske* threshold was not invalidated by the trial court's erroneous rejection of his bipolar diagnosis.**

Satisfaction of the *Ake/Husske* threshold is a legal conclusion, not a factual finding. Thus, as argued in Mr. Walden's opening brief (and not disputed by the Commonwealth's brief) the trial court's rejection of counsel's proffer is not entitled to factual deference.

The Commonwealth appears to argue that, in any event, the trial court was entitled to determine the evidentiary weight of the proffer - and thus to deem it insufficient due to low evidentiary weight. *Commonwealth's Brief* at 16-17. Notably the Commonwealth does not argue that the proffer was inadmissible or otherwise improperly made; and the authority to which it cites in fact demonstrates that evidentiary weight is irrelevant to a legal evaluation of a threshold proffer, during which the court should assume a proper proffer is true. *See Bethea v. Commonwealth*, 297 Va. 730, 756 (2019) (*Batson*'s inquiry requires a

threshold showing "not based on any credibility findings concerning the defendant's prima facie assertion in step one. In this case, the transition from step one to step two simply meant the trial court found that the hearsay proffer, *if true*, could demonstrate purposeful discrimination.").

### III. Mr. Walden demonstrated a particularized need for expert assistance, markedly distinguishing him from the defendant in *Johnson*.

The Commonwealth likens this case to *Johnson v. Commonwealth*, 292 Va. 772 (2016), but it couldn't be more different. The defendant in *Johnson* requested a mental health expert for sentencing under *Husske*, "with no idea what evidence might be developed or whether it would assist him in any way." 292 Va. at 778. The Supreme Court correctly found this "mere hope" failed to demonstrate particularized need. *Id.* Likely anticipating this result, Johnson then asked for the right to an expert "independent of any showing of particularized need," *id.* at 779, under the codal provision governing PSRs, a request that was also denied. *Id.*

In denying Johnson's request to create such a broad right to expert assistance, the Court took the opportunity to reaffirm its existing *Husske* framework: "That said, however, if information regarding a defendant's

physiology or psychology exists in a defendant's history. . . . such information could be used as part of the showing necessary to demonstrate a 'particularized need' under *Husske*." 292 Va. at 779-80.

That is precisely what Mr. Walden did here. Mr. Walden's claim is highly fact-bound and particularized. He suffers from complex mental diseases including bipolar disorder and repeated significant traumas from age five or six, through adulthood, including childhood neglect and abuse, losing his own three-year-old daughter to homicide (she was beaten to death by a caregiver), and losing a three-month-old daughter to SIDS. His public defender requested an expert psychologist not only to explain the connection between Mr. Walden's mental health history and past criminal behavior, but most-importantly to present an expert opinion on how his conditions could be successfully treated, greatly reducing his risk for recidivism.

No other witness was situated to testify on these matters. And yet, the trial court erroneously found no particularized need for the expert assistance. As a result, Mr. Walden received an enormous amount of prison time for an unarmed crime in which no one was wounded and all property returned.

Long-settled law from this Court, the Supreme Court of Virginia, and the United States Supreme Court has established a framework for indigent defendants to obtain expert services. *Johnson* is an example of a defendant failing to satisfy that framework; this case is a (rarer) example of the opposite. Correcting the clear error in this case would not in any way expand or loosen *Johnson* or any other existing law. The Commonwealth's implications to the contrary are a hollow attempt to stoke fear of a floodgate opening. That will not happen.

## IV. Mr. Walden moved for expert assistance at the appropriate time.

Mr. Walden was not incompetent to stand trial; and he did not enter a plea of Not Guilty by Reason of Insanity. He only required the resources to develop mental health evidence for use in his sentencing hearing. To that end, he filed and argued a motion for expert assistance, and made detailed factual proffers in support thereof, prior to the date of his scheduled sentencing hearing. The Commonwealth's repeated implications that his motion lacked merit due to the absence of competency or NGRI litigation in the case is of no moment.

## CONCLUSION

Mr. Walden respectfully requests that this Court grant him relief in the form of vacating his sentence, ordering the trial court to grant his motion for expert assistance, and ordering a new sentencing hearing.

Respectfully Submitted,

Mr. Linwood Walden, by counsel:

/s/ Meghan Shapiro
Meghan Shapiro
Va. Bar No. 79046
Senior Assistant Public Defender,
Appellate Cohort
Virginia Indigent Defense Commission
1604 Santa Rosa Rd., Suite 200
Richmond, VA 23229
Tel: 804.662.7249
Email: mshapiro@vadefenders.org

**CERTIFICATE**

1) On December 16, 2021, an electronic copy of this Reply Brief of Appellant was filed with the Clerk of the Court of Appeals of Virginia, via VACES. On this same day, I sent a copy of this filing to opposing counsel Susie Wosk, Office of the Attorney General, via email at SWosk@oag.state.va.us.

2) Appellant does not waive oral argument.

3) The number of words in this Reply Brief is 3,338, and the number of pages is 18, excluding cover page, tables, signature blocks, and certificate. That is in compliance with the length limitation of 20 pages or 3,500 words, found in Rule 5A:19(a).

/s/ Meghan Shapiro
*Counsel for Appellant*

COURT OF APPEALS OF VIRGINIA

Present:    Judges Beales, O'Brien and Fulton
Argued by videoconference


LINWOOD GEQUAN WALDEN

                                                MEMORANDUM OPINION* BY
v.      Record No. 1376-20-2                     JUDGE JUNIUS P. FULTON, III
                                                     FEBRUARY 22, 2022
COMMONWEALTH OF VIRGINIA


           FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                      Clarence N. Jenkins, Jr., Judge

        Meghan Shapiro, Senior Assistant Public Defender, Appellate
        Cohort (Virginia Indigent Defense Commission, on briefs), for
        appellant.

        Susan Brock Wosk, Assistant Attorney General (Mark R. Herring,[1]
        Attorney General, on brief), for appellee.

        The trial court convicted appellant of two counts of robbery and two counts of abduction

with the intent to obtain pecuniary benefit.  The issue on appeal is whether the trial court abused

its discretion by denying Walden's request for funds to hire a mitigation expert to testify at his

sentencing.  We conclude that the trial court's decision was neither plainly wrong nor without

evidentiary support.  We therefore affirm.

                                I. BACKGROUND

        On January 21, 2020, in a bench trial, the trial court found Walden guilty of two counts of

robbery and two counts of abduction with the intent to obtain pecuniary benefit.  A presentence

investigation report was ordered and a sentencing date set.  After the presentence report was

_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

UNPUBLISHED

completed and prior to the sentencing hearing, Walden's counsel sought funds to retain an independent defense expert for consultation and evaluation of Walden to be utilized for purposes of mitigation at his sentencing hearing.  At the motion hearing on this issue on September 30, 2020, Walden's counsel argued that the requested funds would allow "the ability to have him investigated, see what underlying mental health issues there are or may be that would impact his cognitive properties."  There was no assertion that Walden was currently demonstrating any signs or symptoms of mental illness.  Walden specifically moved the trial court for "release of court funds" to hire a psychologist to evaluate him, prepare a written report, and potentially testify at the sentencing hearing "to aid in explaining mitigating evidence at sentencing." Walden's counsel proffered that Walden had been diagnosed with bipolar disorder as a juvenile and suffered "family trauma as a child and as an adult, including domestic violence."  Walden's counsel further proffered that Walden's mother contracted HIV after being "sexually assaulted and robbed in an alley" when he was six years old and she "coped" by using "crack cocaine." When Walden was thirteen, he lived with his aunt, who beat him with her fists and frying pans. Walden left his aunt's house and was homeless for two weeks before moving in with his father, mother, and mother's boyfriend.  In addition, counsel proffered that three of Walden's children had died while they were all under the age of three.

Walden asserted that, if his motion was granted, the psychologist would (1) evaluate how the above mental health history and trauma "contribute[d] to the current situation" and underlying offenses, and (2) assist the trial court in fashioning a "plan" for moving forward that protected Walden and the community after his incarceration.  Walden maintained that he had lashed out because of his "emotional trauma" and a mitigation expert could expand his ability to address that trauma, inhibit impulses, and control his behavior.  Walden argued that he would be prejudiced without such an expert because he would not be able to "explore . . . how this

happened, how he came to be here, and, most importantly, how we can fix it moving forward." His request was aimed at addressing recidivism concerns with the goal of contributing to a lower sentence.

The Commonwealth, objecting to the motion, cited the "very detailed" presentence investigation report which in many ways contradicted the defense proffer, in which Walden described his "current health as good" and reported that he had "no history of mental health treatment," stated that he "received love, guidance and discipline" as a child, and that there was "no alcohol or drug use in his family life."  Moreover, Walden reported that he had "adequate food, clothes and shelter" and suffered "[n]o type of abuse."  Walden did report one death — the tragic loss of his three-year-old daughter in 2016.

The trial court cited Walden's statements in the presentence report and, "based upon that," found that Walden had not demonstrated a particularized need for a mitigation expert. Accordingly, the court denied Walden's motion.  Walden renewed his motion for expert funds at the beginning of his sentencing hearing but did not, at that time, present or proffer any additional evidence in support of the motion.  The trial court found that Walden had not presented "any further information" and denied his renewed motion.

## II. STANDARD OF REVIEW

Whether an indigent defendant has made the required showing of particularized need for expert assistance "is a determination that lies within the sound discretion of the trial court." *Johnson v. Commonwealth*, 292 Va. 772, 778 (2016) (quoting *Commonwealth v. Sanchez*, 268 Va. 161, 165 (2004)).

## III. ANALYSIS

The trial court did not err in concluding that Walden failed to present a particularized need for a mitigation expert.  The Commonwealth is required, "upon request, [to] provide

indigent defendants with 'the basic tools of an adequate defense.'" *Husske v. Commonwealth*, 252 Va. 203, 211 (1996) (citing *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)). "[I]n certain instances, these basic tools may include the appointment of non-psychiatric experts." *Id.* Nevertheless, an indigent defendant's right to the appointment of an expert "is not absolute." *Johnson*, 292 Va. at 778 (quoting *Husske*, 252 Va. at 211). Instead, an indigent defendant "must demonstrate that the subject which necessitates the assistance of an expert is 'likely to be a significant factor in his defense' and that he will be prejudiced by the lack of expert assistance." *Id.* (quoting *Ake*, 470 U.S. at 82-83). That is, he "must show a particularized need." *Id.* "A particularized need is more than a 'mere hope' that favorable evidence can be obtained through the services of an expert." *Green v. Commonwealth*, 266 Va. 81, 92 (2003) (quoting *Husske*, 252 Va. at 212). Rather, it amounts to a "demonstrat[ion] that the services of an expert would materially assist [the defendant] in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial." *Johnson*, 292 Va. at 778. "[W]hether a defendant has made the required showing of particularized need is a determination that lies within the sound discretion of the trial court." *Id.* (quoting *Sanchez*, 268 Va. at 165).

Here, the record demonstrates that Walden's proffers regarding his family dysfunction, abuse, and mental health were either expressly contradicted or inconsistent with the statements he made to the probation officer who prepared the presentence investigation report. The July 1, 2020 presentence investigation report, which was available to the trial court at the motion hearing, indicated that "Walden reports no history of mental health treatment." The report did not indicate whether Walden volunteered or was asked about any current or prior mental health diagnoses. The report did, however, reflect that Walden indicated that he was raised by both parents in a single-family dwelling where "[h]e was provided adequate food, clothes, and shelter. He received love, guidance and discipline. Education and religion were emphasized in the

household.  No type of abuse reported.  He reports no alcohol or drug use in his family life."
The report also mentioned that Walden lost his three-year-old daughter to homicide on February 15, 2016.

The portrait of Walden's life offered to the probation officer preparing the report was in stark contrast to the proffers made by defense counsel in support of the motion for expert funds. In support of his motion, Walden's counsel proffered that Walden may have received a bipolar diagnosis as a juvenile.  Defense counsel's proffer was based on information from Walden's mother that "he was maybe diagnosed."  Walden did not provide any supporting documentation at the time of his motion hearing nor was there any allegation that he was currently suffering from any mental illness.  Further, there was no indication in the trial court record of any concern about Walden's mental capacity nor did the Commonwealth indicate that it planned to present any psychiatric testimony at the sentencing hearing regarding Walden's future dangerousness or propensity to commit crimes.  Walden's stated purpose for requesting funds for the expert was so the expert could conduct "a comprehensive psychological evaluation and . . . talk about the developmental impact of psycho-social trauma and head trauma."  Also such an expert could, in large part, "see what underlying mental health issues there are or may be" so as to "help[] his case and help[] for when he is released to reduce the risk of recidivism and to make the community safer."  Walden argued that denial of the expert funds would significantly prejudice him by preventing him from exploring his childhood trauma and mental health issues as well as precluding him from developing a plan to address any recidivism concerns.  The Commonwealth challenged the weight to be given to Walden's counsel's proffer largely because of the

contradictory evidence contained in the presentence report, and the trial court evaluated the evidence before it in making its decision.[2]

Because of Walden's statements during the presentence investigation about his stable family life and pleasant childhood, the trial court gave little weight to his contrary proffers regarding his family dysfunction and abuse and the death of his three young children. The trial court also found the proffers regarding Walden's potential prior mental health diagnosis to be "insufficient," in light of the lack of any allegation of current mental illness or medical documentation indicating a past diagnosis as well as Walden's mother's self-interest and apparent credibility issues. *Bethea v. Commonwealth*, 297 Va. 730, 756 n.13 (2019) (noting that even if a proffer is properly admitted, the rules of evidence "say[] nothing about the evidentiary weight the factfinder may or should give to the proffer" (citing *Bloom v. Commonwealth*, 262 Va. 814, 821 (2001))).

In light of the trial court's determination that Walden's proffers were insufficient to satisfy the legally required threshold showing, Walden's motion for expert funds was denied. That determination is neither plainly wrong nor without evidentiary support. Like in *Hoverter v. Commonwealth*, 23 Va. App. 454 (1996), Walden hoped that expert assistance would develop mitigation evidence that would lead to leniency in sentencing. But "a mere hope or suspicion that favorable evidence may result from an expert's services does not create a constitutional mandate." *Id.* at 467. *Husske* requires that the subject matter necessitating assistance of an

---

[2] This was not an instance of a proffer offered without any resistance to its merits. The Commonwealth challenged the weight to be given to the proffers in light of the contradictory evidence in the record, namely the presentence investigation report. It was then up to the trial court to weigh the proffered evidence, and it did. The fact-finder must independently "determine[] the weight of the evidence" admitted, including proper proffers. *Bethea v. Commonwealth*, 297 Va. 730, 756 n.13 (2019) (quoting *Bloom v. Commonwealth*, 262 Va. 814, 821 (2001)).

expert is "likely to be a significant factor in his defense" and that the defendant "will be prejudiced by the lack of an expert." *Husske*, 252 Va. at 211 (internal quotations omitted). Walden's desire to address recidivism concerns that might be present at his sentencing is understandable but all he offered in support was mere speculation that he *might* have a mental illness. His claim was not based on any current symptomatology, but on an uncorroborated possible history of a bipolar diagnosis as a juvenile and contradicted assertions of family dysfunction and abuse. Surely every defendant could justify a request for expert funds if the test only required an allegation that they *might* benefit from a psychological expert, but that is not the standard nor is it the Commonwealth's burden to fund such an expert in every case. Under these facts where the trial court had to weigh a defendant's proffer against contrary evidence in the record that had largely been supplied by the defendant himself, the trial court did not abuse its discretion by giving the proffer little weight and holding that Walden failed to demonstrate a particularized need for expert assistance. We will not disturb the trial court's ruling on appeal. Code § 8.01-680.

## IV. CONCLUSION

Because the trial court's decision to deny Walden's request for expert funds was not plainly wrong or without evidentiary support, we affirm.

*Affirmed.*